No. 25-50130

# In the United States Court of Appeals for the Fifth Circuit

THE LUTHERAN CHURCH—MISSOURI SYNOD, A MISSOURI NONPROFIT
CORPORATION,

*Plaintiff-Appellant,*

v.

DONALD CHRISTIAN; CHRISTOPHER BANNWOLF; JOHN DOES 1-12;
CONCORDIA UNIVERSITY TEXAS INCORPORATED,

*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court
for the Western District of Texas (Austin)
No. 1:23-cv-01042, Hon. David A. Ezra

———————————————

## BRIEF FOR APPELLANT

———————————————

STEVEN C. LEVATINO
LEVATINO | PACE, L.L.P.
1101 S. Capital of Texas Hwy.
Bldg. K, Suite 125
Austin, TX 78746

ANDREW F. MACRAE
MACRAE LAW FIRM, P.L.L.C.
3267 Bee Cave Road
Suite 107, PMB 276
Austin, TX 78746

DANIEL H. BLOMBERG
ANDREA R. BUTLER
ROBERT K ELLIS
THE BECKET FUND FOR
    RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
    Suite 400
Washington, D.C. 20006

WALLACE B. JEFFERSON
KEVIN H. DUBOSE
ALEXANDER DUBOSE &
    JEFFERSON, L.L.P.
1844 Harvard Street
Houston, TX 77008

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff-Appellant | Counsel for Plaintiff-Appellant |
|---|---|
| • The Lutheran Church—Missouri Synod, a Missouri Nonprofit Corporation | *The Becket Fund for Religious Liberty:*<br>• Daniel H. Blomberg<br>• Andrea R. Butler<br>• Robert K Ellis<br><br>*Alexander Dubose & Jefferson, L.L.P.*<br>• Wallace B. Jefferson<br>• Kevin H. Dubose<br><br>*Kronenberger Law Firm, P.L.L.C.*<br>• Gregg R. Kronenberger<br><br>*Levatino Pace, L.L.P.*<br>• Steven C. Levatino<br><br>*MacRae Law Firm, PLLC*<br>• Andrew F. MacRae |

| Defendants-Appellees | Counsel for Defendants-Appellees |
|---|---|
| • Donald Christian<br><br>• Christopher Bannwolf<br><br>• Concordia University Texas, Inc. | *Richards, Rodriguez & Skeith, L.L.P.*<br><br>• Daniel R. Richards<br><br>• Albert A. Carrion, Jr.<br><br>• Clark W. Richards<br><br>*Law Office of Max Renea Hicks*<br><br>• Max Renea Hicks |

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg
*Counsel for Plaintiff-Appellant*

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is warranted given the important constitutional and statutory issues at stake, including church-state relations under the First Amendment's Religion Clauses, constitutional comity issues among the States, and the Texas Religious Freedom Restoration Act.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ............................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................iii

TABLE OF AUTHORITIES ....................................................................vii

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 3

STATEMENT OF ISSUES PRESENTED ................................................. 3

STATEMENT OF THE CASE .................................................................. 4

    A. The Lutheran Church—Missouri Synod and its polity .................. 4

    B. LCMS establishes and maintains the Church's
       civil interest in Concordia University Texas ................................. 8

    C. Concordia unilaterally rejects Church governance ...................... 10

    D. The proceedings below .................................................................. 12

    E. The district court's ruling ............................................................. 14

SUMMARY OF THE ARGUMENT .......................................................... 16

STANDARD OF REVIEW........................................................................ 18

ARGUMENT ............................................................................................. 18

I.  Under Rule 17, LCMS is the real party in interest........................... 18

    A. The First Amendment's church autonomy
       doctrine confirms that LCMS is the
       real party in interest. .................................................................... 20

       1.  Under the church autonomy doctrine,
           courts must accept the Church's
           authoritative explanation of its polity. ...................................... 21

2. Applying the constitutionally required
respect for church autonomy, LCMS is
the real party in interest. ........................................... 25

3. The district court failed to follow the
church autonomy doctrine and entangled
itself in the Church's polity. ....................................... 29

B. Texas law governing unincorporated non-profit
associations confirms that LCMS is the real party
in interest................................................................... 36

1. The Act's plain language does not cover
an entity that has already incorporated................... 36

2. The Act's purpose and history confirm it does not
cover an entity that has already incorporated. ......... 38

3. The district court erred in applying the Act
because the Church had already incorporated........... 40

C. The canon of constitutional avoidance confirms
that LCMS is the real party in interest. ....................... 43

D. Texas RFRA confirms that LCMS is the real
party in interest.......................................................... 45

E. The Full Faith and Credit Clause's internal
affairs doctrine confirms that LCMS is the real
party in interest.......................................................... 47

II. There is no required or indispensable party that
must be joined alongside LCMS under Rule 19. ................ 50

A. There is no required party under Rule 19(a). ............... 51

B. There is no indispensable party under Rule 19(b)......... 52

C. The district court erred in finding that there
was a required and indispensable party that
must be joined.............................................................. 53

CONCLUSION ..................................................................................... 54

CERTIFICATE OF SERVICE................................................................ 56

CERTIFICATE OF COMPLIANCE ....................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amberson,*
  54 F.4th 240 (5th Cir. 2022) ................................................................ 42

*Barr v. City of Sinton,*
  295 S.W.3d 287 (Tex. 2009) ............................................................... 45

*Belya v. Kapral,*
  59 F.4th 570 (2d Cir. 2023) ................................................................. 31

*Benn v. Seventh-day Adventist Church,*
  304 F. Supp. 2d 716 (D. Md. 2004) ..................................................... 27

*Billard v. Charlotte Catholic High Sch.,*
  101 F.4th 316 (4th Cir. 2024) .............................................................. 35

*Boatmen's First Nat'l Bank v. S. Mo. Dist. Council of the
  Assemblies of God,*
  806 S.W.2d 706 (Mo. Ct. App. 1991) .................................................. 49

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ............................................................................. 45

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ............................................................................. 18

*Brown v. Fifth Jud. Dist. Drug Task Force,*
  255 F.3d 475 (8th Cir. 2001) ............................................................... 41

*Brown v. Pac. Life Ins. Co.,*
  462 F.3d 384 (5th Cir. 2006) ............................................................... 53

*Christi Bay Temple v. GuideOne Specialty Mut. Ins.,*
  330 S.W.3d 251 (Tex. 2010) ............................................................... 42

*Corp. of Presiding Bishop of Church of Jesus Christ of
  Latter-day Saints v. Amos,*
  483 U.S. 327 (1987) ............................................................................. 24

*Cox v. Thee Evergreen Church,*
   836 S.W.2d 167 (Tex. 1992) ............................................................. 38

*Crowder v. S. Baptist Convention,*
   828 F.2d 718 (11th Cir. 1987) ......................................................... 30

*D&T Partners v. Baymark Partners,*
   No. 3:21-cv-1171, 2022 WL 1778393 (N.D. Tex.
   June 1, 2022) ...................................................................................... 49

*Darby v. Pasadena Police Dep't,*
   939 F.2d 311 (5th Cir. 1991) ............................................. 27, 28, 40

*De La Rosa v. Reliable, Inc.,*
   113 F. Supp. 3d 1135 (D.N.M. 2015) ............................................ 48

*In re Diocese of Lubbock,*
   624 S.W.3d 506 (Tex. 2021) .............................. 22, 23, 31, 34

*Edgar v. MITE Corp.,*
   457 U.S. 624 (1982) ........................................................................ 48

*EEOC v. St. Francis Xavier Parochial Sch.,*
   77 F. Supp. 2d 71 (D.D.C. 1999) .................................................. 28

*In re Elsinghorst Bros. Co.,*
   180 B.R. 52 (Bankr. W.D.N.Y. 1995) ........................................... 24

*Episcopal Diocese of Fort Worth v. Episcopal Church,*
   602 S.W.3d 417 (Tex. 2020) .................................................. 24, 43

*Evangelical Lutheran Synod of Mo., Ohio & Other States*
   *v. Hoehn,*
   196 S.W.2d 134 (Mo. 1946) ...................................... 37, 40, 49

*F.E.L. Publ'ns, Ltd. v. Catholic Bishop of Chi.,*
   754 F.2d 216 (7th Cir. 1985) ......................................................... 28

*Farrell Const. Co. v. Jefferson Parish,*
   896 F.2d 136 (5th Cir. 1990) ............................... 18, 19, 26, 35

*Folwell v. Bernard*,
  477 So. 2d 1060 (Fla. Dist. Ct. App. 1985) ......................................... 24

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
  991 F.3d 370 (2d Cir. 2021) ................................................. 50

*Greer v. O'Dell*,
  305 F.3d 1297 (11th Cir. 2002) ........................................... 19

*HB Gen. Corp. v. Manchester Partners*,
  95 F.3d 1185 (3d Cir. 1996) ....................................... 19, 52

*Herbert v. Thornton*,
  No. 2:12-cv-607, 2014 WL 896795 (E.D. La. Mar. 6, 2014) .......... 41, 47

*Hersh v. United States*,
  553 F.3d 743 (5th Cir. 2008) ........................................... 43-44

*Hollis v. Hill*,
  232 F.3d 460 (5th Cir. 2000) ............................................. 48

*Hosanna-Tabor Evangelical Lutheran Church
  & Sch. v. EEOC*,
  565 U.S. 171 (2012) .................................................. *passim*

*HS Res. v. Wingate*,
  327 F.3d 432 (5th Cir. 2003) ............................................. 52

*Huntsman v. Corp. of the President of the Church of Jesus
  Christ of Latter-day Saints*,
  127 F.4th 784 (9th Cir. 2025) ........................................... 31

*Hutchison v. Thomas*,
  789 F.2d 392 (6th Cir. 1986) ............................................. 29

*Inhance Techs v. EPA*,
  96 F.4th 888 (5th Cir. 2024) ............................................. 43

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox
  Church in N. Am.*,
  344 U.S. 94 (1952) ......................................................... 23

*Kingman Holdings v. Chase Home Fin., L.L.C.*,
  No. 5:15-cv-19, 2015 WL 13802564
  (W.D. Tex. Apr. 20, 2015) ...................................................... 27

*Kreshik v. Saint Nicholas Cathedral*,
  363 U.S. 190 (1960) ................................................................ 23

*Magallon v. Livingston*,
  453 F.3d 268 (5th Cir. 2006) ................................................. 18

*Masterson v. Diocese of Nw. Tex.*,
  422 S.W.3d 594 (Tex. 2013) .................................................. 33

*McDermott Inc. v. Lewis*,
  531 A.2d 206 (Del. 1987) ....................................................... 48

*McRaney v. N. Am. Mission Bd.*,
  966 F.3d 346 (5th Cir. 2020) ........................................... 22, 29

*Merced v. Kasson*,
  577 F.3d 578 (5th Cir. 2009) ................................... 45, 46, 47

*Moss v. Princip*,
  913 F.3d 508 (5th Cir. 2019) ........................................ *passim*

*MT Falkin Invs. v. Chisholm Trail*,
  400 S.W.3d 658 (Tex. App.–Austin 2013, pet. denied) ...................... 38

*Myerscough v. United Methodist Church*,
  No. 2:22-cv-226, 2023 WL 3995847
  (W.D. Mich. June 14, 2023) ................................................. 27

*NLRB v. Catholic Bishop*,
  440 U.S. 490 (1979) ......................................................... 43, 44

*Northside Baptist Church v. Goodson*,
  387 F.2d 534 (5th Cir. 1967) ............................................... 23

*Ord. of United Com. Travelers of Am. v. Wolfe*,
  331 U.S. 586 (1947) .............................................................. 48

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) ................................................................... *passim*

*Paxton v. Longoria*,
  646 S.W.3d 532 (Tex. 2022) ................................................. 43

*PHH Mortg. Corp. v. Old Republic Nat'l Title Ins.*,
  80 F.4th 555 (5th Cir. 2023) .................................... 18, 50, 54

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull
  Mem'l Presbyterian Church*,
  393 U.S. 440 (1969) ........................................................... 29-30

*Pulitzer-Polster v. Pulitzer*,
  784 F.2d 1305 (5th Cir. 1986) ........................................... 53

*Rajet Aeroservicios v. Castillo Cervantes*,
  801 F. App'x 239 (5th Cir. 2020) ...................................... 51

*Rolfe v. Parker*,
  968 S.W.2d 178 (Mo. Ct. App. 1998) ................................ 49

*Serbian E. Orthodox Diocese v. Milivojevich*,
  426 U.S. 696 (1976) ................................................................. *passim*

*Simpson v. Wells Lamont Corp.*,
  494 F.2d 490 (5th Cir. 1974) .................................. 29, 31, 32

*Smith v. State Farm Fire & Cas. Co.*,
  633 F.2d 401 (5th Cir. 1980) ............................................. 52

*Transamerica Life Ins. Co. v. Moore*,
  105 F.4th 823 (5th Cir. 2024) ........................................... 36

*Trinity Presbyterian Church v. Tankersly*,
  374 So. 2d 861 (Ala. 1979) ................................................. 24

*Turner v. Church of Jesus Christ of Latter-day Saints*,
  No. 3:95-cv-1354, 1996 WL 34447787
  (N.D. Tex. Feb. 22, 1996) .................................................... 42

*In re Unger & Assocs.*,
  292 B.R. 545 (Bankr. E.D. Tex. 2003) ................................................ 19

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1872) ........................................................ 22, 23

*Westbrook v. Penley*,
  231 S.W.3d 389 (Tex. 2007) .................................................................. 21

*Whole Woman's Health v. Smith*,
  896 F.3d 362 (5th Cir. 2018) ........................................................ 21, 35

**Statutes**

28 U.S.C. § 1291 ............................................................................................. 3

28 U.S.C. § 1332 ............................................................................................. 3

La. Stat. § 12:501 ...................................................................................... 42

Tex. Bus. Orgs. § 1.102 ............................................................................ 48

Tex. Bus. Orgs. § 1.105 ............................................................................ 48

Tex. Bus. Orgs. § 252.001 *et seq.* ..................................................... 36, 38

Tex. Civ. Prac. & Rem. § 110.002 ......................................................... 45

**Other Authorities**

66 Am. Jur. 2d *Religious Societies* § 9 (2025) ................................... 24

Fed. R. Civ. P. 17 .................................................................................. *passim*

Fed. R. Civ. P. 19 .................................................................................. *passim*

Franchise Tax Account Status, Tex. Comptroller of Public
  Accounts ........................................................................................................ 7

Walter O. Forster, *Zion on the Mississippi: The Settlement of
  the Saxon Lutherans in Missouri 1839-1841* (1953) ............................ 4

H. Rsch. Org., Bill Analysis, HB 1661, 74th Leg., Reg. Sess.
(Tex. 1995) ........................................................................ 39

Michael W. McConnell & Luke W. Goodrich, *On Resolving
Church Property Disputes*, 58 Ariz. L. Rev. 307 (2016) ...................... 30

Revised Unif. Unincorporated Nonprofit Ass'n Act (2008).................... 39

Unif. Unincorporated Nonprofit Ass'n Act (1992)............................ 38, 39

Hermann Sasse, *The Social Doctrine of the Augsburg
Confession and its Significance for the Present* (1930), *in 1
The Lonely Way 1927-1939* (2001).................................. 5, 26

6A Wright & Miller, *Federal Practice and Procedure* § 1543
(3d ed. 2016) .................................................................... 35

## INTRODUCTION

The First Amendment bars civil courts from second-guessing churches in matters of governance, faith, and doctrine. Such matters are purely ecclesiastical. Judicial interference in them harms both church and state, infringing the free exercise of religion and overstepping structural limits on civil entanglement in religious affairs. Here, the district court crossed those constitutional boundaries. The court rejected a church's longstanding, authoritative understanding of its polity and supplanted it with the court's own reading of internal church governance.

For over 130 years, the Lutheran Church—Missouri Synod has implemented its religious beliefs distinguishing sacred and secular spheres by having the Church's civil affairs represented by its nonprofit corporation. Under the Church's polity, this corporation—known as LCMS, incorporated in Missouri in 1894—represents the Church in civil court.

That's what LCMS was doing below when it sued in diversity to restore Church governance over a school that LCMS founded a century ago, Concordia University Texas. Yet even though Concordia's own policies identified LCMS as *owning* the school, the court below found LCMS had no enforceable interest in the case. Instead, the court concluded that a Church's ecclesial body known as the Synod—which can neither sue nor own property under Church law—was the real party in interest, indispensable to the case. And the court found that the Synod was a Texas "unincorporated association," destroying diversity jurisdiction.

That ruling turns the Church's polity inside out. LCMS has been deprived of its role representing the Church's civil interests. And the Synod has been ordered to accept a new civil form as the price of vindicating the Church's governance over Concordia—a price Church law forbids it to pay. That judicial inversion of Church polity is unconstitutional.

So is how the district court got there: determining that it could answer a question of church polity by adopting its own (mis)interpretation of the Church's governance and rejecting LCMS's contrary authoritative answer to that question. The First Amendment requires just the opposite.

Nor were there legal or practical justifications for these violations. The court's view of the real-party-in-interest analysis under FRCP 17 was based on its novel construction of Texas's unincorporated-associations law. But that construction violated the law's text and purpose, as well as the canon of constitutional avoidance, the Texas Religious Freedom Restoration Act, and comity principles of the Full Faith and Credit Clause.

And the practicalities here mean the court's conclusion that the Synod is "indispensable" also fails under FRCP 19. LCMS and Concordia can obtain all appropriate relief without the Synod, as Concordia knows full well. That's why Concordia is suing LCMS over the same underlying governance dispute in state court—where Concordia has represented that its claims can proceed against LCMS alone. Forcing the Synod into *this* case, then, served just one interest: allowing Concordia to avoid the federal forum.

If left uncorrected, the novel ruling below allows litigants to easily deprive religious denominations of federal jurisdiction altogether. Worse, it will undermine the ability of the Church—or *any* religious body—to freely decide its own ecclesiastical polity. Instead, the ruling requires civil courts to regularly sit as the final arbiter of a church's governance, thus rendering unto Caesar the things that are God's. Those are results that the First Amendment was designed to prevent.

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because LCMS is a citizen of Missouri and all Defendants are citizens of Texas. The district court issued a final judgment dismissing LCMS's claims on February 3, 2025. ROA.3321. LCMS timely appealed on February 21, 2025. ROA.3322. This Court has jurisdiction to review the final judgment under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

1. Whether the district court erred in finding the ecclesial Synod and not LCMS was the real party in interest capable of prosecuting LCMS's claims under Federal Rule of Civil Procedure 17.

2. Whether the district court abused its discretion in determining that the ecclesial Synod was an indispensable party under Federal Rule of Civil Procedure 19.

## STATEMENT OF THE CASE

### A. The Lutheran Church—Missouri Synod and its polity

The Lutheran Church—Missouri Synod (the "Church"), formed in 1847, is the second-largest Lutheran denomination in America. The Church's original name was *Die deutsche evangelisch-lutherische Synode von Missouri, Ohio, und andern Staaten* or the German Evangelical Lutheran Synod of Missouri, Ohio, and Other States. ROA.3223. In part due to hard experience in the Old World with state-established churches and domineering governments, the Church adopted a "unique polity" based on its "doctrinal convictions." ROA.3223.[1]

Two doctrinal convictions relevant here are reflected in the Church's polity. First, the Church is distinct from and does not control the local, autonomous Lutheran congregations that make up the denomination. ROA.3224. While the Church serves a spiritual advisory role and makes denomination-wide ecclesiastical decisions on certain issues, it does not directly control affiliated congregations. ROA.3224. The Church also leads certain collective efforts of the denomination, including the creation, governance, and advancement of Lutheran universities. ROA.3224-25.

---

[1] *See* Walter O. Forster, *Zion on the Mississippi: The Settlement of the Saxon Lutherans in Missouri 1839-1841* 15-17 (1953) (describing Lutherans in Germany facing fines or imprisonment if unwilling to change doctrine to conform with State pressures).

Second, the Church believes that its ecclesiastical identity and mission are fundamentally "not of this world." ROA.3223-24; *see also John* 18:36 (Christ's "kingdom is not of this world."). This reflects the Lutheran "two kingdoms" doctrine, which maintains a distinction between spiritual and secular authorities.[2] The Church is "opposed to any attempt to draw the kingdom of God into this world." Sasse at 7. Although subject to lawful civil authority in civil matters, the Church "does not accept 'any commandments from secular authorities in ecclesiastical matters.'" ROA.3224.

These beliefs led the Church and its affiliated congregations to incorporate a civil entity to manage the civil affairs of the Church. This entity, the Lutheran Church—Missouri Synod ("LCMS"), was incorporated as a Missouri nonprofit corporation in 1894. LCMS is the "civil law reflection" of the Church, sharing the same constitution, bylaws, board of directors, president, officers, and even the same name. ROA.2227-28. When Church theologian Rev. Francis Pieper addressed the Church convention that originally ratified LCMS's incorporation, he explained that the Synod's manner of "church government" is not simply practical but *doctrinal*, "rooted in the doctrine of the church." ROA.3224

---

[2]    *See* Hermann Sasse, *The Social Doctrine of the Augsburg Confession and its Significance for the Present* at 5 (1930), *in 1 The Lonely Way 1927-1939* (2001), https://perma.cc/CX89-KA7D ("Sasse") ("While the secular authority has been given the power of the sword, the spiritual authority has no other power than that of the Gospel.").

Under its "two kingdoms" doctrine, the Church manages its spiritual affairs through its ecclesial entity, often referred to as the "Synod." The Synod's purpose is to "conserve and promote the unity of the true faith" and "provide a united defense against schism, sectarianism (Rom. 16:17), and heresy." ROA.3224-25. For instance, in his role as the head of the Synod, the President is charged with the Church's spiritual affairs—"supervis[ing]" doctrine, exercising the "power to advise, admonish, and reprove," and "promot[ing] and maintain[ing] unity of doctrine and practice" within the Church. ROA.1275. But, critically, the Church and its affiliated congregations have specified that the ecclesial Synod has no separate legal or jural existence and is "not a civil law entity." ROA.1282. It does not have property, bank accounts, assets, or employees, and does not enter contracts. ROA.2228; ROA.3225.

Instead, the Church manages its civil affairs through its incorporated civil entity, LCMS, which is sometimes referred to as "Corporate Synod." ROA.3225-26; ROA.1281. The LCMS Board is the "custodian of all the property of The Lutheran Church—Missouri Synod, directly or by its delegation of such authority to an agency of the Synod," ROA.1276 (Constitution), and all property of the Church is accordingly "titled or held in the name of [C]orporate Synod, its nominee, or an agency of the Synod," ROA.1282; ROA.1374 (Bylaws). In addition to the Church's real property, its bank accounts, contracts, assets, and employees are also handled by LCMS or its designees. ROA.2228.

6

Similarly, the LCMS Board serves as "the legal representative" of the Church. ROA.1276 (Constitution). The Board of Directors' Policy Manual provides that LCMS is the proper party for any litigation involving the Church. ROA.2083. It explains that litigation "against the Synod" is "litigation in which Corporate Synod" or an "employee of Corporate Synod … acting in their capacity as [an employee] or on behalf or for the benefit of Corporate Synod" is a party. ROA.2083. LCMS is accordingly the proper recipient for service of process. *See, e.g.,* Franchise Tax Account Status, Tex. Comptroller of Public Accounts, https://perma.cc/7E6D-AV85 (noting LCMS is registered as a foreign corporation in Texas for purposes of service of process). And "[t]he initiation of litigation, lawsuit, arbitration, or administrative proceeding must be approved by the LCMS Board of Directors." ROA.2083. Thus, LCMS effectuates the Church's "responsibility to be subject to civil authority." ROA.1281.

Over 130 years of Church practice has confirmed its "two kingdoms" polity. ROA.2227-28. LCMS has owned real property and assets, entered into contracts, held bank accounts, and had employees. ROA.2228, 3225-26. The Synod has not done any of these things. ROA.2228. Likewise, the Church's legal rights and duties have been exercised through LCMS. ROA.2228-29. The Synod has never sued and has no record of ever being sued—until now. ROA.2228.

**B. LCMS establishes and maintains the Church's civil interests in Concordia University Texas**

A key part of the Church's mission is establishing universities and seminaries to produce pastors, teachers, and other church workers to serve Lutheran congregations. ROA.3224-25. To achieve this religious mission while maintaining doctrinal orthodoxy, the Church makes its universities "agencies" of the Synod, subject to the Synod's ecclesiastical governance and LCMS's civil oversight. ROA.3224-25*; see* ROA.1608; ROA.3226. These universities bear the name "Concordia" after the Latin name of the fundamental corpus of the Church's doctrines and confessions, the Book of Concord, first published in 1580. ROA.3255-57. There are six Concordia Universities, one of which is Concordia University Texas ("Concordia"). ROA.1238.

In 1925, LCMS purchased property for a university in Austin that became Concordia. ROA.1240. LCMS paid for the buildings, the furniture, and books for the library. ROA.1240. LCMS conveyed property to Concordia in trust, reserving restrictions and reversionary rights. ROA.1242. All of this was accomplished so that Concordia, as an agency of the Synod, would advance the Church's mission of "training of ministers and teachers for service" in the Church. ROA.1240.

Concordia's leadership has been entrusted with supporting the Church's religious mission since the school's founding. For example, Concordia's Board of Regents is responsible for ensuring that the university

"is confessing Jesus Christ in full accord with the doctrinal position of the LCMS" and "ensuring that all faculty receive appropriate formal, ongoing training in the doctrines of Holy Scripture as rightly taught in the Lutheran Confessions." ROA.1426. Concordia's president is responsible not only for maintaining the "theological fidelity" of the university, ROA.1391 (Bylaws 3.6.6.5), but is also directed to "serve as the spiritual … head" of Concordia, ROA.1428-29 (Bylaws 3.10.6.6). He is thus "responsible for the provision of spiritual care and nurture for every student," and to "carefully watch over the spiritual welfare" of the school and provide "Christian discipline, instruction, and supervision[.]" ROA.1428-29.

Although Concordia is separately incorporated and responsible for its own day-to-day affairs, it cannot unilaterally alter its own governing documents. ROA.1615. Concordia must first receive advance approval from the Commission on Constitutional Matters ("Commission"), the Church's "judicatory body" charged with resolving matters of Church governance. ROA.1615; ROA.3225. Further, the Church's Bylaws require that any separation or divestiture of Concordia from the Church requires a two-thirds vote of approval by the Church's Board of Directors. ROA.1391; ROA.1609. The Bylaws also govern the selection of the university's Board of Regents—with 10 of the 18 potential positions subject to direct appointment by the Church, its district, or its officers. ROA.1424-25. And the Bylaws set out requirements for Concordia's President and the presidential appointment process. ROA.1428-32.

Concordia's governing documents acknowledged LCMS's legal interests. According to Concordia Bylaws, "[t]he University is and shall operate as an educational institution of The Lutheran Church—Missouri Synod, a Missouri not-for-profit corporation, subject to the provisions of the constitution and bylaws of the Lutheran Church—Missouri Synod." ROA.1496 (Concordia Bylaws 2.4). According to the Concordia Board Policy Manual, "the [Concordia] Board recognizes the legal owner of the Concordia University System and the University as the Lutheran Church—Missouri Synod (LCMS, Inc.)." ROA.1513 (Concordia Board Policy 2.5).

### C. Concordia unilaterally rejects Church governance

In 2022, almost a century after its founding, Concordia purported to unilaterally change all that. ROA.1244-45. Concordia acted at the direction of its former president Donald Christian and former board chairman Christopher Bannwolf, both Texas residents. ROA.1233, 1250.

In November 2022, without approval from the Commission, Concordia's Board of Regents held a secret vote that rejected the "historic governance" of LCMS, ROA.2863-64, and purported to amend Concordia's charter to say it is no longer "subject to the authority of or governance by" LCMS, ROA.1245. While claiming to remain aligned with the Church, the board attempted to make adherence to Church doctrine within "the sole and exclusive discretion" of the board. ROA.1246. It also purported to remove the requirement to comply with the Church's bylaws and abolish the Church's authority to appoint regents. ROA.1248.

When the Church learned of these events, it immediately requested that Concordia return to the Church's fold, but Concordia refused. In March 2023, the Commission met to adjudicate Concordia's actions. ROA.1601. After reviewing the Church's governance documents in detail, the Commission ruled that Concordia was "required to receive advance approval from the Commission" before it could change its governance structure, and that its failure to do so was "contrary to the Bylaws of the Synod." ROA.1608-10. This failure rendered Concordia's amendments "null and void ... and unable to be put into practice." ROA.1608-10. Under Church Bylaws, the Commission's opinion is "binding," subject only to appeal to a "convention of the Synod." ROA.1615. Concordia did not appeal. ROA.1615.

In August 2023, the Commission's judgment was brought before the Synod meeting in convention, which is the Church's highest ecclesiastical authority. ROA.1235. The Synod in convention adopted the Commission's opinion "in its entirety," "conclude[d]" that Concordia's president and board "have acted in direct conflict with the Constitution and Bylaws," called on those involved "to repent for having broken" multiple Scriptural commandments, and directed LCMS "to take all appropriate actions" to restore Concordia to the Church's governance. ROA.1615.

Two days later, the Synod in convention elected regents of Concordia's board pursuant to Church Bylaws and sought to have them seated. ROA.1249. Concordia refused, claiming that its current board was "the

sole governing body of the institution," and that "persons elected or appointed … at the LCMS convention … cannot be recognized as members of the Board." ROA.1249.

### D. The proceedings below

Left with no internal ecclesiastical recourse, LCMS filed this lawsuit seeking to enforce the Church's authority over Concordia. ROA.15, 1254-56. LCMS sued Concordia, Christian, and Bannwolf in the Western District of Texas based on diversity jurisdiction.

LCMS agreed to a stay to allow for mediation. But four months later, after mediation failed, Concordia sued LCMS in Travis County court. ROA.3301. It also, for the first known time in LCMS history, named the ecclesial Synod as a defendant and dubbed it "an unincorporated association" that was a Texas resident because it has affiliated congregations in Texas. *See* Notice of Removal and App., *Concordia Univ. Texas v. Lutheran Church—Missouri Synod*, No. 1:24-cv-176 (W.D. Tex.), ECF 1 at 1, ECF 1-1 at 2; ROA.2228. Concordia sought declaratory judgment that LCMS and the Synod do not have authority to elect regents to Concordia's board, that Concordia did not breach any fiduciary duty owed to LCMS or the Synod, and that neither LCMS nor the Synod were entitled to a reversionary interest or damages related to Concordia's property. ROA.3301-02.

LCMS removed the case on diversity grounds. ROA.3302. The court consolidated the removed action with LCMS's case. ROA.2191.

Concordia moved to dismiss LCMS's lawsuit and to remand the state lawsuit. ROA.1800-22; *see also* ROA.2191. Concordia asked the court to rule that the Synod exists as a separate legal entity—a Texas unincorporated association—with citizenship anywhere there is a local Lutheran congregation. ROA.1810-12. Concordia argued that dismissal was required because the Synod—not LCMS—was the indispensable real party in interest, which destroyed diversity jurisdiction under Rules 17 and 19 of the Federal Rules of Civil Procedure. ROA.3302. Concordia argued that remand of the removed case was required for the same reason. ROA.3302. Concordia based its argument on excerpts from the Church's internal governance documents. ROA.1812.

In response, LCMS both provided a more complete articulation of the documents and submitted authoritative explanatory declarations from Rev. John Sias. ROA.2227, 3223. Rev. Sias is the Church's Secretary, a full-time elected and ordained officer that serves on the LCMS Board of Directors and the Commission. ROA.1374-75, 1399. Rev. Sias was charged with articulating the meaning and application of its governance documents and Church polity, as set forth by its Synod convention and Commission, in this case. ROA.2227.

Rev. Sias explained the historical and theological roots underlying the Church's "unique polity" and its distinction between spiritual and civil authority. ROA.3223-25. Sias explained the practical effect of this doctrinal distinction, as the Synod "does not enter into contracts, does not have

any bank accounts and has at no relevant time done business in a civil sense." ROA.2228. He also explained the Church's long history of using LCMS as its "civil law reflection" to "handle its civil law affairs and to exercise civil law functions," such that "the Synod does not exist as a separate civil entity from LCMS." ROA.2227-28. And he articulated how the Church understood its polity as necessary "to facilitate ecclesiastical governance through religiously informed conscience." ROA.3225. Finally, he corrected Concordia's misinterpretation of Church governance documents. ROA.2229.

### E. The district court's ruling

The magistrate judge recommended dismissal of LCMS's federal case and remand of the state-court case. Rejecting LCMS's First Amendment arguments, he concluded that the Synod was a Texas unincorporated association under the Texas Uniform Unincorporated Nonprofit Association Act because "[t]here is no evidence that the Synod is incorporated." ROA.3087-88. He then determined that the Synod "h[eld] the substantive rights at issue" under Rule 17, and that LCMS "cannot show" that it has "independent" rights against Concordia. ROA.3087-88, 3093. He did not analyze whether dismissal was permitted by Rule 19. ROA.3087.

The district court accepted the magistrate judge's conclusions in full, without a hearing, concluding that "the Synod is an indispensable party that must be joined." ROA.3320. The district court granted both of Concordia's motions on the same core grounds: "that the Synod is both a non-

14

diverse (Texas) defendant capable of being sued and a proper party to this case and therefore, it would be improper for this Court to exercise jurisdiction over any claim." ROA.3302.

The court acknowledged that LCMS disputed Concordia's account of its polity and had submitted testimony from the LCMS officer charged with articulating Church polity that "explain[ed] the ecclesiastical meanings in [Church] governance documents." ROA.3314. But the court held that the First Amendment allows "civil authorities to question a religious body's own understanding of its structure." ROA.3311. The court concluded that it could answer that question using the "neutral principles" approach, developed for church property disputes, because in its view resolving the parties' claims "will not involve any change to the Synod's governing documents" or "inquiry into religious doctrine." ROA.3313.

The court then reviewed Church governance documents and, based on its own interpretation of those documents, rejected LCMS's understanding that treating the Synod as a separate legal entity "violate[d] the [Church's] decision regarding polity and governance." ROA.3315. The court instead concluded that the Synod "may be classified" as an unincorporated nonprofit association under Texas law. ROA.3309. The court also overruled or ignored LCMS's objections under the Texas Uniform Unincorporated Nonprofit Association Act, the constitutional-avoidance rule, the Texas Religious Freedom Restoration Act, and the Full Faith and Credit Clause's internal affairs doctrine. ROA.3308-09, 3321.

Having determined that the ecclesial Synod existed as a civil entity separate from LCMS, the court concluded that it lacked diversity jurisdiction because the Synod—not LCMS—held the substantive rights at issue, is a citizen of Texas, and is an indispensable party that must be joined. ROA.3317-20. The court dismissed the federal lawsuit and remanded the state-court lawsuit. ROA.3321. This appeal followed.

## SUMMARY OF THE ARGUMENT

LCMS is the proper party to vindicate the Church's rights and correctly invoked federal diversity jurisdiction. The district court made several errors requiring reversal.

**I.** LCMS is a real party in interest under Rule 17. For over 130 years, LCMS has been the Church's designated means to protect its civil interests. The Church's ecclesial body, the Synod, is barred by Church law from doing so. Yet the district court inverted the Church's polity by holding that LCMS has *no* stake in this case and that only the Synod does— as an unincorporated association. That was error five times over.

*First*, the district court violated the First Amendment, which does not allow "civil courts to probe" into internal religious rules "governing church polity," but "mandate[s]" that courts "accept" the Church's determinations of any "religious issues of doctrine or polity before them." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-09 (1976). According to the Church's authoritative explanation of its polity, supported by its governance documents and a century of Church practice,

LCMS alone can enforce the Church's civil interests here and the Synod cannot. Rather than accept that explanation, the district court second-guessed it using the "neutral principles" framework—which is inapplicable to "questions of church polity," *id.* at 720-21—and misinterpreted the Church's governance documents.

*Second*, the district court incorrectly applied Texas law on *un*incorporated associations, which doesn't apply to an incorporated entity.

*Third*, the canon of constitutional avoidance requires reading Texas law to avoid the serious First Amendment conflict that the district court's interpretation raises.

*Fourth*, the Texas Religious Freedom Restoration Act requires the same construction to avoid burdening LCMS's sincere religious beliefs.

*Fifth*, the internal affairs doctrine, stemming from the Full Faith and Credit Clause, required the district court to respect LCMS's designation as the Church's civil entity under Missouri law.

**II.** Dismissal was also unwarranted under Rule 19. The Synod is not a "required" party because courts can grant "complete relief" without it. Fed.R.Civ.P. 19(a). And it is not indispensable because neither it nor anyone else's interests would be harmed by proceeding without it. Fed.R.Civ.P. 19(b). Nor is there any risk of duplicative lawsuits because the Synod is solely an ecclesial body that *cannot* independently sue Concordia, and courts can easily shape any relief along those lines. The district court abused its discretion in ruling otherwise.

## STANDARD OF REVIEW

In reviewing a pre-answer dismissal under Rule 17, this Court accepts the plaintiff's allegations as true, reviews legal issues de novo, and reviews the dismissal sanction for abuse of discretion. *Magallon v. Livingston*, 453 F.3d 268, 271 (5th Cir. 2006). A dismissal for failure to join an indispensable party under Rule 19 is reviewed for abuse of discretion, such as errors of law or failure to consider significant factors. *PHH Mortg. Corp. v. Old Republic Nat'l Title Ins.*, 80 F.4th 555, 559 (5th Cir. 2023). This Court must "independently review the factual record to ensure that the [lower] court's judgment does not unlawfully intrude" on activity protected by the First Amendment. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648-49 (2000).

## ARGUMENT

### I. Under Rule 17, LCMS is the real party in interest.

Purporting to apply Rule 17, the district court disregarded over a century of the Church's unbroken religious polity making LCMS the correct party to seek civil relief against Concordia and barring the Synod from doing so. Rule 17 does not give a civil court the power to change the Church's internal governance.

Under Rule 17, a plaintiff must be a "real party in interest"—that is, a "person holding the substantive right sought to be enforced." *Farrell Const. Co. v. Jefferson Parish*, 896 F.2d 136, 139-40 (5th Cir. 1990). The rule has a "liberal" scope, one "designed to allow a party to appear as long

as it has a direct stake in the litigation under the particular circumstances." *Greer v. O'Dell*, 305 F.3d 1297, 1302 (11th Cir. 2002); *In re Unger & Assocs.*, 292 B.R. 545, 551 (Bankr. E.D. Tex. 2003) (disputes over real party in interest are "rare[]" and "easily resolved"). Thus, "anyone possessing the right to enforce a particular claim" qualifies, not just "the person who will ultimately benefit from the recovery." *Farrell*, 896 F.2d at 140-41. There are often "multiple real parties in interest for a given claim," and Rule 17 is satisfied if one of those parties is the plaintiff. *HB Gen. Corp. v. Manchester Partners*, 95 F.3d 1185, 1195-97 (3d Cir. 1996).

The purpose of the rule is "simply" to "protect the defendant against a subsequent action," ensuring that "the judgment will have its proper effect as res judicata." Fed.R.Civ.P. 17 advisory committee's note to 1966 amendment; *accord Moss v. Princip*, 913 F.3d 508, 520-21 (5th Cir. 2019). Where there are several appropriate plaintiffs, "[a]ny" risk to Rule 17's purpose of avoiding "duplicative litigation" can "be alleviated through properly shaped protective provisions in the judgment." *Moss*, 913 F.3d at 519-20. Whether to join those additional parties "must be determined under Rule 19," not Rule 17. *Id.* at 520 & n.63 (citing *HB Gen.*, 95 F.3d at 1196-97).

Here, the district court held that LCMS was not a real party in interest, but that the ecclesial Synod was both a Texas unincorporated association and the sole real party in interest capable of enforcing the Church's authority regarding Concordia.

19

That was reversible error, violating (A) the First Amendment, (B) the Texas Uniform Unincorporated Nonprofit Association Act, (C) the canon of constitutional avoidance, (D) the Texas Religious Freedom Restoration Act, and (E) comity principles of the Full Faith and Credit Clause.

## A. The First Amendment's church autonomy doctrine confirms that LCMS is the real party in interest.

The Religion Clauses of the First Amendment afford "broad" protection for the "principle of church autonomy," which guarantees religious groups' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). "State interference" to "dictate or even to influence such matters" would both "obviously violate the free exercise of religion" and "constitute one of the central attributes of an establishment of religion." *Id.* at 746.

One key example of protected church governance is a church's choice of polity. Permitting "civil courts to probe deeply" into internal religious law "governing church polity" would "violate the First Amendment in much the same manner as civil determination of religious doctrine." *Milivojevich*, 426 U.S. at 708-09. Instead, the Religion Clauses "mandate" that civil courts accept the church's authoritative determinations of "religious issues of doctrine or polity before them." *Id.*

Accordingly, the district court should have deferred to LCMS's sincere, authoritative declaration of Church polity with over 130 years of history

and tradition behind it. Under that polity, LCMS is the real party in interest with the ability to enforce the Church's governance over Concordia. By contrast, the Synod *cannot* be the enforcement entity because it cannot sue in civil courts. The court should have recognized that any res judicata concerns animating Rule 17 were obviated by LCMS's authoritative representations. And to the extent double-liability doubts remained, the court could have shaped relief to remove them.

But the district court did exactly the opposite. Instead of accepting LCMS's elucidation of its own Church polity, the court reversed the Synod's and LCMS's ecclesiastical and civil roles to the detriment of both. And the court did so using an analytical framework—the "neutral principles" approach—that the Supreme Court and this Court have expressly rejected to resolve pure questions of internal church governance.

### 1. Under the church autonomy doctrine, courts must accept the Church's authoritative explanation of its polity.

The church autonomy doctrine guarantees "the right of churches and other religious institutions to decide matters" within their ecclesiastical "sphere." *Our Lady*, 591 U.S. at 746; *Westbrook v. Penley*, 231 S.W.3d 389, 395 (Tex. 2007) (noting the "core" First Amendment recognition of "two spheres of sovereignty when deciding matters of government and religion"). This "structural protection" separating the sacred and the secular, *Whole Woman's Health v. Smith*, 896 F.3d 362, 373-74 (5th Cir. 2018), is a distinctive feature of American church-state relations.

Historically, "the English courts" operated within the context of the established Church of England, which permitted judicial resolution of internal church disputes. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727 (1872). The First Amendment charted a different course. Allowing such inquiry would deprive churches of "the right of construing their own church laws" and "open the way to all the evils" of English establishmentarianism. *Id.* at 733. Under both Supreme Court "precedents" and the First Amendment's historical "background," *Our Lady*, 591 U.S. at 747-48, American courts have long held that matters "concern[ing] theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them" are "strictly and purely ecclesiastical," *Watson*, 80 U.S. at 733.

Thus, church autonomy is harmed when government encroaches upon the sphere of activity that is "the church's alone." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 (2012). Government action that "interferes with this autonomy or risks judicial entanglement with a church's conclusions regarding its own rules, customs, or laws" is "prohibited by the First Amendment." *In re Diocese of Lubbock*, 624 S.W.3d 506, 513 (Tex. 2021); *McRaney v. N. Am. Mission Bd.*, 966 F.3d 346, 348 (5th Cir. 2020) (cleaned up) ("matters of church government, as well as those of faith and doctrine, constitute purely ecclesiastical questions" on which "judicial review" is barred). And civil courts, "as arms of the government, must avoid interference with established church

policies and government." *Northside Baptist Church v. Goodson*, 387 F.2d 534, 537 (5th Cir. 1967).

Near the heart of a church's protected "internal management decisions," *Our Lady*, 591 U.S. at 746, is its choice of polity, which is "intimately connected [to] religious views and ecclesiastical government." *Watson*, 80 U.S. at 726. Polity choices are "inherently ecclesiastical," meaning judicial efforts to deeply probe them leave courts "inextricably intertwined" with a matter outside the control of civil courts. *Diocese of Lubbock*, 624 S.W.3d at 518. Concluding otherwise would both "deprive these bodies of the right of construing their own church laws" and cause civil government to become entangled in the "fundamental organization of every religious denomination." *Watson*, 80 U.S. at 733.

Thus, the Supreme Court has invalidated statutes that purported to "displace[] one church administrator with another," *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952), as well as "common law" doctrines that sought a similar result—even when the church polity appeared co-opted by "the secular authority in the U.S.S.R.," *Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191 (1960). And in *Milivojevich*, the Court barred courts from second-guessing a church's decisions to reorganize its diocesan structure. 426 U.S. at 710. Instead of questioning whether the church "compl[ied] with [its own] church laws and regulations," *id.* at 713, the lower courts should have accepted the church's determinations of these matters, *id.* at 724-25.

Those principles apply to a church's determination about how its polity should operate in the civil sphere. Sometimes, that is as an unincorporated association. *See, e.g.*, *Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417, 430 & n.54, n.55 (Tex. 2020) (church "formed and operating" as an "unincorporated association"). Often, as here, it is a choice to be represented in civil disputes by an incorporated entity that serves, but is spiritually distinct from, its ecclesiastical existence. *See, e.g., Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 330 n.3 (1987) (describing corporations "organized under Utah law to perform various activities on behalf of the Church," which were distinct from the Church itself). And, in this type of polity, "[a]fter incorporation, the underlying religious society retains its existence separate and apart from the corporate structure," submitting the corporation to civil law but retaining autonomy for the ecclesial entity. 66 Am. Jur. 2d *Religious Societies* § 9 (2025).[3]

---

[3]   *See, e.g., In re Elsinghorst Bros. Co.*, 180 B.R. 52, 53 (Bankr. W.D.N.Y. 1995) (cleaned up) ("Even when a religious society incorporates, it retains an existence that is separate and apart from any corporate structure. Not owing its ecclesiastical or spiritual existence to the civil law, a religious congregation possesses an existence in addition to the legal identities either of its members or of whatever corporate structure those members may have created for operational purposes."); *Folwell v. Bernard*, 477 So. 2d 1060, 1063 (Fla. Dist. Ct. App. 1985) ("[W]henever a religious society incorporates, it assumes a dual existence; two distinct entities come into being—one, the church, which is conceived and endures wholly free from the civil law, and the other, the corporation created through the state prescribed method. … The components of the ecclesiastical interrelationship between the parent church and the subordinate body cannot be permitted to serve as a bridge capable of reaching the nonsecular parent in a civil proceeding."); *accord Trinity Presbyterian Church v. Tankersly*, 374 So. 2d 861, 866 (Ala. 1979).

### 2. Applying the constitutionally required respect for church autonomy, LCMS is the real party in interest.

The church autonomy doctrine resolves the Rule 17 analysis here: LCMS is the real party in interest; the Synod is not.

As explained by Rev. Sias—the official charged with explaining and applying Church polity—the Church incorporated LCMS over 130 years ago to represent its "civil law" interests and "to carry out its secular functions, including the ability to sue and be sued." ROA.2227-28. The Church's Constitution and Bylaws specify that the LCMS Board "is the legal representative and custodian of all the property of The Lutheran Church—Missouri Synod, directly or by its delegation of such authority to an agency of the Synod." ROA.1276 (Constitution); *see also* ROA.1374 (Bylaws).

That includes the Church's authority over Concordia. LCMS paid for Concordia's campus, buildings, and textbooks to advance the Church's mission of "training ministers and teachers" to serve the Church. ROA.1240; ROA.3255-56. Concordia's governing documents expressly reflected this reality, acknowledging that it is "an educational institution of The Lutheran Church—Missouri Synod, a Missouri not-for-profit corporation," ROA.1496, and "recogniz[ing] the legal owner of the … the University as the Lutheran Church—Missouri Synod (LCMS, Inc.)." ROA.1513.

By contrast, as Rev. Sias further explains, "the Synod does not exist as a separate civil entity from LCMS," and under "the express ecclesiastical law of the Synod, the Synod is not a civil law entity." ROA.2227. Accordingly, the Synod makes no contracts and has no property, assets, bank accounts, or employees. ROA.2228, 3226. Nor has it ever sued or been sued. Rather, LCMS is the only fully authorized and capitalized entity to enforce civil rights for the Church before civil courts. ROA.2083 (Policy Manual §§ 4.18.1.7 and 4.18.3.1); ROA.2228-29.

For the Church, this separation of powers effectuates "[o]ur Lord's will." ROA.1270. As explained in 1896 at the convention ratifying LCMS's incorporation, Lutheran "church government" is itself a matter of "doctrine," one "rooted in the doctrine of the church" which draws a line between civil and ecclesiastical matters. ROA.3224 (emphasis omitted). This chosen "polity" ensures "autonomy of the Synod to facilitate ecclesiastical governance through religiously informed conscience." ROA.3225; *see* Sasse at 7 ("Lutheranism is opposed to any attempt to draw the kingdom of God into this world."). These doctrinal positions are amply supported by the Church's long, unbroken history of practicing what it preaches.

In light of Church polity and practice, LCMS is the Church's civil entity "holding the substantive right sought to be enforced" under Rule 17. *Farrell*, 896 F.2d at 140; ROA.3225-26. The Synod is not and cannot be that entity. ROA.1282; ROA.3224-25.

26

Nor is there any threat of the "duplicative litigation" concerns animating Rule 17, *Moss*, 913 F.3d at 520-21, since the Synod is unable to sue Concordia. And even if such concerns existed, they can be "alleviated through properly shaped protective provisions in the judgment," *id.*—not by disregarding Church polity in violation of the First Amendment.

Holding otherwise would fall far short of the "special solicitude" that "the text of the First Amendment" gives to "the rights of religious organizations," *Hosanna-Tabor*, 565 U.S. at 189, treating them worse than the mine-run of secular entities. Courts routinely reject litigants' attempts to carve up secular entities to ignore their lawful organizational form. *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313 (5th Cir. 1991) ("[L]ike a corporation, a Texas city is allowed to designate whether one of its own subdivisions can be sued as an independent entity."); *see also Kingman Holdings v. Chase Home Fin., L.L.C.*, No. 5:15-cv-19, 2015 WL 13802564, at *2 (W.D. Tex. Apr. 20, 2015) ("Under Texas law, '[c]ivil suits may be maintained only by or against parties having an actual legal existence.'").

The same is true of the Synod. The ecclesial body is a "religious denomination, not a legal entity." *Myerscough v. United Methodist Church*, No. 2:22-cv-226, 2023 WL 3995847 (W.D. Mich. June 14, 2023); *see also Benn v. Seventh-day Adventist Church*, 304 F. Supp. 2d 716, 721-22 (D. Md. 2004) ("the Seventh-[d]ay Adventist Church is a religion, not a cognizable legal entity"). Thus, Concordia "no more can proceed against" the Synod "than it could against the accounting department of a corporation."

*Darby*, 939 F.2d at 313; *see also EEOC v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71, 79 (D.D.C. 1999) (citing *F.E.L. Publ'ns, Ltd. v. Catholic Bishop of Chi.*, 754 F.2d 216, 221 (7th Cir. 1985) (courts do not "fragment the legal status of an incorporated religious entity")).

That LCMS holds enforceable rights here is further confirmed by Concordia's own actions: if LCMS were truly a stranger to this dispute, Concordia would not be seeking relief *against LCMS* in state court. Nor would Concordia be insisting—after persuading the federal court to dismiss this case because *only* Synod and *not* LCMS is the real party in interest—that "even if … th[e] Synod is not an appropriate party," "there is no contest that LCMS *is* a proper party." Concordia Resp. to Mot. to Stay at 11, *Concordia Univ. Tex. v. LCMS*, No. D-1-GN-24-000358 (Tex. 353rd Dist. Ct. Apr. 14, 2025) (emphasis in original), https://perma.cc/K2SH-6HDS; *accord* Hr'g on Mot. to Stay Tr. at 57:2-7, *Concordia Univ. Tex. v. LCMS*, No. D-1-GN-24-000358 (Tex. 353rd Dist. Ct. Apr. 17, 2025), https://perma.cc/LN28-8XE6 (Concordia counsel: "there's no dispute that LCMS is properly here, the corporate entity. … So this case proceeds against LCMS even if somehow the Synod evaporates into the ecclesiastical cloud."). Thus, even Concordia admits LCMS has a cognizable legal interest in this dispute.

### 3. The district court failed to follow the church autonomy doctrine and entangled itself in the Church's polity.

The district court disregarded church autonomy and substituted its judgment for the Church's. In doing so, the court made four reversible errors. First, it employed a faulty analytical framework for resolving church polity issues. Second, it failed to defer to the Church's authoritative explanation of its polity. Third, it misinterpreted the Church's governance documents. And finally, it mistakenly concluded that because the Synod would benefit from restoring Church governance over Concordia, LCMS could not be a real party in interest.

*The "Neutral Principles" Framework.* The district court's first error was its analytical framework, which derailed the rest of its analysis. The "neutral principles" approach the court employed "has never been extended to religious controversies in the areas of church government, order and discipline, nor should it be." *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986). That is because "matters of church government" necessarily "constitute purely ecclesiastical questions" with which civil interference is barred. *McRaney*, 966 F.3d at 348. This Court has thus rejected using "neutral principles of law" to resolve church-governance cases. *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974).

The "neutral principles" approach was "developed for use" to adjudicate intra-church property disputes. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449

29

(1969). Those are "fundamentally different types of dispute[s]" because they involve situations where two religious factions both claim to be the sole "true" church, making it impossible to judicially defer to a single religious body. Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 316-19, 336 (2016).

A rule designed for dealing with churches split into two factions isn't applicable here, where a single religious body is being challenged over its internal governance. Under similar circumstances, *Milivojevich* rejected "reli[ance] on purported 'neutral principles'" to review "a matter of internal church government" within one church, because such matters were "obviously" beyond the "competence" of "[c]ivil judges." 426 U.S. at 714-15, 714 n.8, 717, 721; *accord Crowder v. S. Baptist Convention*, 828 F.2d 718, 725 (11th Cir. 1987) (confirming *Milivojevich* held "civil courts may not use the guise of the 'neutral principles' approach" to adjudicate whether a church followed its "church constitution" in polity matters). And for similar reasons, *Hosanna-Tabor* refused to allow "neutral" laws to contest a Lutheran church's decision to terminate a minister. *Hosanna-Tabor*, 565 U.S. at 189-90. Why? Because requiring a church to "retain an unwanted minister … intrudes upon more than a mere employment decision"—it "interferes with the internal governance of the church." *Id.* at 188.

The church autonomy doctrine *prevents* "neutral" laws from "interfer[ing] with an internal church decision that affects the faith and mission of the church itself." *Id.* at 190. Choosing to "apply neutral principles" in matters of church government thus "invade[s] a religious institution's 'autonomy with respect to internal management decisions that are essential to the institution's central mission.'" *Diocese of Lubbock*, 624 S.W.3d at 518 (quoting *Our Lady*, 591 U.S. at 746). Such misapplication effectively "sideline[s] the church autonomy doctrine," *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints,* 127 F.4th 784, 798 (9th Cir. 2025) (en banc) (Bress, J., concurring in judgment), allowing the exception to "swallow" the constitutional rule "altogether." *Belya v. Kapral*, 59 F.4th 570, 580 (2d Cir. 2023) (Park, J., dissenting from denial of rehearing en banc) (extending approach outside "church property disputes" will "eviscerate the church autonomy doctrine"). Thus, where—as here—a case requires a "searching … inquiry into church polity," the "neutral principles" approach is "impermissible." *Milivojevich*, 426 U.S. at 722-23.

The district court held that the "neutral principles" framework was applicable because the court did not believe this case required "inquiry into religious doctrine." ROA.3313. But this Court has expressly rejected the "narrow[]" idea that the "neutral principles of law" approach applies anytime a case doesn't require "interpretation of religious doctrine." *Simpson*, 494 F.2d at 493-94. Rather than "such a strict" and "narrow[]"

31

view, this Court recognized that church autonomy fully encompasses "matters of church *government* as well as those of faith and doctrine." *Id.* (emphasis added). Rightly so. A religion's choice of polity often *is* a matter of "*the doctrine of the church*," as LCMS demonstrated was true here. ROA.3224. The lower court's contrary conclusion thus intruded on both Church polity and doctrine.

***Acceptance of Church Authority.*** Because the district court employed the wrong framework, it further erred by adopting its own view of Church governance, rejecting the Church's authoritative contrary explanation, ROA.2228, and somehow concluding that nullifying LCMS and forcing the Synod to represent the Church's civil interests would "not alter or reorganize the Synod's internal governance." ROA.3313.

As an initial matter, "inquiring into" the Church's "own procedures," decisions of "ecclesiastical tribunals," and "rules and regulations for internal … government" all intrudes into "quintessentially religious controversies" that "the First Amendment commits exclusively" to the Church. *Hosanna-Tabor*, 565 U.S. at 187 (citing *Milivojevich*, 426 U.S. at 720, 724-25). But that's exactly what Concordia asked the court to do, and exactly what it did. ROA.2228; ROA.3313; *see also* Hr'g on Mot. to Stay Tr. at 40:7-16 (Concordia arguing "this whole fight is about" how to understand the Church's "own laws and their own rules and all of these kind of made-up court things that they claim they have in the ecclesiastical world").

And the court went one step further by rejecting the contrary explanation of Church polity provided by the Church's designated authority. Thus, as in *Milivojevich*, "the fallacy fatal to the judgment of [the court below] is that it rests on an impermissible rejection of the decisions of the highest ecclesiastical" officials to which the matter had been taken "upon the issues in dispute." 426 U.S. at 708. Instead, it "impermissibly substitutes its own inquiry into church polity." *Id.*

Again, the district court was misled by treating the polity question relevant to federal jurisdiction here as if it concerned a church property dispute. ROA.3313. It doesn't. The question is whether the Church can structure its governance such that LCMS is its representative in civil court and the Synod is wholly ecclesiastical. Those are pure questions of church polity. Courts cannot second-guess a church's "exercise of ecclesiastical authority on those questions." *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 608 (Tex. 2013); *Milivojevich*, 426 U.S. at 723.

***Misinterpreting Church Governance.*** Having arrogated the power to interpret the Church's internal governance documents, the district court then misread them.

For example, the district court developed its own interpretation of the LCMS policy manual (an interpretation not advanced by either party) elevating the term "litigation brought against the Synod" as conclusive evidence "that even LCMS recognizes the Synod's capacity to be sued." ROA.3314. But the district court overlooked that "litigation brought

against the Synod" is a defined term within the policy that refers to either (1) "litigation in which Corporate Synod is named" or (2) when an agent "of Corporate Synod is named" so long as that party was acting "for the benefit of Corporate Synod." ROA.719-20 (Policy Manual, "Definitions" at 4.18.1.7); *see also* ROA.668 ("Corporate Synod" is LCMS). Neither definition contemplates a lawsuit against the *ecclesial* Synod—an event that the Church cannot recall having occurred once in LCMS's 130-year history. ROA.2228. Yet this misreading of LCMS policy is the only cited justification for the court's determination that its interpretation "does not violate the Synod's decision regarding polity and governance." ROA.3315.

The district court similarly misinterpreted other church governance provisions in other sections of its ruling. For example, it found that the Synod is a civil association under Texas law because the Church's bylaws use the word "association" to describe the Synod—ignoring that the next sentence explains that the Synod "is not a civil law entity." ROA.3308; *see* ROA.1282 (Bylaws at 1.2.1.v). The court also took out of context the internal description of the Synod board (which is also the LCMS board) as the "legal representative" to find that the Synod is separately represented in the civil realm apart from LCMS, which is contradicted by both the governing documents and the Church's own explanation of these documents' meaning. ROA.3307; *see* ROA.2229; *Diocese of Lubbock*, 624 S.W.3d at 511 (reversing for failing to accept Catholic definition of term of "minor").

***Expected Beneficiary***. Finally, the district court concluded that LCMS was not even *a* real party in interest because it was "clear that the Synod is the party that would benefit" from restoring Church authority over Concordia. ROA.3317-18. But "anyone possessing the right to enforce a particular claim is a real party in interest," even a party who is *not* "beneficially interested in the potential recovery." 6A Wright & Miller, *Federal Practice & Procedure* § 1543 (3d ed. 2016); *accord Farrell*, 896 F.2d at 141. LCMS obviously qualifies, as even Concordia now admits in the state-court action. *Supra* at Section I(A)(2).

\* \* \* \*

The ruling below isn't just unconstitutional. It also broadly harms the interests of both church and state. Like LCMS, many religious bodies understand their polity as drawing an ecclesiastical and civil distinction. And all civil courts have an independent obligation to observe "constitutional limits on judicial authority" imposed by the church autonomy doctrine, which requires them to "limit[]" themselves "to their proper sphere" and respect "structural concerns regarding separation of powers." *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 325-26 (4th Cir. 2024); *accord Whole Woman's Health*, 896 F.3d at 373-74. Yet the district court's reasoning sets all that aside, subjects ecclesiastical entities to general civil jurisdiction, sharply restricts access to federal courts by denominational corporations, and entangles the judiciary in purely ecclesiastical matters. This Court should reverse.

35

## B. Texas law governing unincorporated nonprofit associations confirms that LCMS is the real party in interest.

The Texas Uniform Unincorporated Nonprofit Association Act (the "Act") also requires reversal. The Act's plain text confirms that it doesn't apply to incorporated entities. So does the Act's express purpose, advisory comments, and legislative history. The district's court conclusion that the Synod and its affiliated congregations formed a Texas unincorporated association misapplies the Act. Neither the Act nor Rule 17 gives courts license to impose an entirely new organizational form, domicile, and civil-law roles on the Church after 130 years as an incorporated entity.

### 1. The Act's plain language does not cover an entity that has already incorporated.

When interpreting a Texas statute, the "starting point" of this Court's analysis "is the plain language of the statute." *Transamerica Life Ins. Co. v. Moore*, 105 F.4th 823, 826 (5th Cir. 2024). Here, the Act's plain language shows that it does not create unincorporated associations out of entities, such as the Church, that have already incorporated.

This Court need look only as far as the Act's definition section. The Act applies only to a "nonprofit association" which is "an *unincorporated* organization," created by its "members" by "mutual consent" and "for a common, nonprofit purpose." Tex. Bus. Orgs. § 252.001(2) (emphasis added). Here, no "unincorporated organization" exists. Rather, the Church and its affiliated congregations chose to create an *incorporated* non-profit— LCMS—to accomplish their common purposes.

The Church's governing documents demonstrate that it and its affiliated congregations made a conscious choice to accomplish their shared goals through LCMS's corporate form. As spelled out in its Articles of Incorporation, LCMS exists to allow the Church and its congregations to "unite in a corporate body," to "support the establishment and maintenance of theological seminaries, colleges, universities," and to support "schools, Sunday schools, preaching stations, and agencies of the Synod for the dissemination of the Christian Gospel." ROA.1462. LCMS also has the broad authority to "conduct all such enterprises and endeavors and to exercise such further power as may be necessary or expedient to carry out the objectives" stated in the Church's constitution. ROA.1462. Thus, while "the Synod originally was a voluntary association [when] formed in 1847," it "was incorporated in 1894" and has thus for civil law purposes long been recognized as a corporation under Missouri law. *See Evangelical Lutheran Synod of Mo., Ohio & Other States v. Hoehn*, 196 S.W.2d 134, 138, 140 (Mo. 1946); ROA.3180-81 (1894 Articles of Incorporation stating that "it is desirable that" the "voluntary organization [that] has existed since 1847" "should … be incorporated").

Accordingly, the Church and its affiliated congregations *did* "mutual[ly] consent" to join together for the "common, nonprofit purpose[s]" at issue here—by incorporating LCMS under Missouri law. And they specifically empowered LCMS to handle the Church's civil affairs, including the Church's legal interactions with Concordia. ROA.2228. But the

Church and its congregations did *not* consent to associate as the Synod for such affairs. ROA.2227-28. By its plain terms, then, the Act does not force the Synod into a role that supplants the existing nonprofit corporation created to enforce the Church's civil rights.

### 2. The Act's purpose and history confirm it does not cover an entity that has already incorporated.

The Act's purpose and history confirm its language. The Act codified the model Uniform Unincorporated Nonprofit Association Act (UUNAA) and must "be applied and construed to make uniform the law" of unincorporated associations "among states enacting" UUNAA. Tex. Bus. Orgs. § 252.014; *MT Falkin Invs. v. Chisholm Trail*, 400 S.W.3d 658, 661 (Tex. App.–Austin 2013, pet. denied). UUNAA's commentary is deemed "persuasive authority" to that end. *MT Falkin*, 400 S.W.3d at 661.

"Unincorporated associations long have been a problem for the law." *Cox v. Thee Evergreen Church*, 836 S.W.2d 167, 169 n.3 (Tex. 1992). Unlike corporations, unincorporated associations at common law had no "separate legal … existence apart from their individual members," were "incapable" of "suing or being sued," and could not "hold property." *Id.* at 169. The Act, as part of the larger UUNAA scheme, was expressly meant to fix those problems. UUNAA Prefatory Note at 6-7 (1992), https://perma.cc/VJC7-B95P. It allowed unincorporated nonprofits to exist at law, to enforce their civil rights, and to own property. Tex. Bus. Orgs. § 252.001 *et seq.*

But the Act wasn't meant to displace existing corporate entities that already have those powers. Rather, it is for "informal nonprofit organizations that do not have legal advice and *so may not consider whether to incorporate.*" UUNAA Prefatory Note at 10 (emphasis added); *accord* H. Rsch. Org., Bill Analysis, HB 1661, 74th Leg., Reg. Sess. (Tex. 1995), https://perma.cc/3T5L-3AH6 (the Act helps "small groups" like "local PTAs" that are "unincorporated" and "rarely have the benefit of legal counsel to handle their affairs"). Where an organization has created a corporation to manage its legal affairs, the Act doesn't apply. UUNAA Prefatory Note at 10; *see also* Revised Unif. Unincorporated Nonprofit Ass'n Act (2008), Prefatory Note at 2, https://perma.cc/T7HL-JARN (UUNAA "is not intended to be a substitute for organizing … a nonprofit corporation under state law."); *id.* at § 2 cmt. 11 ("An organization cannot be a nonprofit association if it is organized as a corporation.").

None of these problems are implicated here. The Church incorporated LCMS expressly to carry out those functions, and it has full authority to do so here. ROA.1463 (Articles of Incorporation giving LCMS "power to acquire … property of every kind and description"); ROA.1281 (Bylaw confirming LCMS is a "Missouri nonprofit corporation" that is "subject to civil authority" with the power to sue and be sued); ROA.2083 (confirming independent legal existence). Thus, because the Church expressly chose to incorporate as LCMS, the Act's purposes do not require making the Synod an unincorporated association.

### 3. The district court erred in applying the Act because the Church had already incorporated.

The district court's contrary conclusion was wrong. For starters, it broadly adopted the magistrate judge's recommendation, which did not examine the Act's plain text or purpose at all. ROA.3081-99. Instead, the recommendation simply asserted that "[t]here is no evidence that the Synod is incorporated." ROA.3093. But it is undisputed that the Church *did* incorporate LCMS in 1894 to handle its civil affairs. *Hoehn*, 196 S.W.2d at 138; *see also* ROA.3180-81 (marking incorporation of "voluntary association [that] has existed since 1847"). And the record shows that the Synod is forbidden from independently entering the civil arena, ROA.2227-28, as it would have to as an unincorporated association.

Things get no better from there. In finding that the Synod is the *sole* real party in interest under Rule 17, the district court concluded that the Synod and its affiliated congregations are an unincorporated association under the Act because the Synod is supposedly a jural entity distinct from LCMS. ROA.3308. But that misreads both the Church's polity and the Act. LCMS "is the incorporation of the Synod," ROA.3226, and the Synod is not "a separate civil entity from LCMS" or otherwise "a civil law entity." ROA.1281-82; ROA.2227, 3150-51. In other words, the Church has not "taken explicit steps to grant … jural authority" to the Synod, and therefore it has no "separate legal existence." *Darby*, 939 F.2d at 313.

Nor does it matter that the Church distinguishes "the Synod" from "LCMS," or calls the Synod an "association," in its governing documents. The distinction is spiritual, not legal. ROA.3308-09, 3314-15. And "'unincorporated association' is a term of art—every group that is not a corporation or partnership is not automatically an unincorporated association." *Brown v. Fifth Jud. Dist. Drug Task Force*, 255 F.3d 475, 477 (8th Cir. 2001) (finding task force was "not separate legal entit[y] subject to suit").

A good example of how the analysis should have gone is *Herbert v. Thornton*. There, a plaintiff sued the Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints in state court, and the corporation removed to federal court on diversity grounds. No. 2:12-cv-607, 2014 WL 896795, at *1 (E.D. La. Mar. 6, 2014). Like Concordia here, the plaintiff attempted to add the Church of Jesus Christ of Latter-day Saints as an "unincorporated, nonprofit, religious organization." *Id.* And the plaintiff made the same argument Concordia does here—that the Church was a citizen of every state in which its members reside, and therefore diversity was destroyed. *Id.* at *5. The court rejected that attempt as fraudulent joinder, because the Church was a "spiritual organization without assets, money, or a representative for which it would use during trial." *Id.* at *7.

This case is nearly identical. Yet the district court disregarded *Herbert* solely because the case "did not apply the [Act] and instead applied Louisiana law." ROA.3306. But Louisiana law *is* the UUNAA, and its provisions governing unincorporated associations track the provisions of the Act at issue here. *See* La. Stat. § 12:501(5). And Texas law requires "examining other states' judicial decisions" to effectuate the legislature's goal of "mak[ing] uniform the law of those states that enact" a uniform act. *In re Amberson*, 54 F.4th 240, 253 (5th Cir. 2022).

Instead, the district court relied on three inapplicable cases. The court first cited *Turner v. Church of Jesus Christ of Latter-day Saints*, which found that an unincorporated church was amenable to suit in part because it had engaged in "secular activities" such as participating in lawsuits. No. 3:95-cv-1354, 1996 WL 34447787, at *3 (N.D. Tex. Feb. 22, 1996). But *Turner* never construes or even cites the Act. And the Synod neither sues nor manages "secular activities"; LCMS does. ROA.3150-51.

The court's reliance on *Christi Bay Temple v. GuideOne Specialty Mut. Ins.*, 330 S.W.3d 251 (Tex. 2010)—which also doesn't address the Act—is even further afield. There, a church's insurer tried to claim that the church was actually "a non-profit corporation that had forfeited its charter years earlier and thus lacked capacity to sue." *Id.* at 252. But the church was found to be an unincorporated association precisely because it had always operated as one. *Id.* at 253. So too here—LCMS is a Missouri corporation because it has chosen to operate as one for 130 years.

42

Finally, the court mistakenly relied on *Episcopal Diocese of Fort Worth*. But that case concerned a distinguishable church property dispute, which allowed some review of the church's governing documents to determine which faction truly governed. 602 S.W.3d at 430; *see supra* Section I(A)(2). And, even there, the court construed the Act to *honor* the Diocese's choice to organize as an unincorporated association, 602 S.W.3d at 430 & n.54, which is the opposite of the wholesale judicial reorganization of Church polity here.

### C. The canon of constitutional avoidance confirms that LCMS is the real party in interest.

The canon of constitutional avoidance likewise bars the district court's novel construction and application of the Act.

"When statutory language is susceptible of multiple interpretations," a court should "shun an interpretation that raises serious constitutional doubts" and instead "adopt an alternative that avoids those problems." *Inhance Techs v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024); *see also Paxton v. Longoria*, 646 S.W.3d 532, 539 (Tex. 2022) (courts should "interpret a statute in a manner that avoids constitutional infirmity"). The analysis proceeds in two steps. First, courts must determine whether an interpretation "would give rise to serious constitutional questions" or "present[] a significant risk that the First Amendment will be infringed." *NLRB v. Catholic Bishop,* 440 U.S. 490, 501-02 (1979). If so, a court must then "construe the statute to avoid such [constitutional] problems unless such

construction is plainly contrary to the intent of [the Legislature]." *Hersh v. United States*, 553 F.3d 743, 753-54 (5th Cir. 2008).

*Catholic Bishop* applies this analysis in the church autonomy context. There, the Supreme Court considered whether Congress gave the NLRB jurisdiction over lay faculty members at Catholic schools. 440 U.S. at 491. Because the Religion Clauses could be violated by "the very process of inquiry" into charges of unfair labor practices against religious schools, the Court concluded that "serious First Amendment questions" would follow from finding jurisdiction. *Id.* at 502, 504. Thus, the Court held that the statute should be interpreted to avoid that result unless there was "clear expression of an affirmative intention of Congress" to require it. *Id.* at 504. Finding no express intent, the Court construed the statute not to grant the NLRB jurisdiction. *Id.* at 504-07.

The constitutional threat is far more severe here than in *Catholic Bishop*. There, even evaluating how often lay teachers had to attend mass was too intrusive. *Id.* at 502 n.10, 507-08. Here, the district court not only subjected the Church's 130-year-old polity to invasive examination, it rejected the Church's detailed explanation of that polity. Yet the lengths *Catholic Bishop* took to avoid constitutional conflict—broadly depriving the NLRB of jurisdiction over religious schools—were far more extensive than necessary here. This Court need only recognize that LCMS is a Missouri non-profit corporation which represents the Church's civil-law interests here, as LCMS has done for over a century.

44

The district court did not address LCMS's constitutional avoidance argument. *See* ROA.3131-32. The court's construction of the Act creates serious constitutional concerns. And far from clearly supporting that construction, the Act's plain text and express purpose reject it. *See supra* Section I(B)(1)-(2). Accordingly, this Court should reverse.

### D. Texas RFRA confirms that LCMS is the real party in interest.

The district court's construction of the Act likewise violates the Texas Religious Freedom Restoration Act and must be avoided.

Texas RFRA provides that the government may not "substantially burden a person's free exercise of religion" without showing the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that interest." *Merced v. Kasson*, 577 F.3d 578, 587 (5th Cir. 2009). Texas RFRA applies broadly across all Texas law, and other provisions, like the Act, must be interpreted to avoid conflict with the statute's requirements where possible. *See* Tex. Civ. Prac. & Rem. § 110.002(c). Thus, like its federal counterpart, Texas RFRA "operates as a kind of super statute, displacing the normal operation of other … laws." *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020); *Barr v. City of Sinton*, 295 S.W.3d 287, 296 (Tex. 2009) (construing TRFRA based on RFRA precedent).

Construing the Act to outlaw the Church's polity in Texas substantially burdens its sincere religious beliefs. Polity choices are fundamentally matters of religious belief, and civil interference in "disputes over church polity" necessarily "inhibit[s] the free development of religious doctrine." *Milivojevich*, 426 U.S. at 710. Here, the Church implemented its "two kingdoms" doctrine by incorporating LCMS to represent its civil affairs while maintaining its separate ecclesial Synod subject to only spiritual authority. ROA.3148 ; ROA.1281-82. The district court's ruling nullifies that religious exercise in Texas.

Nor is there any "specific evidence" of a compelling government interest justifying that burden. *Merced*, 577 F.3d at 592. Even in the abstract, it is hard to conceive of a legitimate, much less compelling, governmental interest in confounding church polity as the district court did. If civil courts "violate the First Amendment" by "*prob*[*ing*]" too deeply into matters of "church polity," *Milivojevich*, 426 U.S. at 709 (emphasis added), then they can hardly have an interest in *prohibiting* the Church's polity.

That becomes even clearer at a practical level. The Church incorporated LCMS specifically to be its representative in civil disputes like this one. And it agrees that LCMS is the proper party to be named in Concordia's cross-claims in this litigation, fully capable of providing appropriate civil relief. ROA.3150; *see also* Hr'g on Mot. to Stay Tr. at 57:2-7, *supra*, https://perma.cc/LN28-8XE6. LCMS fully possesses and represents the legal rights and duties of the Church, ROA.2227-28, while the Synod has

no bank accounts, property, or authority to appear in civil court, ROA.2228, 3226. *See Herbert*, 2014 WL 896795, at *7 ("spiritual organization without assets, money, or a representative for which it would use during trial" not capable of being sued). The Church is not attempting to evade liability through its polity. To the contrary, the religious burden here serves no practical purpose other than letting Concordia evade a federal forum. Forum shopping isn't a compelling interest.

Even if there *were* legitimate interests at stake, disregarding the Church's polity isn't the least restrictive means of addressing them. Most obviously, the court could have employed the standard Rule 17 remedy of shaping the judgment to hold LCMS to its word that it fully represents the Church's interests here. *Supra* Section I(A)(2); *Merced*, 577 F.3d at 595 (for purposes of identifying less restrictive means, even "one will do"). That would not only have respected Texas RFRA, the First Amendment, and Rule 17, but it would also have addressed any legitimate concerns Concordia may have had. Dismissal did the opposite.

The district court's application of the Act, which failed to address this argument, ROA.3143-44, violates Texas RFRA and must be rejected.

## E. The Full Faith and Credit Clause's internal affairs doctrine confirms that LCMS is the real party in interest.

The district court's application of the Act is also inconsistent with the Full Faith and Credit Clause's internal affairs doctrine.

Texas follows the "internal affairs doctrine." *Hollis v. Hill*, 232 F.3d 460, 464-65 (5th Cir. 2000). This doctrine "is a conflict of laws principle" recognizing "that only one State should have the authority to regulate a corporation's internal affairs" to avoid "conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982). Texas law provides that "the law of the state or other jurisdiction in which" a foreign corporation is incorporated "governs the formation and internal affairs of the entity." Tex. Bus. Orgs. § 1.102. Those internal affairs include "the rights, powers, and duties of its governing authority, governing persons, officers, owners, and members" and "matters relating to its membership or ownership interests." *Id.* at § 1.105.

This rule is rooted in the Full Faith and Credit Clause. That clause "requires controlling effect to be given to the law of the state of incorporation in interpreting" and applying a corporation's "constitution and by-laws." *Ord. of United Com. Travelers of Am. v. Wolfe*, 331 U.S. 586, 614 (1947). The internal affairs doctrine is more than a conflict of laws principle—it's "also one of serious constitutional proportions—under due process, the commerce clause and the full faith and credit clause." *McDermott Inc. v. Lewis*, 531 A.2d 206, 216 (Del. 1987); *see also De La Rosa v. Reliable, Inc.*, 113 F. Supp. 3d 1135, 1177 (D.N.M. 2015) (Full Faith and Credit Clause mandates internal affairs doctrine).

LCMS is incorporated under Missouri law, meaning Missouri law governs its internal affairs. And as already noted, the Missouri Supreme

Court has recognized that LCMS's incorporation *transformed* the Church's legal form from an unincorporated association into a corporate entity. *See Hoehn*, 196 S.W.2d at 138; ROA.3180-81. Further, under Missouri law, "[t]he bylaws of a not-for-profit corporation may contain any provision … which is not inconsistent with law or the corporation's articles of incorporation." *Boatmen's First Nat'l Bank v. S. Mo. Dist. Council of the Assemblies of God*, 806 S.W.2d 706, 713 (Mo. Ct. App. 1991). This includes provisions that remove aspects of a church's polity from civil adjudication because they make clear that governance decisions are matters of religious doctrine. *See Rolfe v. Parker*, 968 S.W.2d 178, 181 & n.4, 184 (Mo. Ct. App. 1998) (courts cannot review dispute over duly elected officers of "governing body" when Church authority made it an "ecclesiastical decision"). LCMS's Bylaws explain that the Synod "is not a civil law entity," and that LCMS is a jural entity that handles the Church's civil affairs. ROA.1282. This must be given effect under Missouri law.

The district court's explanation for avoiding Missouri law was that Rule 17(b) requires that "the law of the state in which the district court is held" determines an unincorporated association's capacity. ROA.3309. But that reasoning skips a step in the analysis. Texas law requires looking to Missouri law to determine if an unincorporated association *exists*. *See D&T Partners v. Baymark Partners*, No. 3:21-cv-1171, 2022 WL 1778393, at *3 (N.D. Tex. June 1, 2022) (Texas law requires looking to law of state of formation "to determine [an entity's] existence."). While

Rule 17(b) "permits courts to imbue unincorporated associations … with the capacity to sue" in certain instances, that "power does not extend to entities that lack legal existence." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 382 (2d Cir. 2021).

In sum, LCMS is a real party in interest under Rule 17. And the Synod cannot be the real party in interest because it does not exist as a separate jural entity under either the First Amendment or state law.

## II. There is no required or indispensable party that must be joined alongside LCMS under Rule 19.

Even if the Synod were a real party in interest, it is not either a "required" or "indispensable" party under Rule 19. The district court accordingly abused its discretion in dismissing the case for failure to join an indispensable party. ROA.3320.

Rule 19 governs whether another party must be joined to LCMS's suit. The rule's "two-step inquiry" focuses on "pragmatic concerns," particularly "the effect on the parties and on the litigation." *PHH Mortg.,* 80 F.4th at 560. The first step asks whether a missing party is even "required" in the case. *Moss*, 913 F.3d at 515. And, second, if a party is "required" but "cannot be joined without destroying subject-matter jurisdiction," the court must determine whether that party is truly "indispensable." *PHH Mortg.*, 80 F.4th at 560.

Both steps must be completed before dismissal is appropriate. *Id.* at 563. Here, neither were.

## A. There is no required party under Rule 19(a).

Rule 19(a) identifies two ways to conclude that a party is "required." The first is if, without that party, "the court cannot accord complete relief among existing parties." Fed.R.Civ.P. 19(a)(1). But here, the court can provide complete relief between LCMS and Concordia. LCMS seeks a declaratory judgment recognizing that Concordia had no authority to remove the university from the Church's governance, or alternatively, damages for Concordia's breaches. ROA.1255-57. LCMS thus seeks relief from Concordia alone. Further, LCMS is the only party able to seek this relief, because the Synod cannot initiate litigation or hold property or money. ROA.2228; ROA.3150-51.

By much the same token, LCMS is the only party against whom Concordia could obtain appropriate relief for its counter-claims. Joining the Synod is not only improper; it is superfluous.

That leaves the second path, which ends in the same place. A missing party may be "required" if it "claims an interest" in the action and excluding the party may "as a practical matter" impair or impede its "ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed.R.Civ.P. 19(a)(1). But here, there are no additional parties who "claim[] an interest" in the action. As explained, the Synod has not claimed any interest for itself in the "subject of the action." *Rajet Aeroservicios v. Castillo Cervantes*, 801 F. App'x 239, 246-47 (5th Cir. 2020).

51

Further, the Church is committed to "rely[ing] on the efforts" of LCMS, and there is thus no "substantial risk" of Concordia "incurring double liability" based on multiple lawsuits. *See Smith v. State Farm Fire & Cas. Co.*, 633 F.2d 401, 405 (5th Cir. 1980). The Synod is not "required."

**B. There is no indispensable party under Rule 19(b).**

But even if the Synod *were* "required," it is not "indispensable" under Rule 19(b) because "equity and good conscience" do not require joining it. Fed.R.Civ.P. 19(b). To rule otherwise, the district court must have determined whether: (1) judgment without the Synod "might prejudice" the Synod "or the existing parties"; (2) "prejudice could be lessened" by measures like "protective provisions in the judgment"; (3) judgment without the Synod "would be adequate"; and (4) LCMS "would have an adequate remedy if the action were dismissed." *Id.* The district court made none of those findings, and Concordia can't meet its burden to show them. *HS Res. v. Wingate*, 327 F.3d 432, 439 (5th Cir. 2003).

First, Concordia cannot show harm to the Synod's interests, since those interests are "fully represented by" and "d[o] not diverge from the interests" of LCMS. *Moss*, 913 F.3d at 519; *see also HB Gen.*, 95 F.3d at 1193 (absent party not indispensable where "interests will be effectively advanced" by existing parties). Similarly, Concordia is not prejudiced because the Synod cannot sue or be sued in civil court, alleviating any concern of duplicative litigation. *See supra* Section I(A)(2). Further, even if there were a "threat of piecemeal, inconsistent litigation of claims and

issues," that concern would be "insufficiently prejudicial" to outweigh the First Amendment rights at stake. *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 394 (5th Cir. 2006) (interests in favor of arbitration trump joinder); *Moss*, 913 F.3d at 518 n.46, 519 (Rule 19(b) balancing is "context-sensitive" and factors in "unique relationship[s]" between the parties).

Second, the court could easily shape relief to obviate any legitimate concerns. Given the Church's binding position that the Synod can't sue, the court could simply bar any other forms of duplicative suits, such as making clear that LCMS may not bring a future suit against Concordia on the Synod's behalf. *See Moss*, 913 F.3d at 519.

Third, the parties' remedies would be adequate without joining the Synod. LCMS can receive the declaration and damages it seeks from Concordia, and Concordia can receive appropriate relief from LCMS.

Fourth, LCMS would not have an adequate remedy if the suit were dismissed. In addition to that the Synod is not a jural entity and cannot sue in any venue, the district court's order closes the doors to federal court to the Church in *any* state in which it has affiliated congregations—which is every state. *See Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1312 (5th Cir. 1986) (considering party's "interest in the federal forum").

## C. The district court erred in finding that there was a required and indispensable party that must be joined.

The district court determined that "(1) the Synod is an indispensable party that must be joined," and that "(2) the Synod's joinder as a Texas

entity defeats this Court's diversity jurisdiction." ROA.3320. But instead of performing the required Rule 19 analysis, the district court relied on Rule 17(a) in concluding the Synod was indispensable. *See* ROA.3315 (ruling the Synod was "an indispensable party for Rule 17(a) purposes").

That was reversible error. "[T]he question of who should or may be joined in the action *must* be determined under Rule 19 … rather than Rule 17(a)." *Moss*, 913 F.3d at 520 (emphasis added). "The fact that an absent person could bring the action as a real party in interest does not of itself make that person a necessary or indispensable party." *Id.*

Further, nowhere did the district court factor into the analysis that LCMS provided binding assurances rooted in its polity and longstanding ecclesiastical tradition that Synod was unnecessary. *See PHH Mortg.,* 80 F.4th at 563 (failure to consider such factors is an "abuse of discretion"). Thus, the district court's ruling misses the key Rule 19 considerations: the pragmatic effect on the parties and the litigation. *Id.* at 561. Here, catering to Concordia's forum preference came at an unconstitutionally high price. Under the ruling below, LCMS can't enforce the Church's rights in civil court; under 130 years of Church polity, neither can the Synod. Thus, the ruling broadly deprives the Church of its ability to vindicate its civil rights. That unjust result was an error of law.

## CONCLUSION

The Court should reverse the judgment.

Respectfully submitted,

Dated:    April 28, 2025

STEVEN C. LEVATINO
LEVATINO│PACE, L.L.P.
1101 S. Capital of Texas Hwy.
Bldg. K, Suite 125
Austin, TX 78746

ANDREW F. MACRAE
MACRAE LAW FIRM, P.L.L.C.
3267 Bee Cave Road
Suite 107, PMB 276
Austin, TX 78746

*/s/ Daniel H. Blomberg*
DANIEL H. BLOMBERG
ANDREA R. BUTLER
ROBERT K ELLIS
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006

WALLACE B. JEFFERSON
KEVIN H. DUBOSE
ALEXANDER DUBOSE &
  JEFFERSON, L.L.P.
1844 Harvard Street
Houston, TX 77008

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I certify that on April 28, 2025, I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and will be served by the court's electronic filing system.

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,783 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg

Dated:   April 28, 2025