No. 25-50130

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

THE LUTHERAN CHURCH–MISSOURI SYNOD,
a Missouri nonprofit corporation,

*Plaintiff-Appellant*,

v.

DONALD CHRISTIAN, CHRISTOPHER BANNWOLF; JOHN DOES 1–12,
CONCORDIA UNIVERSITY TEXAS INCORPORATED,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the
Western District of Texas, No. 1:23-cv-1042 (Ezra, J.)

## BRIEF FOR *AMICI CURIAE* RELIGIOUS LIBERTY SCHOLARS
## SUPPORTING APPELLANT AND REVERSAL

Kurt A. Johnson
JONES DAY
150 West Jefferson, Suite 2100
Detroit, MI  48226
(313) 733-3939
kajohnson@jonesday.com

Ethan D. Beck
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 879-3939
ebeck@jonesday.com

Brandon L. Winchel
 *Counsel of Record*
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA  92612
(949) 851-3939
bwinchel@jonesday.com

*Counsel for* Amici Curiae *Religious
Liberty Scholars*

**SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES**

Counsel of record certifies under Fifth Circuit Rule 29.2 that the following listed persons and entities, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case.

| _Amici_[1] | Counsel for _Amici_ |
|---|---|
| Elizabeth A. Clark<br>   Professor of Law<br>   J. Reuben Clark Law School at Brigham Young University<br>   Associate Director, BYU International Center for Law and Religion Studies | Brandon L. Winchel<br>Kurt A. Johnson<br>Ethan D. Beck |
| Robert J. Pushaw, Jr.<br>   James Wilson Endowed Professor of Law<br>   Pepperdine Caruso School of Law | |

May 5, 2025

/s/ Brandon L. Winchel
Brandon L. Winchel
_Counsel for_ Amici Curiae

---

[1] The affiliated academic institutions are included for identification purposes only; these institutions take no position concerning this matter.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES..........................i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST OF AMICI CURIAE.............................1

INTRODUCTION ...............................................................................2

ARGUMENT ......................................................................................2

    I.     The First Amendment's Religion Clauses Protect Church Polity Decisions From Interference By Secular Authorities .........................2

          A.     Structure, Governance, and Polity are Part of Religious Exercise ................................................................................3

          B.     The First Amendment's Religion Clauses Broadly Protect a Religious Organization's Structure, Governance, and Polity Determinations ...................................6

    II.     The District Court's Decision Violates The Lutheran Church–Missouri Synod's Autonomy To Define Its Polity In Accord With Its Sincere Religious Beliefs .....................................16

          A.     The Religion Clauses Protect the Lutheran Church–Missouri Synod's Sincere Articulation of its Chosen Polity .....................................................................17

          B.     The District Court Disregarded the Synod's Sincere Articulation of its Polity, Violating the First Amendment ......19

    III.    Decisions Like The District Court's Threaten The Religious Liberty Of All Americans .................................................23

CONCLUSION.................................................................................26

CERTIFICATE OF COMPLIANCE....................................................27

CERTIFICATE OF SERVICE .............................................................28

# TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

*Am. C.L. Union of Ohio v. Capitol Square Rev. & Advisory Bd.*,
   243 F.3d 289 (6th Cir. 2001) .......................................................................11, 12

*Bryce v. Episcopal Church in the Diocese of Colo.*,
   289 F.3d 648 (10th Cir. 2002) .....................................................................12, 15

*Church of Jesus Christ of Latter–Day Saints v. Amos*,
   483 U.S. 327 (1987)..........................................................................................25

*Demkovich v. St. Andrew the Apostle Par., Calumet City*,
   3 F.4th 968 (7th Cir. 2021) (en banc) ..............................................................15

*Donatelli v. Nat'l Hockey League*,
   893 F.2d 459 (1st Cir. 1990)............................................................................24

*EEOC v. Cath. Univ. of Am.*,
   83 F.3d 455 (D.C. Cir. 1996)...........................................................................12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012)....................................................................................*passim*

*Hummel v. Townsend*,
   883 F.2d 367 (5th Cir. 1989) ...........................................................................23

*Huntsman v. Corp. of the President of the Church of Jesus Christ*
   *of Latter–Day Saints*,
   127 F.4th 784 (9th Cir. 2025) (en banc) .....................................................*passim*

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox*
   *Church in N. Am.*,
   344 U.S. 94 (1952)..............................................................................13, 14, 21

iii

*Larson v. Valente,*
    456 U.S. 228 (1982)..................................................................................25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    591 U.S. 732 (2020)...........................................................................*passim*

*Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich,*
    426 U.S. 696 (1976).........................................................................*passim*

*Simpson v. Wells Lamont Corp.,*
    494 F.2d 490 (5th Cir. 1974) ...............................................................22

*Watson v. Jones,*
    80 U.S. (13 Wall.) 679 (1872) .............................................................12

**STATUTES**

28 U.S.C. § 1332(a) ................................................................................23

28 U.S.C. § 1391(b) ...............................................................................24

**OTHER AUTHORITIES**

Asma Afsaruddin, *Shari'a and Fiqh in the United States,*
    *in* Oxford Handbook of American Islam (2014) ...................................4

*Belgic Confession* (1561)..........................................................................3

*Baptist Faith & Message 2000,* Southern Baptist Convention..................4

Carl H. Esbeck, *Church Autonomy, Textualism, and Originalism:*
    *SCOTUS's Use of History to Give Definition to Church Autonomy*
    *Doctrine,*
    108 Marquette L. Rev. (forthcoming 2025) .........................7, 9, 10, 11

*Codex Iuris Cononici* (1983) ....................................................................4

*Doctrinal Positions of the LCMS,* Lutheran Church–Missouri Synod
    (1932)...............................................................................................5, 19

iv

Eleanor Nesbitt, *Sikhism and the Third Millennium*,
*in* Sikhism: A Very Short Introduction (2d. ed. 2016) ..........................................4

*Fatwa No. 1670, Religious Hierachy in Islam*, Assembly of Muslim
Jurists of America (Aug. 6, 2006) ..........................................................4

Hermann Sasse, *The Social Doctrine of the Augsburg Confessions and
its Significance for the Present* (1930),
*in* 1 The Lonely Way 1927–1939 (2001) ......................................5, 18

*History*, Lutheran Church–Missouri Synod .......................................................17

*Lumen Gentium*, Second Vatican Ecumenical Council (1964) .................................3

Michael W. McConnell, *Establishment and Disestablishment at the
Founding, Part I: Establishment of Religion*,
44 Wm. & Mary L. Rev. 2105 (2003) ...........................................8, 9

Michael W. McConnell, *Reflections on* Hosanna-Tabor,
35 Harv. J.L. & Pub. Pol'y 821 (2012) .............................................7

*Organization*, Encyclopedia Britannica (Mar. 15, 2025) ........................................5

*Rosters and Statistics*, Lutheran Church–Missouri Synod
(Nov. 2018) ............................................................................17

*Smalcald Articles* (1537) .......................................................................3

Thomas C. Berg et. al., *Religious Freedom, Church-State Separation,
and the Ministerial Exception*,
106 Nw. U.L. Rev. ...........................................................10, 11

*Westminster Confession of Faith* (1647) ........................................................3

### STATEMENT OF INTEREST OF AMICI CURIAE[2]

*Amici* are constitutional law scholars who research, write, and teach at well-respected U.S. law schools on the Constitution's protection of religious liberty. *Amici* submit this brief to address the important constitutional considerations in this case, and to urge this Court to uphold core protections for religious liberty threatened by the district court's ruling. *Amici*'s full titles and institutional affiliations (listed for identification purposes only) are listed in the supplemental statement of interested parties.

---

[2] All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part. No person other than *amici curiae* or its counsel contributed money for this brief.

**INTRODUCTION**

The First Amendment's Religion Clauses prohibit the government from interfering with the internal affairs of a church or other religious organization. This right to be free from interference includes the right of a church to determine its governance structure, or polity, in line with its religious convictions. Accordingly, when a church's highest authority sincerely articulates its polity, civil authorities may not second guess the church's polity without violating the Religion Clauses.

Nevertheless, that is precisely what the district court did in this case. It rejected the Lutheran Church–Missouri Synod's chosen polity—consistently expressed for more than 100 years—in favor of the court's own, newly minted concept of church governance. That ruling violates the First Amendment. If sustained, it will lead to numerous practical harms to religious organizations far beyond the Lutheran Church–Missouri Synod.

This Court should reverse the district court's judgment.

**ARGUMENT**

**I. The First Amendment's Religion Clauses Protect Church Polity Decisions From Interference By Secular Authorities.**

A religious organization's determination about how it should be structured is itself an exercise of religion—often rooted in the unique doctrines or practices of the religious organization. The First Amendment's Religion Clauses, understood in the context of America's early history and later judicial precedent, safeguard the right

of a religious organization to make this determination free from government interference.

### A.   Structure, Governance, and Polity are Part of Religious Exercise.

A religious organization's ability to structure and govern itself is fundamental to its religious exercise.  Decisions on how a church organizes, makes decisions, selects leaders, determines members, stands in relation to the state, and relates both to peer congregations and other religious groups, all raise significant questions of religious belief and practice.

Reflecting that reality, matters of polity are prominent in many Christian statements of religious teaching.  *See, e.g.*, *Smalcald Articles* (1537), https://tinyurl.com/3tz4bpk9 (describing Lutheran views on the church); *Belgic Confession* (1561), https://tinyurl.com/5fufrhyf (describing how the "true church ought to be governed," offices of the church, and the election of officers); *Westminster Confession of Faith* (1647), https://tinyurl.com/2yhhyetu (explaining the nature of the church and the role of synods and councils); Second Vatican Ecumenical Council, *Lumen Gentium*, ch. III, ¶ 22 (1964), https://tinyurl.com/2hbd7hnr ("Just as . . . St. Peter and the other apostles constitute one apostolic college, so in a similar way the Roman Pontiff, the successor of Peter, and the bishops, the successors of the apostles, are joined together.").  As illustrated in these teachings, a church's governance structure is an integral aspect of its religious exercise, no less significant than other spiritual matters.

Unsurprisingly then, just as different Christian denominations hold varying views on questions like the role of baptism or what constitutes a proper liturgy, so too do they vary in their views of polity. In the Roman Catholic tradition, for example, Jesus appointed Peter as the first Pope. *See Matthew* 16:18. And each Pope, as the successor of Peter, "possesses power over the universal Church" and "all particular churches and groups of them." *Codex Iuris Canonici* (Code of Canon Law), 1983 CIC c.333, https://tinyurl.com/bdcj5s9f. In contrast, Baptist denominations generally teach that a local church "operates under the Lordship of Christ through democratic processes" and is "autonomous" from any other church. *Baptist Faith & Message 2000*, Southern Baptist Convention, https://bfm.sbc.net/bfm2000/#vi. Each local church is led by elders and deacons selected by the congregation according to scriptural qualifications. *See 1 Timothy* 3:1–13 (qualifications for elders and deacons).[3]

As most relevant here, the "polity of the Lutheran churches" in America

---

[3] Beyond Christianity, other faith traditions also have varying structures specific to their beliefs and practices. *See, e.g.*, Asma Afsaruddin, *Shari'a and Fiqh in the United States*, *in* The Oxford Handbook of American Islam 174, 177 (2014), https://tinyurl.com/yau2wrv6 ("[I]n Sunni Islam," "there is no centralized religious hierarchy"); Fatwa No. 1670, "Religious Hierarchy in Islam," *Assembly of Muslim Jurists of America* (Aug. 6, 2006), https://tinyurl.com/4bazmm6s ("[T]here is no hierarchy" among "the 'clergy,'" and "clergy . . . are accountable and answerable to their congregation."); Eleanor Nesbitt, *Sikhism and the Third Millennium*, *in* Sikhism: A Very Short Introduction 120, 134 (2d ed. 2016), https://tinyurl.com/yhmkze6p (noting in Sikhism, "there is no tidy, centralized hierarchy" and "the authority of certain bodies is strongly contested").

generally takes "a complex form," with individual congregations exercising primary authority over their own affairs, while "yield[ing] some authority to synods on regional and national levels." *Organization*, Encyclopedia Britannica (Mar. 15, 2025), https://tinyurl.com/3ndwssa6. Consistent with this general form, the Lutheran Church–Missouri Synod is "not an ecclesiastical government exercising legislative or coercive powers" over its members, "and with respect to the individual congregation's right of self-government it is but an advisory body." ROA.1273. This composite structure reflects Lutheran theology: While scripture refers to "one Church, which embraces the believers of all places," it also speaks "of churches in the plural, that is, of local churches." *Doctrinal Positions of the LCMS* at 7, Lutheran Church–Missouri Synod (1932), https://tinyurl.com/5bu5vtpn.

Lutheran theology also influences Lutheran polity when it comes to relations with the state. Ascribing to the theology of "two kingdoms," Lutherans generally hold that God has ordained both an "office of secular government" embodied in "the state," alongside "the spiritual office" of "the church," with each "delimited from the other." Hermann Sasse, *The Social Doctrine of the Augsburg Confessions and its Significance for the Present* at 4–5 (1930), *in 1 The Lonely Way* 1927–1939 (2001), https://tinyurl.com/ym9vfuem. While the two kingdoms are distinct, Lutherans believe that Christians are called to engage both the secular and spiritual. *See id.* at 5–6.

Given this particular belief, and critical to this case, the Lutheran Church–
Missouri Synod (the "Church") exists as both an ecclesial and civil entity. More
specifically, the Church's ecclesial body (the "Synod") created the Church's civil
corporation ("LCMS") in 1894 "as a civil law reflection of its ecclesiastical
denomination." ROA.2227. On the one hand, the Synod "is the church body or
religious denomination in which self-governed Lutheran congregations . . .
voluntarily profess and seek to maintain and live out a common faith," ROA.2228,
and is "not a civil law entity," ROA.1282, 2228. On the other hand, LCMS is the
civil law embodiment of the Synod, created "to carry out [the Synod's] secular
functions" "before the law in the civil realm." ROA.2227–29. LCMS is thus how
the Synod's member congregations have chosen to "represent themselves before the
state." ROA.2228. Through the Synod and LCMS, the Church engages in both the
spiritual and secular kingdoms.

**B.  The First Amendment's Religion Clauses Broadly Protect a Religious
Organization's Structure, Governance, and Polity Determinations.**

The First Amendment provides that "Congress shall make no law respecting
an establishment of religion, or prohibiting the free exercise thereof." U.S. Const.
amend. I. These Religion Clauses provide robust protections for religious liberty,
including for "the right of religious institutions 'to decide for themselves, free from
state interference, matters of church government as well as those of faith and
doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737,

(2020).  That protection, commonly referred to as the church autonomy doctrine, flows from "both of the Religion Clauses in the First Amendment."  Carl H. Esbeck, *Church Autonomy, Textualism, and Originalism: SCOTUS's Use of History to Give Definition to Church Autonomy Doctrine*, 108 Marquette L. Rev. (manuscript at 8, forthcoming 2025), https://ssrn.com/abstract=5099688.  While state "interference" in matters of church polity "would obviously violate the free exercise of religion," "any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion."  *Our Lady*, 591 U.S. at 746; *accord Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 185–89 (2012).  Both the historical context of America's founding and later judicial precedents affirm as much.  Take each in turn.

**1.**  The "'background' against which 'the First Amendment was adopted'" readily confirms that the First Amendment prevents government interference with matters of church polity.  *Our Lady*, 591 U.S. at 748; *accord* Michael W. McConnell, *Reflections on* Hosanna-Tabor, 35 Harv. J.L. & Pub. Pol'y 821, 827 (2012).

Chief among historical examples, "the rejection . . . of the Church of England as a federal model for church-government relations" during America's founding illuminates the First Amendment's church autonomy protections.  Esbeck, *supra*, at 35; *see Hosanna-Tabor*, 565 U.S. at 182–85 (discussing the founding generation's aim "to foreclose the possibility of a national church"); *Huntsman v. Corp. of the*

*President of the Church of Jesus Christ of Latter–Day Saints*, 127 F.4th 784, 804–09 (9th Cir. 2025) (en banc) (Bumatay, J., concurring in the judgment) (same).  In 1215, King John signed the Magna Carta, agreeing that "the English church shall be free, and shall have its rights undiminished and its liberties unimpaired."  Magna Carta App. IV, p. 317, cl. 1 (J. Holt ed. 1965).  That freedom did not endure. *Hosanna-Tabor*, 565 U.S. at 182.  Henry VIII signed the Act of Supremacy in 1534, which consolidated the Crown's power as the head of the Church of England.  *Id.*; Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2112–13 (2003).  The Act in Restraint of Annates, enacted the same year, also gave the Crown "the authority to appoint the Church's high officials." *Hosanna-Tabor*, 565 U.S. at 182. Later enactments—including the Articles of Faith (setting forth "the doctrinal tenets of the Church, and the Book of Common Prayer, which prescribed the liturgy for worship") and the Acts of Uniformity (requiring minister conformity with the Articles of Faith and "making the Church of England the sole institution for lawful public worship")—further entrenched state control over religious affairs. McConnell, 44 Wm. & Mary L. Rev. at 2112–14.

Given this history, "the American colonies inherited two conflicting views" of church-state relations. *Huntsman*, 127 F.4th at 805 (Bumatay, J., concurring in the judgment).  Southern colonists, for their part, "brought the Church of England

with them." *Hosanna-Tabor*, 565 U.S. at 183. Indeed, laws that "controlled the selection of religious personnel, dictated the content of religious teaching and worship, vested certain civil functions in church officials, and imposed sanctions for the public exercise of religion outside of the established church" provided a "model throughout the South." McConnell, 44 Wm. & Mary L. Rev. at 2119. In comparison, the New England colonies, "broke from the established Church of England and substituted a localized establishment based on the religious convictions of majorities in the various towns." *Id.* at 2121. And while the New England colonies initially "attempted to maintain religious homogeneity by banishing or punishing dissenters," this policy "gradually eased over the course of the eighteenth century" as religious tolerance gained traction. *Id.* at 2123–24.

"It was against this background that the First Amendment was adopted." *Hosanna-Tabor*, 565 U.S. at 183. In particular, the American Revolution "shifted church-state relations closer to the New England approach," in which authoritarian notions of religion were deemed "at odds with the growing American ethos of liberty." *Huntsman*, 127 F.4th at 806 (Bumatay, J., concurring in the judgment). The American Revolution thus "brought not only a change in political regime but [also] a change in the government's relationship to the institutional churches," which "required that the continental (later federal) government eschew involvement with the internal operations" of churches. Esbeck, *supra*, at 37–38.

The years following independence (even before the ratification of the First Amendment) are replete with events confirming "that the new American government didn't possess authority over religious matters," including matters of church polity. *Huntsman*, 127 F.4th at 806 (Bumatay, J., concurring in the judgment). For example, in 1783, American clergy petitioned the Pope to appoint Rev. John Lewis as "both Superior and Bishop over Catholics in the American states." Esbeck, *supra*, at 39. But the Papal Nuncio in Paris, seeking to undermine the influence of the Vatican and to control any bishop in America, petitioned Congress for authority to appoint a Catholic bishop in America. *Id.* at 40; *see* Thomas C. Berg et. al., *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 Nw. U.L. Rev. Colloquy 175, 181 (2011). Benjamin Franklin saw the request as "absolutely useless" because Congress "can not . . . intervene in the ecclesiastical affairs of any sect." Berg et al., *supra*, at 181. Congress agreed, explaining that "it had 'no authority to permit or refuse' the appointment, and the Pope could appoint whomever he wished because 'the subject . . . being purely spiritual . . . is without the jurisdiction and powers of Congress.'" *Id.* As this incident illustrates, "ecclesiastical polity disputes were outside the authority of the confederation government." Esbeck, *supra*, at 41.

As another example, following the Louisiana Purchase, federal officials in the Orleans Territory closed a Catholic parish church "in response to a conflict between

two priests concerning who was the rightful leader of the congregation." *Id.* at 45. When President Thomas Jefferson learned of what unfolded, he wrote that it "was an error in our officer to shut the doors of the church," as "priests must settle their difference in their own way" without governmental interference in church polity, and that "church-discipline" is "never to be enforced by the public authority." *Id.*

Shortly thereafter, President Jefferson, in another example, once again affirmed the freedom of churches in matters of governance. In response to a letter from a mother superior expressing concerns about whether the Louisiana Purchase would undermine her convent's title to real estate, Jefferson assuaged her fears. *Id.* at 47. But he went further, assuring the convent of its right of self-governance:

> [T]he principles of the constitution . . . are a sure guaranty to you that [your property] will be preserved to you sacred and inviolate, and that your institution will be permitted to govern itself according to it's [*sic*] own voluntary rules, without interference from the civil authority.

*Id.* (alterations in original).

James Madison also reaffirmed the importance of church autonomy in polity matters when, as President, he vetoed an act to incorporate an Episcopal church in the District of Columbia. *Id.* at 50–51; *Am. C.L. Union of Ohio v. Capitol Square Rev. & Advisory Bd.*, 243 F.3d 289, 294 (6th Cir. 2001). In his message to Congress, Madison stated the statute would violate the First Amendment insofar as it "establishes by law, sundry rules and proceedings relative purely to the organization and polity of the church incorporated, and comprehending even the election and

removal of the Minister." *Am. C.L. Union of Ohio*, 243 F.3d at 294.

The bottom line is that the historical context of America's founding leaves no doubt that the First Amendment's Religion Clauses protect church polity decisions.

**2.** Judicial precedent confirms this historic understanding. A "long line of Supreme Court cases . . . affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 462 (D.C. Cir. 1996); *see Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655–56 (10th Cir. 2002) (recounting history of church autonomy decisions).

The Supreme Court first applied church autonomy principles in *Watson v. Jones*. A bitter dispute between antislavery and proslavery factions within a Presbyterian church splintered the church "into two distinct bodies," with "each claiming to be the true Walnut Street Presbyterian Church." 80 U.S. (13 Wall.) 679, 717 (1872). The Presbyterian Church's highest national decision-making authority recognized the antislavery faction as the authorized church. The nation's highest court declined to disturb that decision, holding that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them." *Id.* at 727. Indeed, where the "subject-matter of dispute[s]" concerns "ecclesiastical

government," the Court reasoned that civil tribunals have "no jurisdiction" to resolve such "purely ecclesiastical" matters. *Id.* at 733. To do so would "exceed[] the powers conferred upon [courts]," as it would require "civil courts . . . to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination," which would "deprive these bodies of the right of construing their own church laws." *Id.*

Over 80 years later, the Court expounded on these principles in *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*. At issue was whether Russian Orthodox churches in North America could occupy St. Nicholas Cathedral in New York. The right to use the Cathedral, in turn, depended on whether that right was held by an archbishop elected by the North American churches or one appointed by the Patriarch in Moscow. The New York Court of Appeals sided with the North American churches based on a state law that purported to transfer control of Russian Orthodox churches in New York to the American churches. But the Supreme Court reversed. 344 U.S. 94, 107 (1952). Use of the Cathedral, the Court reasoned, was "strictly a matter of ecclesiastical government, the power of the Supreme Church Authority of the Russian Orthodox Church to appoint the ruling hierarch of the archdiocese of North America." *Id.* at 115. Religious organizations, the Court noted, possess the "power to decide for

themselves, free from state interference, matters of church government." *Id.* at 116.

By "pass[ing] the control of matters strictly ecclesiastical from one church authority

to another," the New York law intruded the "power of the state into the forbidden

area of religious freedom contrary to the principles of the First Amendment," which

"directly prohibit[ed] the free exercise of an ecclesiastical right, the Church's choice

of its hierarchy." *Id.* at 119.

The Court reiterated these principles in *Serbian Eastern Orthodox Diocese for*
*United States and Canada v. Milivojevich*, which addressed the authority of the

American–Canadian Diocese of the Serbian Orthodox Church to defrock a bishop

and the power of the Holy Synod of the Serbian Orthodox Church to reorganize the

American-Canadian Diocese.   The Supreme Court of Illinois had held that the

defrockment was "arbitrary" because it was "not conducted according to the Illinois

Supreme Court's interpretation of the Church's constitution and penal code," and

that the Holy Synod's reorganization of the American-Canadian Diocese was invalid

because it was in "excess of [the Holy Synod's] own jurisdiction."  426 U.S. 696,

708, 720–21 (1976).   The Supreme Court disagreed, holding that the Illinois

Supreme Court had impermissibly rejected "the decisions of the highest

ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and

impermissibly substitute[d] its own inquiry into church polity and resolutions based

thereon of those disputes."  *Id.* at 708.  "To permit civil courts to probe deeply

enough into the allocation of power within a [hierarchical] church so as to decide . . . religious law [governing church polity]," the Court reasoned, "would violate the First Amendment." *Id.* at 709 (alterations in original). Equally forbidden by the First Amendment was the state court's "substituted . . . interpretation" of the Holy Synod's governing documents in place of the interpretation by "the highest ecclesiastical tribunals in which church law vests authority to make that interpretation." *Id.* at 721. Rather, the Religion Clauses "mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding." *Id.* at 709.

Following these precedents, the Supreme Court and Courts of Appeals have routinely held that matters of religious polity and internal governance are beyond the purview of federal courts. *See, e.g., Our Lady*, 591 U.S. at 747 (religious institutions have "independence in matters of faith and doctrine and in closely linked matters of internal government"); *Hosanna-Tabor*, 565 U.S. at 188 ("Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, . . . interferes with the internal governance of the church[.]"); *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 985 (7th Cir. 2021) (en banc) ("[A]voidance, rather than intervention, should be a court's proper role when adjudicating disputes involving religious governance."); *Bryce*, 289 F.3d at 655 ("[C]hurch autonomy doctrine prohibits civil court review of internal church

disputes involving matters of faith, doctrine, church governance, and polity."); *see also Huntsman*, 127 F.4th at 793 (Bress, J., concurring in the judgment) ("Courts therefore cannot resolve disagreements over church teachings and governance, which would pose grave threats to the autonomy of religious organizations.").

## II. The District Court's Decision Violates The Lutheran Church–Missouri Synod's Autonomy To Define Its Polity In Accord With Its Sincere Religious Beliefs.

These well-established First Amendment principles—rooted in text, history, and precedent—render a church's sincere, authoritative articulation of its religious polity binding on secular courts. In this case, the Lutheran Church–Missouri Synod provided just such an articulation: two undisputed declarations delineating the Church's longstanding, theology-backed polity as reflected in its governing documents. *See* ROA.2227–30, 3223–26. Through those declarations, the Church explained that it had separated its ecclesial and civil functions. The Synod, as "the church body or religious denomination," is solely a religious entity; it is "not a civil law entity." ROA.2228. LCMS, as a civil nonprofit corporation, carries out the Church's "secular functions, including the ability to sue and be sued." ROA.2228. Nevertheless, the district court rejected the Church's chosen polity and "impermissibly substitute[d] its own inquiry into church polity" based on the court's interpretation of select phrases from the Church's governing documents, *Milivojevich*, 426 U.S. at 708, deeming the Synod "an unincorporated association [that] has the capacity to sue or be sued," ROA.3315. That decision plainly violates

the Religion Clauses.

### A. The Religion Clauses Protect the Lutheran Church–Missouri Synod's Sincere Articulation of its Chosen Polity.

The Lutheran Church–Missouri Synod traces its origins to 1847, when immigrant groups "established a new church body in America, seeking the freedom to practice and follow confessional Lutheranism." *History*, Lutheran Church–Missouri Synod, https://tinyurl.com/2rpeut8k. Today, the Church is "the second largest Lutheran denomination in America," *Hosanna-Tabor*, 565 U.S. at 177, with approximately 6,000 member congregations throughout the country, *see Rosters and Statistics*, Lutheran Church–Missouri Synod (Nov. 2018), https://tinyurl.com/3js8rb5a.

For well over 100 years, the Church's polity has consistently featured two characteristics that are important to its doctrine and important to this case. Both are entitled to protection from state interference under the Religion Clauses as decisions regarding internal governance.

*First*, the Church has separated its religious and civil functions. The "Synod is not a civil law entity" and it performs no civil law activities. ROA.2228. It does not own assets, enter into contracts, control bank accounts, possess "civil law interests," or engage in litigation. ROA.3226. To perform those secular functions, the Synod incorporated LCMS in 1894 "to handle its civil law affairs and to exercise civil law functions," including to represent the Synod's interests in litigation.

17

ROA.2228; *see* ROA.3226 (LCMS "owns property, both real and personal, and engages in all types of other civil law interests"). Consequently, with the exception of this case, the Synod has never "sued or been sued in a civil court." ROA.2228.

That decision regarding the Church's internal structure flows directly from the Church's religious convictions. With its dual structure, the Church embodies the Lutheran distinction between two kingdoms: the kingdom of spiritual affairs (where the Synod acts) and the kingdom of civil affairs (where LCMS acts). *See* Sasse, *supra*, at 5. Each entity acts only in its appropriate sphere, thus affirming that the kingdom of God and the kingdom of the world are presently distinct. *See* ROA.2228, 3223–24.

*Second*, the Church possesses limited authority over its member congregations. Congregations voluntarily associate with the Church and remain "self-governed." ROA.2228. "The Synod does not take part in any civil law management decisions" of its member congregations. ROA.2229. Instead, the Synod "is but an advisory body." ROA.2229. Accordingly, the member congregations "have an ecclesial and civil legal existence apart from the ecclesial and legal existence" of the Synod and LCMS. ROA.2229.

This feature of the Church's polity also flows from its doctrine. The Synod's oversight of spiritual matters common to all member congregations mirrors the apostolic church and early church counsels. *See* ROA.1270. Meanwhile, the self

governance of those congregations recognizes that the Bible speaks "of churches in the plural, that is, of local churches," as independent units within the "one Church, which embraces the believers of all places." *Doctrinal Positions of the LCMS*, *supra*, at 7. Accordingly, individual congregations "are the seat of church authority." ROA.3224. And it is the congregations, acting collectively, that "direct the work [of] the Synod," not the other way around. ROA.3224.

Under the Religion Clauses, these core features of the Church's polity are entitled to protection. *See Our Lady*, 591 U.S. at 746. They are longstanding decisions regarding the Church's internal governance. There is no fact (or even an alleged fact) providing a basis to question the sincerity of those polity decisions. And there can be no doubt that they embody the Church's beliefs. In sum, the Church's longstanding, theology-backed governance structure is binding on secular courts under the Religion Clauses. *See Milivojevich*, 426 U.S. at 709, 721.

## B. The District Court Disregarded the Synod's Sincere Articulation of its Polity, Violating the First Amendment.

Despite the Church's clear articulation of these aspects of its polity, the district court disregarded them. Faced with a straightforward question regarding subject matter jurisdiction, the court concluded that the parties were not completely diverse. ROA.3321. To reach that result, the court concluded that the Synod itself was the true party in interest in this civil contract dispute (rather than LCMS), and it concluded that the Synod is an unincorporated association (rather than a solely

19

religious entity corporately represented by LCMS) that is a citizen of—and therefore can sue and be sued in—every state where it has member congregations. ROA.3315, 3318–19; ROA.3087–88, 3098.

Those conclusions contradict the Church's polity. As explained, Church doctrine holds that the Synod is not an unincorporated association or "a civil law entity" of any kind; it is purely a religious body without civil law functions. ROA.2228. Nor does the Synod own property or hold contract rights such that it could be the "real party in interest" in a civil case. ROA.3226 ("The Synod . . . has no civil law interests."). "The Synod, instead of operating as a civil law entity," created LCMS, a nonprofit corporation, "to carry out its secular functions, including the ability to sue and be sued." ROA.2228. Thus, while the Church adheres to a "strict[]" separation between the kingdoms of secular and religious affairs, ROA.3225, the district court's decision forces the Synod to straddle both, ignoring the exclusive spheres assigned to the Synod and LCMS by the Church and its chosen polity.

Moreover, by transforming the Synod into an "unincorporated association," ROA.3315, the court works a fundamental transformation of the Church's congregational structure. While local churches are meant to retain autonomy and are joined together under the Synod for certain common, national objectives, the court ignores this composite structure, lumping all local churches into a singular

"association." Member churches did not agree to that hierarchy when joining the Synod. By the same token, the transformation vastly expands the Synod's responsibility for the conduct of individual congregations beyond what it agreed to bear through LCMS.

The court's ruling plainly violates the First Amendment. Civil courts cannot override a "Church's choice of its hierarchy" or internal governance. *Kedroff*, 344 U.S. at 119. But the district court's ruling purports to do just that, disregarding the Church's chosen polity and thus denying its right to self-governance. At the same time, the ruling also improperly involves civil authorities in church affairs by imposing a state-sanctioned associational form, raising the specter of government entanglement with religion. *See Our Lady*, 591 U.S. at 761 (rejecting a test that would "risk judicial entanglement in religious issues").

The district court's attempt to justify this result fails. The court purported to avoid "any inquiry into religious doctrine," claiming that it could determine "the corporate status, or lack thereof, of the Synod" as an "external[]" matter without "reorganiz[ing] the Synod's internal governance." ROA.3313.

As an initial matter, the court's claim that its decision would not "inquir[e] into religious doctrine" is no defense. The court's failure to consider (and abide by) the Church's sincere articulation of its doctrine—in this case, reflected in its polity— is the problem, not the solution. *See Milivojevich*, 426 U.S. at 713 (explaining that

a "civil court must accept the ecclesiastical decisions of church tribunals as it finds them"); *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974) (church autonomy includes decisions regarding "church government"). In fact, it is impossible to rule that the Synod is a civil law entity and simultaneously steer clear of internal religious doctrine. The Church, as a matter of its *internal* governance, holds that the Synod is "not a civil law entity." ROA.2228. To reach the result it did, the court necessarily overrode the Church's definitive statement of its own polity.

Moreover, the court did not, in fact, avoid "any inquiry into religious doctrine." ROA.3313. The court instead relied on select phrases from the Church's governing documents to support its ruling, preferring its own interpretation of those documents over the Church's authoritative articulation. *E.g.*, ROA.3087–88, 3308–09, 3314, 3316–17. That is impermissible: Courts "must accept" the articulated stance of "the highest of [the] church judicatories" on matters of internal governance "as final." *Hosanna-Tabor*, 565 U.S. at 185–86; *see Milivojevich*, 426 U.S. at 721 (The Religion Clauses "forbid" a court to "substitute[] its interpretation [of church] constitutions . . . for that of the highest ecclesiastical tribunals in which church law vests authority to make that interpretation.").

The "narrow" exceptions to the autonomy guaranteed church polity, such as fraud or bad faith, do not justify the district court's novel holding either.

*Milivojevich*, 426 U.S. at 712–13 (describing these exceptions). In view of the Church's longstanding polity stemming from its sincere religious beliefs, there is no basis to conclude that this structure was adopted for fraudulent purposes or in bad faith. Indeed, the district court did not even hint to the contrary. Nor could it have, given that the ruling came at the pleading stage with little in the record besides LCMS's complaint and governing documents. In any event, it would make no practical sense to apply these exceptions to conclude that the Synod is subject to suit because LCMS represents the Synod and is already participating in the litigation. Accordingly, with no basis in these exceptions to church autonomy, the court unconstitutionally seized authority to disregard church polity.

## III. Decisions Like The District Court's Threaten The Religious Liberty Of All Americans.

The district court's approach, which allows secular laws and litigants to redefine a religious organization's chosen structure, could spawn disastrous consequences if left uncorrected.

This case serves as a ready example. Deeming the Synod an unincorporated association strips it of many of the ordinary protections afforded secular litigants. Because its citizenship would be determined by that of its approximately 6,000 member congregations, *Hummel v. Townsend*, 883 F.2d 367, 369 (5th Cir. 1989), the Synod would often (or perhaps even always) be unable to invoke diversity jurisdiction to remove a case to federal court, 28 U.S.C. § 1332(a). Even if the Synod

carefully restricts its operations to Missouri, it may nevertheless be subject to personal jurisdiction throughout the country via its member congregations. *See Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 469 (1st Cir. 1990) (recognizing that an "unincorporated association" can "possess the requisite minimum contacts" to a forum based on one of its member's acts). And because venue will often (or perhaps even always) be proper, the Synod will face hurdles if it seeks to transfer venue. 28 U.S.C. § 1391(b) ("A civil action may be brought in . . . a judicial district in which any defendant resides. . . ."). Consequently, the Synod may be systematically forced to litigate in inconvenient or hostile forums. The stakes of litigation may also be heighted: as an unincorporated association, the Synod would lack the protections of incorporation.

What is more, these threats to the Synod are not idiosyncratic but emblematic of threats that other religious organizations may face. In particular, other non-hierarchical religious organizations may similarly be deemed unincorporated associations or otherwise treated inconsistently with their chosen polity. And this threat may coerce these organizations to embrace a more hierarchical polity potentially more immune to the judicial reorganization that occurred here. This thumb on the polity scale violates the rule that one religious organization should not be favored over any other—the "clearest command of the Establishment Clause," and a principle that is "inextricably connected with . . . the Free Exercise Clause."

*Larson v. Valente*, 456 U.S. 228, 244–45 (1982). That is because "[f]ear of potential liability" from a judicial misconstruction (or even misunderstanding) of "religious tenets" might influence how "an organization carrie[s] out what it underst[ands] to be its religious mission." *Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 336 (1987). "These are certainly dangers that the First Amendment was designed to guard against." *Hosanna-Tabor*, 565 U.S. at 197 (Thomas, J., concurring). This Court should guard against those dangers here by reversing the district court's decision and upholding the First Amendment.

# CONCLUSION

For these reasons, this Court should reverse the decision below.

May 5, 2025

Respectfully submitted,

*/s/ Brandon L. Winchel*

Kurt A. Johnson
JONES DAY
150 West Jefferson, Suite 2100
Detroit, MI  48226
(313) 733-3939
kajohnson@jonesday.com

Ethan D. Beck
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC  20001
(202) 879-3939
ebeck@jonesday.com

Brandon L. Winchel
    *Counsel of Record*
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA  92612
(949) 851-3939
bwinchel@jonesday.com

*Counsel for* Amici Curiae *Religious Liberty Scholars*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with Federal Rule of Appellate Procedure 29(a), and Fifth Circuit Rules 29.2 and 32.1–32.2.  Excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, the brief contains 5,715 words and has been prepared using Microsoft Word in Times New Roman 14-point font with 13-point font for footnotes.

May 5, 2025

*/s/ Brandon L. Winchel*
Brandon L. Winchel
*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

On May 5, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will sent a notification of such filing to all counsel of record.

May 5, 2025

*/s/ Brandon L. Winchel*
Brandon L. Winchel
*Counsel for* Amici Curiae
