No. 25-50130

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

THE LUTHERAN CHURCH - MISSOURI SYNOD,
A MISSOURI NONPROFIT CORPORATION,

*Plaintiff-Appellant*,

*v.*

DONALD CHRISTIAN; CHRISTOPHER BANNWOLF; JOHN DOES 1-12; CONCORDIA
UNIVERSITY OF TEXAS INCORPORATED,

*Defendants-Appellees*,

On Appeal from the United States District Court
for the Western District of Texas, No. 1:23-cv-01042
Before the Honorable David A. Ezra

**BRIEF OF THE ETHICS AND RELIGIOUS LIBERTY COMMISSION,
NATIONAL ASSOCIATION OF EVANGELICALS, THE ASSEMBLY OF
CANONICAL ORTHODOX BISHOPS OF THE UNITED STATES OF
AMERICA, THE ALEPH INSTITUTE, THE ANGLICAN CHURCH IN
NORTH AMERICA, THE GENERAL CONFERENCE OF SEVENTH-DAY
ADVENTISTS, AND THE TEXAS CATHOLIC CONFERENCE OF
BISHOPS, AS AMICI CURIAE IN SUPPORT OF THE PLAINTIFF-
APPELLANT LUTHERAN CHURCH – MISSOURI SYNOD**

MATTHEW T. MARTENS
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
matthew.martens@wilmerhale.com

*Counsel for Amici Curiae*

May 5, 2025

*(Counsel continued on inside cover)*

ROBERT KINSLEY SMITH
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02186
(617) 526-6000
robert.smith@wilmerhale.com

PATRICK G. SELWOOD
OLUWALANI OISAGHIE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
matthew.martens@wilmerhale.com
patrick.selwood@wilmerhale.com
olu.oisaghie@wilmerhale.com

*Counsel for Amici Curiae*

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, undersigned counsel states that it is unaware of any additional parties with an interest in the amicus brief other than Amici and those listed in Plaintiff-Appellant's Certificate of Interested Parties.

*/s/ Matthew T. Martens*
MATTHEW T. MARTENS

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rules 26.1 and 28.2, undersigned counsel certifies that the following persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Amici Curiae**
Ethics And Religious Liberty Commission
National Association Of Evangelicals
The Assembly Of Canonical Orthodox Bishops Of The United States Of America
The Aleph Institute
The Anglican Church In North America
The General Conference Of Seventh-Day Adventists
The Texas Catholic Conference Of Bishops

**Attorneys for Amici Curiae**
Wilmer Cutler Pickering Hale and Dorr LLP, Counsel
      Matthew T. Martens
      Robert Kinsley Smith
      Patrick G. Selwood
      Oluwalani Oisaghie

*/s/ Matthew T. Martens*
MATTHEW T. MARTENS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF INTEREST OF AMICI CURIAE ............................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 5

BACKGROUND ....................................................................................... 7

ARGUMENT .......................................................................................... 10

I.     The Church Autonomy Doctrine Precludes State Interference In A
       Religious Organization's Internal Governance ............................................. 10

       A.     Church Autonomy Is Deeply Rooted In The First Amendment
              And The Limits Of Civil Judicial Competence ................................... 11

       B.     The Supreme Court Has Been Consistent and Clear: The
              Church Autonomy Doctrine Is A Rule of Strict Deference ............... 13

       C.     The "Neutral Principles" Exception Is Narrow.................................... 16

II.    The District Court Violated The Church Autonomy Doctrine ...................... 19

       A.     The District Court Wrongly Concluded That The Synod's
              Choice Of Corporate Structure Was Not Constitutionally
              Protected ............................................................................................. 20

       B.     The District Court Misapplied The Neutral Principles Exception ...... 24

              i.     The Court Did Not Apply The Neutral Principles Exception
                     To A Dispute Over "Formal Title" To "Real Property" ...... 24

              ii.    The District Court Misapplied The Neutral Principles
                     Exception Framework ............................................................ 25

       C.     The District Court's Misapplication Of The Neutral Principles
              Exception Violated The Very Principles The Church Autonomy
              Doctrine Protects ................................................................................ 27

III.   The Far-Reaching Consequences Of The District Court Decision .............. 28

CONCLUSION ................................................................................33

CERTIFICATE OF COMPLIANCE .......................................................35

CERTIFICATE OF SERVICE ..............................................................36

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Americold Realty Trust v. Conagra Foods, Inc.*,
577 U.S. 378 (2016)..............................................................32

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day
Saints v. Amos*, 483 U.S. 327 (1987)...................................6, 21, 22

*Duquesne Univ. of the Holy Spirit v. NLRB*,
947 F.3d 824 (D.C. Cir. 2020)...........................................11, 21, 22

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
565 U.S. 171 (2012)..............................................................*passim*

*Jones v. Wolf,*
443 U.S. 595 (1979).................................................................12, 17

*Kedroff v. St. Nicholas Cathedral*,
344 U.S. 94 (1952)...............................................................*passim*

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) ......................................................12

*Kreshik v. St. Nicholas Cathedral*,
363 U.S. 190 (1960)...............................................................14, 19

*Larson v. Valente*,
456 U.S. 228 (1982).....................................................................32

*McRaney v. N. Am. Mission Bd. of the S. Baptist Conv., Inc.*,
966 F.3d 346 (5th Cir. 2020) ..........................................18, 19, 25

*NLRB v. Catholic Bishop of Chicago*,
440 U.S. 490 (1979)......................................................................28

- iii -

*Our Lady of Guadalupe School v. Morrissey-Berru*,
     591 U.S. 732 (2020)................................................................................*passim*

*Palmer v. Liberty University, Inc.*,
     72 F.4th 52 (4th Cir. 2023) ...........................................................................20

*Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Church*,
     393 U.S. 440 (1969)..............................................................................14, 17

*Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*,
     589 U.S. 57 (2020) ................................................................................30, 31

*Serbian Eastern Orthodox Diocese v. Milivojevich*,
     426 U.S. 696 (1976)................................................................................*passim*

*Maryland & Virginia Churches v. Sharpsburg Church*,
     396 U.S. 367 (1970)..........................................................................17, 18, 27

*Simpson v. Wells Lamont Corp.*,
     494 F.2d 490 (5th Cir. 1974) .........................................................13, 19, 24

*Watson v. Jones*,
     80 U.S. 679 (1871)..................................................................................*passim*

*Widmar v. Vincent*,
     454 U.S. 263 (1981).......................................................................................28

*Wisconsin v. Yoder*,
     406 U.S. 205 (1972).......................................................................................20

## DOCKETED CASES

*Concordia University Texas v. LCMS*,
     No. 24-cv-00176 (W.D. Tex. 2024) ..............................................................8

*Concordia University Texas v. LCMS*,
     No. D-1-GN-24-000358 (Tex. 353rd Dist. Ct. 2024)...................................8

*LCMS v. Christian,*
No. 23-cv-01042 (W.D. Tex. 2023) ...............................................8

## CONSTITUTIONS, STATUTES, RULES, AND REGULATIONS

U.S. Const. amend. I .......................................................................11

28 U.S.C. § 1332(a) .......................................................................31

5th Cir. R. 29.2 ................................................................................1

Fed. R. App. P. 29(a)(4)(E) .............................................................1

Tex. Bus. Orgs. Code
§ 2.002 ......................................................................................9
§ 252.001 ..................................................................................9

## OTHER AUTHORITIES

ByLaws of the Executive Committee of the Southern Baptist
Convention, Art. 2.3 ...............................................................29

Edward L. Buelt & Charles Goldberg, *Canon Law & Civil Law
Interface: Diocesan Corporations*, 36 Cath. Law. 69 (1995-
1996) ......................................................................................30

Mark E. Chopko & Michael F. Moses, *Freedom to Be A Church:
Confronting Challenges to the Right of Church Autonomy*, 3
Geo. J.L. & Pub. Pol'y 387 (2005) ..........................................19

Carl H. Esbeck, *An Extended Essay on Church Autonomy,*
*22* Fed. Soc. Rev. 244 (2021) ............................................13, 16

Letter from James Madison to Bishop Carroll (Nov. 20, 1806),
*reprinted in* 20 Recs. of the Am. Cath. Hist. Soc'y 63 (1909).....................11

Patty Gerstenblith, *Associational Structures of Religious
Organizations*, 1995 B.Y.U. L. Rev. 439 (1995) ........................29

Paul Horwitz, *Churches As First Amendment Institutions: Of
Sovereignty and Spheres*, 44 Harv. C.R.-C.L. L. Rev. 79 (2009).................18

Douglas Laycock, *Towards A General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L. Rev. 1373 (1981) .....................................21

Jody Lipford, *Organizational Reputation and Constitutional Constraints: An Application to Religious Denominations,* Const. Pol. Econ. 343 (1992)..........................................................................29

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) .........................13

Brett G. Scharffs, *The Autonomy of Church and State,* 2004 B.Y.U. L. Rev. 1217 (2004) .................................................................22

Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253 (2023).......................................................25, 26

The Ethics and Religious Liberty Commission, the National Association of Evangelicals, the Assembly of Canonical Orthodox Bishops of the United States of America, the Aleph Institute, the Anglican Church in North America, the General Conference of Seventh-day Adventists, and the Texas Catholic Conference of Bishops (collectively, the "Amici Curiae" or "Amici") respectfully submit that this Court should reverse the district court's decision and remand with instructions consistent with the principles set forth herein to correct the district court's clear violation of well-established First Amendment principles protecting against state intrusion into church autonomy and governance.

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

The Amici are religious organizations that provide a wide range of spiritual, educational, and social services to people across the world, religious and non-religious alike.  Each Amici is or is a part of a broader religious community—communities consisting of vast consortiums of members and entities, organized by their own distinct structures of authority and polity consistent with their respective theological commitments.

---

[1]     In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E) and Fifth Circuit Rule 29.2, the Amici affirm that no party or counsel for a party authored this brief in whole or in part and that no person other than Amici or their counsel have made any monetary contributions intended to fund the preparation or submission of this brief.

*The Ethics and Religious Liberty Commission* ("ERLC") is the moral concerns and public policy entity of the Southern Baptist Convention ("SBC"), the nation's largest Protestant denomination, with nearly 13 million members in in over 45,000 churches and congregations. The ERLC is charged by the SBC with addressing public policy affecting such issues as religious liberty, marriage and family, the sanctity of human life, and ethics. Religious freedom is an indispensable, bedrock value for Southern Baptists. The Constitution's guarantee of freedom from governmental interference in matters of faith is a crucial protection upon which SBC members and adherents of other faith traditions depend as they follow the dictates of their conscience in the practice of their faith.

*The National Association of Evangelicals* ("NAE") is the largest network of evangelical churches, denominations, colleges, and independent ministries in the United States. Its member ministries have diverse polities derived from their distinct doctrinal commitments, but all share the conviction that religious groups must be free to govern their internal affairs free of government interference.

*The Assembly of Canonical Orthodox Bishops of the United States of America* ("Assembly of Bishops") consists of all active, canonical Orthodox Christian bishops in every jurisdiction in the United States. The Assembly of Bishops preserves and contributes to the unity of the Orthodox Church in the United States by furthering her spiritual, theological, ecclesiological, canonical, educational,

missionary, and philanthropic aims.   In this way, the Assembly of Bishops demonstrates its particular interest in safeguarding the liberty of all Americans to practice their faith.

*The Aleph Institute* ("Aleph") is a certified nonprofit Jewish organization dedicated to assisting and caring for the spiritual wellbeing of members of specific populations who are isolated from the regular community, such as U.S. military personnel, prisoners, and people institutionalized or at risk of incarceration due to mental illness or addictions.  Aleph addresses the religious, educational, and spiritual needs of those populations, advocates for their civil and religious rights, and provides support to their families at home left to fend for themselves.

*The Anglican Church in North America* ("ACNA") unites some 100,000 Anglicans in nearly 1,000 congregations and twenty-eight dioceses across the United States and Canada into a single Church.   It is a Province in the Fellowship of Confessing Anglicans, initiated at the request of the Global Anglican Future Conference ("GAFCon") and formally recognized by the GAFCon Primates – leaders of Anglican Churches representing 70 percent of active Anglicans globally. The ACNA is determined with God's help to maintain the doctrine, discipline, and worship of Christ as the Anglican Way has received them and to defend the God-given inalienable human right to free exercise of religion.

*The General Conference of Seventh-day Adventists* is the highest administrative body for the Seventh-day Adventist Church. Formally organized as a religious body in 1863, the Adventist Church is a worldwide Protestant Christian denomination with more than 154,000 congregations and 22 million members, including 6,300 congregations with more than 1.2 million members in the United States. The work of the Adventist Church in the United States is divided between 51 conferences, eight union of conferences, the North American Division, and the General Conference itself. Moreover, the Adventist Church operates an extensive network of spiritual, educational, medical, and other social services, including: the largest Protestant school system in the world, dozens of healthcare institutions, publishing houses, community service centers, and an international development non-governmental organization. All administrative levels of the Church have a strong interest in protecting their organizational structure and polity from government intrusion. Having endured conflicts between its values and the requirements of governments during its early history, the Adventist Church has long been committed to protecting the rights of religious liberty for people of all faiths and religious traditions. The Adventist Church has done so in a variety of ways, including through participation in numerous amicus briefs (both individually and in collaboration with other religious organizations) advocating for constitutional protections for religious liberty.

*The Texas Catholic Conference of Bishops of Texas* ("TCCB") is a Texas nonprofit unincorporated association that furthers the religious ministry of the Roman Catholic bishops and archbishops in Texas, particularly through advocacy for the social, moral, and institutional concerns of the Catholic Church, including the promotion of religious liberty.

\* \* \*

The questions presented in this case are of substantial importance to the Amici, which have a strong interest in ensuring that the First Amendment remains a bulwark against government interference in matters of church governance, including the autonomy of religious communities to organize in a manner consistent with their theological commitments.

## INTRODUCTION AND SUMMARY OF ARGUMENT

At issue in this appeal is the extent to which a federal court may usurp for itself the right to determine a religious community's *undisputed* understanding of its own polity and self-governance for purposes of determining federal diversity jurisdiction.  The district court's decision that it was authorized to intrude upon such matters is plainly unconstitutional.  *See Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708 (1976) (holding that "inquiry into church polity" is "impermissible").

Firmly grounded in the First Amendment, the "Church Autonomy Doctrine" was acknowledged more than 150 years ago, when the Supreme Court recognized "a spirit of freedom for religious organizations" to be shielded from government intrusion into the practice and expression of their faith. *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (discussing *Watson v. Jones*, 80 U.S. 679 (1871)).  Through its long line of precedent since, the Supreme Court has consistently reaffirmed and strengthened the Church Autonomy Doctrine to protect a private sphere in which religious bodies can "order[] their internal affairs, so that they may be free to 'select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions." *Cf. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 341-42 (1987) (Brennan, J. concurring, with Marshall, J. joining) ("Religion includes important communal elements for most believers. They exercise their religion through religious organizations, and these organizations must be protected.").

By disregarding centuries of unbroken First Amendment precedent, the district court's decision rejecting the Lutheran Church – Missouri Synod's understanding of its own polity and self-governance in favor of the district court's understanding marks one of the few times, if not the *only* time, in the history of the Church Autonomy Doctrine that a federal court has done so.  It also marks the first

time in the Lutheran Church – Missouri Synod's 178-year history that any court has declared it to have any civil juridic identity other than the one it has chosen in light of its theological commitments.

If permitted to stand, the district court's decision not only imposes unconstitutional intrusion into the affairs of the Lutheran Church – Missouri Synod and its millions of faithful but also poses a real and substantial threat of interference with internal governance decisions of countless religious organizations across the country.

## BACKGROUND

The Lutheran Church – Missouri Synod ("Synod"), is "a religious denomination" in which "self-governed Lutheran congregations, principally in the United States, voluntarily profess and seek to maintain and live out a common faith." ROA.2228. The eponymously-named "Lutheran Church – Missouri Synod" ("LCMS") is a Missouri nonprofit corporation that the Synod has chosen as its "civil law reflection." ROA.2227-2228. Concordia University Texas Incorporated ("CTX") is a university located in Austin, Texas and an agent of the Synod. ROA.1234-1235.

In November 2022, CTX purported to amend its Charter, Bylaws, and Policy Manual without the Synod's approval and to individuate from the Synod. *Id.* On March 30, 2023, the Synod's Commission on Constitutional Matters ("CCM"), the

- 7 -

Synod's highest judicatory authority, convened to consider the extent to which CTX's amendments violated the Synod's Bylaws. ROA.1234-1235. The CCM concluded that CTX and its officers had violated the Synod Bylaws by amending CTX's Charter, Bylaws, and Policy Manual without the prior approval of the CCM and without the other approvals required by the Synod. ROA.1235.

CTX rejected CCM's determination. In August 2023, LCMS, as the sole "civil law expression" of the Synod, filed suit in the United States District Court for the Western District of Texas asserting claims for declaratory judgment, breach of contract, breach of fiduciary duty, and violations of Chapter 252 of the Texas Business Organization Code. *See LCMS v. Christian*, No. 23-cv-01042 (W.D. Tex.) ("2023 Action"), ROA.15-49, 1233-1269. Federal jurisdiction was based on the complete diversity of the parties—LCMS being a Missouri corporation and the defendants all being citizens of Texas. ROA.1234. CTX reciprocated by filing suit in Texas state court against LCMS and the Synod, asserting a claim for declaratory judgment. *See Concordia Univ. Tex. v. LCMS,* No. D-1-GN-24-000358 (Tex. 353rd Dist. Ct. 2024). On February 21, 2024, LCMS removed the 2024 Action to the United States District Court for the Western District of Texas, asserting diversity jurisdiction. *See Concordia Univ. Texas, et al. v. LCMS et al.*, No. 24-cv-00176 (W.D. Tex. 2024) ("2024 Action"). The 2023 and 2024 Actions were subsequently consolidated. ROA.2191.

CTX filed two motions, requesting that the 2023 Action be dismissed for lack of subject jurisdiction and that the 2024 Action be remanded to state court. ROA.1800-1822, 413. Both motions asserted that the Synod was a non-diverse, civilly recognized entity with Texas citizenship precluding diversity jurisdiction. *Id.*

On November 20, 2024, Magistrate Judge Dustin M. Howell issued a Report and Recommendation granting both motions. ROA.3081-3099. On February 2, 2025, District Judge David A. Ezra adopted and elaborated upon the Report and Recommendation. ROA.3299-3321. In doing so, the district court concluded that the Synod was an "unincorporated association" under Texas law and, thus, a juridic entity separate from LCMS. ROA.3308.[2] The district court also concluded that the Synod—not LCMS—was the real party interest. ROA.3315. And, because an unincorporated association is deemed to be a citizen of every state in which a member is present, including Texas, the Synod's status as a party to the case destroyed federal diversity jurisdiction. ROA.3305-3310.

The district court reached those conclusions over the objection of LCMS, which asserted—with the support of a sworn declaration from Rev. Dr. John Sias, the Secretary of the Synod—that LCMS and the Synod are not distinct civil juridic

---

[2]    ROA.3308 ("[T]he plain language of the Texas Business Organization Code states that a '[n]onprofit association" means an unincorporated organization, other than one created by a trust, consisting of three or more members joined by *mutual consent for a common, nonprofit purpose.* This definition may include religious organizations, such as a church.'") (citing Tex. Bus. Orgs. Code §§ 252.001, 2.002 (stating that the purpose of a nonprofit entity may include "religious" purposes)).

- 9 -

entities.  ROA.2228.  Indeed, as Rev. Dr. Sias explained, LCMS is the "civil law reflection" of the Synod, a position set forth in the Synod Constitution and Bylaws. *Id*.; ROA.1271, 1280-1282, 1374.  Rejecting the Synod's understanding of its polity and organizational structure, the district court relied on its own interpretation of the Synod's Constitution and Bylaws.  ROA.3314-3315.  And, in doing so, the district court concluded that the Church Autonomy Doctrine was inapplicable because "neutral principles of law"—*i.e.*, the standards set forth in Chapter 252 of the Texas Business Organizations Code and statements in LCMS's governing documents—purportedly established that the Synod is a civil juridic entity.  ROA.3309-3315.

On February 24, 2025, LCMS filed its Notice of Appeal, challenging the district court's order of dismissal and remand.  ROA.3322-3323.

## ARGUMENT

### I. THE CHURCH AUTONOMY DOCTRINE PRECLUDES STATE INTERFERENCE IN A RELIGIOUS ORGANIZATION'S INTERNAL GOVERNANCE

The Church Autonomy Doctrine[3] "guarantees religious bodies 'independence from secular control or manipulation'" and the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S.

---

[3]   Courts refer to the Church Autonomy Doctrine by several names, including the "ecclesiastical abstention" or "religious autonomy" doctrine. The term "Church Autonomy Doctrine" is used in this brief consistent with the Supreme Court's term for the doctrine in *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 747 (2020).

- 10 -

171, 199-200 (2012) (Alito, J., joined by Kagan, J., concurring) (quoting *Kedroff*, 344 U.S. at 116); *see also Our Lady*, 591 U.S. at 764 (stating same).  A corollary to this guarantee is that the government must defer to religious organizations on internal determinations of polity and governance.  That is what the Supreme Court first articulated in *Watson v. Jones*—the seminal decision recognizing the Church Autonomy Doctrine—where it declared a "rule of action" prohibiting "civil courts" from deciding any matter that is "ecclesiastical in its character."  *Watson v. Jones*, 80 U.S. 679, 727, 733 (1871).  That "rule of action" dictates the outcome of this appeal. *Id*.

### A.   Church Autonomy Is Deeply Rooted In The First Amendment And The Limits Of Civil Judicial Competence

The Church Autonomy Doctrine is anchored in the two Religion Clauses of the First Amendment, which together provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.  "The Establishment Clause limits governmental involvement in the affairs of religious groups," while "the Free Exercise Clause safeguards the freedom to practice religion, whether as an individual or as part of a group." *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 827-28 (D.C. Cir. 2020) (citing *Hosanna-Tabor*, 565 U.S. at 181-90).  Taken in tandem, the Religion Clauses establish a "scrupulous policy . . . against a political interference with religious affairs." *Hosanna-Tabor*, 565 U.S. at 184 (2012) (cleaned up) (quoting Letter from

James Madison to Bishop Carroll (Nov. 20, 1806), *reprinted in* 20 Recs. of the Am. Cath. Hist. Soc'y 63 (1909)).   Indeed, the Religion Clauses prohibit all civil authorities, including courts, from resolving religious disputes. *Jones v. Wolf,* 443 U.S. 595 (1979); *see also Our Lady*, 591 U.S. at 764 (Thomas, J., joined by Gorsuch, J., concurring) ("This Court usually goes to great lengths to avoid governmental 'entanglement' with religion, particularly in its Establishment Clause cases.").

The Church Autonomy Doctrine stems from the Supreme Court's recognition that secular courts are inherently ill-suited to evaluate religious doctrines and practices or to substitute their own interpretation of those doctrines and practices over the understanding of the authorities each religion determines for itself is supremely competence to express that understanding.   As the Supreme Court recognized in *Watson*:

> Each of these large and influential [religious] bodies ... has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usages and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own.

80 U.S. at 729.   Whereas secular, civil courts are competent to adjudicate matters of secular, civil law, it is only each religion's *religious* authorities that are competent to adjudicate matters of religion.   *Our Lady*, 591 U.S. at 752 n.10; *see also Korte v.*

*Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013) ("Two related principles are at work in [the Supreme Court's Church Autonomy Doctrine] cases. First, civil authorities have no say over matters of religious governance; and second, secular judges must defer to ecclesiastical authorities on questions properly within their domain. These limitations arise from the justification for the different aspects of religious liberty secured by the Religion Clauses.").

**B.**   **The Supreme Court Has Been Consistent and Clear: The Church Autonomy Doctrine Is A Rule of Strict Deference**

Guided by these principles, the Supreme Court has continued to cultivate its Church Autonomy Doctrine since *Watson*. And through its jurisprudence, the Court has made clear that the Church Autonomy Doctrine affords a "'spirit of freedom for religious organizations, an independence from secular control or minipulation [sic] in short, power to decide for themselves, free from state interference, matters of church government." *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974) (quoting *Kedroff*, 344 U.S. at 116); *see also* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1464-65 (1990) (explaining that religious organizations are free "to define their own doctrine, membership, organization, and internal requirements without state interference"); Carl H. Esbeck, *An Extended Essay on Church Autonomy*, 22 Fed. Soc. Rev. 244, 246 (2021) (explaining that the Church Autonomy

Doctrine provides "a zone of protection for an entity's internal governance that is derived from the organization's religious character") (collecting cases).

In *Kedroff v. Saint Nicholas Cathedral,* 344 U.S. 94 (1952), the Supreme Court considered whether the right to use and occupy a cathedral in New York was held by the Russian Orthodox Church, a hierarchical denomination based in Moscow, or by an American diocese formerly in communion with that denomination. At issue was a New York statute that had granted autonomy to the American diocese and the apparent ability to claim title to the property. *Id.* at 95. Relying on *Watson's* rule of deference, the Supreme Court held the statute violated the First Amendment, explaining that it "prohibit[ed] the free exercise of an ecclesiastical right, the Church's choice of [authority]," because "[b]y fiat "the act 'displace[d] one church administrator with another' and 'passe[d] the control of matters strictly ecclesiastical from one church authority to another." *Id.* at 119.[4]

In *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Church*, 393 U.S. 440 (1969), the Supreme Court considered whether Presbyterian congregations in Georgia that withdraw from the national Presbyterian church were entitled to take their physical church buildings with them. Georgia's high court affirmed a jury

---

[4]    *Kedroff's* holding was extended in *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190 (1960), a follow-up case involving the same parties fighting over the same property, where the Court explained that *Kedroff* applies to state power exercised over a religious institution whether that power is legislative or judicial in nature.

verdict in favor of local churches on the theory that the general church had abandoned or departed from the tenets of faith and practice when the Georgia congregations withdrew. *Id*. at 442-44. Reversing that decision, the Supreme Court observed that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Id*. at 449. The Court acknowledged that civil courts are not categorically barred from adjudicating disputes concerning church property, provided those claims concern only "neutral principles of law." *Id*. However, the Court made clear that "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Id*.

In *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), the "basic dispute [was] over control of the Serbian Eastern Orthodox Diocese for the United States of America and Canada," including "its property and assets," after the Serbian Orthodox Church, a hierarchical church, divided the American-Canadian Diocese into three new dioceses and defrocked of one of its bishops. *Id*. at 707-08. The Illinois high court, under the guise of "purported 'neutral principles,'" invalidated the Serbian Orthodox Church's decisions on the grounds they were "arbitrary." *Id*. at 721. Reversing the state court decision, the Supreme Court determined that these disputes—one over internal church administration and the other a clerical appointment—were insulated from civil review under the First

Amendment. The Court rejected any "arbitrariness" exception when the question before the civil courts concerned church polity or supervision of a bishop. *Id*. at 713-14. The Court explained that to accept authority over such a dispute is not "consistent with the constitutional mandate that [the] civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Id*. at 713.

Drawing heavily from *Watson*, the Court in *Milivojevich* observed: (1) "courts cannot delve into ambiguities in canon law or church documents," which are "too sensitive to permit any civil probing because such inquiries may prove intrusive and entail the court taking sides in a religious dispute"; (2) "civil judges have no training in canon law and theological interpretation and thus are not competent to judge such matters"; and (3) "the '[c]onstitutional concepts of due process, involving secular notions of 'fundamental fairness,'" cannot be borrowed from American civil law and grafted onto a church's polity to somehow modernize the rules followed by church judicatories.'" Esbeck, *supra*. at 261 (quoting *Milivojevich*, 426 U.S. at 713-15).

## C.    The "Neutral Principles" Exception Is Narrow

Consistent with the deference afforded the internal governance of religious organizations by the Church Autonomy Doctrine, the Supreme Court has recognized only a limited exception to that deference: the "***formal title doctrine***." *Maryland &*

- 16 -

*Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 369, 370 (1970) (Brennan, J., concurring) (emphasis added).  That is, civil authorities *may* apply "neutral principles of law, developed for use in all property disputes," such as by "studying deeds, reverter clauses, and general state corporation laws," when addressing disputes over formal title to property between Church factions.  *Id.*

In recognizing this limited exception, however, the Supreme Court expressly cautioned that, even when applying neutral principles of law to disputes over title to property, "the First Amendment ***severely circumscribes*** the role that civil courts may play in resolving church property disputes."  *Presbyterian Church*, 393 U.S. at 449 (emphasis added).  Thus, "[w]here the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property," or if "the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the ***court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body***."  *Jones*, 443 U.S. at 604 (emphasis added) (citing *Milivojevich*, 426 U.S. at 709).  "[G]eneral principles of property law ***may not*** be relied upon if their

application requires civil courts to resolve doctrinal issues." *Sharpsburg*, 396 U.S. at 369-70 (emphasis added).[5]

Notably, the Supreme Court has declined to extend the neutral principles approach beyond church disputes over formal title to property. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 190 (rejecting the EEOC's argument that the ADA's prohibition against retaliatory firings was a "neutral law of general applicability," such that it could defeat a church's prerogative over the hiring and firing of ministerial employees); *see also Our Lady*, 591 U.S. at 732 (similarly opting not to apply "neutral principles" to a church personnel dispute). And although this Court has acknowledged the exception *may* have application in other contexts, *see McRaney v. N. Am. Mission Bd. of the S. Baptist Conv., Inc.*, 966 F.3d 346, 350 (5th Cir. 2020) (holding it was premature to determine whether tort claims "require the court to address purely ecclesiastical questions," including questions of "church governance"), it has not formally extended the doctrine beyond the contours outlined by the Supreme Court—and certainly not to internal religious determinations regarding polity and governance. To the contrary, "civil courts are not an

---

[5]    Importantly, some courts have misinterpreted *Jones*. The "neutral principles of law" approach—while a permissive exception to the presumptive application of *Watson's* rule of strict deference—should be understood as *strengthening*, not *weakening*, the protections of the Church Autonomy Doctrine. *See* Paul Horwitz, *Churches As First Amendment Institutions: Of Sovereignty and Spheres*, 44 Harv. C.R.-C.L. L. Rev. 79, 118 (2009) ("*Jones* was, in short, an effort to accommodate church autonomy, not to eliminate it. Whether or not the neutral principles approach is an especially helpful one in settling church property disputes, it should be clear that it does not contradict, but rather serves, the principle of church autonomy.").

appropriate forum for review of internal ecclesiastical decisions" and "must leave to religious organizations the right to "decide for themselves, free from state interference, matters of church government." *Simpson*, 494 F.2d at 494; *see also McRaney*, 966 F.3d at 348 ("'[M]atters of church government, as well as those of faith and doctrine' constitute purely ecclesiastical questions." (quoting *Kedroff*, 344 U.S. at 116)); Mark E. Chopko & Michael F. Moses, *Freedom to Be Church: Confronting Challenges to the Right of Church Autonomy*, 3 Geo. J.L. & Pub. Pol'y 387, 410 (2005) (observing that in *Watson, Kedroff, Kreshik*, and *Milivojevich*, "interference with church governance was ***per se unlawful***, and the Court made no attempt to apply a balancing test" (emphasis added)).

## II.     THE DISTRICT COURT VIOLATED THE CHURCH AUTONOMY DOCTRINE

The "fallacy fatal to the judgment of the [district court] is that it rests upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of th[e] [Lutheran] church upon the issues in dispute, and impermissibly substitutes its own inquiry into church polity and resolutions based thereon of those disputes." *Milivojevich*, 426 U.S. at 708. The district court failed to recognize that decisions concerning the Synod's polity and corporate structure rest firmly within the zone of protection provided by the Church Autonomy Doctrine and misapplied the neutral principles of law exception outside its narrow bounds—violating the very principles the Church Autonomy Doctrine is intended to protect.

- 19 -

**A.    The District Court Wrongly Concluded That The Synod's Choice Of Corporate Structure Was Not Constitutionally Protected**

The Constitution's protections for church autonomy apply as much to questions of the organizational hierarchy and structure of religious institutions as they do to traditional questions of orthodoxy and belief. *Watson*, 80 U.S. at 728-729 ("The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, ***and to create tribunals*** for the decision of controverted questions of faith within the association, and ***for the ecclesiastical government of all the individual members, congregations, and officers within the general association*****, is *unquestioned*.**" (emphasis added)); *see also Milivojevich*, 426 U.S. at 710 (explaining the First Amendment "applies with equal force to church disputes over church polity and church administration"). That was true at the time of *Watson*, and it remains so today. *See Our Lady*, 591 U.S. at 746 (the independence of religious institutions in "matters of church government" is "closely linked" to their independence "in matters of faith and doctrine" (internal quotations omitted)).

This equal protection for both dogma and polity stems from the recognition that faith is not so easily confined. *Wisconsin v. Yoder,* 406 U.S. 205, 220 (1972) ("[B]elief and action cannot be neatly confined in logic-tight compartments."); *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 82 (4th Cir. 2023) ("Religious faith is not confined to a time and place."). This is particularly so for communal faith, where both dogma and the most intimately held dynamics of religion are closely bound

- 20 -

with the ways in which communities organize themselves and express their identities and beliefs. *Duquesne*, 947 F.3d at 827-28 ("Religious organizations warrant First Amendment protections in part because 'religious activity derives meaning in large measure from participation in a larger religious community. Such a community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals.'" (quoting *Presiding Bishop*, 483 U.S. at 342 (Brennan, J., concurring in judgment))).

Accordingly, the clear thrust and weight of the Supreme Court's precedent demonstrate that a religious organization's zone of protection from state intrusion or entanglement is broad, particularly in matters of internal governance and polity. *See* Douglas Laycock, *Towards A General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L. Rev. 1373, 1396-97 (1981) ("This right of autonomy logically extends to all aspects of church operations. There is nothing in the cases to indicate that the Supreme Court would disagree. The Court has consistently extended the right of church autonomy as far as necessary to include the cases before it. Dictum suggesting possible exceptions has been disapproved in the only attempt to apply it.") (collecting cases). Necessarily embodied in this broad protection for internal governance and polity is a church's right to self-define—the ability to design and purpose its institutions. *Presiding Bishop*, 483 U.S. at 342 (Brennan, J., concurring) ("Determining that

certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself. Solicitude for a church's ability to do so reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well."). What charges and functions churches may assign their members and auxiliaries—including whether and to what extent they bear spiritual or secular responsibilities, or both—is a matter left strictly to the judgment of the religious organization, shielded from government review and protected from the *possibility* of entanglement. *Duquesne*, 947 F.3d at 835 (holding that "a 'case-by-case' inquiry into whether an organization's activities are religious or secular entangles the government in religious affairs and 'create[s] the danger of chilling religious activity" by disrupting "the community's process of self-definition'" (quoting *Presiding Bishop*, 483 U.S. at 343-44 (Brennan, J., concurring in judgment)); *see also* Brett G. Scharffs, *The Autonomy of Church and State*, 2004 B.Y.U. L. Rev. 1217, 1278 (2004) ("Even more fundamental than the right to have standing to sue in order to protect one's rights is the right to organize oneself as a legal entity. A conception of autonomy based on independence and inter-independence would view the right to have a legal personality as a basic requirement for churches to have a measure of autonomy. A conception of autonomy based upon

interdependence, however, might not recognize the importance of being able to organize a church and have a legal personality.").

The district court's decision is directly contrary to this authority. Rather than defer to the Synod's determination as to how it organized itself and exists as a civil juridic entity, the district court determined the Synod's juridic identity for itself. ROA.3310-3317. In doing so, it ignored the sworn declaration of Rev. Dr. Sias, Secretary of the Synod, expressing the Synod's position that LMCS and the Synod are not intended to be, nor are in fact, distinct legal entities. ROA.2227-2228. Rather, as Rev. Dr. Sias explained, LCMS is the "civil law reflection" of the Synod, a position expressly set forth in the Synod Constitution and Bylaws. *Id.*; ROA.1271, 1280-1282, 1374. The district court also rejected the determination of the Synod's highest religious authority—the Synod acting in convention—which plainly states that the Synod "is not a civil law entity." ROA.2228.

The district court's substitution of its own judgment for how a religious organization reflects itself as a civil juridic entity is a direct and unconstitutional, intrusion on a religious organization's right to be free to determine its own polity and organize and govern as it believes is consistent with its religious tenets. *Our Lady*, 591 U.S. at 746 ("The independence of religious institutions in matters of "faith and doctrine" is closely linked to independence in what we have termed 'matters of church government,'" which "protect[s] their autonomy with respect to

- 23 -

internal management decisions that are essential to the institution's central mission."

(quoting *Hosanna-Tabor*, 565 U.S. at 186)).

### B.    The District Court Misapplied The Neutral Principles Exception

#### i.    *The Court Did Not Apply The Neutral Principles Exception To A Dispute Over "Formal Title" To "Real Property"*

As explained above, the narrow neutral principles exception to the Church

Autonomy Doctrine has been limited by the Supreme Court to disputes of formal

title to real property. *See supra* at Part I.C.  But the district court did not apply the

doctrine to any dispute concerning formal title to real property.  Instead, the district

court applied the doctrine to determine for itself how it is the Synod has chosen to

exist as a civil juridic entity such that it is subject to suit. *See* ROA.3302 (the district

court noting that central to the dispute is CTX's argument "that the Synod is both a

non-diverse (Texas) defendant capable of being sued and a proper party to this

case"); *see also* ROA.3309-3315 (the district court purporting to apply the neutral

principles doctrine).  Neither the Supreme Court nor this Court has come close to

extending the neutral principles exception that far. *Cf. Simpson*, 494 F.2d at 494

(rejecting application of "neutral principles" exception and noting that "civil courts

are not an appropriate forum for review of internal ecclesiastical decisions.").[6]

---

[6]    The district court's reliance upon federal and Texas state court decisions to the contrary is of no moment. *See* ROA.3097-3098.  Whatever the view of those courts of the scope of the Church Autonomy Doctrine, it is the law of the Supreme Court and this Court that controls.

### ii. *The District Court Misapplied The Neutral Principles Exception Framework*

As this Court acknowledged in *McRaney*, the threshold inquiry is not whether the case can be resolved by neutral principles nor whether it requires resolving a doctrinal dispute, but rather whether resolution of the case "will require the court to address purely ecclesiastical questions"—including questions of "church government." 966 F.3d at 349. It is only after concluding that it will not have to address ecclesiastical questions that the court may turn to assessing whether the dispute can be resolved by application of neutral principles of applicable law. *See id.* (holding it was premature to determine whether Church Autonomy Doctrine precluded the asserted claims because "it is not clear that any of these determinations will require the court to address purely ecclesiastical questions"). Conversely, "[w]hen neutral principles is the starting point for analysis, without clearly recognizing that what is at issue is whether the court will impinge on religious doctrine, it is all too easy for courts to overlook or misclassify conduct in the religious organization in order to be able to adjudicate a case . . . . When formulated this way, it becomes evident that neutral principles don't help in figuring out when a matter is protected as a matter of church governance." Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253, 1278 (2023).

Here, the district court got the analysis backwards. Rather than beginning with an assessment of whether resolving the question of the Synod exists as a

separate juridic entity from LCMS would require the court to address questions of "church governance," the district court ignored that the record evidence made clear that the Synod's decisions about how to organize itself and exist as a civilly recognized entity was a decision informed by church doctrine.  ROA.3224 (explaining that Lutheran "church government" is itself a matter of "doctrine," one "rooted in the doctrine of the church" which draws a line between civil and ecclesiastical matters).  The district court instead went directly to asking whether "it can apply neutral principles of law that will not require inquiry into religious doctrine." ROA.3310.  By so framing the inquiry, the district court set about looking for the "neutral principles" allowing it to make a decision—specifically, considering the provisions of Chapter 252 of the Texas Business Organization Code and looking for statements by the Synod and LCMS that purported to "recognize" the Synod's existence as a civil juridic entity independent of LCMS.  And having found and applied those "neutral principles," the district court concluded that its finding that "the Synod has the capacity to be sued . . . does not violate the Synod's decision regarding polity and governance." ROA.3315.  By so sequencing the analysis, it was "all too easy for [the district court] to overlook or misclassify conduct in the religious organization in order to be able to adjudicate a case." Weinberger, *supra.* at 1278.

**C.     The District Court's Misapplication Of The Neutral Principles Exception Violated The Very Principles The Church Autonomy Doctrine Protects**

By purporting to follow the neutral principles exception to the Church Autonomy Doctrine, the district court became entangled in the very issues the Church Autonomy Doctrine intends to avoid.  That is, the court "probe[d] deeply enough into the allocation of power within a church" in order to resolve a dispute between religious factions, *Sharpsburg*, 396 U.S. at 369-70 (Brennan, J., concurring), and it refused to be bound by the decision of the "highest . . . church judicator[y] to which the matter has been carried." *Watson*, 80 U.S. at 727.

The critical question—which the district court purported to answer—is whether there exists a civil juridic entity in addition to LCMS.  But, as the record makes clear, resolving whether LCMS is the sole civil juridic expression of Synod involves the interpretation of the Synod's governing documents.  Indeed, both the district court *and* LCMS purported to answer the question by recourse to the Synod's governing documents.  *Compare* ROA.3314 (district court quoting directly, line-by-line, from the LCMS Policy Manual) *with* ROA.2229 (Rev. Dr. Sias, Secretary of LCMS, declaring that "the Constitution and Board of Directors of the Synod are also the Constitution and Board of Directors of LCMS," that the "Synod is not a civil law entity but has formed LCMS to be its civil law entity," and that "the one Board of Directors, which is of both the Synod and LCMS, is legal representative of the Synod

- 27 -

precisely by directing the legal actions of LCMS, the Synod's civil law entity."). But instead of deferring to religious authorities' interpretations of their own organic laws—as is required by the First Amendment—the district court saw fit to substitute its own views by supposedly applying the neutral principles exception to Church Autonomy Doctrine.

The district court's substitution of its own understanding of religious laws for that of the Synod, the district court engaged in the very entanglement into religious affairs that the Church Autonomy Doctrine precludes. *Milivojevich*, 426 US at 709; *see also Widmar v. Vincent*, 454 U.S. 263, 269-70 n.6, 272 n.11 (1981) (holding that inquiries into religious significance of words or events are to be avoided); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. at 502 ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.").

## III.   THE FAR-REACHING CONSEQUENCES OF THE DISTRICT COURT DECISION

Affirming the district court's decision will be significantly consequential for religious organizations across the United States.

*First*, the district court's decision extends beyond just this case, and to religious organizations beyond just the Lutheran Church – Missouri Synod.

Numerous religious organizations have chosen a particular civil juridic status that aligns with their specific ecclesiology.[7]

For example, consistent with its theological ecclesiology, Southern Baptists have established separate juridic entities for different purposes, including, among other entities: (1) the Southern Baptist Convention, a Georgia domestic nonprofit corporation; (2) the Executive Committee of the Southern Baptist Convention, a Tennessee nonprofit corporation; (3) various ministries, such as the ERLC, a Tennessee nonprofit corporation; and (4) individual Southern Baptist churches, variously incorporated in the states in which they reside. The relationships between these entities are expressly "ecclesiastical" and "deal with the governance of a religious body"—*i.e.*, they are the chosen civil juridic expression of the Southern Baptists. *See*, *e.g.*, ByLaws of the Executive Committee of Southern Baptist Convention, Art. 2.3. However, any court applying purported "neutral principles" divined by the district court could decree the existence of a separate unincorporated association subject to suit: "The Southern Baptists."[8]

---

[7]       *See generally* Patty Gerstenblith, *Associational Structures of Religious Organizations*, 1995 B.Y.U. L. Rev. 439, 443-44 (1995) (explaining the various associational structures made available to religious organizations under state law, including the unincorporated association, charitable trust, not-for-profit corporation, religious corporation, specific denominational corporation, and finally corporation sole).

[8]       *See generally* Jody Lipford, *Organizational Reputation and Constitutional Constraints: An Application to Religious Denominations*, 3 Const. Pol. Econ. 343 (1992) (examining structures of the Southern Baptist Convention along with the seven other "dominant Christian denominations," including the Roman Catholic Church, the Episcopal Church, the United Methodist Church, the

Similarly, consistent with the theological ecclesiology of the Roman Catholic Church, Roman Catholic dioceses are separately organized juridic entities under the Church's Canon Law and, accordingly, generally express that organizational structure through separate civil juridic organizations.[9] However, any court applying the purported "neutral principles" divined by the district court could decree that all dioceses within a particular state are a single unincorporated association liable to suit—overriding the theological ecclesiology of the Roman Catholic Church. *Cf.* Brief of United States Conference of Catholic Bishops as Amicus Curiae in Support of Petitioners, *Roman Cath. Archdiocese of San Juan v. Acevedo Feliciano*, 589 U.S. 57 (2020) (No. 18-921), 2019 WL 669769, at *9-11.

*Second*, plaintiffs looking to reach assets held by legal entities other than the offending party may assert that those entities collectively constitute an *additional* juridic person subject to suit. For example, parish collaboratives—*i.e.,* multiple separately incorporated parishes, *e.g.*, Parish A and B, served by the same clergy— may be named together as an unincorporated association when Parish A engaged in the alleged wrongdoing but only Parish B has the assets to pay any judgment. This

---

Church of Jesus Christ of Latter-Day Saints, the Presbyterian Church, the Evangelical Lutheran Church in America, and the Lutheran Church – Missouri Synod).

[9]     *See generally* Edward L. Buelt & Charles Goldberg, *Canon Law & Civil Law Interface: Diocesan Corporations*, 36 Cath. Law. 69, 70-72 (1995-1996) (discussing the canon law requirements for juridic persons and the reasons for creating canonical statutes" and using historical examples to show the "role" and an archdiocese's "articles of incorporation and by-laws … play in limiting the civil liability …, while preserving its Catholic autonomy" and remaining consistent with Church teaching and tradition).

is no speculative threat—but for the Supreme Court's intervention on other grounds, the Puerto Rico Supreme Court purported to hold liable the entire "Catholic Church" in Puerto Rico as a single juridic entity for purposes of tort liability. *See Roman Cath. Archdiocese of San Juan v. Acevedo Feliciano*, 589 U.S. 57 (2020).

*Third*, in addition to overriding a religious organization's chosen polity, allowing a court to decide for itself whether a religious organization has a civil juridic status other than the civil juridic status chosen by the religious organization poses the real possibility of destabilizing internal church governance. Regardless of whether substantive claims are cognizable in light of the Church Autonomy Doctrine, disgruntled factions may file serial nuisance suits against certain structures within religious denominations claiming those structures, contrary to the internal governance and organization of the religious organization itself, are a cognizable unincorporated association.

*Fourth*, allowing a court to decide for itself whether a religious organization has a civil juridic status other than the civil juridic status chosen by that entity risks precluding religious organizations from ever invoking federal diversity jurisdiction. A court free to determine whether a religious organization—or a particular religious body—is a separate juridic person recognized by the law of the state in which an action is brought would, in many instances and as it did here, destroy the diversity necessary for federal diversity jurisdiction. *See* 28 U.S.C. § 1332(a). That is

- 31 -

because, as the district court acknowledged, an unincorporated juridic entity is a citizen of every state in which a member resides—destroying diversity for any religious organization with nationwide membership. *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 381 (2016).

*Lastly*, permitting courts to determine the legal status of a religious organization based on its view of the organization's polity creates fertile ground for Establishment Clause issues. As shown, religious organizations structure their membership and governing authorities differently—a distinction reflective of the diversity of religious, moral, and cultural traditions. And, as this case demonstrates, a court's determination of legal status carries with the imposition of certain rights and liabilities. Accordingly, where a particular jurisdiction—whether by legislative or judicial degree—assigns greater legal advantages or disadvantages to religious organizations based on its structure or form of governance, such an assignment implicates the Establishment Clause. *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). Indeed, the Supreme Court faced an analogous scenario in *Larson*, where a party challenged the constitutionality of a statute that "impos[ed] certain registration and reporting requirements upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers." *Id.* at 230, 246 n.23. The law did not facially

favor one denomination over another; however, it preferred religions structured in one way over differently structured religions. *Id*. at 246 n.23. As a result, the Court invalidated the law because it "effectively distinguishe[d] between 'well-established churches'" and "churches which are new and lacking in a constituency." *Id.*

Put simply, the consequences that flow from a district court determining for itself how a religious organization has expressed itself as a civil juridic entity cannot be "square[d] with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations." *Hosanna-Tabor*, 565 U.S. at 189.

## CONCLUSION

For all the foregoing reasons, the Court should decline to endorse a civil court's authority to determine for a religious organization its internal polity, governance, and its civil law expression, and reverse and remand the district court's decision with instructions consistent with the principles stated in this brief.

- 33 -

Respectfully submitted,

*/s/ Matthew T. Martens*
MATTHEW T. MARTENS
PATRICK G. SELWOOD
OLUWALANI OISAGHIE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 2037
(202) 663-6000
mattew.martens@wilmerhale.com
patrick.selwood@wilmerhale.com
olu.oisaghie@wilmerhale.com

ROBERT KINSLEY SMITH
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02186
(617) 526-6759
robert.smith@wilmerhale.com

May 5, 2025                    *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Federal Rules of Appellate 32(g) and 29(a).

1.    Exclusive of the exempted portions, this brief contains 7,787 words and 687 lines. Fed. R. App. P. 32(a)(f) and 29(a)(5).

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  Undersigned has relied upon the word count feature of this word processing system in preparing this certificate.  Fed. R. App. P. 32(g)(1).

*/s/ Matthew T. Martens*
MATTHEW T. MARTENS

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2025, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Matthew T. Martens*
MATTHEW T. MARTENS