No. 25-50130

# In the United States Court of Appeals for the Fifth Circuit

_____

THE LUTHERAN CHURCH – MISSOURI SYNOD, a Missouri
nonprofit corporation,

*Plaintiff-Appellant,*

v.

DONALD CHRISTIAN, CHRISTOPHER BANNWOLF, CONCORDIA UNIVERSITY
TEXAS, INC., & JOHN DOES 1–12,

*Defendants-Appellees.*

_____

On appeal from the United States District Court for the Western
District of Texas, Austin Division, No. 1:23-cv-01042
Hon. David Alan Ezra, United States District Judge

_____

**BRIEF OF THE ASSOCIATION OF CHRISTIAN SCHOOLS
INTERNATIONAL AND THE AMERICAN ASSOCIATION OF
CHRISTIAN SCHOOLS AS AMICI CURIAE IN SUPPORT OF
PLAINTIFF-APPELLANT**

_____

William H. Forman
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1992
WHForman@winston.com

Jonathan D. Brightbill
WINSTON & STRAWN LLP
1901 L Street N.W.
Washington, D.C. 20036
(202) 282-5000
JBrightbill@winston.com

May 5, 2025

William R. Morris III
   *Counsel of Record*
WINSTON & STRAWN LLP
2121 N. Pearl Street
Dallas, TX 75201
(214) 453-6500
WMorris@winston.com

*Counsel for Amici Curiae*

i

## STATEMENT OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Amici Curiae | Counsel for Amici Curiae |
|---|---|
| • American Association of Christian Schools<br>• Association of Christian Schools International | • William R. Morris III<br>WINSTON & STRAWN LLP<br>2121 N. Pearl Street<br>Dallas, TX 75201<br>(214) 453-6500<br>WMorris@winston.com<br>• William H. Forman<br>WINSTON & STRAWN LLP<br>333 S. Grand Avenue<br>Los Angeles, CA 90071<br>(213) 615-1992<br>WHForman@winston.com<br>• Jonathan D. Brightbill<br>WINSTON & STRAWN LLP<br>1901 L Street N.W.<br>Washington, D.C. 20036<br>(202) 282-5000<br>JBrightbill@winston.com |

| Plaintiff-Appellant | Counsel for Plaintiff-Appellant |
|---|---|
| • The Lutheran Church—Missouri Synod, a Missouri Non-profit Corporation | THE BECKET FUND FOR RELIGIOUS LIBERTY:<br>• Daniel H. Blomberg<br>• Andrea R. Butler<br>• Robert K. Ellis<br><br>ALEXANDER DUBOSE & JEFFERSON, L.L.P.<br>• Wallace B. Jefferson<br>• Kevin H. Dubose<br><br>KRONENBERGER LAW FIRM, P.L.L.C.<br>• Gregg R. Kronenberger<br><br>LEVATINO PACE, L.L.P.<br>• Steven C. Levatino<br><br>MACRAE LAW FIRM, PLLC<br>• Andrew F. MacRae |
| Defendants-Appellees | Counsel for Defendants-Appellees |
| • Donald Christian<br>• Christopher Bannwolf<br>• Concordia University Texas, Inc. | RICHARDS, RODRIGUEZ & SKEITH, L.L.P.<br>• Daniel R. Richards<br>• Albert A. Carrion, Jr.<br>• Clark W. Richards<br><br>LAW OFFICE OF MAX RENEA HICKS<br>• Max Renea Hicks |

*/s/ William R. Morris III*
William R. Morris III
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The American Association of Christian Schools and the Association of Christian Schools International are non-profit 501(c)(3) organizations, have no corporate parents, and are not owned in whole or in part by any publicly held corporation.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTERESTED PARTIES ............................................. i

CORPORATE DISCLOSURE STATEMENT .......................................... ii

TABLE OF CONTENTS ................................................... ..... iv

TABLE OF AUTHORITIES ................................................ ...... v

INTERESTS OF AMICI CURIAE ........................................... 1

SUMMARY OF ARGUMENT ................................................ 3

ARGUMENT ........................................................... 6

    I.    The church autonomy doctrine bars judicial interference in ecclesiastical matters, such as questions of church government............................................................ 6

    II.   Even in religious cases involving property, the neutral principles exception does not displace the church autonomy doctrine when the gravamen of the underlying dispute is ecclesiastical. ......................................... 11

    III.   The lower court's trespass upon matters of internal church governance and identity violated the Constitution and binding precedent................................................ 17

    IV.   The lower court's ruling sets a troubling precedent for individuals and institutions of faith. ................................... 25

CONCLUSION ........................................................ 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v.*
  *E.E.O.C.,*
  565 U.S. 171 (2012) ........................................................... 6, 7, 8, 9, 18

*Jones v. Wolf,*
  443 U.S. 595 (1979) ...................................................... 9, 11, 12, 13, 14

*Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox*
  *Church in N. Am.,*
  344 U.S. 94 (1952) .................................................. 5, 6, 7, 9, 10, 17, 18

*In re Lubbock,*
  624 S.W.3d 506 (Tex. 2021) ............................................................ 20

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention,*
  *Inc.,*
  966 F.3d 346 (5th Cir. 2020) ................................. 7, 8, 9, 18, 19, 23, 25

*McRaney v. N. Am. Mission Bd. of S. Baptist Convention,*
  *Inc.,*
  980 F.3d 1066 (5th Cir. 2020) ................................................ 8, 25, 26

*Md. & Va. Eldership of the Churches of God v. Church of*
  *God at Sharpsburg, Inc. (Maryland & Virginia Churches),*
  396 U.S. 367 (1970) .......................................................... 11, 12, 13, 15

*Our Lady of Guadalupe School v. Morrissey-Berru,*
  591 U.S. 732 (2020) ................................................. 5, 6, 7, 9, 10, 18, 19

*Paul v. Watchtower Bible & Tract. Soc'y of N.Y., Inc.,*
  819 F.2d 875 (9th Cir. 1987) ............................................................. 7

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull*
  *Mem'l Presbyterian Church (Presbyterian Church I),*
  393 U.S. 440 (1969) ................................................. 8, 9, 10, 14, 15, 24

*Roman Catholic Archdiocese of San Juan, Puerto Rico v.*
   *Acevedo Feliciano*,
   589 U.S. 57 (2020) ................................................................ 21

*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v.*
   *Milivojevich*,
   426 U.S. 696 (1976) ....................................3, 8, 9, 10, 16, 21, 22, 26

*Watson v. Jones*,
   80 U.S. 679 (1872) ................................ 6, 8, 9, 11, 12, 13, 26

*Whole Woman's Health v. Smith*,
   896 F.3d 362 (5th Cir. 2018) ................................................. 5

## Other Authorities

Fed. R. App. P. 29(a)(4) ........................................................... 1

U.S. Const. amend. I ....................3, 4, 5, 6, 7, 9, 10, 15, 17, 18, 21, 27, 29

U.S. Const. amend. XIV ........................................................... 3

## INTERESTS OF AMICI CURIAE[*]

The Association of Christian Schools International (ACSI) is a nonprofit association that supports 25,000 Christian schools in over 100 countries. ACSI serves member schools worldwide, including 2,200 Christian preschools, elementary, and secondary schools and 60 postsecondary institutions in the United States. ACSI provides pre-K–12 accreditation, professional development, curricula, and other services that cultivate a vibrant Christian faith that embraces all of life.

The American Association of Christian Schools (AACS) is an association of 38 state, regional, and international associations that promote high-quality Christian education. AACS represents more than 700 K-12 schools and higher ed institutions and provides high quality services such as school and childcare accreditation, teacher certification, student testing, teacher benefit programs, legal consultation, and government outreach. AACS supports each school as they carry out their

---

[*] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), Amici Curiae certify that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than the Amici Curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

mission immersing scholarship into faith and forming the next generation of Christian leaders.

These organizations, their members, and the students that they serve have a unique interest in the outcome of this case. These schools' religious and educational missions include the integration of faith throughout all aspects of their educational programs, and they have a wide variety of foundational documents outlining these objectives. Many of these foundational documents also create atypical organizational bonds between the educational institutions and the religious traditions with which they affiliate. Accordingly, these religious schools desire to safeguard their ability to determine their own structures and to resolve internal disputes about the same free from judicial interference.

## SUMMARY OF ARGUMENT

The outcome of this appeal is squarely controlled by Supreme Court precedent. "[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government." *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 724 (1976). "When this choice is exercised . . . the Constitution requires that civil courts accept their decisions as binding upon them." *Id.* at 724–25.

In *Milivojevich*, the lower court improperly intervened in a dispute over the reorganization of a religious diocese. *Id.* at 707–08. Reversing, the Supreme Court deferred to the denomination's governing documents, which provided that "the details of the reorganization . . . were expressly left for the Diocesan National Assembly to determine." *Id.* at 723–24. In doing so, the Supreme Court pointedly "[would] not delve into the various church constitutional provisions relevant to this conclusion, for that would repeat the error of the [lower court]." *Id.* at 721. Instead, the Court succinctly held, "It suffices to note that the reorganization of the Diocese involves a matter of internal church government, an issue at the core of ecclesiastical affairs." *Id.*

The same reasoning applies here. According to foundational documents dating back over a century—and controlling interpretations of those documents from the relevant religious authorities dating back just as long—LCMS[1] is a Missouri corporation established in 1894 as the civil law reflection of the Synod in all secular affairs. The lower court should have recognized this fact, deferred to the internal organizational structure established by the Synod, and ended its inquiry. Instead, the lower court divorced LCMS and the Synod, upending 130 years of the Synod's internal rule, and thereby injecting itself as the final arbiter of the denomination's self-governance.

When reversing another decision that unnecessarily impinged religious First Amendment rights in a different case—albeit arising from the same district court—the Fifth Circuit articulated the following:

> With due respect to the district court, its analysis was incorrectly dismissive of the seriousness of the issues raised by [Appellant]. It is no accident that we have found no case directly on point on the issue . . . . It is no accident that several religiously affiliated organizations have filed amicus briefs in support of [Appellant's] claim.

---

[1] This brief uses the same terminology as Plaintiff-Appellant's brief, referring to the Lutheran Church Missouri Synod—identified below as the "Corporate Synod" or "LCMS"—as "LCMS," and referring to the eponymous, unincorporated ecclesiastical government of the Lutheran Church Missouri Synod as "the Synod."

*Whole Woman's Health v. Smith*, 896 F.3d 362, 370 (5th Cir. 2018), as revised (July 17, 2018). So too here. The lower court's decision does not appropriately weigh the core First Amendment protections at issue, it contradicts binding Supreme Court precedent, and it necessitates the attention of religiously affiliated organizations such as Amici.

By sidestepping bedrock principles of religious liberty, the lower court's decision eschews the fact that religious organizations have the power to "decide for themselves, free from state interference, *matters of church government* as well as those of faith and doctrine," *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) (emphasis added) (quoting *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). It thus has dangerous implications for the First Amendment freedoms of institutions and individuals of faith if left unaddressed. For these reasons, and those expressed *infra*, the decision of the lower court should be reversed.

## ARGUMENT

### I. The church autonomy doctrine bars judicial interference in ecclesiastical matters, such as questions of church government.

The "church autonomy" doctrine has deep roots in the Free Exercise and Establishment Clauses of the First Amendment. *Our Lady of Guadalupe*, 591 U.S. at 747. As the Supreme Court has explained, "the Religion Clauses protect the right of churches and other religious institutions to decide matters of 'faith and doctrine' without government intrusion." *Id.* at 746 (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 186 (2012)). The Constitution thus requires courts to grant "special solicitude to the rights of religious organizations" in numerous ways. *Hosanna-Tabor*, 565 U.S. at 189.

As far back as 1872, the Court has held that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Watson v. Jones*, 80 U.S. 679, 727 (1872). Nearly a century later, the Court reaffirmed the same "spirit of freedom for religious organizations, an independence from secular control or manipulation" by

secular laws. *Kedroff*, 344 U.S. at 116 (discussing *Watson*). In *Kedroff*, the Court held that a New York state law recognizing the primacy of one of two religious factions to access a cathedral violated the Constitution's separation of church and state. *Id.* at 121.

More recently, the Court recognized that the "principle of church autonomy" required a "ministerial exception" to the application of the civil rights laws. *Our Lady of Guadalupe*, 591 U.S. at 747–49 (surveying the origins of the Religion Clauses and the church autonomy precedents interpreting them); *Hosanna-Tabor*, 565 U.S. at 181–90 (same). The Court pointedly declared that the "constitutional foundation for our holding [in *Hosanna-Tabor*] was the general principle of church autonomy"—specifically, "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 591 at 747.

Some courts describe this judicial deference to church autonomy as the "ecclesiastical abstention doctrine." *See, e.g.*, *Paul v. Watchtower Bible & Tract. Soc'y of N.Y., Inc.,* 819 F.2d 875, 878 (9th Cir. 1987). The Fifth Circuit has alternately used both the "ecclesiastical abstention" and "church autonomy" articulations, sometimes within the same case.

*Compare McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.* ("*McRaney* (panel op.)"), 966 F.3d 346, 347 (5th Cir. 2020) (referring to the "ecclesiastical abstention doctrine"), *with McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.* ("*McRaney* (en banc denial)"), 980 F.3d 1066, 1067 (5th Cir. 2020) (denying en banc review) (Ho, J., dissenting) (referring to the "church autonomy doctrine"). Whatever the label, when a court is faced with a controversy where the "subject-matter of dispute" is "strictly and purely ecclesiastical in its character" or "concerns . . . ecclesiastical government," that is "a matter over which the civil courts exercise no jurisdiction." *Watson*, 80 U.S. at 733; *see also Milivojevich*, 426 U.S. at 713–14 (approvingly quoting *Watson* for the same proposition).

Thus, when a lower court waded into ecclesiastical matters in *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church (Presbyterian Church I)*, 393 U.S. 440 (1969), the Supreme Court reversed. It reprimanded the state court for "engag[ing] in the forbidden process of interpreting and weighing church doctrine." 393 U.S. at 451. For our "civil courts [can]not

review and enforce [a] church decision without violating the Constitution." *Id.*[2]

Additional Supreme Court case law has established that the principle of "church" autonomy applies to all religious institutions and organizations, not just places for worship. *Watson* first emphasized, with specific reference to "Protestant dissenters . . . Catholics and Jews," everyone in the United States enjoys "the full and free right" to entertain "any religious belief." 80 U.S. at 728. This wide range of protected religious expression necessarily means that some oft-repeated terms, such as "church," will not fully reflect the breadth of the First Amendment's protections. *Cf. Our Lady of Guadalupe*, 591 U.S. at 752 (explaining how "priests, nuns, rabbis, and imams" all benefit from the same protections as a "minister"); *see also McRaney* (panel op.), 966 F.3d at 347 (suggesting possible use of the term of "religious autonomy doctrine"). Church autonomy cases thus regularly reference "religious organizations," rather than simply churches. See *Jones v. Wolf*, 443 U.S. 595, 604 (1979) (citation omitted); *Milivojevich*, 426 U.S. at 724;

---

[2] In this way, the broader church autonomy doctrine or ecclesiastical abstention doctrine differs from the more specific ministerial exception to civil rights liability, which is "not a jurisdictional bar." *Hosanna-Tabor*, 565 U.S. at 195 n.4.

*Presbyterian Church I*, 393 U.S. at 449; *Kedroff*, 344 U.S. at 116; *Watson*, 80 U.S. at 714. When examining the same First Amendment principles, *Hosanna-Tabor* and *Our Lady of Guadalupe* discussed "religious groups" and "religious institutions," respectively. *Hosanna-Tabor*, 565 U.S. at 184; *Our Lady of Guadalupe*, 591 U.S. at 746. Religious organizations, groups, and institutions come in many forms. There are churches, cathedrals, synagogues, mosques, schools, hospitals, community centers, charities, and more. The church autonomy doctrine, borne out of the Religion Clauses of the Constitution, protects the faith-related and faith-implicated aspects of them all.

The church autonomy doctrine also protects both hierarchical and "congregational" religious organizations. Certain precedents discuss deferring to the governing bodies of "hierarchical" religious organizations. See *Kedroff*, 344 U.S. at 110; *Presbyterian Church I*, 393 U.S. at 441; *Milivojevich*, 426 U.S. at 724. This is not a limitation of the constitutional protections to certain formal religious structures. It simply reflects the historic context and facts in which these principles and precedents first arose. Many religious organizations have hierarchical structures. But this circumstance does not and cannot

10

principally limit the protections of the First Amendment to only certain forms of religious organization.

## II. Even in religious cases involving property, the neutral principles exception does not displace the church autonomy doctrine when the gravamen of the underlying dispute is ecclesiastical.

Ecclesiastical matters are under the sole purview of religious authorities. But civil courts are not deprived of all jurisdiction to resolve disputes about and among a religious institution. There are, of course, secular matters that religious authorities are without jurisdiction to decide, or which it is proper for civil judicial authorities to resolve. As the Court in *Watson* concisely explained, "[I]f the General Assembly of the Presbyterian Church should undertake to try one of its members for murder, and punish him with death or imprisonment, its sentence would be of no validity in a civil court or anywhere else." <u>80 U.S. at 733</u>.

In addition, when a dispute over "real or personal" property "*in no sense* depend[s] on ecclesiastical questions," civil authorities can resolve such controversies, even when they occur between religious parties. *Id.* (emphasis added). In these situations, civil authorities "may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual

and liturgy of worship or the tenets of faith." *Jones*, 443 U.S. at 602 (emphasis omitted) (quoting *Md. & Va. Eldership of the Churches of God v. Church of God at Sharpsburg, Inc. (Maryland & Virginia Churches)*, 396 U.S. 367, 368 (1970) (Brennan, J., concurring)).

*Jones* reflects that the application of "neutral principles of law" *can* resolve *certain* church property disputes consistent with the Constitution. *Id.* at 603. But civil authorities are not empowered to inquire into and resolve any church-related issue by purporting to apply a "'neutral principles of law' method." *Id.* at 600. It is closely circumscribed by the case law. Therefore, properly applied, this approach must "rel[y] exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." *Id.* at 603. Only this can "free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id.*

The Court subsequently affirmed the application of neutral principles in *Maryland & Virginia Churches*. This was "a church property dispute" between a general church and two secessionist congregations. 396 U.S. at 367 (per curiam). There, the Maryland Court of Appeals "relied upon provisions of state statutory law governing the

holding of property by religious corporations, upon language in the deeds conveying the properties in question to the local church corporations, upon the terms of the charters of the corporations, and upon provisions in the constitution of the [general church] pertinent to the ownership and control of church property." *Id.* There was, however, no dispute as to the religious status of the disputing parties or that they each could and did represent distinct civil bodies. Because there was "no inquiry into religious doctrine," the Court affirmed the state court's resolution of the case. *Id.* at 368; *see also Jones*, 443 U.S. at 602–03 (noting that the "neutral-principles approach was approved in *Maryland & Virginia Churches*").

*Maryland & Virginia Churches* should not, however, be misread as a blank check for civil courts to invoke so-called "neutral principles." For "the application of the neutral-principles approach is [not] wholly free of difficulty." *Jones*, 443 U.S. at 604. Depending on the case and context, a neutral-principles approach may "require[] a civil court to examine certain religious documents, such as a church constitution" to resolve a property dispute. *Id.* The Supreme Court thus warned that "[i]n undertaking such an examination, a civil court must take special care to

scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Id.* The same limitations apply when considering a religious institution's "deed" or "corporate charter." *Id.* Therefore, if "the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.*

Proper application of "neutral principles" is therefore not—as the lower court erroneously conceived—a simple matter of applying secular, civil law to the bylaws, corporate charters, and facts of religious institutions. For example, in *Presbyterian Church I*, two local churches trying to leave the general Presbyterian church sued in state court. Both churches sought to secure their claims to their local church's properties. 393 U.S. at 441–44. The documented "title to [the property] was in the local churches." *Id.* at 443. The general church nevertheless claimed ownership over the property of the breakaway congregations based on principles of implied trust. The local churches defended that the general

church had departed from church doctrine when disputing the application of such a trust. *Id.*

The jury determined that the general church had departed from religious doctrine, thus ruling in the local churches' favor on the question of implied trust. *Id.* at 444. The Supreme Court later reversed. It explained that the controversy "requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role." *Id.* at 450. *Presbyterian Church I* thus stands as a counterpoint to *Maryland & Virginia Churches*—where no question of religious import was required to address control. While both cases putatively involved church property, there is a key difference between them. *Presbyterian Church I* strayed into ecclesiastical matters of church organization and identity as a question-precedent to resolving the underlying property dispute. 393 U.S. at 451. *Maryland & Virginia Churches* reflects a wholly secular property dispute—requiring no inquiry into religious qualification, identity, or organization—that could be resolved using neutral principles. 396 U.S. at 367–68.

This distinction is especially relevant here.  The underlying case—a controversy between a hierarchical religious body and its allegedly wayward subordinate institution—does have property implications, which will surely be litigated later.  Yet the dispute before this court is not about the nature of the property, but of the very nature and existence of one of the purported "parties"—a party that is a religious organization. The only question before this court is whether to affirm the lower court's decision that the Synod is an unincorporated association, with a distinct existence for purposes of civil law and authority from the Missouri corporation created expressly for interaction with civil, secular society. This question implicates an inquiry into the religious history, tradition, internal governance, and structure of LCMS and the Synod.  The fundamentally ecclesiastical nature of this question-precedent cannot be ignored because of any property-related matters that may follow it.

Instead, when civil judicial authorities recognize that a given dispute can only be resolved through a process straying into an ecclesiastical inquiry, the duty is simply to abstain.  The Supreme Court explicitly rejects even an "arbitrariness exception" that would allow courts to consider a religious body's compliance with its own written

16

rules. *Milivojevich*, [426 U.S. at 713](). For "recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them." *Id*.

At bottom, a neutral-principles approach is sometimes permissible. But it is a situational tool. It cannot swallow the First Amendment's protections. "Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls." *Kedroff*, [344 U.S. at 120]()–21.

## III. The lower court's trespass upon matters of internal church governance and identity violated the Constitution and binding precedent.

The lower court blithely asserted that its decision "does not alter or reorganize the Synod's internal governance." Dist. Ct. Op. at 15, [ROA.3313](). The opposite is true. For over 130 years, the Synod organized itself and its relationship to secular, civil society through a Missouri corporation—LCMS—to represent the Synod in all civil affairs. Now, by judicial decree, LCMS is a legal nullity, and the Synod is an

17

unincorporated association that, in theory, exists everywhere and can be sued anywhere a member of the Synod is found.

To reach this conclusion, the lower court's First Amendment analysis contains citations to five cases. Those cases are all highly relevant. But rather than supporting the district court's actions, each case expressly cautions against the exact kind of ecclesiastical interference that the lower court engaged in.

For example, *Our Lady of Guadalupe* specifically identifies "matters of church government" as necessarily "free from state interference." 591 U.S. at 746 (quoting *Kedroff*, 344 U.S. at 116). As the Court further explained:

> The independence of religious institutions in matters of "faith and doctrine" is closely linked to independence in what we have termed " 'matters of church government.' " This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission.

*Id.* at 746 (quoting *Hosanna-Tabor*, 565 U.S. at 186). Thus, while religious organizations are not generally immune from secular laws, they do enjoy independence from judicial oversight with respect to matters of church organization and government.

The *McRaney* panel opinion echoes this same legal principle:

> The ecclesiastical abstention doctrine recognizes that the Establishment Clause of the First Amendment precludes judicial review of claims that require resolution of "strictly and purely ecclesiastical" questions. *"[M]atters of church government, as well as those of faith and doctrine" constitute purely ecclesiastical questions*.

966 F.3d at 348 (citations omitted) (emphasis added). As such, the *McRaney* panel opinion, much like *Our Lady of Guadalupe*, stands for the proposition that matters of church government implicate ecclesiastical matters that preclude judicial inquiry and review.

Of course, the district court makes much of the *McRaney* panel's warning that the secular components of religious relationships should not be categorically insulated from judicial scrutiny. But the *McRaney* panel's application of this principle provides little justification for the actions of the district court here. Specifically, the *McRaney* panel held that a church cannot broadly assert "valid religious reasons" at the outset of a case to shield itself from all scrutiny in an employment dispute. 966 F.3d at 351. But even then, the *McRaney* panel noted that the action might still be dismissed on remand if the church could substantiate its "valid religious reasons" with evidence, and if there was no other way to resolve the matter without addressing those reasons. *Id.* Nowhere does

this carefully cabined reasoning justify reinterpreting a religious institution's organizational hierarchy and reviewing the very nature of its existence and identity, as the district court did here.

*In re Lubbock* also provides no real support for the district court. 624 S.W.3d 506 (Tex. 2021). According to *In re Lubbock*:

> A court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into religious doctrine, interference with the free-exercise rights of believers, or *meddling in church government.* Under the neutral-principles methodology, "courts decide non-ecclesiastical issues such as property ownership based on the same neutral principles of law applicable to other entities, *while deferring to religious entities' decisions on ecclesiastical and church polity questions.*"

*Id.* at 513 (citations omitted) (emphases added). And as its holding, the Supreme Court of Texas directed a dismissal for want of jurisdiction because the underlying case would have required an evaluation of the proper application of Canon Law and would have "inextricably intertwined" the courts with a religious institution's internal directives. *Id.* at 509. Put simply, the case warns against meddling in church government, evaluating religious texts, and intertwining with a religion's internal directives. *In re Lubbock* does not support the district court's decision to do all of the above.

20

*Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano* is similarly unhelpful for the district court. 589 U.S. 57, 63 (2020). The Supreme Court disposed of that case without ever addressing the question of the Catholic Church's legal existence and identity (distinct from certain Catholic schools) because the lower Puerto Rican court's relevant orders were issued during a period when a federal district court properly possessed jurisdiction over the matter. *Id.* at 63–64. The concurrence to that judgment observes that "*the degree* to which the First Amendment permits civil authorities to question a religious body's own understanding of its structure and the relationship between associated entities" is a question that the Court is continuing to explore. *Id.* at 67 (Alito, J., concurring) (emphasis added). In this way, *Roman Catholic* is technically the most helpful case for the district court, given that it offers no substantive opinion on the question at hand, while all the other cited cases expressly undercut the district court's actions.

Finally, the district court considered *Milivojevich*. And the district court correctly observed that *Milivojevich* requires civil deference to religious tribunals on matters of church government. 426 U.S. at 724. But the district court failed to recognize that the Synod is such a religious

governance body that has the final say on its denomination's internal structure and governance, including the prerogative to incorporate LCMS for purposes of civil relations.  The district court also failed to engage with the central reasoning of *Milivojevich* that "the composition of the church hierarchy [is] at the core of ecclesiastical concern."  *Id.* at 696.

Rather, the district court charged into this sensitive question of church identity and organization.  It conducted its own review of LCMS's and the Synod's governing documents.  It discounted a declaration from the relevant religious authority explaining how LCMS's and the Synod's structures are direct implementations of theological precepts.  *See, e.g.*, Declaration of Rev. Dr. John W. Sias, at ¶6, ROA.3224 ("Francis Pieper, a foremost theologian and later president of the Synod, called church government a *doctrine*, rooted in the *doctrine of the church*, identifying as its means of government the Word of God, and as its master, Christ alone (Matt. 23:8)." (emphasis original)); *see also id.* at ¶7, ROA.3224 ("The purpose of our Synod community is . . .  preservation and promotion of the unity of the pure confession and supervision of the unity and purity of doctrine. . . . [T]he entire Synod institution is to serve the sole dominion

of the Word of God." (alterations accepted) (emphasis, quotations, and citations removed)). Then, the district court injected its own judgment as the final word on the matter. Dist. Ct. Op. at 16, ROA.3314 ("In reviewing not only the Synod's constitution and bylaws, but also the LCMS Board of Director's Policy Manual ('LCMS Policy Manual'), the Court finds that even LCMS recognizes the Synod's capacity to be sued."). And the lower court did all of this, to quote *McRaney*, based on a "premature" forecast that the underlying property dispute would not require any inquiry into religious doctrine. *McRaney* (panel op.), 966 F.3d at 351.

The wide-reaching practical effect of this analysis of church organizational documents is further evidence why courts should stay out of the religion business in the first place. According to the district court, (1) the Synod is legally distinct from LCMS, (2) the Synod holds all the substantive rights that would traditionally find their end in LCMS, and (3) the Synod is an unincorporated association that is a citizen of Texas. Because of these findings, the district court concluded that the non-diverse Synod was a necessary party whose joinder would defeat jurisdiction. But by this logic, the Synod would be a citizen of every state

where a member resides, provided those states had similar unincorporated association laws to Texas. And it is not clear how the Synod may avoid this fate. Clearly, 130 years of history, tradition, doctrine, declarations, and documentation are an insufficient counterbalance to the interpretations of the (secular) court. And what is to become of LCMS? If the district court's decision is afforded its full scope of effect, LCMS's existence is a practical nullity—given that it lacks independent substantive rights and the ability to sue or be sued absent the Synod.

The district court should have recognized that its searching inquiry into the texts of church governance and beliefs and understandings of its leaders constituted a trespass on sacred lands. Then, it should have stopped. It should have deferred to the judgment of the Synod that LCMS represented its civil identity and organization, and moved on. The district court's failure to follow this constitutionally mandated course of action, and its alternate decision to "inject the civil courts into substantive ecclesiastical matters," was error. *Presbyterian Church I*, 393 U.S. at 451. The burden now falls on this court to correct that error.

## IV. The lower court's ruling sets a troubling precedent for individuals and institutions of faith.

The lower court's decision depends upon a logical fallacy that threatens to upend the church autonomy doctrine and the protections it offers. Specifically, the lower court seemingly concludes that because a part of the case involves a property issue that might eventually be capable of resolution by neutral principles, then every issue in the case is subject to judicial review by such principles.[3] If unchecked, this faulty reasoning would essentially erase the church autonomy doctrine.

These concerns are no invention of Amici. At least six judges on this court have expressed similar reservations. As Judge Ho—joined by Judges Jones, Smith, Elrod, Willett, and Duncan—articulated in his dissent to the denial of en banc review in *McRaney*, under this misplaced logic, "no claim would *ever* be subject to the church autonomy doctrine— *every* civil plaintiff purports to invoke neutral legal principles, and *every* application of the church autonomy doctrine grants religious organizations special treatment." *McRaney* (en banc denial), 980 F.3d at 1070 (Ho, J., dissenting) (emphases original). And as Judge Ho further

---

[3] As discussed above, the condition precedent for this equation–that the case involves a property issue capable of resolution by neutral principles—is itself premature.

expounded, "if an appeal to 'neutral principles of tort law' were all it took to sue a religious institution, it would be the exception that swallowed the rule." *Id.* at 1072.

Nor are these concerns unique to members of this court. The Supreme Court shares the view that the "neutral-principles approach" must only be employed to review the "corporate charter or the constitution" of a religious institution "so long as the use of that method does not impair free-exercise rights or *entangle the civil courts in matters of religious controversy*." *Jones*, 443 U.S. at 607–08 (emphasis added). In other words, the neutral-principles approach is a situational tool, not a generalizable rule of procedure. As the Court wrote in *Milivojevich*, allowing civil courts to inquire into ecclesiastical matters "would deprive these [religious] bodies of the right of construing their own church laws, . . . [a]nd would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions." 426 U.S. at 714 (quoting *Watson*, 80 U.S. at 733–34).

Both concerns—impaired free exercise and ecclesiastical entanglement—are at play here. For the first time since the Steam Age, Plaintiff-Appellant is grappling with the question of what entity or

26

individual speaks for its faithful. And this quandary carries implications far beyond Plaintiff-Appellant's relations with Defendants; indeed, within its denomination, every member, minister, and affiliated institution is touched by the district court's pronouncement that LCMS is no longer legally representing and protecting the interests of the Synod in the secular world. And it is not lost on Amici that Plaintiff-Appellant lacks any meaningful ecclesiastical recourse. By asserting its authority into this dispute above LCMS and the Synod, the district court has installed itself as the highest arbiter within that denomination, such that there is no higher ecclesiastical body that may entertain an appeal. And by extension, there is no way to remove the district court's unconstitutional intervention, save a reversal by this Court.

Amici fear a similar fate; namely, that their organizational structures might be examined, chopped up, and reformed by secular courts purporting to apply "neutral principals." But that end is not yet written. This Court should not allow First Amendment protections to become contingent upon the document-drafting skills of a religious entity or its attorneys. The thousands of religious schools represented by Amici each have different founding documents. Many are budget-constrained,

with limited capacity to hire lawyers. Their ability to successfully protect their identities, organizations, and thereby the core tenants of their particular institutions should not turn on their successful prediction of the myriad ways that creative litigants and reviewing courts might someday pervert (or ignore statements in) their establishing documents. Nor should their religious freedoms be risked by civil courts reframing ecclesiastical questions of church governance as property disputes for "neutral" resolution. And particularly their conscious organizational choices—however orthodox or unorthodox, *and here it was very orthodox*—should certainly not be second-guessed by courts parachuting into religious controversies.

This case presents an excellent opportunity for this court to reaffirm the limits of a "neutral principles" approach. The Constitution requires civil courts to decline jurisdiction entirely when asked to address ecclesiastical questions such as church organization and governance, even—and especially—when those questions are intertwined with property claims. Here, the lower court failed to do so. This warrants correction, lest continued widespread overapplication of "neutral

principles" undermine the important First Amendment barrier that decades of precedents have carefully and consistently policed.

## CONCLUSION

For the foregoing reasons, this court should reverse the judgment below and remand this action for further proceedings before the district court.

Respectfully submitted,

/s/ *William R. Morris III*

William R. Morris III
    *Counsel of Record*
WINSTON & STRAWN LLP
2121 N. Pearl Street
Dallas, TX 75201
(214) 453-6500
WMorris@winston.com

William H. Forman
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1992
WHForman@winston.com

Jonathan D. Brightbill
WINSTON & STRAWN LLP
1901 L Street N.W.
Washington, D.C. 20036
(202) 282-5000
JBrightbill@winston.com

*Counsel for Amici Curiae*

May 5, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of <u>Federal Rules of Appellate Procedure 29(a)(5)</u> and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by <u>Federal Rule of Appellate Procedure 32(f)</u> and the Rules of this court, it contains 5,431 words.

This brief also complies with the typeface and type-style requirements of <u>Federal Rules of Appellate Procedure 29(a)(4)</u>, <u>32(a)(5)</u>, and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated:  May 5, 2025

<u>/s/ William R. Morris III</u>
William R. Morris III
*Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of the Association of Christian Schools International and the American Association of Christian Schools as Amici Curiae in Support of Plaintiff-Appellant with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit on May 5, 2025, using the Appellate Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 5, 2025

/s/ William R. Morris III
William R. Morris III
*Attorney for Amici Curiae*