No. 25-50130

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

THE LUTHERAN CHURCH–MISSOURI SYNOD, A MISSOURI NONPROFIT
CORPORATION,
*Plaintiff-Appellant,*

v.

DONALD CHRISTIAN; CHRISTOPHER BANNWOLF;
JOHN DOES 1-12;
CONCORDIA UNIVERSITY TEXAS INCORPORATED,
*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION
1:23-CV-1042

---

## BRIEF OF APPELLEES

---

Renea Hicks
Law Office of Max Renea Hicks
P. O. Box 303187
Austin, Texas 78703
(512) 480-8231
rhicks@renea-hicks.com

Daniel R. Richards
Clark Richards
Albert A. Carrion, Jr.
Richards Rodriguez & Skeith, LLP
611 West 15th Street
Austin, Texas 78701
Tel (512) 476-0005
drichards@rrsfirm.com
crichards@rrsfirm.com
acarrion@rrsfirm.com

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| **Parties/Entities** | **Trial & Appellate Counsel** |
| --- | --- |
| *Plaintiff-Appellant*<br>The Lutheran Church–Missouri Synod, a Missouri nonprofit corporation | Daniel H. Blomberg,<br>Andrea R. Butler<br>Robert K. Ellis<br>THE BECKET FUND FOR RELIGIOUS LIBERTY<br><br>Wallace B. Jefferson<br>Kevin H. DuBose<br>ALEXANDER DUBOSE & JEFFERSON, L.L.P.<br><br>Gregg R. Kronenberger<br>KRONENBERGER LAW FIRM, P.L.L.C.<br><br>Steven C. Levatino<br>LEVATINO PACE, L.L.P.<br><br>Andrew F. MacRae<br>MACRAE LAW FIRM, PLLC |
| *Real Plaintiff in Interest*<br>The Lutheran Church–Missouri Synod, an unincorporated | Daniel H. Blomberg<br>Andrea R. Butler<br>Robert K. Ellis |

ii

| Parties/Entities | Trial & Appellate Counsel |
|---|---|
| association of Lutheran congregations | THE BECKET FUND FOR RELIGIOUS LIBERTY<br><br>Wallace B. Jefferson<br>Kevin H. DuBose<br>ALEXANDER DUBOSE & JEFFERSON, L.L.P.<br><br>Gregg R. Kronenberger<br>KRONENBERGER LAW FIRM, P.L.L.C.<br><br>Steven C. Levatino<br>LEVATINO PACE, L.L.P.<br><br>Andrew F. MacRae<br>MACRAE LAW FIRM, PLLC |
| *Defendants-Appellees*<br>Donald Christian<br>Christoper Bannwolf<br>Concordia University Texas Incorporated | Daniel R. Richards<br>Clark Richards<br>Albert A. Carrion, Jr.<br>RICHARDS RODRIGUEZ & SKEITH, LLP<br><br>Renea Hicks<br>LAW OFFICE OF MAX RENEA HICKS |
| *Defendants*<br>John Does 1-12 (*"unknown individuals" presently or formerly on the Concordia University Texas, Inc., Board of Regents*) | *No counsel* |

| **Other Interested Parties** | **Counsel for Interested Parties** |
|---|---|
| Aleph Institute | Matthew Martens of Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, DC |
| American Association of Christian Schools | William Morris of Winston & Strawn, L.L.P., Dallas, TX |
| Anglican Church in North America | Matthew Martens of Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, DC |
| Assembly of Canonical Orthodox Bishops of the United States of America | Matthew Martens of Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, DC |
| Association of Christian Schools International | William Morris of Winston & Strawn, L.L.P., Dallas, TX |
| Ethics and Religious Liberty Commission | Matthew Martens of Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, DC |
| General Conference of Seventh-day Adventists | Matthew Martens of Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, DC |
| National Association of Evangelicals | Matthew Martens of Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, DC |
| Religious Liberty Scholars | Ethan Beck of Jones Day, Washington, DC and Brandon Winchel of Jones Day, Irvine, CA and Kurt Johnson of Jones Day, Detroit, MI |
| Texas Catholic Conference of Bishops | Matthew Martens of Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, DC |

*/s/ Daniel R. Richards*

Daniel R. Richards
*Counsel of Record for Defendants-Appellees*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

LCMS chose to initiate suit on state law claims in a federal forum, then invoked the church autonomy doctrine to try to bar the district court from exercising its duty to determine whether it had jurisdiction to adjudicate those claims. Oral argument would aid closer evaluation of this unprecedented use of the doctrine.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ..........................................ii

STATEMENT REGARDING ORAL ARGUMENT ..................................v

TABLE OF CONTENTS ...................................................................vi

INDEX OF AUTHORITIES ............................................................viii

INTRODUCTION............................................................................1

STATEMENT OF JURISDICTION.....................................................3

ISSUES PRESENTED ......................................................................3

STATEMENT OF THE CASE ...........................................................4

    I.  Facts of the Case ..............................................................4

        A.  Entities in The Dispute ..............................................4

        B.  Concordia's November 2022 Actions .........................12

        C.  Synod's Response .....................................................14

    II.  Course of Proceedings in the District Court....................16

        A.  Proceedings ..............................................................16

        B.  Disposition in the District Court ...............................19

SUMMARY OF THE ARGUMENT ...................................................23

STANDARDS OF REVIEW .............................................................28

ARGUMENT ...............................................................................29

    I.  The Church Autonomy Doctrine Does Not Bar the Determination that the Synod is the Real Party to the Controversy. ...................31

        A.  The Church Autonomy Doctrine Does Not Absolve LCMS of Shouldering the Burden of Establishing Diversity Jurisdiction, Nor Does it Strip Federal Courts of the Obligation to Determine Whether They Have Jurisdiction...........................31

        B.  The District Court's Inquiry Into Its Jurisdiction Did Not Intrude on Church Autonomy. ...............................................37

    II.  The Synod is an Unincorporated Association with Texas Citizenship..................................................................................42

        A.  Precedent Establishes that Churches are Unincorporated Associations Under Texas Law. ...............................................43

B.  The Synod and LCMS are Not One and The Same, and The
    Synod is Not Incorporated. .......................................................45

C.  LCMS's Effort to Buttress its Erroneous Argument that the
    Synod is Not An Unincorporated Association is Unavailing...48

    1.  The Doctrine of Constitutional Avoidance is Inapplicable
        Here. ..................................................................................48

    2.  The Texas Religious Freedom Restoration Act Says
        Nothing About Proper Interpretation of the
        Unincorporated Association Act.......................................50

    3.  The "Internal Affairs Doctrine" Is Inapplicable. ..............51

III. LCMS's Rule 19 Argument Is Irrelevant......................................53

CONCLUSION ....................................................................................55

CERTIFICATE OF SERVICE................................................................56

CERTIFICATE OF COMPLIANCE.......................................................57

# INDEX OF AUTHORITIES

## Cases

*Airlines Reporting Corp. v. S and L Travel, Inc.,*
  58 F.3d 857 (2d Cir. 1995) .......................................................................30

*Arena v. Graybar Elec. Co.,*
  669 F.3d 214 (5th Cir. 2012) ...................................................................29

*Askanase v. Fatjo,*
  130 F.3d 657 (5th Cir. 1997) ...................................................................52

*Carden v. Arkoma Assocs.,*
  494 U.S. 185 (1978) .......................................................................... 29, 30

*Catholic Church v. Tobbein,*
  82 Mo. 418 (1884) ....................................................................................48

*Cf. Employment Div'n, Dept. of Human Resources of Oregon v. Smith,*
  494 U.S. 872 (1990) .................................................................................34

*City of Indianapolis v. Chase Nat'l Bank of City of New York,*
  314 U.S. 63 (1941) ...................................................................................33

*Cole v. Gen'l Motors Corp.,*
  484 F.3d 717 (5th Cir. 2007) ...................................................................28

*Corfield v. Dallas Glen Hills LP,*
  355 F.3d 853 (5th Cir. 2003) ...................................................................29

*Douglass v. United Servs. Auto. Ass'n,*
  79 F.3d 1415 (5th Cir. 1996) ............................................................ 28, 54

*Edgar v. MITE Corp.,*
  457 U.S. 624 (1982) .................................................................................52

*Elliott v. Tilton,*
  62 F.3d 725 (5th Cir. 1995) .....................................................................43

*Episcopal Diocese of Fort Worth v. Episcopal Church,*
  602 S.W.3d 417 (Tex. 2020).....................................................................43

*Evangelical Synod of Mo., Ohio & Other States v. Hoehn,*
    196 S.W.2d 134 (Mo. 1946) ......................................................47

*Ex parte McCardle,*
    74 U.S. (7 Wall.) 506 (1868) ...................................................31

*Fortune Production Co. v. Conoco, Inc.,*
    52 S.W.3d 671 (Tex. 2000) ......................................................18

*Frye v. Anadarko Petro. Corp.,*
    953 F.3d 285 (5th Cir. 2019) ...................................................17

*Gen'l Elec. Cap. Corp. v. Posey,*
    415 F.3d 391 (5th Cir. 2005) .....................................................4

*Great Southern Fire Proof Hotel Co. v. Jones,*
    177 U.S. 449 (1900) ................................................................33

*Grynberg v. Grynberg,*
    535 S.W.3d 229 (Tex.App.—Dallas 2017, no pet.) ...........................52

*Harrell & Sumner Contracting Co. v. Peabody Peterson Co.,*
    546 F.2d 1227 (5th Cir. 1977) .................................................55

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ................................................................22

*Hummel v. Townsend,*
    883 F.2d 367 (5th Cir. 1989) ....................................... 26, 32, 43

*In re Lubbock,*
    624 S.W.3d 506 (Tex. 2021) ....................................................39

*Jones v. Wolf,*
    443 U.S. 594 (1979) .......................................................... 39, 40

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church,*
    344 U.S. 94 (1952) ..................................................................37

*Krier-Hawthorne v. Beame,*
    728 F.2d 658 (4th Cir. 1984) ...................................................30

*Lapides v. Bd. of Regents of the University System of Georgia*,
    535 U.S. 613 (2002) ...................................................................35

*Lehigh Mining and Mfg. Co. v. Kelly*,
    160 U.S. 327 (1895) ...................................................................29

*Lilly v. Tobbein*,
    103 Mo. 477, 15 S.W. 618 (1890).............................................48

*Lowrey v. Texas A&M Univ. System*,
    117 F.3d 242 (5th Cir. 1997) ...................................................20

*Magallon v. Livingston*,
    453 F.3d 268 (5th Cir.) .............................................................28

*Maryland and Virginia Eldership of the Churches of God v. Church of
    God at Sharpsburg Church, Inc.*,
    396 U.S. 367 (1970) (per curiam) ...........................................40

*Masterson v. Diocese of Nw. Texas*,
    422 S.W.3d 594 (Tex. 2013).....................................................39

*McKee v. Kansas City Southern Ry. Co.*,
    358 F.3d 329 (5th Cir. 2004) ...................................................28

*McRaney v. North American Mission Bd. of the Southern Baptist
    Convention, Inc.*,
    966 F.3d 346 (5th Cir. 2020) ...................................................35

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
    571 U.S. 161 (2014) ...................................................................33

*Murchison Capital Ptnrs., L.P. v. Nuance Communications, Inc.*,
    625 Fed.Appx. 617 (5th Cir. 2015).........................................10

*Navarro Savings Ass'n v. Lee*,
    446 U.S. 458 (1980) ........................................................... 29, 30

*O'Connell v. United States Conference of Catholic Bishops*,
    134 F.4th 1243 (D.C. Cir. 2025) .............................................32

*Okpalobi v. Foster,*
  244 F.3d 405 (5th Cir. 2001) (*en banc*) ..................................................17

*Oscar Gruss & Son, Inc. v. Hollander,*
  337 F.3d 186 (2d Cir. 2003) ..................................................30

*Our Lady of Guadalupé School v. Morrissey-Berru,*
  591 U.S. 732 (2020) .......................................................... passim

*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull*
  *Memorial Presbyterian Church,*
  393 U.S. 440 (1969) ..................................................34

*Prete v. Bradbury,*
  438 F.3d 949 (9th Cir. 2006) ..................................................28

*S. Methodist Univ. v. S. Cent. Jurisdictional Conference of the United*
  *Methodist Church,*
  No. 23-0703, slip op. (Tex. June 27, 2025) ..................................................36

*Sanders v. Univ. of Texas Pan American,*
  776 Fed.Appx. 835 (5th Cir. 2019) ..................................................16

*Serbian E. Orthodox Diocese v. Milivojevich,*
  426 U.S. 696 (1976) ..................................................38

*Soc'y of Helpers of Holy Souls v. Law,*
  186 S.W. 718 (Mo. 1916) .................................................. 47, 48

*Steel Co. v. Citizens for a Better Environment,*
  523 U.S. 83 (1998) ..................................................34

*Strawbridge v. Curtiss,*
  7 U.S. (3 Cranch) 267 (1806) ..................................................29

*Thomson v. Gaskill,*
  315 U.S. 442 (1942) ..................................................29

*United States v. Albertini,*
  472 U.S. 675 (1985) ..................................................49

*Utica Lloyd's of Texas v. Mitchell*,
 138 F.3d 208 (5th Cir. 1998) ..................................................................17

*Wolff v. Wolff*,
 768 F.2d 642 (5th Cir. 1985) .................................................................30

*Yacubian v. United States*,
 750 F.3d 100 (1st Cir. 2014) ....................................................................4

## **Statutes**

28 U.S.C. § 1291 ............................................................................................3

28 U.S.C. § 1332 ........................................................................ 3, 17, 29, 33

28 U.S.C. § 1447 ..........................................................................................53

Tex. Bus. Org. Code § 1.102 .....................................................................52

Tex. Bus. Org. Code § 252.001 ........................................................... 45, 49

Tex. Bus. Org. Code § 252.004 .................................................................45

Tex. Bus. Org. Code § 252.007 .................................................................45

Tex. Civ. Prac. & Rem. Code § 110.001 ...................................................51

Tex. Civ. Prac. & Rem. Code § 110.002 ...................................................50

Tex. Civ. Prac. & Rem. Code § 110.003 ...................................................50

Tex. Civ. Prac. & Rem. Code § 110.0031 .................................................50

Tex. Civ. Prac. & Rem. Code § 110.004 ...................................................51

## **Other Authorities**

6A Wright & Miller,
 *Fed. Prac. & Proc.* § 1556 (3d ed.)..........................................................30

**<u>Rules</u>**

Fed. R. Civ. P. 17 ................................................................ 27, 30, 53, 54

Fed. R. Civ. P. 19 ................................................................ 27, 53, 54, 55

## **INTRODUCTION**

This appeal does not present the constitutional drama sketched by the appellant's and *amici's* briefs of a federal court delving into church doctrine to decide the merits of an internal church dispute. Rather, this appeal is about something narrower and quite different: whether the court below correctly decided that jurisdictional limits on its authority meant that the merits of the dispute could not be adjudicated in federal court.

Concordia University Texas, Inc. ("Concordia") chose to alter its relation to the Lutheran Church—Missouri Synod ("Synod") by remaining aligned in faith but separated from its governance. Synod reacted by making an internal ecclesiastical decision that, whatever Concordia thought, Synod retained control of Concordia and its campus. Synod called for Concordia to succumb.

When Concordia did not capitulate, a corporation created by Synod, the Lutheran Church Missouri—Synod, a Missouri nonprofit corporation ("LCMS"), sued Concordia in federal court, asking it to enforce Synod's internal decision and force Concordia to return to Synod control. Synod did not join as a party, instead waiting in the wings for LCMS's lawsuit to return control of Concordia to Synod.

1

Even though Synod chose, through LCMS, to bring what it claimed to be an internal church dispute into civil court, and even though Synod sought a judicial affirmation that Synod's internal decision was binding, Synod and LCMS objected when the court said it lacked jurisdiction because Synod is the real party in interest, which destroyed diversity. This jurisdictional holding, LCMS says, unconstitutionally intrudes on church autonomy.

Accepting LCMS's argument would turn the church autonomy doctrine inside out. Instead of being a principle that, when applicable, prevents courts from deciding the merits of ecclesiastical disputes, it would become a forum-shopping tool to force jurisdiction on federal courts they do not otherwise have. Synod and LCMS deliberately chose the federal forum instead of a Texas state court which undoubtedly has subject matter jurisdiction. But Synod's choice does not constitute a right to force a federal court to disregard the constitutional limits of its jurisdiction. Furthermore, the church autonomy doctrine does not preclude the jurisdictional inquiry federal courts are duty-bound to conduct.

## STATEMENT OF JURISDICTION

The district court lacked subject matter jurisdiction. LCMS's lawsuit against the Concordia defendants claimed only violations of Texas law. Jurisdiction was based on 28 U.S.C. § 1332(a)(1). ROA.1234 (¶6). The magistrate judge concluded that the district court lacked jurisdiction because: (a) the Synod was the real party in interest and a necessary party; and (b) joining the Synod as plaintiff would destroy complete diversity and deprive the court of subject matter jurisdiction. ROA.3086-3089, 3098.

The district court adopted the magistrate judge's report and recommendation and dismissed LCMS's suit without prejudice. ROA.3321.

LCMS timely appealed the dismissal order. ROA.3322. This Court has appellate jurisdiction under 28 U.S.C. § 1291 to decide the jurisdictional issues presented.

## ISSUES PRESENTED

Did the district court have subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) over  Synod's suit, by LCMS, claiming Concordia's campus property?

## STATEMENT OF THE CASE

This appeal asks whether the district court had diversity jurisdiction over a lawsuit arising from a dispute between Synod and Concordia over control of the university and its campus.[1]

## I.  Facts of the Case

In November 2022, Concordia's board of regents took formal action that altered the governance relationship between the university and Synod. ROA.1542-1558. Synod—not LCMS—opposed these actions and, in August 2023, adopted "in convention" a resolution finding Concordia's actions to be null and void and asking Concordia to relent. ROA.1614-1616. The merits of the underlying dispute turn on the propriety of the actions taken by the Concordia defendants and the rights, if any, Synod has in Concordia's property. ROA.1254-1256.

### A.  Entities in The Dispute

On one side is Concordia, one of six Synod counts as "Synod universities." ROA.1238 (¶19). Concordia was originally established as

---

[1] In the district court, Concordia is sometimes referred to as "CTX." Except as otherwise indicated, the facts here are from the live complaint, its exhibits, and documents they reference. The exhibits sometimes contradict the complaint's allegations, and exhibits control over allegations. *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014); *Gen'l Elec. Cap. Corp. v. Posey*, 415 F.3d 391, 398 n.8 (5th Cir. 2005). The facts are from the exhibits when there is such a contradiction.

The Lutheran Concordia College of Texas a century ago in Austin, Texas, ROA.1241 (¶¶22-23). In 1950, it was incorporated as a Texas nonprofit educational institution. ROA.1823-1824. Over time, and after several name changes, the university has come to be known as Concordia University Texas. ROA.1240 (¶23).

Concordia is a Christian university grounded in, and aligned with, the Confession of the Lutheran church. It is guided by Christian principles and Synod practices, and its aim is to enhance the spiritual life of students with Synod doctrines. ROA.1530, 1540. Concordia:

- subscribes to the confessions of the Synod as unalterable;

- unreservedly accepts the biblical scriptures "as the written Word of God and the only rule and norm of faith and of practice;" and

- considers the Symbolical Books of the Evangelical Lutheran Church to be true and an "exposition of the Word of God."

ROA.1550.

On the other side are two entities. They are not, as LCMS claims, effectively a single entity. LCMS Br. 36-37. Instead, one (LCMS) was "formed by" Synod and is the named plaintiff. ROA.1276; ROA.3308. The other is the Synod, which holds the purported substantive rights in dispute. ROA. 3315-3318.

LCMS is the plaintiff in whose name the case is formally being pursued. LCMS is an adjunct of Synod, not the Synod itself. It is a "civil law corporation formed by the ecclesiastical denomination, the Synod." ROA.1237; *see also* ROA.1234 n.1 (LCMS is a "civil law entity incorporated by the Synod").

The Synod convention is LCMS's "ultimate authority." ROA.1237 (¶15 n.6). The Synod constitution authorized LCMS's creation by the Synod to "purchase, hold, administer, and sell property … *in the interest of the Synod*." ROA.1271 (Art. IV.1) (emphasis added). It is not "an agency of the Synod." Rather, it is a "Missouri nonprofit corporation," denominated as "Corporate Synod," and designed by the Synod to carry out Synod business, property, and civil law functions. ROA.1829 (§ 1.2.1(f)); ROA.1234 (¶8 & n.1).

The second entity in opposition to Concordia is Synod. It asserts ownership of the property in dispute and, the court below found, is the real party in interest in this case. The Synod is the church itself, self-described as an "association of self-governing congregations." ROA.1830 (§ 1.2.1(v)). It is a Christian religious denomination with nearly 6,000 voting-member congregations, along with Lutheran ministers and teachers, all working together to achieve "commonly adopted objectives."

ROA.2011-2012 (Art. V); ROA.1235 (¶9); ROA.1828 (§ 1.1.1); ROA.1830 (§ 1.2.1(v)); ROA.1271-1272 (Art. V). Synod congregations are divided into geographical districts, at least one of which is in Texas. ROA.2016 (Art. XII.1); ROA.1438 (§ 3.12.3.2); ROA.1248 (¶36), 1251 (¶19), 1256 (¶ 55).

The Synod claims ownership of Concordia property through the Synod's governing documents. The Synod, not LCMS, is the church-designated owner of all properties of all Synod agencies, which, the Synod says, includes Concordia. ROA.1465 (Res. 4-04); ROA.1280 (§ 1.2.1(a)(1)). This Synod ownership purportedly extends to all assets titled or held in the name of LCMS and agencies of Synod, such as Concordia. ROA.1830 (§ 1.2.1(r)). The "legal representative and custodian" of all Synod properties is the Synod's board of directors. ROA.1276 (Art. XI.E.2); ROA.1374 (§ 3.3.4); ROA.1377 (§ 3.3.4.7). LCMS's statement to the contrary—that the *LCMS* board is the legal representative and custodian of all Synod properties, LCMS Br. 25—is belied by the unambiguous language of Synod bylaws.

> The Board of Directors *of the Synod* is the legal representative of the Synod and the custodian of all the property of *the Synod*.

7

ROA.1374 (§ 3.3.4) (emphases added).[2]

The Synod bylaws recite that the Synod is "not a civil law entity," ROA.1282 (§ 1.2.1(v)). LCMS places near-decisive weight on this phrase in its argument that it, not Synod, is the proper plaintiff and real party in interest. But whatever the phrase's import in isolation, other provisions in Synod governance documents clearly provide that Synod, like all organizations, is subject to civil authority, owns property, and has capacity to participate in litigation.

Most obviously, the same bylaws expressly acknowledge that the Synod is "subject to civil authority." ROA.1280 (§ 1.1.1(f)(2)). The Synod, in fact, invokes civil laws—the "laws of the State of Missouri"—as a source of the powers of its board of directors. ROA.1375 (§ 3.3.4.2).

---

[2] Similarly, LCMS incorrectly describes statements quoted from the Synod constitution as giving power and authority to LCMS that the plain words of the document do not provide. LCMS says that its board is "custodian" of church property, citing the Synod constitution. LCMS Br. 6, citing ROA.1276. It says that its board is the church's "legal representative," again citing the Synod constitution. LCMS Br. 7, citing ROA.1276. But this is taking liberties unsupported by the cited provision, which says that "the Board of Directors" is legal representative and custodian of church properties. *Id.* (XI.E.2). Its last sentence says that, as to Article XI (and only Article XI), "The Lutheran Church—Missouri Synod includes both the Synod formed by this Constitution and the Missouri corporation formed by the Synod." It does *not* say that the referenced board of directors is only the LCMS board. LCMS, despite bearing the burden on this matter, has not identified any record facts that help discern when the board is the Synod's board and when it is LCMS's in regard to matters concerning Concordia.

8

Synod's civil law capacity is clearly expressed on the subject of Synod property. The church constitution designates the Synod board of directors as the "legal representative and custodian"—not an ecclesiastical concept—of all church properties. ROA.1276 (Art. XI.E.2). The bylaws invest the Synod board of directors with the same type of "authority and responsibility" concerning Synod property as a secular corporation's board of directors. ROA.1377 (§ 3.3.4.7).[3] And in the first chapter of its bylaws, the Synod accedes to a practical reality: resorting to "secular courts" to resolve property and contract disputes is sometimes an unavoidable alternative to the intra-church dispute resolution process, whose remedies the bylaws acknowledge to be non-exclusive. ROA.1298 (§ 1.10.3); *see also id.* (§ 1.10.2) (specifically carving this § 1.10.3 exception from intra-church dispute resolution process).

LCMS argues that it is the "only … entity" that can enforce the church's rights in civil courts and that this is "binding" on the Court. LCMS Br. 26, 53. But the governing documents say otherwise. The Synod

---

[3] This passage from Synod bylaws distinguishes the Synod from LCMS as an entity. LCMS is specifically identified as an incorporated entity. Were LCMS and the Synod one and the same, and were the Synod therefore an incorporated entity, there would be no need to *analogize* the Synod board to a corporate board. It would be a corporate board. LCMS's brief devotes several pages to an argument about the Synod's corporate status, LCMS Br. 36-43, that this passage refutes.

9

is self-empowered to engage in litigation in its own right. The policy manual for the Synod board of directors says so. There, the Synod board of directors is assigned the duty of approving the initiation of any lawsuits "on behalf of the Synod *or* Corporate Synod," ROA.2069 (§ 4.14.2.2(h)(3)) (emphasis added), thus providing that the Synod is empowered to file its own lawsuit without LCMS involvement. The point is reiterated only a few passages later, with specific reference to the Synod and no mention of the Corporate Synod. ROA.2084 (§ 4.18.3.3) ("[n]o litigation proceeding shall be commenced by the Synod" without prior board approval). The record includes a concrete example from as recently as 2022 of the Synod's exercise of this authority when, along with other religious interests, the Synod—not LCMS—filed a federal appellate *amicus* brief. ROA.2146-2175.[4]

In response to Concordia's dismissal motion, LCMS belatedly added a declaration of LCMS's secretary, a non-lawyer, in attempted rebuttal of these documented facts about the Synod. *See* ROA.2227-2230 ("Sias declaration").[5] The fact section of LCMS's brief describing church polity

---

[4] This filing may be judicially noticed. *Murchison Capital Ptnrs., L.P. v. Nuance Communications, Inc.*, 625 Fed.Appx. 617, 618 n.1 (5th Cir. 2015).

[5] Later, in its objections to the magistrate-judge's report and recommendation, LCMS proffered another Sias declaration. ROA.3223-3265. It again disputes the magistrate

draws mostly from the Sias interpretations, de-emphasizing the explicit terms of the governing documents themselves and adding an ecclesiastical patina that should be disregarded as *ipse dixit* contradicted by the Synod governing documents. LCMS Br. 4-8.[6]

Sias's declaration provided no new facts pertinent to the roles of Synod and LCMS. Rather, it provided legal argument based on Sias's alternative interpretation, in contradiction to the unambiguous language, of Synod governing documents. For example, Sias's interpretation is that the Synod does not directly own any property. ROA.2228 (¶ 8). By Synod's own documents the opposite is true. It is LCMS that does not directly own any property. Bylaw § 1.2.1(r), for example, defines "Property of the Synod" to include "[a]ll assets, real or personal," even if it is held in the name of LCMS or LCMS holds formal title. ROA.1282.

Concordia objected to the Sias declaration. ROA.2267. The report and recommendation did not advert to it. The district court's order of

---

judge's legal interpretation of the Synod's governance documents, offering an extended exegesis of the last century and a half of church doctrine. Concordia again objected, ROA.2267, and the dismissal order does not mention it.

[6] By Concordia's count, over 65% of the record citations in that section are to the two Sias declarations.

dismissal mentions it, but finds its assertion that the Synod simply does not exist as a civil law entity refuted by the plain words of LCMS's own document. ROA.3314. The Sias declaration changes nothing in the factual background pertinent to the jurisdictional dispute.

## B.  Concordia's November 2022 Actions

Concordia's relationship with the Synod shifted gradually over time. In 1950, an unidentified committee of what appears to be the Synod board of directors took no action but "recommend[ed]" that title of the Austin campus—specifically described as "*Synod's* property"—be transferred to Concordia, with a trust retained "in favor of *the Synod.*" ROA.1467 (¶7.a-b) (emphases added).[7] What actually happened in response to the recommendation—and whether a trust was created at all—is not documented in the record.

LCMS says that in 2006, to facilitate Concordia's sale of its long-time Austin campus to move to a new one, it waived a reversionary interest of unidentified origin it had held in the old campus. LCMS alleges that a 2004 Synod resolution (Res. 4-04) required the university

---

[7] The complaint's text specifically refers to this document but mischaracterizes it as showing that "LCMS approved" transfer of the Concordia property in trust. ROA.1242 (¶26). The document is not an LCMS document, does not mention LCMS, and approves nothing. On its face, it is a "committee recommend[ation]" to turn the matter over to "our Synodical attorney … before action is taken."

to grant a reversionary interest in the new campus property "to LCMS," ROA.1241 (¶25), but the controlling resolution does not do that. The Synod, not LCMS, asserted the right to a reversionary interest right (contested to be sure by Concordia). The resolution says that "*the Synod* owns the properties" of what it claims to be its Lutheran universities and claims those properties—Concordia's included—are "subject to a reversionary interest or possibility of a reverter *in favor of the Synod.*" ROA.1465 (emphases added).

In May 2022, Concordia amended its certificate of formation with the Texas Secretary of State to  secure from the Internal Revenue Service its own 501(c)(3) tax exemption for "religious [and] educational … purposes." ROA.1487.

The litigation's precipitating event happened in November 2022. This marks a critical demarcation in university-church relations. LCMS's briefing suggests that Concordia acknowledges it is part of LCMS's college collection and owned by LCMS. LCMS Br. 10, 25 (citing Concordia bylaws and its board's policy manual). But the suggestion is wrong. Concordia's actions of November 2022 definitively turned the page on the relationship, rejecting control by Synod. *See* ROA 1543 (Concordia's current "Purpose" and "Board" Articles of its Articles of Incorporation);

ROA.1550 (Concordia's current bylaws language); ROA.1568 (Concordia's current policy manual language).

In a bylaws-authorized majority vote of its board of regents, ROA.1503, the Concordia board amended its bylaws and articles of incorporation. ROA.1546-1558 (amended bylaws); ROA.1542-1545 (amended articles of incorporation). The amendments vested control of the university in its board of regents and removed Concordia from the governing authority of Synod and its agencies. ROA.1543; ROA.1550. Until then, Concordia had been subject to the bylaws and constitution of Synod, and election to its board of regents had been pursuant to Synod bylaws. ROA.1496-1497. The 2022 amendments eliminated these requirements, and governance of Concordia was separated from Synod governance. The Concordia board reaffirmed the separation in April 2023. ROA.1615. Henceforth, the university is "aligned with, but not subject to the authority or governance by" the Synod. ROA.1549.

## C. Synod's Response

Accused of attempting to "walk away with a historic property of the Synod," ROA.0253 (¶53), Concordia faced blowback from the church. The Synod's Commission on Constitutional Matters ("CCM") issued a March 2023 opinion that the November 2022 actions violated Synod bylaws and

its constitution. ROA.1253-1254 (¶46) (Op. 23-3006). Declaring Concordia, as a Synod university, to be "property of the Synod," ROA.1612, the CCM concluded that Concordia's "unauthorized separation … from the Synod inherently involves a legal and property matter" that is to be referred to the Synod Board of Directors "as the legal representative and custodian of the property of the Synod," ROA.1612-1613.

Four months later, the "Synod in convention"—the highest authority of the Synod, ROA.1236 (¶12)—affirmed the CCM opinion. ROA.1235 (¶8). It found the November 2022 Concordia actions null and void and called on the university "to submit to the governance of the Synod." ROA.1614-1616. Concordia did not acquiesce, ROA.1254 (¶47), and a few days later declined to seat four people that the Synod in convention purportedly elected to Concordia's board. ROA.1249 (¶37); ROA.1597-1600.

## II.    Course of Proceedings in the District Court

### A. Proceedings

A month later, ROA.3 (Doc. 1),[8] LCMS filed suit in federal district court against Concordia, its then-President Donald Christian, and its then-Board Chair Christopher Bannwolf. ROA.1233 (¶¶2-4). It also sued John Does 1-12 as unknown members of the Concordia board of regents who voted for the November 2022 actions. ROA.1234 (¶5).

LCMS, "on behalf of itself *and Synod*," requested a declaratory judgment to establish "LCMS rights with respect to CTX's property" and "confirming as a matter of law the Synod's decision" that the Concordia defendants illegally amended the Concordia charter, bylaws, and policy manual. ROA.1235 (¶8); ROA.1254-1255 (¶49, 50) (emphasis added). More specifically, LCMS sued for a federal court declaration "confirming the CCM decision, as ratified by the Synod convention." ROA.1255 (¶50). The Synod was not a named plaintiff.

---

[8] LCMS amended its complaint after the Concordia defendants moved to dismiss on jurisdictional grounds. ROA.826-1227; ROA.1233-1795. Record citations here are to the amended complaint, except that LCMS's original complaint asserted all legal claims "by and on behalf of the Synod." ROA.35 n.10. The phrase may well have ceased to be legally binding when LCMS's amended complaint dropped it, but the admission that the suit was "by ... the Synod" retains *evidentiary* value. *Sanders v. Univ. of Texas Pan American*, 776 Fed.Appx. 835, 837-38 (5th Cir. 2019).

LCMS made only state law claims. ROA.1254-1265 (¶¶48-81). The only asserted basis for jurisdiction was diversity under 28 U.S.C. § 1332(a)(1), because the only named plaintiff, LCMS, was a Missouri citizen and the three named defendants were Texas citizens. ROA.1233 (¶¶1-4); ROA.1234 (¶6). The Texas state law claims were:

- breach of contract or, alternatively, promissory estoppel (against Concordia), ROA.1256-1259 (¶¶53-63);

- breach of fiduciary duty (against all Concordia defendants), ROA.1260-1262 (¶¶64-72);

- violation of the Texas Business Organizations Code (against Concordia and its President), ROA.1262-1264 (¶¶73-79); and

- tortious interference with contract (against the Concordia President), ROA.1265 (¶¶80-81).

All the claims arise from injuries the Synod is said to have suffered.[9]

The contract that LCMS alleges Concordia breached is composed of five documents, none of which is a LCMS document. Three are Concordia documents, and two are Synod documents. ROA.1245 (¶30) (defining

---

[9] In addition to requesting declaratory relief based on these claims, LCMS also requested monetary damages, but only "alternatively" in the event the requested declaratory relief was not granted. ROA.1266 (¶86.b). LCMS mistakenly labeled its request for declaratory relief as a cause of action. ROA.1254-1256 (¶¶48-52). Texas's declaratory judgment statute does not apply. *Utica Lloyd's of Texas v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998). The federal declaratory judgment statute applies, but provides a potential remedy, not a cause of action. *Okpalobi v. Foster*, 244 F.3d 405, 423 n.31 (5th Cir. 2001) (*en banc*). Nor does it create federal court jurisdiction. *Frye v. Anadarko Petro. Corp.*, 953 F.3d 285, 293 (5th Cir. 2019)

"CTX governance documents"). All the rights allegedly impaired by the breach are *Synod* rights, not LCMS rights. ROA.1256-1257 (¶55.a-f). The alternative promissory estoppel claim[10] is to the same effect. The alleged promises were to the Synod, not LCMS, and the purported acts of reliance were acts of the Synod. ROA.1258-1259 ¶¶60-63).

The breach of fiduciary duty claim is even more bluntly asserted as an invasion of the *Synod's* rights. *See*, *e.g.*, ROA.1260 (¶64) (defendants "owe a fiduciary duty to the Synod"); ROA.1262 (¶71) (defendants "breached fiduciary duties to the Synod").

The claim under the Texas Business Organizations Code follows the same pattern. The statutory obligations Concordia allegedly violated are purportedly owed to the Synod, not to LCMS. *See*, *e.g.*, ROA.1263 (¶76) (appointments pursuant to Synod rules and regulations and Concordia bylaws and "pre-approval of the Synod" of changes to Concordia governance documents); ROA.1264 (¶78) (Concordia's November 2022 amendments caused "loss to Synod").

The tortious interference claim likewise takes the same path. The allegedly interfered-with contract is the same as in the breach of contract

---

[10] The claim is only available in the absence of a valid contract, *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

claim: a collection of Synod and Concordia documents. ROA.1265 (¶81). The alleged harms yet again are harms to the Synod.

## B.  Disposition in the District Court

The Concordia defendants moved to dismiss LCMS's amended complaint for lack of subject matter jurisdiction and for failure to join an indispensable party. ROA.1800-2175. The amount-in-controversy requirement was not contested, ROA.3090 n.7. The existence of complete diversity was. The Synod was argued to be the real party in controversy, the real party in interest and an indispensable party. ROA.1815 (real party in controversy); ROA.1813 (real party in interest); ROA.1817 (indispensable party). Since the Synod was a Texas citizen (as were the defendants), Concordia urged dismissal of the lawsuit for lack of subject matter jurisdiction. ROA.1820.

About a month and a half before Concordia's motion to dismiss, LCMS had removed to the same federal court a mirror-image state court suit for declaratory judgment that Concordia had filed against it and the Synod. *See Concordia University Texas v. The Lutheran-Church–Missouri Synod, an unincorporated Association of Lutheran Congregations, et al.*, No. 1:24cv176 (filed Feb. 21, 2024) ("Concordia state

suit").[11] The removed suit was consolidated with this suit for purposes of determining the motion to dismiss in this suit and the motion to remand in the removed suit, ROA.2191, and the motions were assigned to the magistrate-judge. ROA.3082.

The magistrate-judge recommended granting Concordia's motion to dismiss LCMS's suit and its motion to remand the removed Concordia state suit. ROA.3098. LCMS objected. ROA.3192-3265. The district court adopted the magistrate-judge's report and recommendation "in full" as the opinion of the court, granted Concordia's motion to dismiss without prejudice, and granted Concordia's motion to remand the Concordia state suit for lack of subject matter jurisdiction. ROA.3321.

The court found that the Synod is an unincorporated association and, because it has Texas members, is a Texas citizen. ROA.3093. Explaining that the Synod and the LCMS "are not one and the same,"

---

[11] The Court may take judicial notice of pleadings filed in other judicial proceedings. *Lowrey v. Texas A&M Univ. System*, 117 F.3d 242, 246 n.3 (5th Cir. 1997). The factual allegations in the two lawsuits differ in some details. As already indicated, the facts here are drawn nearly entirely from those alleged in LCMS's live pleading in *this* federal suit.

ROA.3308,[12] it rejected LCMS's argument that the formation of LCMS "precludes the existence of Synod as a separate unincorporated association," ROA.3304, and held that Texas law recognizes the Synod as an unincorporated association. ROA.3307.

The court determined that the Synod "holds the substantive rights at issue" in the case and that the rights LCMS asserts against the defendants "are the Synod's." ROA.3087. LCMS, the court said, does not "possess[] rights with respect to Defendants that are independent of the Synod." ROA.3088 ("even if LCMS held title" to the property at issue, it would "belong to the Synod").

The court then marched through the specific claims. Assuming the contractual breach claim actually identified a contract, LCMS failed to show that it was a party to the contract. *Id*. The court applied the same reasoning to the tortious interference claim. ROA.3089. If any fiduciary duties existed, they were owed to the Synod, not LCMS. *Id*. The same rationale applied to the claims under the Texas Business Organizations Code. *Id*.

---

[12] The magistrate-judge found it "paradoxical[]" that LCMS was arguing that the Synod is not a separate entity from LCMS given its "repeated assertions" that the Synod created LCMS. ROA.2217.

The court rejected the argument that the Synod's status as a religious organization is a bulwark against it ever being a proper party to a lawsuit. ROA.3096. The lawsuit is about "the Synod's interest in CTX's new campus property," and that, said the court, is a "pure civil-law controversy." ROA.3313. Resolving that controversy does not require "any inquiry into religious doctrine," ROA.3098, and the church autonomy doctrine is therefore inapplicable.

The court found that LCMS did not have standing because it did not have rights with respect to the Concordia defendants "independent of the Synod." ROA.3088.[13] It held the Synod to be the real, indispensable party in interest whose Texas citizenship defeated the requirement of complete diversity, ROA.3098, ROA.3320, and  dismissed the lawsuit for lack of jurisdiction.

---

[13] "[M]ere authorization to represent a third party's interests" is not sufficient to confer Article III standing on "private parties with no injury of their own." *Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013).

## SUMMARY OF THE ARGUMENT

This appeal is the culmination of a nearly two-year forum shopping effort by which Synod has attempted to force this state law dispute into federal court under the guise of the free exercise of religion. The district court's decision is an uncontroversial application of clearly applicable jurisdictional rules and long-standing precedent. Synod's citizenship controls the diversity analysis because it is the real party in interest and real party in controversy and holds all of the alleged substantive rights at issue. Based on the unambiguous provisions of its own governing documents, Synod is an unincorporated association with legal power and capacity to litigate. Synod has members in Texas therefore diversity jurisdiction does not exist. The only reason for this proceeding is Synod's unsupported claim that it can simply declare that it has no capacity to litigate as a matter of religious freedom. However, this argument is unavailing because nothing in the First Amendment or the church autonomy doctrine abrogates the constitutional limits of federal court jurisdiction. Alternatively, if the investigation of jurisdiction requires intrusion on church autonomy, the courts lack jurisdiction and must dismiss.

There is a presumption against finding diversity jurisdiction. LCMS had the burden to establish jurisdiction but refused—and still refuses—to do its job, saying that religious freedom releases it from that legal duty. But federal jurisdictional limits are not subject to religious doctrinal adjustment. The district court had an independent duty to go beyond the pleadings to determine jurisdiction. Unsurprisingly, with the application of neutral, secular, and universally applicable precedent, the district court found no diversity and correctly dismissed for lack of jurisdiction. The denial of access to federal court does not inhibit Synod's free exercise of religion because religious freedom does not guarantee federal court jurisdiction and does not eliminate the independent duty of courts to examine jurisdiction.

Synod's claim that it lacks capacity to litigate is completely unsupported and contradicted by its own governing documents. Synod's constitution, bylaws, and board policy manual unambiguously state that: a) Synod is separate from LCMS (dubbed "Corporate Synod"); b) Synod is an association of congregations; c) Synod is subject to civil authority; d) Synod can and does own property; e) Contract and property disputes sometimes require resort to secular courts; f) Synod's board (not LCMS) is Synod's legal representative and custodian of Synod's property; and g)

24

Synod's board has authority to initiate litigation on Synod's behalf. It cannot be reasonably questioned that Synod has capacity to participate in this lawsuit that seeks to enforce rights that it purports to hold.

The complaint filed on Synod's behalf expressly states that all of the rights at issue belong to Synod. The alleged contract, promissory estoppel, fiduciary duty, Business Organizations Code, and tortious interference claims are all asserted to vindicate Synod's (not LCMS's) purported rights. Accordingly, LCMS is a nominal party that must be ignored and diversity must be determined by Synod's citizenship because it is the real party in interest and the real party in controversy.

The district court's dismissal does not in any way infringe on the religious autonomy of Synod. The religious autonomy doctrine prohibits court interference with ecclesiastical determinations of internal management decisions, internal discipline, and internal governance. The sole issue in this appeal is whether Synod has capacity to be a party in court, which is an issue of how Synod interacts with external governmental bodies. This has nothing to do with internal ecclesiastical management or discipline. The church autonomy doctrine does not provide a church "general immunity from secular laws." *Our Lady of Guadalupé School v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Synod's

proposed rule would make it completely immune to jurisdictional limits, rendering *Morrissey* a nullity.

The claim that Synod and LCMS are a single entity, and therefore Synod cannot be an unincorporated association, makes no sense. Synod's governing documents and the pleadings make clear that Synod and LCMS are distinct, that LCMS is incorporated, that Synod is not incorporated, and that the alleged rights to be adjudicated belong to Synod. For more than a century, Missouri precedent establishes that when a religious organization forms a corporate entity, the religious organization continues its separate existence. This Court's precedents, as well as Texas Supreme Court precedent, clearly establish that churches exist as unincorporated associations. Furthermore, the citizenship of a church operating as an unincorporated association controls for diversity purposes. *Hummel v. Townsend*, 883 F.2d 367 (5th Cir. 1989).

There is no basis to apply the doctrine of constitutional avoidance. Nothing in the unincorporated association act, or its application intrudes upon Synod's internal management or discipline. The obvious conclusion is that the bylaws provision stating that Synod is an association of congregations means exactly what it says – Synod is an unincorporated association.

26

The Texas Religious Freedom Restoration Act ("TRFRA") has no application to this case because it only applies to state government agencies. The district court's conclusion that it lacked jurisdiction in no way infringed on Synod's free exercise of religion. TRFRA cannot impose limitations on the district court and does not expand or alter the limits of diversity jurisdiction.

The internal affairs doctrine only prohibits interference with relationships among or between a corporation and its officers, directors, and shareholders. Nothing in the district court's order interferes with any such internal relationships for LCMS or Synod.

Appellant's final argument miscites the district court's order to manufacture a nonexistent Rule 19 issue. The magistrate and the district court determined that Synod is the real party in interest under Rule 17 and the real party in controversy. Nothing in the magistrate's report or the district court's order dismissed for failure to join an indispensable party under Rule 19. LCMS did not object to the magistrate's Rule 17 findings or conclusions and did not object to the absence of a Rule 19 indispensable party analysis, therefore this argument is irrelevant and cannot provide the basis for appellate relief.

27

The arguments of Synod and LCMS are unavailing. The district court properly dismissed and the Court should affirm.

## STANDARDS OF REVIEW

District court determinations of diversity jurisdiction are reviewed *de novo* on appeal. *McKee v. Kansas City Southern Ry. Co.*, 358 F.3d 329, 333 (5th Cir. 2004). Any facts expressly or impliedly found are reviewed for clear error. *Cole v. Gen'l Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007).[14]

Appellate review of a pre-answer determination that the real party in interest is absent is *de novo. Magallon v. Livingston*, 453 F.3d 268, 271 (5th Cir.).

Appellate review of magistrate findings and conclusions to which no objection has been lodged is for plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

---

[14] Contrary to LCMS's claim, LCMS Br. 18, the standard for review of facts in cases involving the First Amendment's right to freedom of association—assumed here to extend to the First Amendment's freedom of religion clause—is mixed. Historical facts, such as weighing conflicting evidence, are reviewed for clear error, while questions of constitutional fact are reviewed *de novo. Prete v. Bradbury*, 438 F.3d 949, 960 (9th Cir. 2006). To the extent there are fact issues pertinent to the jurisdictional question here, review would be for clear error, not *de novo*. For example, discrepancies between the alleged facts or the Sias declarations on the one hand and the exhibit documents on the other should be, and were, resolved by implication in favor of the statements in the exhibits. Such fact findings are not clearly erroneous.

## **ARGUMENT**

Disposition of the diversity jurisdiction issue in this appeal is guided by basic, well-established principles. First the limits on federal court jurisdiction to decide the merits of a lawsuit presenting only state law claims—as this one does—are *constitutional*. There must be complete diversity. No party on the defendant side may share the same state citizenship as any party on the plaintiff side. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806) (construing U.S. Const. Art. III, § 2). The same limitation is imposed by § 1332. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1978).

Second, the presumption is against complete diversity. *Lehigh Mining and Mfg. Co. v. Kelly*, 160 U.S. 327, 337 (1895). The plaintiff— here, LCMS—has the burden of establishing complete diversity. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 219 (5th Cir. 2012).

Third, a federal court must disregard nominal or formal parties, such as LCMS, and rest diversity jurisdiction "only upon the citizenship of real parties to the controversy." *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 461 (1980); *see also Corfield v. Dallas Glen Hills LP*, 355 F.3d 853, 857 (5th Cir. 2003). A real party to the controversy for diversity purposes

29

is one with "a 'substantial stake' in the outcome of the case." *Krier-Hawthorne v. Beame*, 728 F.2d 658, 664 n.8 (4th Cir. 1984).[15] Here, that is the Synod.

Fourth, the citizenship of its members determines the citizenship of an unincorporated association. *Carden*, *supra*, 494 U.S. at 195-96. The "members" are "the several persons composing such association." *Id*. at 196. When an unincorporated association is a real party to the controversy, complete diversity—and thus jurisdiction—does not exist if one of its members has the same state citizenship as one of the defendants. At least one member of the Synod shares Texas citizenship with the Concordia defendants.

---

[15] As this Court has sometimes done, *see, e.g., Wolff v. Wolff*, 768 F.2d 642, 645 (5th Cir. 1985), the district court used the phrase "real party in interest" from Fed. R. Civ. P. 17(a)(1) interchangeably with the phrase "real party in controversy," ROA.3315, and concluded that the Synod held "the substantive rights" in the lawsuit. ROA.3318. That the analysis supporting this conclusion was largely framed in Rule 17 terms does not alter its jurisdictional determination. First, courts often use the citizenship of the real party in interest to determine whether diversity exists. 6A Wright & Miller, *Fed. Prac. & Proc.* § 1556 (3d ed.). There is "rough symmetry" between the Rule 17 phrase and the jurisdictional phrase "real party to the controversy." *Navarro*, 446 U.S. at 462 n.9. Second, Rule 17(a)'s "real party in interest" standard is a procedural rule that neither extends nor limits subject matter jurisdiction, *Airlines Reporting Corp. v. S and L Travel, Inc.*, 58 F.3d 857, 861 n.4 (2d Cir. 1995), therefore the jurisdictional phrase sets a stricter constitutional standard. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 194 (2d Cir. 2003). A finding that the Synod is the real party in interest necessarily means that the Synod is a real party to the controversy. Third, this Court makes its own, independent jurisdictional determination. *Carden*, *supra*, 494 U.S. at 195.

I.  **The Church Autonomy Doctrine Does Not Bar the Determination that the Synod is the Real Party to the Controversy.**

This appeal asks whether LCMS established federal diversity jurisdiction. LCMS argues that the district court was compelled to take LCMS at its word on the question of diversity, despite the fact that what LCMS and Sias claimed is directly contradicted by the unambiguous terms of Synod's constitution and bylaws. This turns the inquiry into subject matter jurisdiction inside out. Compelled judicial passivity is anathema to the duty to independently determine federal jurisdiction and has no basis in the law of federal courts. "Without jurisdiction the court cannot proceed at all in any case." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868).

A.  **The Church Autonomy Doctrine Does Not Absolve LCMS of Shouldering the Burden of Establishing Diversity Jurisdiction, Nor Does it Strip Federal Courts of the Obligation to Determine Whether They Have Jurisdiction.**

LCMS's primary challenge to the district court's jurisdictional dismissal ruling rests on the First Amendment doctrine of church autonomy. LCMS Br. 20-35. LCMS argues that the district court's determination unconstitutionally intruded on church autonomy by not accepting LCMS's and Sias's unsupported declaration that Synod cannot

be a real party in controversy in litigation regarding Synod's own interests. No case authority adopts such a wild variant in the church autonomy doctrine. It would be unconstitutional to do so in the context of a diversity jurisdiction case.

The church autonomy doctrine does not strip federal courts of the fundamental obligation to determine whether they have subject matter jurisdiction. There is no First Amendment religious freedom right to compel a federal district court to disregard basic constitutional and statutory limitations on its jurisdictional authority in forced obeisance to internal church doctrine and deliberations.

The courts have made this point. The church autonomy doctrine does not provide a church "general immunity from secular laws." *Morrissey-Berru*, 591 U.S. at 746 (2020); *O'Connell v. United States Conference of Catholic Bishops*, 134 F.4th 1243, 1254 (D.C. Cir. 2025); *Hummel*, 883 F.2d at 372 (5th Cir. 1989) (Bishop claiming to represent the LDS church's interests in a representative capacity failed to establish diversity because the citizenship of the church controlled for jurisdictional purposes). The federal diversity constitutional and statutory rules are indisputably secular laws, and Synod cannot immunize itself from judicial inquiry into whether the jurisdictional

32

requirements have been met, particularly in a lawsuit instigated on behalf of Synod itself. Synod, after all, was not hauled into court in this case. Synod, through LCMS, filed the lawsuit, asking the federal court to exercise diversity jurisdiction over claims that, because diversity is absent, could only have been brought in a Texas state court.

Diversity jurisdiction is notoriously not a pliable concept. The statute conferring diversity jurisdiction, 28 U.S.C. § 1332, is one of "jealous restriction" and must be strictly construed. *City of Indianapolis v. Chase Nat'l Bank of City of New York*, 314 U.S. 63, 76 (1941). This restrictive jurisdiction "cannot be conferred" by a party's "own determination of who are plaintiffs[.]" *Id.* at 69. To satisfy its jurisdictional duty, a federal court must make the determination itself and "look beyond the pleadings." *Id.*; *see also Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 174 (2014) (courts sometimes must "look behind the pleadings to ensure that parties are not improperly creating … diversity jurisdiction").

Jurisdiction cannot be hypothesized. Rather, it is the "first and fundamental question" and the requirement that it be established as a threshold matter is "inflexible and without exception." *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900); *see also Steel Co.*

33

*v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998) (rejecting concept of "hypothetical jurisdiction").

The church autonomy doctrine does not absolve churches and religious organizations of the duty to carry their burden of establishing jurisdiction. If Synod takes the initiative and prays for a federal court to resolve a property dispute, Synod cannot simultaneously truncate the jurisdictional inquiry by putting what it self-proclaims to be internal matters off limits to scrutiny. Allowing that would relieve Synod of its clear duty to prove the existence of diversity jurisdiction. Churches do not have the right to evade that duty on religious grounds. Religious organizations, like everyone else, must positively establish the jurisdiction they claim as the basis for their lawsuit. *Cf. Employment Div'n, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) (being compelled to follow neutral laws of general applicability is not a violation of religious freedom).

Civil courts "do not inhibit free exercise of religion merely by opening their doors" to church property disputes, *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969). By the same token, closing the federal

court doors as required by constitutional limits on federal judicial power does not inhibit the free exercise of religion.

The church autonomy doctrine is not a permission slip for Synod and LCMS to have it both ways. Eleventh Amendment waiver rules exemplify why and provide a useful model for analyzing this case. A state may not voluntarily invoke federal jurisdiction to seek exercise of federal judicial power on the merits of a legal dispute, then turn around and claim Eleventh Amendment immunity from the exercise of that power. *Lapides v. Bd. of Regents of the University System of Georgia*, 535 U.S. 613, 618-19 (2002). It would be "anomalous and inconsistent" to hold otherwise. *Id*. There is no reason the same principle should apply differently in the context of this case and the church autonomy doctrine.[16] Synod, through LCMS, filing suit in federal court on diversity grounds waived any conjured-up church autonomy defense against an inquiry into whether diversity existed. The Supreme Court has instructed district courts to look behind the pleadings to ensure diversity exists. The district

---

[16] This Court has not yet resolved whether, when applicable, the church autonomy doctrine—sometimes call the "ecclesiastical abstention doctrine"—is a jurisdictional bar or an affirmative defense. *See McRaney v. North American Mission Bd. of the Southern Baptist Convention, Inc.*, 966 F.3d 346, 348 n.1 (5th Cir. 2020). However, the waiver principle is the same either way.

court performed this duty. The church autonomy doctrine has not cancelled the instruction, and the court below properly carried it out.

Alternatively, if the district court's jurisdictional investigation is off limits because, as claimed by Synod, it requires determination of ecclesiastical matters, the court lacked jurisdiction and was required to dismiss. In a decision handed down on the date of this brief, the Texas Supreme Court clearly articulated this requirement. In response to a claim that ecclesiastic abstention applied and that the court was required to enforce the position of the United Methodist conference, the court concluded that if church autonomy applied, it could not adopt the ecclesiastic position of any party because it would lack subject matter jurisdiction. *S. Methodist Univ. v. S. Cent. Jurisdictional Conference of the United Methodist Church*, No. 23-0703, slip op. at 11 (Tex. June 27, 2025).

In this case, Synod is claiming that the jurisdictional determination intrudes on its religious autonomy and therefore the district court and this Court are required to adopt and enforce Synod's ecclesiastic position. This is precisely what the church autonomy doctrine prohibits. If the court is required to adopt an ecclesiastic position of any party, the court

lacks subject matter jurisdiction under the autonomy doctrine and must dismiss.

### B. The District Court's Inquiry Into Its Jurisdiction Did Not Intrude on Church Autonomy.

Even if the church autonomy doctrine could conceivably be considered a justified limitation on a court's duty to determine its own jurisdiction, the district court inquiry and decision challenged by LCMS did not intrude on the Synod's autonomy.

As already observed, religious institutions are not immune from secular laws. *Morrissey-Berru*, *supra*, 591 U.S. at 746. Nothing in the church autonomy doctrine exempts Synod from complying with such neutral legal principles as the constitutional limits of jurisdiction. The church autonomy doctrine only limits a court's involvement in "internal management decisions that are essential to the institution's central mission" that require resort to ecclesiastic, rather than legal, principles. *Id.* For example, in *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94 (1952), the church autonomy doctrine applied because it was an internal church dispute regarding a patriarchal appointment of a bishop conflicting with an election by a convention – an inherently internal dispute that would require the court to determine the

ecclesiastical authority of the patriarch and the convention. Similarly, in *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), the doctrine applied to an internal dispute about competing ecclesiastical authorities. Appellant, and *amici*, have cited a myriad of similar cases which all bear the identical trait, which is an *internal* church dispute regarding ecclesiastical discipline, authority, or doctrinal adherence.

This appeal does not involve an internal dispute requiring interpretation of ecclesiastical doctrine. The sole issue in this appeal is whether Synod can simply declare that it lacks capacity to be a party to a lawsuit seeking enforcement of its own interests. This is an issue of how Synod interacts with external, not internal, bodies such as courts and other governmental institutions. Therefore, this appeal has nothing to do with "rules and regulations for internal discipline and government" to which the autonomy doctrine applies. *Milivojevich*, 426 U.S. 696, 724.

If adopted, Synod's proposed application of the autonomy doctrine would grant religious institutions a general immunity from secular laws in abrogation of *Morrissey-Berru*. Synod proposes that a religious institution can, merely by declaration of sincere religious belief, render itself completely immune to the jurisdiction of all courts. If effective, such a declaration would make it impossible for any court to enter any

38

judgment binding on the religious institution, rendering the institution completely immune from all secular law. We know that the autonomy doctrine does not go so far. "This does not mean that religious institutions enjoy a general immunity from secular laws." *Morrissey-Berru*, 591 U.S. at 746. Adopting Synod's proposed rule would render *Morrissey-Berru* and its predecessors a nullity.

Furthermore, the limits of the autonomy doctrine find their fullest expression in the context of church property disputes of the sort involved here. There is no First Amendment requirement in such disputes to follow a "rule of compulsory deference to religious authority." *Jones v. Wolf*, 443 U.S. 594, 605 (1979). Instead of that, the courts take what is called a "neutral principles of law" approach, which allows civil adjudication of such disputes while at the same time avoiding the "resolution of issues of religious doctrine or polity." *Id*. at 602. Texas courts do this, too. *See In re Lubbock*, 624 S.W.3d 506, 513 (Tex. 2021), citing *Masterson v. Diocese of Nw. Texas*, 422 S.W.3d 594, 596 (Tex. 2013).

Application of the neutral principles approach typically includes court examination of some religious documents such as church constitutions. *Jones*, *supra*, 443 U.S. at 603 (citing *Maryland and Virginia Eldership of the Churches of God v. Church of God at*

39

*Sharpsburg Church, Inc.*, 396 U.S. 367, 368 (1970) (*per curiam*)). But such scrutiny is conducted on secular terms, avoiding reliance on religious concepts. *Jones*, 443 U.S. at 604.[17]

The district court adhered closely to these precepts. Speculation about religious doctrine was abjured, and the terms of the documents were viewed only from a secular perspective.

In these documents, the court found the church—the Synod—describing itself as an "association of self-governing congregations." ROA.1282 (Bylaws § 1.2.1(v)). The church-in-convention claimed ownership of all the properties of all Synod agencies, including its universities. ROA.1465 (Convention Res. 4-04). The board of directors of the Synod is the Synod's legal representative and "custodian of all the property of the Synod." ROA.1374 (Bylaws § 3.3.4). The Synod, say the documents, is "subject to civil authority," ROA.1282 (Bylaws § 1.1.1(f)(2)), acknowledging the necessity of sometimes turning to "secular courts" to resolve the church's property and contract disputes. ROA.1298 (Bylaws § 1.10.3). Finally, the governing documents make clear that the Synod

---

[17] This limitation is another reason the Sias declarations are inapposite to the issue in this case. They try to infuse unambiguous secular terms of the governing church documents with religious concepts.

Board may initiate lawsuits "on behalf of Synod *or* Corporate Synod." ROA.2069 (Board Policy Manual § 4.14.2.2(h)(3)).

The claims in the lawsuit reflect the foregoing: that the rights Synod considers to be at stake in the lawsuit are the Synod's rights, not LCMS's. As the district court found, each state law claim is framed as arising from an invasion of, or injury to, *the Synod's rights*, which, of course, makes perfect sense given what the governing documents say. The "not a civil law entity" phrase that is included in the documents is not a talisman warding off all judicial scrutiny. It is just one, among many, descriptions of what the church is and what its powers are, which expressly include participating in litigation such as this.

This, then, is what the district court considered when it determined that the Synod was a real party to the controversy. It considered the terms in the church documents from a neutral, secular perspective (as it was permitted and required to do). And from that consideration, it reached the conclusion that it had to consider whether the presence of the Synod as the real party to the controversy regarding control of Concordia's campus left it with jurisdiction to hear the case. Nothing in all this violated a single strand of the church autonomy doctrine or intruded into the spiritual affairs of Synod.

41

The next task, then, was to determine the impact of Synod as the real party to the controversy on the requirement of complete diversity—and the court concluded it destroyed it.

## II.   The Synod is an Unincorporated Association with Texas Citizenship.

LCMS's next argument is that Synod is not an unincorporated association under the Texas Uniform Unincorporated Nonprofit Association Act, Tex. Bus. Org. Code ch. 252 ("Unincorporated Association Act" or "Act"). The argument is unavailing and its premise insupportable.

The core of LCMS's argument is that the Synod cannot be considered an unincorporated association under the Act because LCMS is incorporated, LCMS *is* the Synod, and an incorporated entity cannot be an unincorporated one. LCMS Br. at 37-43. It seeks to buttress the statutory argument by relying on three broad principles none of which have any actual bearing on the language of the statute or the applicable precedents from this Court and the Texas Supreme Court. LCMS Br. 43-50.

## A. Precedent Establishes that Churches are Unincorporated Associations Under Texas Law.

This Court has already addressed the question of whether a church with members in Texas is an unincorporated association with Texas citizenship for diversity purposes. *Hummel v. Townsend*, *supra*, 883 F.2d 367, held that because the LDS church had members in Texas, it was a Texas citizen preventing the exercise of diversity jurisdiction. A few years later, the Court reached a similar conclusion in *Elliott v. Tilton*, 62 F.3d 725 (5th Cir. 1995). The Court found a church to be an unincorporated association for diversity purposes. *Id.* at 728.

Texas courts have reached the same conclusion. *See, e.g.*, *Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417, 430 (Tex. 2020) (religious organization made up of member congregations is unincorporated association). The Texas court specifically held that the religious organization is subject to, and governed by, the Unincorporated Associations Act, the very act that LCMS argues does not apply to the Synod.

LCMS does not discuss or even cite the two cases from this Court. It does, however, try to distinguish the state *Episcopal Diocese* decision. It argues that the situation is different here, and that the same Act found

43

applicable to the religious organization in *Episcopal Diocese* is nonetheless inapplicable to the Synod, because the Synod has made "a choice to be represented in civil disputes by an incorporated entity." LCMS Br. 24. Plus, says LCMS, *Episcopal Diocese* is different because the case involved a "distinguishable church property dispute". LCMS Br. at 43.

The latter distinction is completely irrelevant. The Texas Supreme Court's determination that the religious organization there was an unincorporated association subject to the Act was not dependent on the nature of the property dispute. The application of the Unincorporated Association Act in *Episcopal Diocese* and in this case is completely unrelated to the nature of the property dispute. In fact, the merits of the property dispute in the underlying case are not before this Court because the district court lacked subject matter jurisdiction.

Instead, Concordia now addresses the other distinction LCMS offers: that the Synod must be considered incorporated, and thus outside the Act, because LCMS is incorporated.

### B.  The Synod and LCMS are Not One and The Same, and The Synod is Not Incorporated.

As a collective association of self-governing congregations, the Synod falls squarely within the definition of a nonprofit association in the Unincorporated Associations Act. It is "an unincorporated organization … consisting of three or more members joined by mutual consent for a common, nonprofit purpose." Tex. Bus. Org. Code § 252.001(2). As such, it may, and does, "hold" real estate, *id*. § 252.004(a)[18], and "may institute … a judicial … proceeding." *Id*. § 252.007(a).

In other words, the Act explicitly recognizes the separate existence of the Synod as its own entity, enabled to file a lawsuit involving real estate it claims to hold. So, Texas law allows the Synod to file the lawsuit LCMS filed on the Synod's behalf.

LCMS improbably argues that the Synod's creation of LCMS as an incorporated entity takes the Synod outside the Act's definition of it as an organization capable of suing over issues about the rights it claims to hold in Concordia. The reason LCMS gives for this position is that the church and its congregations chose "to accomplish their shared goals

---

[18] Similarly, the Synod constitution of 1924 expressly provided Synod power to "purchase, hold, administer, and sell property of every description in the interests of the Synod." ROA.257.

through LCMS's corporate form." LCMS Br. 37. According to LCMS, this means that the Synod is not a "jural entity distinct from LCMS," *id*. 40, and while there may be a distinction, it is purely "spiritual, not legal." *Id.* 41. The Act, precedent, and the events creating LCMS reject this argument. Regardless of underlying spiritual intentions and objectives, the Act plainly provides that the Synod is a separate entity, capable of suing on its own and that the form of that separate entity is as an unincorporated association. The precedents of this Court and the Texas Supreme Court compel the same conclusion. And the Synod's creation of LCMS likewise belies LCMS's stubborn assertion that the two entities are really one entity.

The constitution of the Synod distinguishes the two entities, stating that LCMS was "formed by the Synod." ROA.1276 (Synod Const. Art. XI.E.2). LCMS even admits this. It asserts that LCMS was "formed by" the Synod, ROA.1237 (¶16), and that it (LCMS) was "one of the corporate entities formed by the Synod in convention." ROA.1238 (¶18).

Against this backdrop, the district court's finding that "[t]here is no evidence that the Synod is incorporated," ROA.3093, is clearly correct (and certainly not clearly erroneous). As the district court framed it, the Synod and LCMS are "not one and the same." ROA.3308. Incorporation

of LCMS is not incorporation of the Synod. And since the Synod is not incorporated, it is an unincorporated association under Texas law, with Texas citizenship—meaning that there is not complete diversity and the district court did not have subject matter jurisdiction.

LCMS cites *Evangelical Synod of Mo., Ohio & Other States v. Hoehn*, 196 S.W.2d 134 (Mo. 1946), to support its argument that LCMS is the Synod. LCMS Br. 37. The case, however, is inapposite. It decided the question of whether a publishing company that was a corporate subsidiary of the church was entitled to a tax exemption as a religious corporation and held that it was not. The decision's recitation of facts assumed that the church had been incorporated, but made no decision about the implications of such incorporation. The decision actually supports Concordia's position in this case, because it said that the Missouri Constitution did not allow a legal corporation to be formed for the purpose of imparting religious instruction through teaching of a church's religious tenets. 196 S.W.2d at 140 (citing *Soc'y of Helpers of Holy Souls v. Law*, 186 S.W. 718, 725 (Mo. 1916)). Missouri precedent clearly establishes that religious organizations maintain their separate existence when they form nonprofit corporations. "The Catholic Church at Lexington did not lose its existence or organization in the

incorporation of the plaintiff by the same name." *Catholic Church v. Tobbein*, 82 Mo. 418, 424 (1884); *see also Lilly v. Tobbein*, 103 Mo. 477, 488, 15 S.W. 618, 620 (1890) ("It was, however, held in that case, and we think correctly held, that the church society did not lose its existence, or become wholly merged in the corporation."); *Soc'y of Helpers of Holy Souls v. Law*, 267 Mo. 667, 680, 186 S.W. 718, 727 (1916) ("And the attempted incorporation of plaintiff did not destroy the independent and continued existence of "The Order of Little Helpers" whose name as a religious society was used as the corporate name of plaintiff.")

Under this principle, then, Missouri law says that LCMS cannot be considered to be the Synod undermining LCMS's argument that it and the Synod are of one indivisible piece.

## C. LCMS's Effort to Buttress its Erroneous Argument that the Synod is Not An Unincorporated Association is Unavailing.

### 1. The Doctrine of Constitutional Avoidance is Inapplicable Here.

LCMS's invocation of the constitutional avoidance doctrine is wholly misplaced. It postures the doctrine as a reason for interpreting the Unincorporated Associations Act favorably toward LCMS. LCMS Br. 43-45. But its substantive argument has nothing to do with statutory

interpretation. LCMS's brief on this issue does not identify or cite to any provision or phrase of the Act whose interpretation needs to be narrowed to avoid a constitutional problem that would otherwise be present. Instead, it is merely a rehash of its argument that the district court erred in determining that LCMS and the church are not the same thing and the related determination that the record has nothing in it to indicate that the Synod is incorporated.

The Act only covers "unincorporated associations" as defined in Tex. Bus. Org. Code § 252.001(2). The constitutional avoidance doctrine "is not a license for the judiciary to rewrite [legislative] language." *United States v. Albertini*, 472 U.S. 675, 680 (1985). LCMS makes no effort, even a contorted one, to explain how rewriting the phrase "unincorporated associations" could somehow remove the Synod from coverage by the Act.

LCMS's position boils down to an argument that the facts of the case have to be reconfigured to make the Synod a corporation instead of an unincorporated association that is a Texas resident. That is not something the doctrine of constitutional avoidance speaks to at all. It cannot be used to skew a fact finding that the Synod is not a corporation.

## 2.    The Texas Religious Freedom Restoration Act Says Nothing About Proper Interpretation of the Unincorporated Association Act.

LCMS's search for something to take the Synod outside the Act's obvious inclusion is far off target when it zeroes in on the Texas Religious Freedom Restoration Act, Tex. Civ. Prac. & Rem. Code ("TRFRA"). LCMS Br. 47. TRFRA provides no interpretive guidance, much less directive, for the Unincorporated Associations Act and requires no analytical adjustment to the conclusion that the Synod is an unincorporated association.

LCMS's argument on this point only cites a specific provision of TRFRA once, where it correctly notes that TRFRA applies to the Act because it applies to "each law" of Texas. *See* LCMS Br. 45 (citing TRFRA § 110.002(c)). However, TRFRA does *not* say, as LCMS claims, that the Act "must be interpreted to avoid conflict with [TRFRA's] requirements if possible." And no other provision of TRFRA says this either.

What TRFRA actually does is provide for certain things a "government agency" may not do respecting burdening a person's religious freedom, *see* TRFRA §§ 110.003, 110.0031, and authorizes the person to raise these protections as a defense in a judicial or

50

administrative proceeding.[19] *Id.* § 110.004. A court, be it state or federal, however, does not come within the statute's definition of "government agency." *Id.* § 110.001(2). Consequently, TRFRA does not restrain or control the jurisdiction of this Court, the court below, or even Texas state courts in their interpretation of whether the Synod is an unincorporated association. Nor does TRFRA indirectly restrain these judicial bodies by imposing an interpretive restriction that negates the plain language of the Act.[20]

### 3.    The "Internal Affairs Doctrine" Is Inapplicable.

The internal affairs doctrine has nothing to do with interpreting whether the Synod comes within the Unincorporated Associations Act. LCMS's argument that the doctrine is in "conflict" with the district court's application of the Act fares no better than its other two efforts to artificially constrain the Act's meaning as applied to the Synod. LCMS Br. 47-50.

---

[19] Any proposed application of TRFRA in this appeal makes no sense because Synod, purportedly represented by LCMS, is the plaintiff, not the defendant and TRFRA cannot be interpreted under any guise to abrogate the constitutional limits of federal court jurisdiction.

[20] For these same reasons, TRFRA does not speak to the church autonomy doctrine and its application, or not, to the diversity jurisdiction issue at the heart of this appeal. This is only mentioned here because LCMS's argument on the interpretation of the Unincorporated Associations Act also includes discussion about the church autonomy doctrine. LCMS Br. 45-46.

This particular doctrine is directed at trying to cabin one state's ability to control the internal affairs of a corporation incorporated in another state in order to relieve the corporation from facing conflicting legal demands. *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982). It only applies to "matters peculiar to the relationship among or between the corporation and its current officers, directors, and shareholders." *Id.*; *see also Askanase v. Fatjo*, 130 F.3d 657, 670 (5th Cir. 1997) (same). These internal affairs have to do with the formation and *internal* relationship of the corporation and its officers. Tex. Bus. Org. Code § 1.102. It is a conflict of laws principle as between states, not a jurisdictional principle. *Grynberg v. Grynberg*, 535 S.W.3d 229, 233 (Tex.App.—Dallas 2017, no pet.).[21]

The district court's conclusion about the Act's application to the Synod does not affect LCMS's internal affairs and relationship among its officers. It orders LCMS to do nothing. It speaks to the Synod's role in

---

[21] For the same reasons, the State of Missouri's *amicus* brief is wholly irrelevant to this appeal. Nothing in the district court's decision attempts to control the internal affairs of Synod (which is not a corporation and therefore not subject to the internal affairs doctrine) or LCMS. Furthermore, the various Missouri statutory exemptions relating to religious corporations are irrelevant to the jurisdictional determination by the district court. Finally, the district court's order does not treat religious organizations any differently than other unincorporated associations. If a non-religious unincorporated association forms a nonprofit corporation and retains its independent existence, the same citizenship and jurisdictional analysis would apply.

this case, not LCMS's. Inasmuch as they are two separate entities, LCMS's internal affairs are not implicated.

All the district court order determines is that the Synod is a real party to this controversy and is an unincorporated association with Texas citizenship. That is by no stretch in conflict with the internal affairs doctrine and the operations of LCMS.

## III.   LCMS's Rule 19 Argument Is Irrelevant.

In pages 50-54, LCMS's brief sets up a false premise to argue that the district court failed to conduct a required analysis under Rule 19. At p.53-54, LCMS cites ROA.3320 for the proposition that the district court improperly granted the motion to dismiss because Synod is an indispensable party under Rule 19. However, this section of the district court's order solely addresses the remand of the removed state court lawsuit. ROA.3319-3320.[22] The remand order is distinct from the dismissal at issue in this appeal and not subject to appellate review. 28 U.S.C. § 1447(d).

---

[22] LCMS similarly cites ROA.3315 as stating that the court improperly concluded that Synod is an indispensable party. The cited provision merely posits a question and does not constitute a conclusion under Rule 17 or Rule 19.

The magistrate's report and recommendation concluded that Synod holds the substantive rights at issue, that LCMS failed to demonstrate that it held substantive rights independent of Synod, and recommended dismissal under Rule 17 for failure to prosecute in the name of the real party in interest. ROA.3085-3089. Nowhere does the magistrate recommend dismissal for failure to join an indispensable party under Rule 19. LCMS did not file any objection to the Rule 17 findings or recommendations. ROA 3192-3221. Furthermore, there is no objection to failure to conduct a Rule 19 analysis. *Id.* Accordingly, except on the ground of plain error, which is not asserted, an attack on the magistrate's findings is barred. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

The district court's order adopts the recommendation to dismiss under Rule 17 and does not, as claimed by LCMS, conclude that dismissal is required under Rule 19. ROA.3315-3318. Accordingly, LCMS's brief argues an entirely irrelevant issue. LCMS Br. 50-54.

The determination that Synod holds the substantive rights and is a real party to the controversy, and that LCMS does not have rights independent from Synod, makes it unnecessary to reach Rule 19. Subject matter jurisdiction is absent entirely aside from a Rule 19 analysis.

However, to the extent that a Rule 19 analysis may have been relevant, Synod is clearly an indispensable party. The sole basis for LCMS's argument is a rehash of the argument that Synod lacks capacity, which has been thoroughly addressed above. Because Synod holds the purported substantive rights at issue and has capacity to participate in litigation, and because Synod (and LCMS) have access to all requested remedies in state court, dismissal for failure to join an indispensable party is undoubtedly necessary. *Harrell & Sumner Contracting Co. v. Peabody Peterson Co.*, 546 F.2d 1227, 1228-29 (5th Cir. 1977). The case could not proceed without Synod, which means that complete diversity would be destroyed.

## CONCLUSION

The Court should affirm the district court's order of dismissal without prejudice.

Respectfully submitted,

*/s/ Daniel R. Richards*

Daniel R. Richards
Texas Bar No. 00791520
drichards@rrsfirm.com
Clark Richards
Texas Bar No. 90001613
crichards@rrsfirm.com
Albert A. Carrion, Jr.
Texas Bar No. 03883100
acarrion@rrsfirm.com
RICHARDS RODRIGUEZ & SKEITH, LLP
611 West 15th Street
Austin, Texas 78701
 (512) 476-0005


Renea Hicks
Texas Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703
(512) 480-8231
rhicks@renea-hicks.com

***ATTORNEYS FOR APPELLEES***

## CERTIFICATE OF SERVICE

Using the appellate CM/ECF system, this document was served on all registered counsel for the parties and transmitted to the Clerk of the Court on the 27th day of June 2025.

*/s/ Daniel R. Richards*

Daniel R. Richards

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 11,313 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and 5th Cir. R. 32.1 and type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point (12-point for footnotes) Century Schoolbook font.

*/s/ Daniel R. Richards*
Daniel R. Richards