

**CLARK RICHARDS**
PARTNER

September 11, 2025

<u>**Via E-Filing**</u>
Lyle W. Cayce, Clerk of Court
U.S. Fifth Circuit Court of Appeals
600 S. Maestri Place, Suite 115
New Orleans, LA 70130-3408

> Re:    Case No. 25-50130; *The Lutheran Church-Missouri Synod, a Missouri Nonprofit Corporation v. Donald Christian, Christopher Bannwolf, and Concordia University Texas Incorporated.*

Dear Mr. Cayce,

Under Fed. R. App. Proc. 28(j) and 5th Cir. R. 28.4, the Concordia Appellees bring to the Court's attention a new opinion by this Court, *McRaney v. The North American Mission Bd. of the Southern Baptist Convention, Inc.*, No. 23-60494 (Sept. 9, 2025) ("*McRaney II*") (filed with this letter), which extensively discusses the church autonomy doctrine.

*McRaney II* re-stated the long-established principle that the church autonomy doctrine does not bar civil courts from adjudicating "certain disputes over church property" and that "churches cannot avoid civil courts' jurisdiction" by themselves adjudicating property disputes. Op. 17-18 n.3. This mirrors the Concordia Appellees' argument that there is no constitutional hands-off rule for federal courts in adjudicating church property disputes. Br. of Appellees 39. *McRaney II* further explains that "'the ordinary principles which govern voluntary associations'" apply to church-property-dispute cases. *Id.* at 32 (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 725 (1871)). This buttresses the Concordia Appellees' position that applying the Texas Unincorporated Nonprofit Association Act here does not violate the church autonomy doctrine. Br. of Appellees 42-48.

---

 *McRaney II* also explains that federal courts "have no power to resolve questions covered by the church autonomy doctrine," Op. 24, later explaining that "the church autonomy doctrine reflects an independent limitation on courts sticking their noses in the church door, *even when/if asked to do so*." *Id*. 28 n.6 (emphasis added). As the briefing explains, that is the situation here. It was *the church* that initiated the request that the federal district "enforce Synod's internal decision" by confirming it. Br. of Appellees 1, 16. Confirmation of the Synod's decision requires the Court to do exactly what is prohibited – stick its nose in the church door – therefore the Court lacks power to grant the relief requested in this appeal. Concordia Appellees argue that, in this situation, "closing the federal court doors as required by constitutional limits on federal judicial power does not inhibit the free exercise of religion," *id*. 34-35, which is why the district court decided correctly.

      Sincerely,
      **Richards Rodriguez & Skeith, LLP**

      Clark Richards


Enclosure as stated

cc: All counsel of record (by e-filing system)

# United States Court of Appeals for the Fifth Circuit

---

No. 23-60494

---

United States Court of Appeals
Fifth Circuit

**FILED**

September 9, 2025

Lyle W. Cayce
Clerk

WILL MCRANEY,

*Plaintiff—Appellant*,

*versus*

THE NORTH AMERICAN MISSION BOARD OF THE SOUTHERN BAPTIST CONVENTION, INCORPORATED,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:17-CV-80

---

Before RICHMAN, OLDHAM, and RAMIREZ, *Circuit Judges*.

ANDREW S. OLDHAM, *Circuit Judge*:

Pastor Will McRaney brought employment-related claims against the North American Mission Board. But the church autonomy doctrine prohibits any court from adjudicating McRaney's claims. Therefore, the district court was correct to enter summary judgment for the Board.

I

We begin with background on (A) the religious institutions involved and (B) the procedural posture of this suit.

No. 23-60494

## A

Baptist ecclesiology is non-hierarchical, and each Baptist church is autonomous. Nevertheless, Baptist churches have long voluntarily cooperated in fellowship with one another and pooled resources for missions, evangelism, and church planting. It is common for cooperating Baptist organizations to have a shared confession of faith and doctrinal commitments. Each Baptist association and convention is itself autonomous and exercises no control over cooperating congregations.

The Southern Baptist Convention ("SBC") is one such national organization. The SBC's confession of faith is the *Baptist Faith & Message* (2000). Defendant–Appellee, the North American Mission Board ("NAMB"), is one of 12 different constituent boards or agencies of the SBC. Its ministry priorities include assisting churches with evangelism and church planting, "providing missions education," "coordinating volunteer missions," and helping with "relief ministries to victims of disaster and other people in need." ROA.1701. NAMB pursues these ministry priorities through cooperative partnerships with 42 different state or regional conventions of Baptist churches. One of these cooperative partners is the Baptist Convention of Maryland/Delaware ("BCMD"), an organization of more than 500 autonomous Baptist churches in Maryland and Delaware.

In 2012, NAMB and BCMD entered into a Strategic Partnership Agreement ("SPA"). The SPA was a joint ministry agreement that memorialized "the relationships and responsibilities" of the two entities "in areas where the two partners jointly develop, administer and evaluate a strategic plan for" reaching nonbelievers "through church planting and evangelism." ROA.1702. As the district court recognized, the SPA is "steeped in religious doctrine," *see McRaney v. N. Am. Mission Bd. of S. Baptist Convention*, No. 17-CV-00080, 2023 WL 5266356, at *3 (N.D. Miss.

Aug. 15, 2023), and it is "inexorably tied to Baptist faith," Red Br. at 4. The ultimate purpose of the partnership was to "accomplish the Great Commission as given to us by our Lord in Matthew 28:19–20 and Acts 1:8." ROA.1702; *see Matthew* 28:19–20 (ESV) ("Go therefore and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, teaching them to observe all that I have commanded you."). The partnership was "driven by shared values" including "Biblical Authority," "Kingdom Advancement," "Evangelism and Missions," and "Autonomy of Individual Baptist Entities." ROA.1702. And the agreement was designed to "be consistent with the most recently adopted version of the Southern Baptist Convention Baptist Faith and Message." ROA.1703.

Plaintiff Will McRaney is an ordained minister who was employed as BCMD's Executive Director and Executive Missional Strategist from September 2012 to June 2015. The position was a ministerial role in which McRaney sought to implement the SPA's evangelical objectives. His responsibilities included overseeing and directing efforts to reach nonbelievers through church planting and evangelism.

A schism developed between McRaney and NAMB about how best to carry out the SPA. NAMB was not satisfied with McRaney's "performance of the cooperative evangelistic mission," ROA.1835, and was concerned about his "serious and persistent disregard" of the SPA's principles, ROA.2232. Specifically, they disagreed about "missionary selection and funding, associational giving, and missionary work requirements." *McRaney*, 2023 WL 5266356, at *1. In December 2014, "[a]fter careful and prayerful consideration," NAMB tendered to BCMD its one-year notice of intent to terminate the SPA. ROA.2232.

In June 2015, BCMD's board unanimously voted, 37–0, to terminate McRaney as the Executive Director. In an email to another pastor, BCMD's

president explained that "we fired Will because of his wretched leadership." ROA.2239. At his deposition, he explained that McRaney "betrayed a spirit of unwillingness to make the changes from his heart that needed to be made in his leadership" and "lack[ed] the humble spirit necessary" for his evangelical mission. ROA.1814. Board members complained that McRaney was "just not Joshua or Jeremiah"; that he was not "a good captain that can navigate tumultuous waters in a storm"; that "HE has to do Matthew 18"; that under McRaney's leadership "8 times to 2 it's [S]atan discussed over God"; and that "[i]f we pray, we check it off the list." ROA.4096–97.

Since then, McRaney has publicly campaigned against NAMB and its president for their perceived role in his termination from BCMD. In February 2016, he circulated a "Letter of Concern" accusing NAMB's president of "vindictive tactics." ROA.2270. That June, he sent another letter calling for "restoration and restitution for the damages caused by [NAMB's president] acting on behalf of NAMB." ROA.2274. And he made numerous posts on Facebook and Twitter to criticize NAMB and its president. *See* ROA.2322–26.

In October 2016, a pastor saw McRaney's posts on Facebook "declaring war on the [NAMB]." ROA.2298. In response to those posts, the pastor disinvited McRaney from speaking at a conference in Mississippi because "significant numbers of our ministry partners were [NAMB] ministers." ROA.2298–99. In response to McRaney's public campaign, NAMB hired private security personnel and purchased a home security system for its president due to fear for his physical safety. NAMB also posted a no-entry photograph of McRaney behind the reception desk at its headquarters.

B

In 2017, McRaney sued NAMB in Mississippi state court. He alleged tortious interference with business relationships, defamation, and intentional infliction of emotional distress. NAMB removed the case to federal district court under 28 U.S.C. §§ 1332, 1441(a)–(b).

NAMB then moved to dismiss for failure to state a claim under Rule 12(b)(6). *McRaney v. N. Am. Mission Bd. of S. Baptist Convention*, No. 17-CV-00080, 2019 WL 1810991, at *1 (N.D. Miss. Apr. 24, 2019). In that motion, NAMB argued that McRaney's claims were barred by the church autonomy doctrine. *See ibid.* The district court denied the motion in material part. *Ibid.* NAMB reasserted its church autonomy defense at summary judgment. *Ibid.* The district court concluded that "under the First Amendment it lack[ed] subject matter jurisdiction to adjudicate McRaney's disputes" and dismissed the case. *Id.* at *3–4.

On appeal, a panel of our court reversed. *See McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 966 F.3d 346, 351 (5th Cir. 2020). The panel reasoned that the early stage of the litigation made it "premature" to conclude that the church autonomy doctrine barred McRaney's claims, *ibid.*, but clarified that the district court was "free to reconsider" dismissing "some or all of McRaney's claims" on remand, *id.* at 350. Our court denied rehearing en banc in a 9–8 vote. *See McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 980 F.3d 1066 (5th Cir. 2020); *see also id.* at 1075 (Oldham, J., dissenting from the denial of rehearing en banc).

On remand, the parties continued discovery. The parties deposed multiple pastors and many sensitive internal ministry records were produced. NAMB again moved for summary judgment on church autonomy grounds, among others. *McRaney*, 2023 WL 5266356, at *1. The district court granted the motion for summary judgment, concluding that adjudicating McRaney's

claims would "impermissibly delv[e] into church matters in violation of" the church autonomy doctrine. *Id.* at *3. Somewhat confusingly, however, the district court also concluded that it lacked subject matter jurisdiction and purported to dismiss the case. *Id.* at *5. McRaney timely appealed.

## II

Civil courts cannot adjudicate ecclesiastical matters. That august principle has a "rich historical pedigree" stretching well past the Founding. *McRaney*, 980 F.3d at 1076 (Oldham, J., dissenting from the denial of rehearing en banc). The First Amendment's Religion Clause[1] enshrines that principle within the church autonomy doctrine, which shields religious institutions from interference by state and federal courts. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). We (A) briefly explain the relevant history, (B) clarify its modern doctrinal reception, and (C) explain how the doctrine robustly protects religious institutions.

## A

The independence of religious institutions to govern their own affairs free from government intrusion has "ancient roots" in Anglo-American legal

---

[1] While most courts and scholars refer to the Establishment Clause and the Free Exercise Clauses as the First Amendment's "Religion Clause*s*" (plural), they are in fact a singular clause. The First Amendment provides: "[1] Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; [2] or abridging the freedom of speech, or of the press; [3] or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. Thus, the First Amendment has three clauses separated by semicolons. The Religion Clause (singular) is the first of them, and it has two halves separated by commas. *See* Rodney J. Blackman, *Showing the Fly the Way Out of the Fly-Bottle: Making Sense of the First Amendment's Religion Clauses*, 42 U. Kan. L. Rev. 285, 296 (1994). Understanding the Religion Clause as a unitary provision of the First Amendment has important doctrinal implications because it ensures that courts interpret its two halves to "have complementary purposes, not warring ones." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 510 (2022) (quotation omitted).

history. *McRaney*, 980 F.3d at 1076 n.1 (Oldham, J., dissenting from the denial of rehearing en banc). That principle was already centuries old by the time of the Norman Conquest: Under the Saxon kings of the seventh to the tenth centuries, civil courts categorically lacked jurisdiction over clergymen unless the bishop "secularize[d]" them first. *Id.* at 1076 (quoting Alfred c. 21 (892); and citing, *inter alia*, Felix Makower, The Constitutional History and Constitution of the Church of England 384–94 (London, 1895)). Between 1072 and 1076, William the Conqueror stripped the civil courts of jurisdiction over "any case which pertain[ed] to the rule of souls" and established new ecclesiastical courts with exclusive jurisdiction over matters of religious law and doctrine. *Ibid.* (quoting Ordinance of William I Separating the Spiritual and Temporal Courts). In the Middle Ages, then, it was "natural and inevitable to have church courts and state courts, each with their own field of action and each, perhaps, tending to encroach on the other's domain, but each having their own province in which they were paramount." Roscoe Pound, *A Comparison of Ideals of Law*, 47 Harv. L. Rev. 1, 6 (1933).

The autonomy of churches to adjudicate their own affairs was therefore "hardly new" when King John assented to Magna Carta in 1215. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 182 (2012). And it was so important that the Great Charter's "very first clause," *ibid.*, ensured that "the English church shall be free, and shall have its rights undiminished, and its liberties unimpaired," Magna Carta, ch. 1 (1215). Unfortunately, that decree may have been more aspirational than effective. It "did not survive the reign of Henry VIII," who brought the Church of England under the Crown's control. *Hosanna-Tabor*, 565 U.S. at 182; *see also* Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2110–15 (2003) (recounting more of this history).

No. 23-60494

Puritans and Quakers fled to New England, Pennsylvania, and Delaware "[s]eeking to escape the control of the national church" in England. *Id.* at 182. Even the Anglicans who had colonized Virginia "sometimes chafed at the control exercised by the Crown and its representatives over religious offices" in the New World. *Id.* at 183. The budding American colonies became mired in conflict between colonial governments and minority faiths too. For example, "minority Protestant sects" such as Presbyterians faced "legislative interference with their form of church governance." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1445 (1990). And infamously, Baptist preachers were jailed in Culpeper, Virginia, for dissenting from Anglicanism—a persecution that James Madison called a "diabolical Hell conceived principle." *Id.* at 1452 (quoting Letter from James Madison to William Bradford (Sept. 25, 1773), *in* 1 The Papers of James Madison 104, 106 (R. Rutland & C. Hobson eds., 1977)); *see also Our Lady of Guadalupe*, 591 U.S. at 749 (providing the history of other conflicts); *Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring) (describing the "traditional hallmarks" of religious establishments).

These episodes framed many Christians' arguments for disestablishment and free exercise at the Founding. *See, e.g.*, *Declaration of the Virginia Association of Baptists* (Dec. 25, 1776), *reprinted in* 1 The Papers of Thomas Jefferson 660, 660–61 (Julian P. Boyd ed., 1950). For example, Baptist preacher John Leland argued that "religious opinions [are] not the objects of civil government, nor any way under its jurisdiction." John Leland, *The Yankee Spy: Calculated for the Religious Meridian of Massachusetts, but Will Answer for New Hampshire, Connecticut, and Vermont, Without Any Material Alterations* (1794), *reprinted in* The Writings of the Late Elder John Leland 213, 228 (L.F. Greene ed., 1845). That

proposition would have been familiar to King Edgar the Peaceful, who said basically the same thing while reigning over England nearly a millennium earlier. *See McRaney*, 980 F.3d at 1076 (Oldham, J., dissenting from the denial of rehearing en banc).

Ultimately, our Framers adopted the First Amendment and its Religion Clause "against this background." *Hosanna-Tabor*, 565 U.S. at 183.

## B

Today, the Supreme Court has reified this principle in the First Amendment's church autonomy doctrine. U.S. Const. amend. I. The "general principle of church autonomy" guarantees to religious institutions "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 591 U.S. at 747. We (1) briefly describe the "broad principle" of "church autonomy." *Ibid.* Then we (2) discuss some of its various strands.

### 1

In general, the church autonomy doctrine "protect[s] the right of churches and other religious institutions to decide matters of faith and doctrine" without the "intrusion" of secular courts. *Id.* at 746 (quotation omitted).[2] The doctrine does not grant "religious institutions . . . a general

---

[2] Though the doctrine is called the *church* autonomy doctrine, its protections extend to religious institutions of all faiths. *See Our Lady*, 591 U.S. at 754–56 (discussing Catholicism, various Protestant denominations, Judaism, Islam, the Church of Jesus Christ of Latter-day Saints, and Seventh-day Adventism). And while we use the term church autonomy doctrine, other courts and commentators have used the term "ecclesiastical abstention" to describe the same principle. *See, e.g.*, *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 795 (9th Cir. 2025) (Bress J., concurring); *Belya v. Kapral*, 45 F.4th 621, 628 (2d Cir. 2022); *Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008); *see also* Victor E. Schwartz & Christopher E. Appel, *The Church Autonomy Doctrine: Where Tort Law Should Step Aside*, 80 U. Cin. L. Rev. 431, 448

immunity from secular laws." *Ibid.* Its purpose includes safeguarding religious institutions' "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Ibid.*; *see also Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring) ("To safeguard this crucial autonomy, we have long recognized that the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs."); *Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 257 (2025) (Thomas, J., concurring) (grounding the church autonomy doctrine in "the reality that matters of religious faith and doctrine are closely linked to . . . matters of church government" and the background "understanding that church and state are . . . each supreme in its own sphere" (quotation omitted)). Even the "very process of inquiry" into a church's internal affairs can "impinge on rights guaranteed by the [First Amendment]" *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979).

First and foremost, the First Amendment does not allow civil litigation "to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). That is because judicial "interference in that sphere would obviously violate the free exercise of religion, and any attempt by [courts] to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Our Lady of Guadalupe*, 591 U.S. at 746.

———————————

(2011) ("[T]he Supreme Court has consistently and with little controversy prohibited civil court involvement in 'purely ecclesiastical' matters to ensure that government does not encroach on the sacred precincts of religion. Scholars have dubbed this line of jurisprudence the 'church autonomy doctrine' or the 'ecclesiastical abstention doctrine.'").

2

But the church autonomy doctrine prohibits far more than civil judges telling religious institutions what to believe or how to worship. To help clarify the wide-ranging scope of the doctrine, we identify some areas where church autonomy has barred judicial interference. These include (a) the selection and dismissal of clergy and faith leaders (the so-called "ministerial exception"); (b) the meaning of religious beliefs and doctrines; (c) the determination of religious polity, such as membership, matters of discipline and good standing, and the identification of the "true church" amidst internecine disputes; and (d) internal church communications regarding any of the aforementioned activities. *See, e.g.*, Carl H. Esbeck, *Church Autonomy, Textualism, and Originalism: SCOTUS's Use of History to Give Definition to Church Autonomy Doctrine*, 108 Marquette L. Rev. 705, 710–12 (2025). Of course, these categories are not meant to be exclusive. And many cases will cut across them. Still, they help illustrate both the breadth and the importance of the church autonomy doctrine.

a

Start with the ministerial exception, which is one "component" of the church autonomy doctrine. *Our Lady of Guadalupe*, 591 U.S. at 746. That rule commands courts "to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Ibid.* The name is misleading in two respects. The ministerial exception is not a mere "exception" from statutes or torts. It recognizes a sphere of independence that courts cannot pierce. That is why the ministerial exception does not "safeguard a church's decision to fire a minister only when it is made for a religious reason," but "instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Hosanna-Tabor*, 565 U.S. at

194–95 (citation omitted) (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)). And the ministerial exception is not limited to leaders with the title "minister." Rather, it "include[s] any employee who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or *teacher of its faith.*" *Our Lady of Guadalupe*, 591 U.S. at 754 (quotation omitted).

The ministerial exception bars the application of even neutral, generally applicable employment discrimination statutes—such as the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967 ("ADEA"), and Title VII of the Civil Rights Act of 1964. *See Hosanna-Tabor*, 565 U.S. at 180; *see also Our Lady of Guadalupe*, 591 U.S. at 760. The ministerial exception also bars common law claims that "litigate the employment relationship between the religious organization and the employee." *Starkey v. Roman Cath. Archdiocese of Indianapolis*, 41 F.4th 931, 945 (7th Cir. 2022). Courts have rejected a wide variety of torts that attack ministry staffing decisions, including wrongful termination, breach of contract, tortious interference, intentional infliction of emotional distress, defamation, conspiracy to commit defamation, negligent supervision and detention, and retaliation—to name a few. *See id.* at 942 (tortious interference); *Cha v. Korean Presbyterian Church of Wash.*, 553 S.E.2d 511, 512 (Va. 2001) (wrongful termination, tortious interference, and defamation); *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330 (4th Cir. 1997) (wrongful termination, tortious interference, intentional infliction of emotional distress, and breach of contract); *Hutchison v. Thomas*, 789 F.2d 392, 393 (6th Cir. 1986) (defamation, intentional infliction of emotional distress, and breach of contract); *In re Diocese of Lubbock*, 624 S.W.3d 506, 511 (Tex. 2021) (same), *cert. denied sub nom. Guerrero v. Diocese of Lubbock*, 142 S. Ct. 434 (2021); *Erdman v. Chapel Hill Presbyterian Church*, 286 P.3d

357, 368–71 (Wash. 2012) (negligent supervision and retention); *Black v. Snyder*, 471 N.W.2d 715, 717 (Minn. Ct. App. 1991) (breach of contract, retaliation, and defamation); *see also Puri v. Khalsa*, 844 F.3d 1152, 1158 (9th Cir. 2017) (explaining that the ministerial exception bars "any state law cause of action that would otherwise impinge on the church's prerogative to choose its ministers" (quotation omitted)).

For example, in *Our Lady of Guadalupe School v. Morrissey-Berru*, the ministerial exception barred a schoolteacher's ADEA suit against the Catholic school that previously employed her. 591 U.S. at 756–57. Morrissey-Berru was not a priest or minister, but that did not matter because "she was her students' religion teacher." *Id.* at 739. The Catholic school first moved Morrissey-Berru to a part-time teaching position and then "declined to renew her contract" the next year. *Id.* at 742. The Catholic school's reasons for dismissing her were secular: It cited her "difficulty in administering a new reading and writing program." *Ibid.* But that also did not matter because once a religious school "entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* at 762. So, as a threshold matter, the Court held it could not constitutionally apply the ADEA in Morrissey-Berru's suit.

Our sister circuit's recent decision in *Starkey* is also illustrative. In that case, a former schoolteacher brought state law claims for tortious interference with employment against the Archdiocese, which, she alleged, caused her termination from a Catholic school. 41 F.4th at 938. The court reasoned that adjudicating the schoolteacher's claims "would result in excessive judicial entanglement in ecclesiastical matters" because elements of those claims would "litigate the employment relationship between" her and the school. *Id.* at 945. No less than a Title VII claim, a state tort suit would

"operate as a penalty on the Church for terminating an unwanted minister." *Hosanna-Tabor*, 565 U.S. at 194. So the ministerial exception barred Starkey's claims. *Starkey*, 41 F.4th at 945.

b

Another strand of the church autonomy doctrine forbids civil courts from deciding religious questions. This ancient rule recognizes that a civil court cannot decide questions that are "strictly and purely ecclesiastical in [their] character." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871). It means that religious institutions and people have the "power to decide for themselves, free from state interference, matters . . . of faith and doctrine." *Kedroff*, 344 U.S. at 116. "[L]egal tribunals must" defer the resolution of such questions to "the highest of [the] church judicatories to which the matter has been carried." *Hosanna-Tabor*, 565 U.S. at 185–86 (quoting *Watson*, 80 U.S. (13 Wall.) at 727). The result is the "nonreviewability of questions of faith" and "religious doctrine." *Kedroff*, 344 U.S. at 115 n.20. Accordingly, "courts must take care to avoid 'resolving underlying controversies over religious doctrine.'" *Our Lady of Guadalupe*, 591 U.S. at 751 n.10 (quoting *Blue Hull Mem'l Presbyterian Church*, 393 U.S. at 449).

*Harris v. Matthews*, 643 S.E.2d 566 (N.C. 2007), presents a good illustration of how "[c]ourts are not arbiters of scriptural interpretation." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981). In *Harris*, members of Saint Luke Missionary Baptist Church sued the church's pastor, secretary, and chairman. 643 S.E.2d at 568. They argued that leadership's transfer of Saint Luke's assets to a North Carolina nonprofit was a misappropriation of church funds and a breach of fiduciary duty. *Ibid.* But the Supreme Court of North Carolina held it could not adjudicate the claims. *Id.* at 571. Why? Resolving the claims would require the court to determine whether the "expenditures" by the church's leaders "were proper," which

would turn on the "church's view of the role of the . . . church leaders." *Ibid.* It did not matter that the underlying claims—misappropriation of funds and breach of fiduciary duty—were the types of claims that civil courts adjudicate all the time. What mattered was that the plaintiffs wanted North Carolina's courts to apply those civil legal rules to a matter of "religious doctrine." *Ibid.* The court reasoned that such an inquiry would be "no different than asking a court to determine whether a particular church's" policies were "doctrinally correct" or "accord[ed] with the congregation's beliefs." *Ibid.* The claims were therefore nonreviewable, so the court deferred to Saint Luke's highest authority—the Council for Ministry—which "declared the matter closed." *Ibid.*

For similar reasons, it is not "in the competence of courts under our constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings." *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953). So in *Lippard v. Holleman*, 844 S.E.2d 591 (N.C. Ct. App. 2020), a North Carolina court rejected a church musician's claim that a pastor's sermon, which described the musician as unwilling to commit to the church's reconciliation process, was defamatory because adjudicating it "would necessarily involve interpretation of Matthew 18 and Ephesians 4." *Id.* at 602. In *Schoenhals v. Mains*, 504 N.W.2d 233 (Minn. Ct. App. 1993), members of the Faith Tabernacle of Truth Church sued its pastor for defaming them in a letter he read to the congregation accusing them of "some of the most serious sins found in the Bible." *Id.* at 234. But the Minnesota court rejected the claims since evaluating the truth of the sermon "would require an impermissible inquiry into Church doctrine." *Id.* at 236. And in *McNair v. Worldwide Church of God*, 242 Cal. Rptr. 823 (Cal. Ct. App. 1987), a California court rejected a defamation claim premised on a pastor's statements about the plaintiff's divorce in a speech to 1,000 other ministers at a Pastoral Conference. *Id.* at 827. The court reasoned that it

could not resolve the defamation claim because the pastor's "remarks were made while explaining the Church's newly developed and misunderstood doctrine on divorce and remarriage." *Id.* at 833.

In all of these cases, the plaintiff's underlying claims sounded in traditional civil law—breach of fiduciary duty, defamation, &c. And in all of these cases, that was precisely the problem: Civil courts cannot apply civil rules to religious organizations when doing so necessarily implicates questions of faith, scripture, and religious doctrine.

c

The church autonomy doctrine also forbids courts from adjudicating matters of church governance, including church discipline and the church's understanding of its own membership. *See Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139–40 (1872) ("It may be conceded that we have no power to revise or question ordinary acts of church discipline. . . . [W]e cannot decide who ought to be members of the church, nor whether the excommunicated have been regularly or irregularly cut off."). For the same reason, a court cannot identify the "true" church. *Watson*, 80 U.S. (13 Wall.) at 703.

The Supreme Court clarified this rule in *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696 (1976). In that case, the Holy Assembly of Bishops and the Holy Synod of the Serbian Orthodox Church—*i.e.*, the "Mother Church"—defrocked Dionisije Milivojevich as bishop of the church's American-Canadian Diocese. *Id.* at 697–98. The Mother Church also split the American-Canadian Diocese into three new Dioceses. *Id.* at 698. Milivojevich sued in Illinois state court, arguing that the Mother Church did not follow its own internal regulations when it took both actions, and he sought "to have himself declared the true Diocesan Bishop." *Id.* at 707. The Supreme Court of Illinois held that Milivojevich's "defrockment had to be set aside as 'arbitrary' . . .

No. 23-60494

and that the Diocesan reorganization was invalid." *Id.* at 708. The court reached those results based on its own "interpretation of the Church's constitution and penal code," finding "it was beyond the scope of the Mother Church's authority to effectuate such changes without Diocesan approval." *Ibid.*

The Supreme Court reversed. It held that the Illinois Supreme Court's conclusion that the Mother Church acted arbitrarily when it defrocked Milivojevich necessarily "entail[ed] inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow." *Id.* at 713. But that "is exactly the inquiry that the First Amendment prohibits" because "it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by" secular concepts. *Id.* at 713–14. Similarly, the Supreme Court held that the Illinois Supreme Court "engag[ed] in a searching and therefore impermissible inquiry into church polity" when it stopped the Mother Church from reorganizing the dioceses. *Id.* at 723. The teaching of *Milivojevich* is therefore clear: When "ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." *Id.* at 724–25.[3]

---

[3] The Supreme Court has recognized one narrow exception to this rule: Civil courts can apply "objective, well-established concepts of trust and property law" to resolve certain disputes over church property. *Jones v. Wolf*, 443 U.S. 595, 603 (1979). Even then, however, a civil court must be careful. In examining, say, "a church constitution [] for language of trust," a "civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Id.* at 604. If interpreting the document ends up "requir[ing] the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical

No. 23-60494

d

Finally, the church autonomy doctrine protects a church's internal communications relating to church governance or matters of faith or doctrine. *See Cath. Bishop of Chi.*, 440 U.S. at 502 (explaining that the "very process of inquiry" into a church's internal affairs can "impinge on rights guaranteed by the Religion Clauses"); *Hosanna-Tabor*, 565 U.S. at 205–06 (Alito, J., concurring) (explaining that even the process involved in the "mere adjudication" of a church's sincerity "would pose grave problems for religious autonomy").

A few cases flesh out this principle. For example, in *Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018), abortionists challenged Texas's fetal remains regulations. The district court issued a third-party subpoena against the Texas Conference of Catholic Bishops ("TCCB"), a religious organization that "teaches that the dignity of all human life demands respect and that abortion is gravely sinful." *Id.* at 364. We quashed it. *See ibid.* Why? Because compelling discovery would undermine "TCCB's ability to conduct frank internal dialogue and deliberations" and chill its advocacy by "forc[ing] TCCB to turn over *to a public policy opponent* its internal communications." *Id.* at 373 (emphasis in original). Accordingly, we refused to "empower[] certain interest groups to harass, impose disastrous costs on, and uniquely burden religious organizations." *Id.* at 373–74.

Similarly, in *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), the Tenth Circuit held the church autonomy

---

body." *Ibid.* (citing *Milivojevich*, 426 U.S. at 709). *See also Watson*, 80 U.S. (13 Wall.) at 733 (noting churches cannot avoid civil courts' jurisdiction by adjudicating property disputes any more than churches can avoid secular courts by "undertak[ing] to try one of its members for murder").

doctrine barred a sexual harassment suit against a minister for his "offensive" statements about homosexuality at church meetings that "facilitated religious communication and religious dialogue between a minister and his parishioners." *Id.* at 658. Because these meetings constituted "the church's internal ecclesiastical dialogue," the statements were "not actionable" and fell "squarely within the areas of church governance and doctrine protected by the First Amendment." *Ibid.*

And in *Pfeil v. St. Matthews Evangelical Lutheran Church of Unaltered Augsburg Confession of Worthington*, 877 N.W.2d 528 (Minn. 2016), the church autonomy doctrine protected "statements made in the context of a religious disciplinary proceeding when those statements are disseminated only to members of the church congregation or the organization's membership or hierarchy." *Id.* at 542. The Minnesota Supreme Court accepted the argument that "exposing these proceedings and their participants to civil litigation w[ould] lead to a chilling effect" if they "are not shielded from the scrutiny of civil courts." *Id.* at 539.

## C

Where the church autonomy doctrine applies, its protection is total. That is because the doctrine is a constitutional immunity from suit. Like other immunities from suit, church autonomy must be resolved at the threshold of litigation. Like other immunities, church autonomy can be raised at any stage of litigation. Abridgement of the church autonomy immunity imposes irreparable injury on the religious organization, so its denial is subject to an immediate interlocutory appeal. It applies equally in state and federal courts. And in federal court, it generally produces a judgment on the merits with prejudice—entitled to *res judicata* in state courts, preventing repetitive litigation. The church autonomy defense is therefore more protective than a jurisdictional bar. That should not be surprising, "since

No. 23-60494

'the text of the First Amendment . . . gives special solicitude to the rights of religious organizations.'" *Cath. Charities*, 605 U.S. at 257 (Thomas, J., concurring) (quoting *Hosanna-Tabor*, 565 U.S. at 189).

We (1) explain the jurisdictional-versus-nonjurisdictional debate over the church autonomy doctrine. Then we (2) explain why the church autonomy doctrine requires us to reach the merits and render judgment in this case.

1

The Supreme Court has sometimes described the church autonomy doctrine as nonjurisdictional. In *Hosanna-Tabor*, for example, the Court held the ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." 565 U.S. at 195 n.4. Thus, the Court said, the question presented is "'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'" *Ibid.* (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010)). *See supra* Part II.B.2.a (discussing this portion of the doctrine).

The Supreme Court has elsewhere described the church autonomy doctrine as jurisdictional. In *Watson*, for example, the Court noted "[t]here is, perhaps, no word in legal terminology so frequently used as the word jurisdiction, so capable of use in a general and vague sense, and which is used so often by men learned in the law without a due regard to precision in its application." 80 U.S. (13 Wall.) at 732. The Court then said that, "where a subject-matter of dispute [is] strictly and purely ecclesiastical in its character, . . . the civil courts exercise no jurisdiction." *Id.* at 733. Such purely ecclesiastical disputes include matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Ibid.*; *see also supra* Part II.B.2.b (discussing this portion of the doctrine).

No. 23-60494

These dueling instructions have created confusion across courts and the academy. *Compare, e.g.*, *Rutland v. Nelson*, 857 F. App'x 627, 628 (11th Cir. 2021) ("Civil courts lack jurisdiction to entertain disputes involving church doctrine and polity."), *with O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1258 (D.C. Cir. 2025) ("[I]t seems clear that the Court confirmed the church autonomy doctrine is not jurisdictional; it is an affirmative defense.").[4] In the first appeal in this case, for example, the panel "note[d] that it is somewhat unclear whether the ecclesiastical abstention doctrine" is jurisdictional or a merits defense. *McRaney*, 966 F.3d at 348 n.1; *see also McRaney*, 980 F.3d at 1082 (Oldham, J., dissenting from the denial of rehearing en banc) (noting widespread "confusion" in this area and pondering whether "the *Hosanna-Tabor* footnote necessitates a reexamination of the jurisdictional consequences of ecclesiastical autonomy").

One way to reconcile that confusion is to say that some parts of the church autonomy doctrine are jurisdictional (like the ecclesiastical questions posited in *Watson*) and other parts are nonjurisdictional (like the ministerial

---

[4] For recent scholarship, compare, *e.g.*, Branton J. Nestor, *Judicial Power and Church Autonomy*, Notre Dame L. Rev. (forthcoming 2025) (manuscript at 2), https://perma.cc/T797-667S (arguing that the "church autonomy doctrine limits judicial power"), *with* Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471, 510 (2022) ("Weinberger, *Jurisdictional*") (answering the titular question no, "in the technical, procedural sense of jurisdiction"), *and* Peter J. Smith & Robert W. Tuttle, *Civil Procedure and the Ministerial Exception*, 86 Fordham L. Rev. 1847, 1848 (2018) (concluding that *Hosanna-Tabor* "resolved this debate"). One scholar has even suggested that federal courts have been "flagrantly ignor[ing] the Supreme Court's view" by treating the doctrine as jurisdictional in the civil procedure sense. Weinberger, *Jurisdictional*, *supra*, at 483.

Perhaps more likely is that inferior courts are "struggling to define the contours of the church autonomy doctrine in the wake of *Hosanna-Tabor*." *Belya v. Kapral*, 59 F.4th 570, 582 (2d Cir. 2023) (Park, J., dissenting from denial of rehearing en banc).

exception discussed in *Hosanna-Tabor* and *Our Lady of Guadalupe*). That approach has some appeal given the breadth of the church autonomy doctrine: The doctrine covers many different things, *see supra* Part II.B.2, so perhaps there is no one-size-fits-all answer to the jurisdiction-versus-nonjurisdiction debate. And the Supreme Court has never overruled *Watson*, so perhaps its discussion of jurisdiction continues to bind inferior courts.

On the other hand, many of the courts that have described church autonomy as a jurisdictional barrier have "often used 'jurisdiction'" in a "broad, conceptual sense" to describe the "different spheres of authority" between civil courts and religious institutions. Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471, 488 (2022) ("Weinberger, *Jurisdictional*"). And that does not necessarily mean that the doctrine must always and everywhere be vindicated, say, under Rule 12(b)(1) instead of Rule 12(b)(6). Moreover, *Our Lady of Guadalupe* says the ministerial exception is a "component" of church autonomy—not a separate doctrine—and *Hosanna-Tabor* says it is an affirmative defense on the merits. 591 U.S. at 746; 565 U.S. at 195 n.4. *Hosanna-Tabor* likewise grounded the ministerial exception in other applications of the church autonomy doctrine. *See id.* at 185 (drawing on cases dealing with "disputes over church property"). All of that seems to suggest the doctrine is best understood—like the Religion Clause upon which it rests, *see supra* note 1—as a singular, unitary whole. And that the entire doctrine operates as a defense on the merits, notwithstanding some language in earlier Supreme Court cases. *Cf. Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 84 (2009) (noting an earlier decision's "unrefined use[] of the word 'jurisdiction' [is] entitled to no precedential effect" (quotation omitted)); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006) (noting the Court's precedents have "been less than meticulous" in their jurisdictional verbiage).

Also on the nonjurisdictional side of the ledger is that *Watson*—the source of the autonomy-as-jurisdiction argument—was not a First Amendment case at all. Rather, *Watson* was a diversity case—handed down in the pre-*Erie* world—whose "holding was based on general law." *Kedroff*, 344 U.S. at 116 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 69 (1938)). Thus *Watson* "was decided without depending upon" the First Amendment's "prohibition of state interference with the free exercise of religion," which had not yet been incorporated against the States. *Id.* at 115. "[A]pplying not the Constitution," *Watson* instead relied upon a "broad and sound view of the relations of church and state under our system of laws." *Hosanna-Tabor*, 565 U.S. at 185 (quoting *Watson*, 80 U.S. (13 Wall.) at 727).

So, as *Hosanna-Tabor* explained, *Watson*'s main contribution was atmospheric, not doctrinal: "[O]ur opinion in *Watson* 'radiates . . . a spirit of freedom for religious organizations [and] an independence from secular control or manipulation.'" *Id.* at 186 (quoting *Kedroff*, 344 U.S. at 116); *see also Blue Hull Mem'l Presbyterian Church*, 393 U.S. at 446 (describing *Watson* as having a "clear constitutional ring"). It was not until *Kedroff* itself, decided 80 years after *Watson*, that the Court faced church autonomy "under the Constitution for the first time." *Hosanna-Tabor*, 565 U.S. at 186 (citing *Kedroff*, 344 U.S. at 116). There, the Court grounded church autonomy in the First Amendment, not Article III, a proposition that *Milivojevich* "reaffirmed." *Id.* at 187. The church autonomy doctrine has remained rooted in the First Amendment ever since. *See id.* at 185–87 (walking through *Watson*, *Kedroff*, and *Milivojevich* without mentioning jurisdiction).

2

In our view, this doctrinal confusion arises from the fact that church autonomy is jurisdictional in some senses but not in others. As *Watson* itself noted, the word jurisdiction is a word of many meanings. 80 U.S. (13 Wall.)

at 732; *accord Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998). And it is possible for the church autonomy doctrine to be jurisdictional in some senses and not others. *See* Weinberger, *Jurisdictional*, *supra*, at 487. So we must be precise in what we mean by it.

a

The church autonomy doctrine is "jurisdictional" in at least three senses.

*First*, it is jurisdictional in the sense that matters falling within its ambit are beyond the power and cognizance of civil courts. Jurisdiction is, at its core, a question of judicial power: "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868). We have no power to resolve questions covered by the church autonomy doctrine. So in that broad, colloquial sense, the doctrine is jurisdictional. *See Watson*, 80 U.S. (13 Wall.) at 733.

*Second*, the church autonomy doctrine is jurisdictional in the sense that it rests on structural, constitutional limitations in the First Amendment. In that sense, the church autonomy doctrine is analogous to the jurisdictional doctrine of state sovereign immunity. *See Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 495 n.2 (5th Cir. 2020) (Oldham, J., concurring) (distinguishing state sovereign immunity, which is implicit in the Constitution, from the immunity afforded by the Eleventh Amendment). The most obvious parallel between them is that both church autonomy and sovereign immunity afford immunities from suit that must be resolved at the earliest conceivable point in litigation. *Cf. Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1050–52 (10th Cir. 2022) (Bacharach, J., dissenting) (comparing church autonomy to qualified immunity, absolute immunity, and state sovereign immunity); *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1123

(7th Cir. 2024) (Brennan, J., dissenting) (similar); *Belya v. Kapral*, 59 F.4th 570, 579 (2d Cir. 2023) (Park, J., dissenting from denial of rehearing en banc) (similar); *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 79 (4th Cir. 2023) (Richardson, J., concurring in the judgment) (arguing church autonomy is a "threshold question").

Treating church autonomy as a structural, threshold immunity from suit accords with Supreme Court precedent. For example, *Hosanna-Tabor* was clear that the First Amendment "*prohibits* government involvement in . . . ecclesiastical decisions," makes it "*impermissible*" for a court "to contradict a church's determination of who can act as its ministers," and accordingly "*bars*" covered suits. 565 U.S. at 189, 185, 196 (emphases added); *see also Our Lady of Guadalupe*, 591 U.S. at 746 (telling courts they are "bound to stay out of employment disputes" implicating the doctrine). This language is best read to embrace a structural constitutional protection implicating the separation of powers and the competence of courts. *See Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 326 (4th Cir. 2024) (noting the doctrine's "structural nature"); *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (noting the doctrine "is rooted in constitutional limits on judicial authority"); *Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 836 (6th Cir. 2015) (calling the doctrine "structural").

*Third*, the church autonomy doctrine is jurisdictional in that breaches of it impose irreparable injuries on religious organizations that require immediate appellate review. The church is constitutionally protected against *all* judicial intrusion into its ecclesiastical affairs—even brief and momentary ones. And, as with any other immunity *from suit* (including sovereign immunity and qualified immunity), such intrusions cannot be remedied after the district court renders final judgment. For example, if the district court orders discovery into a pastor's sermon notes to adjudicate a plaintiff's claim,

the pastor cannot be made whole by a take-nothing judgment months or years later. *See Whole Woman's Health*, 896 F.3d at 373–74.[5] Thus, if a district court denies the invocation of church autonomy, that denial is subject to immediate appellate review—under the collateral order doctrine (as with sovereign and qualified immunity), under 28 U.S.C. § 1292(a) (if the church loses a motion for injunctive relief), under 28 U.S.C. § 1292(b) (if the district court certifies the question), or other authorities.

This approach protects religious institutions from the burdens and "prejudicial effects of incremental litigation." *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 982 (7th Cir. 2021). Even the "very process of inquiry" into the internal affairs of a church could itself "impinge on rights guaranteed by the Religion Clauses." *Cath. Bishop of Chi.*, 440 U.S. at 502; *see also Hosanna-Tabor*, 565 U.S. at 205–06 (Alito, J., concurring) (noting the process involved in "the mere adjudication" of a church's sincerity "would pose grave problems for religious autonomy"); *Combs v. Cent. Tex. Ann. Conf. of United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999) (holding that even "investigating . . . claims by ministers against their church" "would necessarily intrude into church governance in a manner that would be inherently coercive" which is "enough to bar the involvement of the civil courts"). An immediate appeal thus protects ecclesiastical organizations from unconstitutional deprivations of the First Amendment's structural limits. *See Garrick*, 95 F.4th at 1118–25 (Brennan, J., dissenting) (making the case); *Belya*, 59 F.4th at 577–80 (Park, J., dissenting from denial of rehearing

---

[5] This is not meant as a criticism of the very able and careful district court judge in this case. The discovery that unconstitutionally burdened the ecclesiastical defendants between our court's first decision and this one is attributable wholly to our first panel decision and the en banc court's denial of rehearing.

en banc) (same); *Tucker*, 36 F.4th at 1057–59 (Bacharach, J., dissenting) (same).

b

But that does not mean church autonomy is jurisdictional in the narrow Rule 12(b)(1) sense. Rule 12(b)(1) is used to raise a defense of lack of subject matter jurisdiction. That means the court lacks jurisdiction over the case as a whole. And that precludes the federal courts from entering judgment on the merits. *See, e.g.*, *Steel Co.*, 523 U.S. at 101.

In our view, the church autonomy doctrine generally is not jurisdictional in this narrower Rule 12(b)(1) sense. That is for three reasons.

*First*, whether a defense is raisable under Rule 12(b)(1) reveals little about the jurisdictional nature of the defense itself. For example, some Rule 12(b)(1) jurisdictional defenses—including some immunities from suit—are waivable. *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 737 (1999) (state sovereign immunity is waivable). Others are not. *See, e.g.*, *Giannakos v. M/V Bravo Trader*, 762 F.2d 1295, 1297 (5th Cir. 1985) (per curiam) ("The question of subject matter jurisdiction can never be waived."). Some courts have taken the view that the church autonomy doctrine is unwaivable and should be addressed *sua sponte*. *See, e.g.*, *Lee*, 903 F.3d at 118 n.4 (not allowing church to waive ministerial exception because it "is rooted in constitutional limits on judicial authority"); *Conlon*, 777 F.3d at 836 (not allowing waiver because the doctrine's protection is "structural"); *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) (similar), *abrogated on other grounds by Hosanna-Tabor*, 565 U.S. at 194–95; *cf. Billard*, 101 F.4th at 326 (addressing ministerial exception *sua sponte* because of its "structural basis" and "importance in partitioning civil authorities from religious ones"). But that

view is not free from doubt.[6] Either way, the waivability *vel non* of the church autonomy doctrine cannot be resolved by saying it can or cannot be raised as "jurisdictional" in the narrow Rule 12(b)(1) sense—just as other Rule 12(b)(1) jurisdictional defenses sometimes can and sometimes cannot be waived. And in any event, we need not resolve the waivability question here because NAMB ardently pressed the point from the outset of litigation. *See* Red Br. at 18 n.10.

*Second*, when a court grants a Rule 12(b)(1) motion, that leaves the plaintiff free to refile elsewhere. But if our dismissal allowed McRaney to refile in Mississippi state court, that would undermine rather than protect the ecclesiastical organizations' autonomy. Mississippi's courts are not bound by what we say—even when we're interpreting the First Amendment. *See Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring). So if we treated church autonomy as a jurisdictional defense in the Rule 12(b)(1) sense, McRaney could refile in state court, get discovery, and perhaps even proceed to judgment. By contrast, treating church autonomy as an immunity

---

[6] Scholars have split on the waivability question. *Compare, e.g.*, Weinberger, *Jurisdictional*, *supra*, at 506–09 (arguing that "church autonomy should not be subject to forfeiture," *id.* at 506, but that a "church should be able to waive church autonomy protections," *id.* at 508–09), *and* Christopher C. Lund, *Church Autonomy in the United States*, *in* Freedom of Religion and Religious Pluralism 192, 205 & n.47 (Md Jahid Hossain Bhuiyan & Carla M. Zoethout eds., 2023) (reading *Hosanna-Tabor* to allow waiver of church autonomy), *with* Smith & Tuttle, *supra*, at 1882–86 (arguing for nonwaivability). The latter view has much to commend it. Unwaivability more neatly reconciles church autonomy's two pillars—respect for religious self-determination and restraint of civil courts from answering religious questions. The church autonomy doctrine reflects an independent limitation on courts sticking their noses in the church door, even when / if asked to do so. To borrow an analogy from *Watson*, an ecclesiastical court could not "undertake to try one of its members for murder," 80 U.S. (13 Wall.) at 733, even if the congregant agreed to waive any objection to it. It is unclear why the principle would change if an ecclesiastical organization asked us to adjudicate theology or doctrine by purporting to waive church autonomy.

No. 23-60494

from suit akin to qualified immunity—which is raiseable under Rule 12(b)(6), not 12(b)(1)—means our judgment *is* binding in all courts under *res judicata*. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979). The latter approach is dramatically more consistent with the tenets of church autonomy. The former approach would make churches worse off than secular institutions: "[I]f religiosity automatically defeated subject-matter jurisdiction, religious organizations would have *fewer* rights than everyone else." *SMU v. S. Cent. Jurisdictional Conf. of United Methodist Church*, 716 S.W.3d 475, 500 (Tex. 2025) (Young, J., concurring).

*Third*, we are unaware of any Supreme Court authority that supports treating the church autonomy doctrine as jurisdictional in the narrow Rule 12(b)(1) sense. Take *Milivojevich* for example. That case bears many similarities to this one because both turn on the propriety of a church's decision to reorganize its ministry and to remove the plaintiff minister. And in *Milivojevich*, the Supreme Court did not order dismissal of the cause. To the contrary, it reversed on the merits. *See* 426 U.S. at 724–25. And on remand, the Illinois courts entered judgment on the merits. *See Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 363 N.E.2d 606, 606 (Ill. 1977) (per curiam), *aff'd*, 387 N.E.2d 285 (Ill. 1979). And the Supreme Court denied certiorari. *See Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Serbian E. Orthodox Diocese for U.S. of Am. & Can.*, 443 U.S. 904 (1979) (mem.) We obviously do not read that unexplained treatment of the jurisdiction-versus-nonjurisdiction debate to be conclusive. But it is consistent with *Hosanna-Tabor* and *Our Lady of Guadalupe*, which *did* consider the debate and held the church autonomy doctrine is raisable under Rule 12(b)(6), not 12(b)(1).

\*

In sum, the church autonomy doctrine has numerous features of a jurisdictional bar. It limits the powers of federal courts. It immunizes ecclesiastical organizations from suit, not just liability. And, when it is denied, it gives rise to an immediate appeal. But "[t]he jurisdictional question . . . is not binary." *SMU*, 716 S.W.3d at 501 (Young, J., concurring). And the fact that some religious questions are beyond our judicial power does not mean that all church-autonomy disputes are properly dismissed under Rule 12(b)(1). Nor does it preclude federal courts from rendering judgment on the merits in cases like this one.

## III

On the merits, the church autonomy doctrine bars all of McRaney's claims against NAMB. Although his claims are facially secular, their resolution would require secular courts to opine on "matters of faith and doctrine" and intrude on NAMB's "internal management decisions that are essential to [its] central mission." *Our Lady of Guadalupe*, 591 U.S. at 746 (quotation omitted). That we cannot do. We address (A) McRaney's threshold argument that Baptists cannot invoke the church autonomy doctrine, (B) McRaney's claims leading up to his termination, and (C) his post-termination claims.

## A

At the outset, McRaney argues that the church autonomy doctrine cannot apply in this case because "NAMB is not a church," "BCMD is not a church," and "[t]here is no Baptist church; only Baptist churches." Blue Br. at 13, 23. He argues his case "does not involve an intra-church dispute in any respect, nor is it about church governance." *Id.* at 24. Our dissenting colleague agrees and would hold that "[b]ecause there is no unified 'Baptist Church,' there can be no 'intra-church dispute' or dispute about 'church

government' in this case." *Post*, at 52 (Ramirez, J., dissenting). On the dissent's view, the church autonomy doctrine only protects religious entities "in which there are superior ecclesiastical tribunals," *Watson*, 80 U.S. (13 Wall.) at 722, thus subjecting the non-hierarchical Baptists to "ordinary principles which govern voluntary associations," *id.* at 725. Having branded Baptists ecclesial anarchists, the dissent subjects the NAMB and BCMD's actions to searching judicial scrutiny—as if this were just an ordinary employment dispute.

We respectfully disagree for five reasons.

First, we decline to be the first court ever to hold the church autonomy doctrine protects only hierarchically organized religious entities. The single "clearest command of the Establishment Clause" is the "principle of denominational neutrality." *Cath. Charities*, 605 U.S. at 247 (Thomas, J., concurring) (quotation omitted). But the dissent and McRaney would reach diametrically opposite results for different denominations. If an Episcopalian priest defamed a congregant from the pulpit, or if an Episcopalian congregation fired its priest, those disputes would be barred by the church autonomy doctrine. *See, e.g.*, Blue Br. at 12 (Episcopalians protected by the doctrine). But the same disputes by Baptists are purely "secular"? *Post*, at 45 (Ramirez, J., dissenting). That is denominational discrimination, not denominational neutrality.

Second, the dissent and McRaney both underread and overread *Watson*. As the Supreme Court has repeatedly emphasized, *Watson* "radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government *as well as those of faith and doctrine*." *Kedroff*, 344 U.S. at 116 (emphasis added); *see also Hosanna-Tabor*, 565 U.S. at 186 (again emphasizing *Watson*'s "spirit of

freedom"). The freedom that radiates from *Watson* does not stop when it reaches a Baptist church. To the contrary, matters of faith and doctrine can be decided inside a church *regardless* of the denominational name that appears on its door. And courts must respect those decisions, again, regardless of what denominational name appears on its door.

Ignoring this core principle from *Watson*, McRaney and the dissent instead seize on dicta in that decision. True, the *Watson* court noted that "the ordinary principles which govern voluntary associations" could apply to certain church *property* disputes. 80 U.S. (13 Wall.) at 725. But the *Watson* Court very clearly limited this "ordinary principles" dictum to "such cases"—that is, to property-dispute cases. *Ibid.*; *see also* Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253, 1276–77 (2023) ("Weinberger, *Limits*") ("The Supreme Court has never applied the neutral-principles analysis outside of the property-law context."). And the authority cited in the *Watson* decision itself proves just how little work "ordinary principles" can do. The *Watson* Court emphasized that "no better representative" of the ordinary-principles standard for church-property disputes "can be found than that of *Shannon v. Frost*." *Watson*, 80 U.S. (13 Wall.) at 725 (citing *Shannon v. Frost*, 42 Ky. 253 (1842)). *Shannon*, in turn, emphasized that civil courts "hav[e] no ecclesiastical jurisdiction" and hence "cannot revise or question ordinary acts of church discipline or excision." 42 Ky. at 258. The court also held "[w]e cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church." *Ibid.* Rather, the *Shannon* court held it could only note that the church did in fact expel certain former members and that the church's decision was final, binding on the civil courts, and preclusive of the expelled individuals' claims

to church property. *See id.* at 258–61.[7] *Shannon* shows that the ordinary principles approach is endogenous to the church autonomy doctrine—it is not some freestanding exception to the doctrine that allows courts to tread on *terra sancta* in the name of "neutrality." Nothing in *Watson* or *Shannon* suggests, as the dissent does, that civil courts ever get to second guess church decisions.

Third, the dissent and McRaney confuse sufficient and necessary conditions for the church autonomy doctrine. It is obviously *sufficient* to trigger the church autonomy doctrine that a higher ecclesial body made a decision that binds an inferior ecclesial body. *Watson* is a clear example. *See* 80 U.S. (13 Wall.) at 734 (describing the Presbyterian form of church government, in which the General Assembly is supreme). But that does not mean hierarchical church governments are *necessary*. That is why our sister courts across the country have recognized the autonomy of non-hierarchical churches and religious entities. *See, e.g., Lee*, 903 F.3d at 121–23 (applying the doctrine to a Baptist church); *Garrick*, 95 F.4th at 1112–14 (stating that the doctrine would apply to an independent Bible college, before ruling on other grounds); *Korte v. Sebelius*, 735 F.3d 654, 668, 675–78 (7th Cir. 2013) (stating that the doctrine applies to religious small businesses). Worryingly, the dissent's logic would exclude from the church autonomy doctrine several Christian denominations and other, non-Christian religions with non-hierarchical governance, such as Judaism, Sunni Islam, and Sikhism. *See* Br. of *Amicus Curiae* The Becket Fund for Religious Liberty at 3–4. And it would prioritize hierarchical organizations like the "Church of Scientology"—

---

[7] The church in *Shannon*, it should be noted, was "a Baptist Church," and the relevant dispute between "discordant and dislocated parties" within that single congregation. 42 Ky. at 253. The church autonomy doctrine nevertheless applied to protect "ordinary acts of church discipline" and goverance from civil court interference. *Id.* at 258.

which, under the dissent's logic, would enjoy broad autonomy protections[8] because it has a clearly identified founder (L. Ron Hubbard) and a "Captain of the Sea Org" (David Miscavage)—over non-hierarchical Baptists who do not have a singular leader.

Fourth, even accepting the dissent's premise that Baptists cannot invoke the church autonomy doctrine over matters of church governance, that still would not help McRaney. Recall that the NAMB and BCMD selected McRaney to conduct "church planting and evangelism," ROA.1702, core religious activity at the heart of both organizations' Christian mission. Evaluating his performance in that role cannot be analogized to applying "objective, well-established concepts of trust and property law," *Jones v. Wolf*, 443 U.S. 595, 603 (1979), or declaring "that the majority rules" in a local congregation, *Watson*, 80 U.S. (13 Wall.) at 725. Rather, the inquiry turns on the degree to which both NAMB and BCMD believed McRaney to have fulfilled his gospel calling—precisely the sort of question the church autonomy doctrine exists to protect from secular meddling. *See McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972) ("The relationship between an organized church and its minsters is its lifeblood."). That neither NAMB nor BCMD is strictly subordinate to a higher Baptist authority is irrelevant, much less a reason to more readily second guess either's evaluation of McRaney's ministerial qualities. Christ advised the Apostles that "where two or three are gathered in my name, there I am among them." *Matthew* 18:20 (ESV). We decline to hold, by contrast,

---

[8] *But see United States v. Heldt*, 668 F.2d 1238, 1242–43 (D.C. Cir. 1981) (affirming criminal convictions against Scientology leaders who used the "'Guardian Offices of Scientology'" to steal government documents and to conceal Scientology practices from federal investigation). Cases like *Heldt* implicate an important question: What is a religion? Thankfully, that question is not implicated here because all agree, obviously, that Baptist churches and missionary groups are religious organizations.

that where two religious entities gather to spread the gospel, both forgo their First Amendment right to autonomy in doing so. *See also infra* Part III.B.2 (applying the ministerial exception).

Fifth and finally, the amicus brief submitted by current and former Baptist leaders does not help the dissent. That brief adamantly insists that there is no singular "Baptist Church" and that, therefore, "McRaney, BCMD, and NAMB are [not] inside that single institution." Amicus Br. at 13. We wholeheartedly agree. Baptists—no less than Presbyterians, Episcopalians, or Catholics—are free to organize themselves in whatever way they choose. They can form General Assemblies or not. They can form ecclesiastical courts or not. They can choose ecclesiastical hierarchies or not. All of those decisions, for people of all faiths, are entirely beyond judicial competence or review.

But it does not follow that courts *do* have competence to review ecclesiastical disputes so long as they arise in non-hierarchical Baptist congregations. The church autonomy doctrine is triggered by the subject matter of the dispute, not the organizational structure of the disputants. The subject matter of this dispute is an evangelism project. Its stakes are eternal not judicial. And it matters not one bit that the particular evangelicals before us happen to be Baptists from different non-hierarchical congregations instead of soul-saving Presbyterians from a singular hierarchical one.

B

Because the church autonomy doctrine applies to Baptists as it applies to Jews and Catholics, we next consider whether McRaney's particular claims fall within the doctrine's ambit. His first set of claims concerns NAMB's conduct leading to his termination by BCMD. McRaney alleges that NAMB tortiously caused BCMD to fire him by defaming him through the dissemination of "disparaging falsehoods" that also intentionally

inflicted emotional distress. ROA.1325–26. The First Amendment bars these claims under both general church autonomy principles and the ministerial exception.

1

Start with general church autonomy principles. Resolving these claims would require the district court to decide "matters of faith and doctrine," *Our Lady of Guadalupe*, 591 U.S. at 747 (quotation omitted), and "risk judicial entanglement in religious issues," *id.* at 761. That is reason enough to enter judgment for NAMB.

McRaney claims that NAMB defamed him and hence tortiously interfered with his employment contract with BCMD. As McRaney tells it, NAMB relied on defamatory statements about his compliance with the SPA as pretext for exiting the partnership with BCMD. And the result of that allegedly defamatory interference was BCMD's termination of McRaney.

The tortious interference claim requires McRaney to show that NAMB's actions were intentional, "calculated to cause damage" to him, and done "without right or justifiable cause." *Alfonso v. Gulf Pub. Co.*, 87 So. 3d 1055, 1060 (Miss. 2012). He must also show that "actual damage or loss resulted" and that NAMB's "acts were the proximate cause of the loss or damage" he suffered. *Ibid.* And to prevail on the defamation claim, McRaney must show "(1) a false and defamatory statement concerning [him]; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; (4) and either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Short v. Versiga*, 283 So. 3d 182, 185 (Miss. 2019) (quotation omitted).

Resolving these claims would impermissibly require a court "to decide matters of faith and doctrine." *Our Lady of Guadalupe*, 591 U.S. at 746

(quotation omitted). To take just a few elements: Can a secular court determine whether NAMB's decision to exit the SPA had "right or justifiable cause," without answering inherently religious questions about the SPA's content or McRaney's conformance with it? When a secular court considers the SPA, how should it determine if McRaney succeeded in "penetrating lostness," "making disciples," and "church planting"? ROA.1701–02. Can a secular court determine whether NAMB's conduct was the "proximate cause" of BCMD's decision to terminate McRaney, without unlawfully intruding on a religious organization's internal management decisions? And can a secular court decide it was "false" that McRaney's leadership lacked Christ-like character?

To ask these questions is to answer them: No.

The SPA is not a mere civil contract; it is "an inherently religious document" that is "steeped in religious doctrine." *McRaney*, 2023 WL 5266356, at *3–4. It seeks to "accomplish the Great Commission as given to us by our Lord in Matthew 28:19–20 and Acts 1:8." ROA.1702. It defines a partnership predicated on commitments to biblical authority, kingdom advancement and evangelism, and explicitly incorporates SBC's confession of faith. How those values, goals, and beliefs translate to specific strategies for successful evangelism are "religious controversies [that] are not the proper subject of civil court inquiry." *Milivojevich*, 426 U.S. at 713.

McRaney is quite right that "breach" and "contractual agreement" are secular terms. Blue Br. at 32 (quotations omitted). For example, the secular meaning of "breach" is a "violation or infraction of . . . [an] agreement." *Ibid.* (quoting BLACK'S LAW DICTIONARY 232 (11th ed. 2019)). But McRaney's problem is that determining *what conduct constitutes breach* of the SPA "turn[s] on the resolution . . . of controversies over religious doctrine and practice." *Blue Hull Mem'l Presbyterian Church*, 393

U.S. at 449. In that sense, McRaney's argument is identical to the ones that failed in *Harris*, *Lippard*, *Schoenhals*, and *McNair*. *See supra* Part II.B.2.b. So too in *Hosanna-Tabor* and *Our Lady of Guadalupe*—both dealt with facially "neutral" causes of action. But in all of these cases, the courts concluded *application* of the neutral rules to religious institutions "concern[ed] government interference with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190.

Nor could a secular court evaluate whether McRaney's conduct "constitute[d] adequate spiritual leadership," *Lee*, 903 F.3d at 121, or was in "conformity . . . to the standard of morals required of" his ministerial responsibilities, *Watson*, 80 U.S. (13 Wall.) at 733. It is essential for a "religious body" to ensure that its representatives "live up to the religious precepts" they "espouse[]" because the "credibility of a religion's message depend[s] vitally on the character and conduct" of its "messenger[s]." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring). Civil courts have no role to play in policing those matters.

2

The ministerial exception "gilds the lily." *Patchak v. Zinke*, 583 U.S. 244, 261 (2018) (Breyer, J., concurring).[9] As the district court noted, McRaney's "claims . . . are brought to protest his dismissal from church leadership." *McRaney*, 2023 WL 5266356, at *3. True, McRaney sued

---

[9] There is no dispute that McRaney was a minister. Anyone "who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or *teacher of its faith*" is a minister. *Our Lady of Guadalupe*, 591 U.S. at 754 (quotation omitted). McRaney's role as BCMD's Executive Director was ministerial: He was responsible for implementing the SPA with NAMB through church planting and evangelism.

NAMB, rather than his former employer BCMD. But that does not change the analysis.

The First Amendment's protection of a religious organization's right to decide "who will personify its beliefs," *Hosanna-Tabor*, 565 U.S. at 188, and "who will minister to the faithful," *id.* at 195, extends just as strongly to ministries structured through voluntary associations and at-will partnerships. The opposite rule would irrationally exclude from the First Amendment's protections religious groups that "for theological reasons have few to no paid clergy," such as the Church of Jesus Christ of Latter-day Saints and Jehovah's Witnesses. Br. of *Amicus Curiae* Becket Fund for Religious Liberty at 15–16. The availability of the ministerial exception cannot turn on the choices religious organizations make about "the formation of corporate entities." *Cath. Charities*, 605 U.S. at 259 (Thomas, J., concurring). Indeed, the decision how to structure a religious institution is *itself* a religious decision. *See ibid.* And "one religious denomination cannot be officially preferred over another" for this—or any—reason. *Larson v. Valente*, 456 U.S. 228, 244 (1982).

Persuasive decisions in our sister circuits confirm this point. Take *Starkey*. There, a former schoolteacher brought federal discrimination claims against the Catholic school where she had worked and tortious interference claims against the Archdiocese that, she alleged, caused her termination. *See* 41 F.4th at 938. Even though the Archdiocese was not the schoolteacher's former employer, the Seventh Circuit held the ministerial exception barred her claims against it "because they litigate the employment relationship between the religious organization and the employee" and "require[] review of the Church's authority over the employer." *Id.* at 945.

Or take *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328 (4th Cir. 1997). There, a pastor who was terminated from a religious nonprofit sued

the "four national religious organizations" that "created and funded" the nonprofit but were not his employers. *Id.* at 329. Nevertheless, the ministerial exception barred the pastor's claims against all four organizations. *Id.* at 332–33. Otherwise, resolving the claims would "interpose the judiciary into . . . the decisions of . . . constituent churches, relating to how and by whom they spread their message and specifically their decision to select their outreach ministry through the granting or withholding of funds." *Id.* at 332.

These cases confirm what the Supreme Court has already told us: We "are bound to stay out of employment disputes" involving ministers and ecclesiastical organizations. *Our Lady of Guadalupe*, 591 U.S. at 746. McRaney's claims against NAMB "litigate the employment relationship between" himself and BCMD, *Starkey*, 41 F.4th at 945, and would force a court to "interpose" itself into NAMB's and BCMD's "decisions . . . relating to how and by whom they spread their message" and how they fund it, *Bell*, 126 F.3d at 332. Secular courts have already interposed into NAMB's and BCMD's internal affairs far too much. If we continued to interfere in this dispute, "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Our Lady of Guadalupe*, 591 U.S. at 747. Instead, every "church must be free to choose those who will guide it on its way." *Hosanna-Tabor*, 565 U.S. at 196.[10]

---

[10] McRaney cannot dodge the ministerial exception by recasting his tortious interference claim as a defamation or emotional distress claim. Such claims threaten "a collateral attack on a decision that is otherwise solidly protected by the ministerial exception" because they effectively require courts "to review the merits of the congregation's decision." Ira C. Lupu & Robert W. Tuttle, *Courts, Clergy, and Congregations: Disputes Between Religious Institutions and Their Leaders*, 7 Geo. J.L. & Pub. Pol'y 119, 155 (2009). Courts have rightly held that the ministerial exception bars these claims. *Cf. In re Diocese of Lubbock*, 624 S.W.3d at 516; *Hutchison*, 789 F.2d at 396

No. 23-60494

## C

McRaney's post-termination claims fare no better. Again, these claims sound in tortious interference, defamation, and intentional infliction of emotional distress. But they boil down to two grievances. First, McRaney complains that NAMB's conduct has caused other religious organizations not to hire him as a minister and resulted in his disinvitation from speaking engagements at church conferences—turning him into a "professional pariah." ROA.1323. Second, McRaney objects to NAMB's posting a no-entry photo of him behind the reception desk at its headquarters. ROA.1320. The church autonomy doctrine bars these claims.

Start with the missed employment opportunities. McRaney's operative complaint named the Safari Christian Business Alliance and the Jacksonville Baptist Theological Seminary as examples of potential employers that failed to hire him because of NAMB's alleged defamation. McRaney alleges the first was seeking an "expert in the field of ministry" and the second was "impressed with" McRaney's "ministry credentials" so it could "upgrade the quality of teaching and training" it provides. ROA.1321–22 (quotation omitted).

The ministerial exception defeats these claims for the same reason it defeats McRaney's claims relating to his termination by BCMD: They are collateral attacks on BCMD's ministry-leadership decisions. *See supra*, Part III.B.2. McRaney's tortious interference and defamation claims against

---

(dismissing defamation and emotional distress claims because they "relate[] to appellant's status and employment as a minister of the church" and "therefore concern[] internal church discipline, faith, and organization"); *see also supra*, Part II.B.2.a. Indeed, the ministerial exception's application to defamation suits may have ancient origins. *See McRaney*, 980 F.3d at 1082 (Oldham, J., dissenting from denial of rehearing en banc) (citing 10 Edw. 2, stat. 1 c. 4 (1316); *Nicholas Fuller's Case* (1607), 12 Co. Rep. 41, 44 (K.B.)).

NAMB for these failed employment opportunities would require a court to determine *why* the other two religious institutions did not hire McRaney for ministry roles. To side with McRaney, the court would have to hold that the ministry groups rejected him because of NAMB's defamation—and *not* because the ministries found another Christ-like leader they liked better, trusted better, or otherwise preferred for any other non-defamatory ecclesiastical reason. That would violate each organization's right "to select, and to be selective about, those who will serve as the very 'embodiment of its message' and 'its voice to the faithful.'" *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 306 (3d Cir. 2006)).

Next take the disinvitations from speaking engagements. For example, a pastor disinvited McRaney from speaking at a church conference in Mississippi. McRaney alleges he was disinvited because an NAMB board member pressured the pastor. But the pastor testified that he disinvited McRaney after seeing his posts on Facebook "declaring war" on NAMB. ROA.2298. And the pastor believed that war was "incompatible" with a successful conference because many of the conference's ministry partners were affiliated with NAMB. ROA.2299. Again, adjudicating these tortious interference and defamation claims would require a court to "interpose" itself into a religious organization's "decisions . . . relating to how and by whom [it] spreads [its] message." *Bell*, 126 F.3d at 332. That is intolerable: "The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine . . . is unquestioned." *Watson*, 80 U.S. (13 Wall.) at 728–29.[11]

---

[11] Although the First Amendment "gives special solicitude to the rights of religious organizations," of course, "freedom of association is a right enjoyed by religious and

Same for the no-entry photograph at NAMB's headquarters. McRaney cannot use the vehicle of a defamation or emotional distress claim to collaterally attack the outcome of a church discipline proceeding. *See* Lael Weinberger, *Limits, supra* at 1260–61 ("[T]he 'ministerial exception' . . . has been long understood to protect churches from defamation lawsuits challenging church discipline proceedings."). The decision to exclude someone from participation in a religious organization is itself a religious decision that secular courts cannot pierce. *See Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 880 (9th Cir. 1987) (holding that the First Amendment defeats emotional distress and defamation claims against Jehovah's Witnesses' practice of shunning); *cf. Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 420 (3d Cir. 2012) (holding that the "First Amendment shields religious institutions from . . . intrusive inquiry" into their "internal excommunication procedures"). Even if NAMB's exclusion of McRaney from its headquarters was based on concerns about security, the genesis of the decision was doctrinal difference.[12]

\*　　\*　　\*

NAMB has endured protracted discovery, two rounds of summary judgment, a previous appeal, and a close en banc rehearing poll. Regrettably,

---

secular groups alike." *Hosanna-Tabor*, 565 U.S. at 189; *see also Cath. Charities*, 605 U.S. at 257 (Thomas, J., concurring). *Cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) (holding unconstitutional under the First Amendment a state law that limited organizers from choosing participants in a parade).

[12] We also doubt that posting a no-entry photograph of someone behind a reception desk is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Herbert v. Herbert*, 374 So. 3d 562, 571 (Miss. Ct. App. 2023) (emphasis omitted), *cert. dismissed*, 375 So. 3d 671 (Miss. 2023).

this litigation has caused NAMB's and BCMD's "[c]hurch personnel and records" to "become subject to . . . the full panoply of legal process designed to probe the mind of the church in the selection of its ministers." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985); *see also Cath. Bishop of Chi.*, 440 U.S. at 502 (explaining that "the very process of inquiry" into a church's internal communications can "impinge on rights guaranteed by the Religion Clauses"). This unconstitutional violation of church autonomy ends today.

The district court's entry of summary judgment in favor of NAMB is AFFIRMED.[13]

---

[13] The district court also purported to dismiss for lack of jurisdiction. As we have explained, however, with-prejudice merits dismissals and without-prejudice jurisdictional dismissals are very different. *See, e.g.*, *Spivey v. Chitimacha Tribe of Louisiana*, 79 F.4th 444, 448–49 (5th Cir. 2023). As we have explained in the foregoing pages, the district court did have jurisdiction to enter judgment on the merits. Therefore, we VACATE the district court's decision insofar as it purported to dismiss for lack of jurisdiction. And we AFFIRM the entry of final judgment ending this case on the merits.

No. 23-60494

Irma Carrillo Ramirez, *Circuit Judge*, dissenting:

William McRaney sued a board of an organization for which he did not work, alleging interference with contract, interference with prospective business relations, defamation, and intentional infliction of emotional distress. Because his secular claims against a third-party organization do not implicate matters of church government or of faith and doctrine, I respectfully dissent.

I

A

In 2012, the Baptist Convention of Maryland and Delaware ("BCMD") and the North American Mission Board ("NAMB") entered into a Strategic Partnership Agreement ("Agreement") to "jointly develop, administer and evaluate a plan for penetrating lostness through church planting and evangelism." The Agreement established BCMD and NAMB's "relationships and responsibilities" regarding hiring, cooperation, and funding. It specifically provided that the hiring of "missionaries must go through the approval process of both the convention and NAMB." The Agreement would be "cooperatively developed and approved by representatives of [BCMD and NAMB]," and NAMB and BCMD "shall conduct a review of this [] Agreement as necessary." Finally, the Agreement provided that it could be amended by mutual agreement and terminated "after consultation between the executive director and the president of [NAMB] or his designee."

BCMD hired McRaney as its Executive Director in 2013. McRaney is an ordained minister, but in his role as Executive Director, he focused on

"[s]etting and implementing a vision for [BCMD] and providing leadership." Evangelism was not "in the job description."

Conflicts between McRaney and NAMB arose soon after his arrival. According to NAMB, McRaney offered positions to candidates and imposed associational giving requirements on church planters without NAMB's approval. McRaney continued "act[ing] unilaterally," despite multiple conversations with NAMB personnel reminding him about "the importance of coordination between BCMD and NAMB *before* decisions are made." NAMB also raised concerns about McRaney's disregard for NAMB staff, as well as additional concerns about budget shortfalls and work allocation. McRaney, on the other hand, "persistently maintained" that he had adhered to the Agreement.

The relationship between McRaney and BCMD continued to deteriorate until, on December 2, 2014, NAMB informed BCMD that it intended to terminate the Agreement. In the letter, NAMB stated that "[McRaney]'s serious and persistent disregard of the Strategic Partnership Agreement between BCMD and NAMB has resulted in a breach of the Agreement." According to NAMB, McRaney's actions, "in willfully and repeatedly ignoring the Strategic Partnership Agreement[,] have left NAMB with no other solution at this time." On June 8, 2014, BCMD's General Mission Board terminated McRaney's employment, but soon after McRaney's termination, NAMB rescinded the termination letter and restored its relationship with BCMD.

B

McRaney sued NAMB, bringing pre- and post-termination claims for interference with contract, interference with prospective business relations, defamation, and intentional infliction of emotional distress. He alleged that NAMB spread "disparaging falsehoods" about him—namely, that he

46

breached the Agreement—that prompted BCMD to terminate his employment. He also alleged that, after his termination, NAMB engaged in additional tortious conduct, including "blacklist[ing]" him and impeding his opportunities as a speaker at conferences and meetings.

NAMB moved for summary judgment on McRaney's claims, arguing that "this suit poses an unconstitutional intrusion into BCMD's 'choice of minister' and its internal governance and policy." NAMB also argued that the ecclesiastical abstention doctrine barred adjudication of McRaney's claims. The district court granted NAMB's motion, holding that it lacked subject-matter jurisdiction because "this case would delve into church matters." It explained that McRaney's claims would require the court to determine why BCMD fired McRaney and whether NAMB's actions were done "'without right or justifiable cause'—in other words, whether the NAMB had a valid religious reason for its actions." That, the district court concluded, it could not do.

McRaney appealed. This court held that, at such an early stage of litigation, it did not appear "certain that resolution of McRaney's claims will require the court to address purely ecclesiastical questions." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 349 (5th Cir. 2020). "His complaint [instead] asks the court to apply neutral principles of tort law to a case that, on the face of the complaint, involves a civil rather than religious dispute." *Id.* This court acknowledged, however, that further proceedings and factual development could reveal that McRaney's claims cannot be resolved without deciding purely ecclesiastical questions. *Id.* at 350. The district court, at that point, would be free to "reconsider whether it is appropriate to dismiss some or all of McRaney's claims." *Id.* Until then,

this court concluded, the dismissal of McRaney's claims was "premature." *Id.* at 351.

## C

On remand, NAMB again moved for summary judgment, arguing that "the First Amendment precludes adjudication of this lawsuit." The district court again determined that "it [could not] adjudicate [McRaney]'s claims in this case without impermissibly delving into church matters in violation of the ecclesiastical abstention doctrine." It reiterated the reasons it gave in its original opinion to support granting NAMB's second motion. It also determined that the Agreement is "an inherently religious document" that is "steeped in religious doctrine." The district court dismissed McRaney's claims rather than remanding them because "[i]f this Court lacks jurisdiction to hear [McRaney]'s claims because the claims involve ecclesiastical disputes, then the state court otherwise lacks jurisdiction." McRaney timely appealed.

## II

McRaney argues that the district court erred in determining that the ecclesiastical abstention doctrine applied to bar his claims.[1]

Under the ecclesiastical abstention doctrine, secular courts cannot adjudicate "strictly and purely ecclesiastical" questions. *Watson v. Jones*, 80

---

[1] Although the district court did not address the ministerial exception in granting NAMB's second motion for summary judgment, NAMB argues that the ministerial exception precludes adjudication of McRaney's claims. The ministerial exception bars claims brought by a minister challenging a church's decision to fire him. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 196 (2012). It only applies to disputes between employees and employers, however, not to disputes between employees and third parties. *See id.* at 195–96; *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 180 (5th Cir. 2012) (applying *Hosanna-Tabor* and affirming the dismissal of a music director's

U.S. 679, 733 (1871). This doctrine protects a church's right to construe "[its] own church laws," *id.*, and anticipates the practical consequences of secular judges deciding disputes rooted in religious doctrine, *id.* at 729 ("It is not to be supposed that the judges of the civil court can be as competent in the ecclesiastical law and religious faith of all these bodies in each."). It applies to "theological controvers[ies], church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id.* at 728. In short, for the doctrine to be applicable, McRaney's claims must concern either "matters of church government" or matters of "faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

## A

McRaney first argues that the district court erred because "this case does not involve an intra-church dispute in any respect, nor is it about church government." I agree.

The Supreme Court first applied the ecclesiastical abstention doctrine in *Watson v. Jones*, 80 U.S. 679 (1871). It involved the Walnut Street Presbyterian Church's purchase and conveyance of property to the church's trustees "to have and to hold to them, and to their successors, to be chosen by the congregation." *Id.* at 683. The church experienced certain internal "disturbances," *id.* at 684, and two factions emerged, each contending that it was entitled to the property, *id.* at 717. One of the factions requested an injunction to restrain the other from taking possession of the property and worshipping in the church. *Id.* at 721.

---

employment-discrimination claims against a Catholic diocese and Catholic church). Here, McRaney is suing a third party, NAMB, rather than his employer, BCMD.

The Supreme Court distinguished situations in which "the property is held by a religious congregation which . . . so far as church government is concerned, owes no fealty or obligation to any higher authority," from those in which "the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals." *Id.* at 723. The Supreme Court found that the Walnut Street Presbyterian Church was in the latter class. *Id.* at 726. "[T]he local congregation [was] itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." *Id.* at 726–27. In these cases involving religious organizations, "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them." *Id.* at 727.

Since *Watson*, the Supreme Court has continued to apply the doctrine to disputes concerning "member[s] of a much larger and more important religious organization . . . under its government and control." *Id.* at 726–27. In *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952), it concluded that it could not adjudicate a dispute between churches in Moscow and North America over the right to occupy a Russian Orthodox Church in New York. The Russian Orthodox Church was a "hierarchical church with a Patriarch at its head," *id.* at 101, and "[n]othing indicate[d] that either the Sacred Synod or the succeeding Patriarchs relinquished [its] authority or recognized the autonomy of the American church," *id.* at 105–06. And in *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696, 709, 708 (1976), the Supreme Court reversed the Illinois Supreme Court, finding that its judgment "rests upon an impermissible rejection of the decisions of

the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and impermissibly substitutes its own inquiry into church polity and resolutions based thereon of those disputes." *See also Jones v. Wolf*, 443 U.S. 595, 602 (1979) ("[T]he [First] Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization.").

Unlike the hierarchical churches in *Watson* or *Kedroff*, there is no unified "Baptist Church." Each Baptist church is autonomous—individual congregations rule themselves according to the governing documents and procedures they have independently established. Brief of Current and Former Baptist Leaders as *Amici Curiae* at 10. By choice, Baptist congregations cooperate or coordinate in local associations for mutual fellowship, support, and the pooling of resources. Local Baptist associations are also often in "fellowship" with state conventions like BCMD. "Just as local associations exercise no authority over congregations, the state conventions exercise no authority over either the local associations or the congregations within those local associations." When local Baptist churches cooperate in state conventions, and when those conventions cooperate in the Southern Baptist Convention, neither the individual churches nor the individual conventions surrender any authority. Brief of Current and Former Baptist Leaders as *Amici Curiae* at 11. According to the Southern Baptist Convention, "[n]o local, state or national entity may exercise control or authority over any Southern Baptist church. Baptists reject the idea of a religious 'hierarchy' or 'umbrella' superior to the local church, or that any Baptist Convention is in hierarchy or governing relationship over another Convention." Ltr. of *Amici Curiae* Ethics and Religious Liberty Commission

and Thomas More Society at 1, *McRaney*, 966 F.3d 346 (5th Cir. 2020) (No. 19-60293) (filed Dec. 14, 2020).

Because there is no unified "Baptist Church," there can be no "intra-church dispute" or dispute about "church government" in this case. The Supreme Court recognized that Baptists are "a religious congregation which . . . so far as church government is concerned, owes no fealty or obligation to any higher authority." *Watson*, 80 U.S. at 721. This differentiates Baptists from the Presbyterian church in *Watson*, which is "a subordinate member of some general church organization in which there are superior ecclesiastical tribunals." *Id.* at 723. Disputes among Baptists "must be determined by the ordinary principles which govern voluntary associations," *id.* at 725, because they lack the "system[s] of ecclesiastical government" that secular courts must accept as final and binding, *id.* at 729. NAMB's actions in this case do not—and cannot—implicate "church government." *See Kedroff*, 344 U.S. at 116.

Notably, current and former Baptist leaders agree. *See* Brief of Current and Former Baptist Leaders as *Amici Curiae* at 10–13. They reiterate that "the individual autonomy of local churches is a venerable, core Baptist distinctive." *Id.* at 10. Accordingly, "a dispute between McRaney (a former employee of BCMD, a state Baptist convention) and NAMB (an entity of the Southern Baptist Convention) [could not be] an 'internal' dispute of 'the Baptist Church.'" *Id.* at 12. To conclude otherwise would first require that there exist a "'Baptist Church' with [a] unified 'mission' and 'government.'" *Id.* at 13. Even then, "McRaney, BCMD, and NAMB [would also need to be] inside that single institution." *Id.* And "when NAMB allegedly interfered with McRaney's BCMD employment [and defamed him], NAMB [must have been] exercising 'the Baptist Church's' unreviewable governance over one of 'the Church's' leaders stationed at a

subordinate entity." *Id.* Such a result would, according to Baptist leaders, be "foreign to Baptist polity." *Id.* at 13.

B

Next, McRaney argues that his claims do not implicate "faith and doctrine." He instead brings "familiar state law tort claims," and asks this court to "apply neutral principles of tort law to a case that . . . involves a civil rather than religious dispute." *McRaney*, 966 F.3d at 349. I agree.

"Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes" involving religious entities. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). "[T]here are neutral principles of law, developed for use in all . . . disputes, which can be applied without 'establishing' churches." *Id.* Secular courts may settle a dispute implicating religious entities or churches "so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Wolf*, 443 U.S. at 602 (quoting *Maryland & Va. Churches*, 396 U.S., 367, 368 (Brennan, J., concurring)). As our sister courts agree, the First Amendment "does not provide religious organizations with a blanket immunity from suit, discovery, or trial."[2] *O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1258 (D.C. Cir. 2025).

_____

[2] *See, e.g.*, *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1112 (7th Cir. 2024) ("Courts may exercise authority [in disputes involving religious institutions] when the resolution does not require inquiry into doctrinal disputes."); *Wells by & through Glover v. Creighton Preparatory Sch.*, 82 F.4th 586, 595 n.4 (8th Cir. 2023) ("Just because Creighton is a Jesuit school and Wells spoke in a vulgar manner does not necessarily mean this case requires an inquiry into religious doctrine, much less an 'extensive' one."); *Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022) ("But secular components of a dispute involving religious parties are not insulated from judicial review[.] . . . So long as the court relies exclusively on

The question, then, is whether adjudication of McRaney's claims will necessitate consideration of "theological controvers[ies], church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson*, 80 U.S. at 728.

1

McRaney brings two sets of almost identical claims based on NAMB's pre- and post-termination conduct. He claims that before he was fired, NAMB "disparaged McRaney with the serious assertion to his employer, BCMD, that [he] violated [the Agreement,]" which led BCMD to terminate his employment. He also alleges "NAMB personnel contended that [McRaney] lied, and that he 'almost single-handedly ruined' the BCMD." These allegations form the basis of his pre-termination claims for interference with contract, defamation, and intentional infliction of emotional distress.

To establish an interference with contract claim, McRaney must establish that: (a) NAMB's acts were intentional; (b) these acts were done with the unlawful purpose of causing McRaney damage and loss, without right or justifiable cause; and (c) actual loss occurred. *See Collins v. Collins*, 625 So.2d 786, 790 (Miss. 1993). No matter of faith or doctrine is implicated in adjudicating this claim. NAMB's motion—and the summary-judgment record—confirm that its conflicts with McRaney arose because he "would act unilaterally," offering positions to candidates and imposing additional requirements on church planters without its approval. This violated the Agreement, NAMB claims, because NAMB and BCMD had agreed that the entities would act jointly and that "missionaries [would] go through the

---

objective, well-established [legal] concepts, it may permissibly resolve a dispute even when parties are religious bodies.").

approval process of both [entities]." Consideration of whether NAMB acted intentionally with an unlawful purpose in informing BCMD that McRaney engaged in "serious and persistent" disregard of the Agreement without right or justifiable cause, and whether these actions caused BCMD to fire McRaney, does not implicate religious questions.

As for McRaney's second pre-termination claim, the elements of a defamation claim are: (a) a false and defamatory statement concerning plaintiff; (b) unprivileged publication to a third party; (c) fault amounting at least to negligence on part of publisher; and (d) harm caused by publication. *See Armistead v. Minor*, 815 So. 2d 1189, 1193 (Miss. 2002). McRaney specifically alleges that NAMB defamed him by telling BCMD that he breached the Agreement, as well as by telling others that he lied and "almost single-handedly ruined" the BCMD. The focus in assessing McRaney's defamation claim will be whether NAMB made these statements to third parties and whether they are true. Inquiry into Baptist religious beliefs—or McRaney's ministerial qualities—will not be required.

McRaney's final pre-termination claim is an intentional infliction of emotional distress claim. To succeed on this claim, McRaney must establish that: (a) NAMB acted willfully or wantonly; (b) NAMB's acts evoke outrage or revulsion in a civilized society; (c) the acts were directed at or intended to cause McRaney harm; (d) McRaney suffered severe emotional distress from those acts; and (e) his resulting emotional distress was foreseeable. *See McGrath v. Empire Inv. Holdings, LLC*, No. 1:11-CV-209-A-S, 2013 WL 85205, at *7 (N.D. Miss. Jan. 7, 2013). Adjudicating this claim will require consideration of why NAMB told BCMD that McRaney breached the Agreement, as well as why it told others that he lied and "almost single-handedly ruined" the BCMD. Determining whether NAMB acted "willfully or wantonly" does not implicate religious beliefs, procedures, or law. NAMB offered evidence that its relationship with McRaney broke

down because he repeatedly acted unilaterally. It offered no "religious explanation for its actions which might entangle the court in a religious controversy in violation of the First Amendment." *Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 472 (8th Cir. 1993).

2

McRaney also alleges that after BCMD fired him, NAMB took the "unprecedented step of posting a photo of [him] at the reception desk of NAMB's headquarters, for the purpose of denying him entry to the building." McRaney also claims that NAMB "blackball[ed] or blacklist[ed] him," and he offers examples of this alleged "decade-long vendetta," including that a member of NAMB's Board of Trustees interfered with his invitation to speak at a large event. He allegedly lost out on two jobs because "the perception portrayed by NAMB . . . was that [McRaney] was a troublemaker." These allegations form the basis of his post-termination claims for interference with prospective business relationships, defamation, and intentional infliction of emotional distress.

To succeed on his claim for interference with prospective business relationships, McRaney must establish that: (a) NAMB's actions were intentional; (b) NAMB's actions were committed to cause McRaney damage in his lawful business; and (c) actual damage and loss resulted. *See Biglane v. Under the Hill Corp.*, 949 So.2d 9, 16 (Miss. 2007). Adjudication of this claim will require consideration of whether NAMB's actions were intended to interfere with McRaney's prospective business relationships. Consideration of whether NAMB posted a no-entry photograph of McRaney for a reason other than "communicat[ing] that [McRaney] was not to be trusted and an enemy of NAMB" or called him a "troublemaker" in order to "blackball" him does not implicate matters of faith or doctrine.

As with McRaney's pre-termination defamation claim, the focus in assessing his post-defamation claim will be on whether NAMB made the alleged statements and their veracity. McRaney alleges that NAMB has falsely claimed that he "resigned" from BCMD, that he is unreasonable, greedy, and seeking to unfairly enrich himself, and that he has refused to engage with NAMB in "biblical reconciliation." Although the question of whether McRaney did or did not engage in "biblical reconciliation" could require interpretation of a religious procedure or belief, the allegations that McRaney resigned or that he seeks to unfairly enrich himself are removed from matters of faith or doctrine. Determining the veracity of these claims would not require any inquiry into Baptist religious beliefs, nor would it require assessing whether McRaney fulfilled his gospel calling. His defamation claim does not fail in its entirety.

McRaney's final post-termination claim is for intentional infliction of emotional distress. Adjudication will require assessment of why NAMB posted a no-entry photo of him at their headquarters, as well as why it portrayed an impression of McRaney as a "troublemaker." Determining whether NAMB acted "willfully or wantonly" does not implicate religious beliefs, procedures, or law. NAMB offered evidence that the photo was "an unoffensive headshot of [McRaney], without any accompanying text." It has also argued that "posting the photograph was a self-evidently reasonable step under the circumstances" because "[b]y 2016, [McRaney] had become a serious security risk for NAMB." NAMB has already offered secular explanations to defend against McRaney's secular allegations. Resolution of McRaney's post-termination intentional infliction of emotional distress claim requires no more than resolution of a secular claim.

No. 23-60494

\*

Because they do not implicate matters of faith and doctrine, McRaney is entitled to continue pursuing his secular claims regarding NAMB's pre- and post-termination conduct.

## III

I respectfully dissent from affirming the entry of summary judgment in favor of NAMB.