No. 25-50130

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

THE LUTHERAN CHURCH – MISSOURI SYNOD,
A MISSOURI NONPROFIT CORPORATION,
*Plaintiff-Appellant,*

*versus*

DONALD CHRISTIAN; CHRISTOPHER BANNWOLF; JOHN DOES 1-12;
CONCORDIA UNIVERSITY TEXAS INCORPORATED,
*Defendants-Appellees.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
1:23cv1042*

## PETITION FOR PANEL REHEARING

Renea Hicks
Law Office of Max Renea Hicks
P. O. Box 303187
Austin, Texas 78703
(512) 480-8231
rhicks@renea-hicks.com

Daniel R. Richards
Clark Richards
Albert A. Carrion, Jr.
Richards Rodriguez & Skeith, LLP
611 West 15th Street
Austin, Texas 78701
(512) 476-0005
drichards@rrsfirm.com
crichards@rrsfirm.com
acarrion@rrsfirm.com

Attorneys for Appellees

Introduction ........................................................................................ 1

Rehearing Points And Argument ......................................................... 2

I. Concordia's Argument That The Church Autonomy Defense
   Was Waived Should Be Reached And Decided In This Appeal ............ 2

    A. The Lead Opinion Concludes That Applicability Of The
       Church Autonomy Doctrine Precludes Using Neutral
       Principles To Determine The Real Party To The
       Controversy ................................................................................ 3

    B. The Waiver Issue, And The Associated Issue Of The
       Church Autonomy Defense's Proper Characterization,
       Should Be Decided In This Appeal ............................................. 4

II. The Court Should Revisit The Lead Opinion's Relegation
   Of The Property Dispute In This Case To Secondary Status .............. 8

III. The Court Should Determine That, Taken As A Whole, The
   Church's Corporate Documents Do Show That It Is The Church,
   Not LCMS, That Separately Owns Synod Property .......................... 9

Conclusion ........................................................................................ 12

Certificate of Compliance .................................................................. 13

Certificate of Service ........................................................................ 13

i

## *INDEX OF AUTHORITIES*

*Alden v. Maine*, 527 U.S. 706, 737 (1999) ................................................. 7

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006)    ..................................... 3

*Catholic Church v. Tobbein*, 82 Mo. 418, 424 (1884) ............................ 11

*Cf.Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Comm'n*, 145 S.Ct. 1583 ............................................................... 11

*Collins v. Dep't of Treasury*, 83 F.4th 970, 979 (5th Cir. 2023) .............. 3

*Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900) ..................................................................... 8

*Jones v. Wolf*, 443 U.S. 595, 603 (1979) ............................................. 3, 4

*Lapides v. Bd. of Regents of the Univ. System of Georgia*, 535 U.S. 613 (2002) ..................................................................... 7

*Lilly v. Tobbein*, 103 Mo. 477, 488, 15 S.W. 618, 620 (1890) ................. 11

*McRaney v. North American Bd. of the Southern Baptist Convention, Inc.*, 157 F.4th 627 (5th Cir. 2025), *cert. denied*, 2026 WL 490870 (U.S. Feb. 23, 2026) ("*McRaney II*") ............................................ 4, 6, 7, 8

*Navarro Savings Ass'n v. Lee, 446 U.S. 458, 461 (1980)* ..................... 1, 2

*Soc'y of Helper of Holy Souls v. Law*, 267 Mo. 667, 680, 186 S.W. 718, 727 (1916) ................................................................................. 11

*United States Conference of Catholic Bishops v. O'Connell* (No. 25-849), seeking review of 134 F.4th 1245 (D.C. Cir. 2025) ............ 7

*Rules*

Fed. R. App. Proc. 40(b)(1)(A) ............................................................... 1
5th Cir. R. 40.1.2     ............................................................................... 1

Concordia University Appellees ("Concordia") petition for rehearing, requesting reconsideration of the Court's panel opinion of June 4, 2026. By a 2-1 vote, the panel's judgment reversed the district court ruling that it lacked diversity jurisdiction and remanded the case for further proceedings in the lawsuit by the Lutheran Church–Missouri Synod, a Missouri nonprofit corporation ("LCMS"), against Concordia.

Mindful of the limitations set by Fed. R. App. Proc. 40(b)(1)(A) and 5th Cir. R. 40.1.2, Concordia presents the particular points and arguments below in Parts I - III without rearguing previously argued issues. For context, this petition starts with an introduction that merely summarizes the core jurisdictional issue and the different rationales used to support the Court's judgment.

## INTRODUCTION

Diversity jurisdiction is determined from "the citizenship of real parties to the controversy." *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 461 (1980); *see* Op. 12. The central question is whether the church—the Lutheran Church–Missouri Synod ("Synod")—is a real party to the controversy in the lawsuit brought by LCMS, the church's corporate arm. If it is, then complete diversity is lacking, as the district court found.

1

The judgment[1] rests on two different legal rationales resulting in the same conclusion: that there is diversity jurisdiction. The panel's lead opinion by Judge Jones rests its conclusion on the church autonomy doctrine. Op. 7-12. The opinion by Chief Judge Elrod concurs in the judgment, but not on the basis of Judge Jones's church autonomy rationale. Op. 14 n.1 (not necessary to address "farthest limits of the church autonomy-doctrine"). The concurrence's conclusion instead rests on "corporate law grounds." Op. 17.[2]

## REHEARING POINTS AND ARGUMENT

### I. CONCORDIA'S ARGUMENT THAT THE CHURCH AUTONOMY DEFENSE WAS WAIVED SHOULD BE REACHED AND DECIDED IN THIS APPEAL

The lead opinion's analysis of the church autonomy doctrine's application in this case is incomplete. It expressly stops short of addressing a squarely presented issue that, if resolved favorably to Concordia, would preclude application of the church autonomy doctrine. On rehearing, this potentially outcome determinative issue should be addressed.

---

[1] "[T]he judgment of the District Court dismissing for lack of diversity jurisdiction is REVERSED, and the case is REMANDED for further proceedings."

[2] Judge Graves's dissent concludes that the church—un-named as a party-plaintiff in LCMS's lawsuit—is a real party in interest and, consequently, that the district court ruling that diversity jurisdiction is lacking should be affirmed. Op. 18-21.

2

Failing to address the issue would do more than just disregard a fairly-raised, potentially dispositive appellate issue. It also would appear to leave the waiver issue open on remand for district court consideration and resolution. But that would create its own unnecessary problem. The question of diversity jurisdiction would arise again, putting the district court in a difficult position. It would be faced with the combination of: (a) its continuing duty to ensure its jurisdiction, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006); (b) an obligation to follow the "explicit directives" of this Court's mandate, *Collins v. Dep't of Treasury*, 83 F.4th 970, 979 (5th Cir. 2023); and (c) the question of waiver—which could result in an absence of diversity—having been raised but purposely left unresolved on appeal.

Rather than leave the district court to face such a quandary, resolving the waiver issue in *this* appeal seems the better option.

## A. The Lead Opinion Concludes That Applicability Of The Church Autonomy Doctrine Precludes Using Neutral Principles To Determine The Real Party To The Controversy

The opinion reaches its conclusion that the church autonomy doctrine applies through two steps. First, while acknowledging that church autonomy is not violated when courts apply neutral principles to church property disputes, Op. 10 (citing *Jones v. Wolf*, 443 U.S. 595, 603 (1979)),

the opinion concludes that the real property exception to the doctrine is inapplicable because the property dispute element of the case is only secondary. Op. 11. Second, concluding that church governance is the primary issue at this stage, the opinion then finds that the "real property exception"—and the "neutral principles" judicial inquiry it entails—is inapplicable. *Id.*

The result, says the opinion, is that the diversity of citizenship issue "involves only church doctrine" about church governance and, consequently, is off limits to the courts. *Id.* In short, says the opinion, the district court was bound by "the Church's description of its polity." Op. 8.

## B. The Waiver Issue, And The Associated Issue Of The Church Autonomy Defense's Proper Characterization, Should Be Decided In This Appeal

The very next paragraph of the opinion is the trigger for this part of the rehearing request. There, the opinion nods to Concordia's appellate argument that filing suit in federal court on diversity grounds waived the church autonomy defense. Op. 11.[3] But, even while agreeing that the

---

[3] Concordia raised and argued the waiver issue in its brief. Concordia Br. 35. At the time, the Court had not yet issued its opinion in *McRaney v. North American Bd. of the Southern Baptist Convention, Inc.*, 157 F.4th 627 (5th Cir. 2025), *cert. denied*, 2026 WL 490870 (U.S. Feb. 23, 2026) ("*McRaney II*"). After *McRaney II*, Concordia raised the issue again in a Rule 28(j) letter. D. Richards to Clerk (Jan. 26, 2026) at 2.

issue is "unsettled," the opinion says "we need not address" it. *Id.* And so the waiver issue is deliberately unresolved.

To resolve the issues raised on appeal, though, Concordia's waiver argument about church autonomy needs to be addressed. Even if the lead opinion is correct in concluding that the church autonomy doctrine applies to bar a judicially neutral inquiry into whether a secular reading of the church's core governance documents means that the Synod is not a real party to the controversy—thereby destroying complete diversity— the doctrine cannot serve as such a bar if it has been waived.

As the opinion itself accurately recounts, LCMS initiated the lawsuit, bringing it in federal court where LCMS "sought a declaratory judgment confirming the CCM and Synod in convention's judgments[.]" Op. 4; *see also* ROA.1235 (¶ 8) (LCMS stating that it sued "for a judicial declaration confirming as a matter of law the Synod's decision").

"[T]he Synod's decision" is the decision by the "Synod in convention"— the church's highest authority, ROA.1236 (¶12)—affirming an opinion by the church's Commission on Constitutional Matters ("CCM"). ROA.1645. LCMS asked the federal district court to place its judicial imprimatur on this internal church decision, asserting that the church decision was correct as a matter of Texas law. LCMS argued that the church autonomy

5

doctrine compelled the district court to adopt the church's ecclesiastical decision on its merits. ROA.1255 (¶ 50). The lead opinion accepts LCMS's argument.

But fundamental to the opinion's conclusion is that the church autonomy doctrine applies. That foundation collapses if the doctrine has been waived. Determining whether waiver has occurred requires determining first the proper characterization of the church autonomy doctrine, then whether waiver occurred.

This Court has not yet settled on a definitive characterization of the doctrine. Its most recent effort occurred earlier this year, in *McRaney II*. There, the Court extensively surveyed case law, but seems to have ended with no definitive conclusion about how to classify the doctrine. *See* 157 F.4th at 641-46. Sometimes, it is classified as a non-jurisdictional affirmative defense. *Id*. at 641-42. Sometimes, it is deemed jurisdictional. *Id*. And even classifications of it as jurisdictional beg the question of what kind of jurisdiction. *Id*. at 644-46 (surveying jurisdictional variants). Without definitively resolving the matter, *McRaney II* merely says that "church autonomy is jurisdictional in some senses but not others." *Id*. 643. But the springboard for the Court's excursion into possibilities is the statement that the doctrine is "a constitutional immunity from suit." *Id*.

6

641.[4] Regardless of the classification ultimately arrived at, waiver of the doctrine's protections is an issue of significant import. *See id.* at 646 n.6 (noting split among scholars on the "waivability question").

Taking *McRaney II*'s "constitutional immunity from suit" characterization of the doctrine, waiver may occur. It is recognized in other constitutional immunity contexts. For example, Eleventh Amendment immunity, held to be a jurisdictional bar, nonetheless may be waived. *See Lapides v. Bd. of Regents of the Univ. System of Georgia,* 535 U.S. 613 (2002). So may state sovereign immunity. *Alden v. Maine,* 527 U.S. 706, 737 (1999). In short, the doctrine's protection is subject to waiver.

Here, the circumstances suggesting waiver are present. Although the opinion remarks that LCMS was "forced" to sue Concordia, Op. 2, it does not follow that LCMS had no choice about the forum where it sued. LCMS

---

[4] In petitioning the Supreme Court of the United States for certiorari in *United States Conference of Catholic Bishops v. O'Connell* (No. 25-849), seeking review of 134 F.4th 1245 (D.C. Cir. 2025), petitioner's lead counsel said that *McRaney II* held that the church autonomy doctrine "confers a constitutional immunity from suit." Pet. for Writ of Cert. at 13 (Jan. 2026). The same counsel is lead counsel for LCMS in this appeal.

*chose* to sue in federal court rather than in a Texas court—thereby forcing the district court inquiry into whether complete diversity was present.[5]

Whether LCMS's exercise of this choice effected a waiver of the church autonomy doctrine's protection is thus an issue that is not appropriately avoidable in this appeal. Rehearing should be granted to allow the Court to address and decide the waiver issue.[6]

## II. THE COURT SHOULD REVISIT THE LEAD OPINION'S RELEGATION OF THE PROPERTY DISPUTE IN THIS CASE TO SECONDARY STATUS

LCMS itself has conceded that the dispute does involve real property, but the lead opinion does not find that concession inconsistent with its application of the church autonomy doctrine even if "a property issue will be addressed down the line." Op. 11 n.6. Concordia is unaware of prior case authority in which a real property dispute is (as it is here) indisputably present, but draws this kind of primary-versus-secondary distinction. Nor is Concordia aware of case authority dividing such cases into discrete phases, one for church governance and another for real

---

[5] Determining jurisdiction is a threshold matter, "inflexible and without exception." *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900).

[6] Because the Court's most extensive treatment of the proper legal pigeonhole for a church autonomy issue, *McRaney II*, came after close of briefing in this case and because the issue is so complex and unsettled, supplemental briefing would likely prove helpful to the Court if it undertakes the requested reconsideration.

property. The opinion does not cite any authority for the division, nor does it indicate what the point of demarcation is.

Besides, LCMS has placed the property dispute at the forefront of its case, accusing Concordia of trying to "walk away with a historic property" of the church. ROA.1253 (¶ 45). LCMS's church-assigned task is self-described as being to "carry out [the church's] business, property, and civil law functions." ROA.1237 (¶ 15). And the very first count of LCMS's lawsuit is about the church "property." ROA.1254 (¶ 49).

Finally, the opinion provides no guidance to the district court or the parties on *when* the property dispute phase will reached. This, at a minimum, should be provided.

## III. THE COURT SHOULD DETERMINE THAT, TAKEN AS A WHOLE, THE CHURCH'S CORPORATE DOCUMENTS DO SHOW THAT IT IS THE CHURCH, NOT LCMS, THAT SEPARATELY OWNS SYNOD PROPERTY

In the concurrence, Chief Judge Elrod concludes from a reading of the church's corporate documents as a whole that those documents "repeatedly state" that the Synod "does not own any property." Op. 17. But that is contrary to what the Synod's bylaws expressly state. The definition of Synod property, for example, is as follows:

> **Property of *the Synod***: All assets, real or personal, … whether situated in the United States or elsewhere, titled or held in the name of corporate Synod, its nominee, or an agency of the Synod.

9

ROA.1280 (Synod Bylaw 1.2.1(a)(1)) (emphasis added). This bylaw provision says that real property, even if titled or held in the name of LCMS, is the Synod's property. In a formal resolution adopted in 2004, the Church in Convention applied this fact of *church* ownership to assert its ownership of university properties regardless of what the title to such properties said:

> *The Synod* owns the properties of all agencies of the Synod, including its institutions of higher education, regardless of how such properties are titled.

ROA.1465 (Convention Res. No. 4-04) (emphasis added). The resolution then instructed:

> That each institution of higher education of the Synod shall hold title to properties presently owned or at any time hereafter acquired by it subject to a reversionary interest or possibility of a reverter in favor of *the Synod*.

*Id.* (emphasis added).

The concurrence also calls into question the district court's interpretation of a provision—§ 4.18.4—of the Synod Board of Directors Policy Manual.[7] The provision should not be given dispositive weight,

---

[7] The opinion—which uses "LCMS" as short-hand for Corporate Synod—refers to the manual as "LCMS's." Op. 15. But the manual's cover does not identify it as Corporate Synod's. It mentions only the "Lutheran Church – Missouri Synod." ROA.2023.

10

says the opinion, but must be harmonized with the full document and the rest of the church's corporate documents. The concurrence says that the district court's approach helped lead it into the mistake of finding the Synod (the church) and LCMS (its corporate arm) to be "two separate legal entities." Op. 15.

But the Policy Manual draws the same distinction between the Synod and Corporate Synod in a passage even more pertinent to this case than §4.18.4. In §4.14.2.2(h)(3), the manual provides that Board action is required to approve the filing of lawsuit on behalf of "Synod *or* Corporate Synod." ROA.2069 (emphasis added). Nothing indicates that this deliberately drawn distinction was simply a drafting error.

And the law of Missouri (where LCMS is incorporated) has long held that religious organizations maintain their own separate existence even when they form nonprofit corporations. *See* Concordia Br. at 47-48 (citing cases).[8] *Cf. Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Comm'n*, 145 S.Ct. 1583, 1595 (J. Thomas, concurring) ("religious institution … not defined by the corporate entities it chooses to form").

---

[8] The cases, along with the pinpoint citations stating the principle, are: *Soc'y of Helper of Holy Souls v. Law*, 267 Mo. 667, 680, 186 S.W. 718, 727 (1916); *Lilly v. Tobbein*, 103 Mo. 477, 488, 15 S.W. 618, 620 (1890); and *Catholic Church v. Tobbein*, 82 Mo. 418, 424 (1884).

Taken together, all this shows that the Synod and LCMS are not one and the same and that the Synod, not LCMS, owns the church properties. The result is that the real party in interest is the Synod, not LCMS.

*CONCLUSION*

The Court should grant rehearing for the reasons stated above in Parts I - III.

Respectfully submitted,

*/s/ Daniel R. Richards*
Daniel R. Richards
Texas Bar No. 00791520
drichards@rrsfirm.com
Clark Richards
Texas Bar No. 90001613
crichards@rrsfirm.com
Albert A. Carrion, Jr.
Texas Bar No. 03883100
acarrion@rrsfirm.com
RICHARDS RODRIGUEZ & SKEITH, LLP
611 West 15th Street
Austin, Texas 78701
(512) 476-0005


*s/ Renea Hicks*
Renea Hicks
Texas Bar No. 09580400
LAW OFFICE OF MAX RENEA HICKS
P.O. Box 303187
Austin, Texas 78703
(512) 480-8231
rhicks@renea-hicks.com

ATTORNEYS FOR APPELLEES

12

## CERTIFICATE OF COMPLIANCE

1.  This petition complies with the type-volume limitation of <u>Fed. R. App. Proc. 40(d)(3)(A)</u> because it contains 2,470 words, excluding the parts exempted by <u>Fed. R. App. Proc. 32(f)</u>.

2.  This petition complies with the typeface requirements of <u>Fed. R. App. Proc. 32(a)(5)(A)</u> and Fifth Cir. R. 32.1 and type style requirements of <u>Fed. R. App. Proc. 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface (Century Schoolbook) using Microsoft Word with 14-point font for text and 12-point font for footnotes).

*/s/ Daniel R. Richards*
Daniel R. Richards

## *CERTIFICATE OF SERVICE*

Using the appellate CM/ECF system, this document was served on all registered counsel for the parties and *amici curiae* and transmitted to the Clerk of the Court on the 18th day of June, 2026.

*/s/ Daniel R. Richards*
Daniel R. Richards

13

# United States Court of Appeals
# for the Fifth Circuit

———————

No. 25-50130

———————

United States Court of Appeals
Fifth Circuit

**FILED**

June 4, 2026

Lyle W. Cayce
Clerk

THE LUTHERAN CHURCH—MISSOURI SYNOD, A MISSOURI NONPROFIT CORPORATION,

*Plaintiff-Appellant*,

*versus*

DONALD CHRISTIAN; CHRISTOPHER BANNWOLF; JOHN DOES 1-12; CONCORDIA UNIVERSITY TEXAS INCORPORATED,

*Defendants-Appellees.*

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:23-CV-1042

———————————————————

Before ELROD, *Chief Judge*, and JONES and GRAVES, *Circuit Judges*.
EDITH H. JONES, *Circuit Judge*:

In his first Epistle to the Corinthians, the Apostle Paul cautions believers against taking their disputes to the secular courts. 1 *Corinthians* 6:1. Unfortunately, litigation within a church is sometimes unavoidable. In such cases, however, the courts of this country are infused with a history of religious tolerance and are guided more specifically by the First Amendment to interfere as little as possible in the affairs that constitute governance of ecclesiastical bodies. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591

No. 25-50130

U.S. 732, 746, 140 S. Ct. 2049, 2060 (2020); *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 157 F.4th 627, 633–34 (5th Cir. 2025).

The Lutheran Church—Missouri Synod, a Missouri nonprofit corporation, was forced to seek judicial restoration of control over Concordia University, an "agency" of the church in Austin, Texas. Taking advantage of the church's unique governance structure, the University responded by asserting lack of diversity of citizenship. The district court agreed. It reached this result only by overlaying a secular corporate law interpretation on the church's spiritually crafted governance documents, and then imposing Texas unincorporated association law on the Lutheran Church, whose special status has been recognized by Missouri law for more than a hundred years. The district court's ruling quintessentially violated the church autonomy doctrine. The judgment of dismissal is REVERSED and REMANDED.

## BACKGROUND

The Lutheran Church—Missouri Synod ("the Synod" or "the Church") was founded in 1847. The Synod incorporated under Missouri law a nonprofit corporation, the Lutheran Church—Missouri Synod ("LCMS"), to manage its civil affairs in 1894. LCMS was organized to reflect the Lutheran "two kingdoms" doctrine which "maintains a distinction between spiritual and secular authorities." The Church believes its identity and mission are "not of this world" based on Biblical Scripture.

Although these entities share the same name, constitution, bylaws, board of directors, president, and officers, they have distinct roles. The Synod manages Church spiritual affairs like supervising doctrine and religious practice and governing the church body. LCMS manages the Synod's civil affairs including its property, bank accounts, contracts, assets, and employees. In the same vein, LCMS is the Church's legal

2

representative and is the proper party to litigation according to its policy manual. Before the present case, the Church had never been sued.

To further the Synod's objectives, it established universities as "agencies" of the Church. In 1925, LCMS bought and conveyed property in trust to Concordia in Austin, Texas, reserving restrictions and reversionary rights.[1] Although "Concordia is separately incorporated and responsible for its own day-to-day affairs," its charter states that its business "shall be conducted and its affairs shall be controlled by a board of trustees to be elected in accordance with the Rules and Regulations of the Lutheran Church—Missouri Synod." Concordia's bylaws state that "[t]he University is . . . subject to the provisions of the constitution and bylaws of [LCMS]."

In November 2022, Concordia's Board of Regents voted unilaterally to change its internal governing documents to reject the authority and governance of LCMS. The Church's Commission on Constitutional Matters ("the CCM") is its "judicatory body charged with resolving matters of Church governance." The CCM concluded that Concordia's amendments were "null and void . . . and unable to be put into practice." The CCM ruled that Concordia was required to receive the CCM's approval before changing its governance structure, and therefore, failure to obtain approval was "contrary to the Bylaws of the Synod."

In August 2023, the CCM's judgment was brought before the Synod meeting in convention, the Church's highest authority, which adopted the CCM's opinion and directed LCMS "to take all appropriate actions." Two days later, the Synod in convention elected regents of Concordia's board, but

---

[1] LCMS paid for the buildings, furniture, and library books. As an agency of the Synod, Concordia's purpose was to advance the mission of "training ministers and teachers for service" in the Church.

Concordia refused to seat them and insisted that the current board was "the sole governing body of the institution."

LCMS was forced to sue Concordia, Donald Christian (the then-president of Concordia), Christopher Bannwolf (the then-chairman of the Concordia Board of Regents), and Does 1–12 (unknown members of the Concordia Board of Regents) ("2023 suit"). LCMS asserted federal jurisdiction on diversity grounds because LCMS is a Missouri corporation and the defendants are Texas citizens. LCMS sought a declaratory judgment confirming the CCM and Synod in convention's judgments and asserted state law claims for breach of contract between LCMS and Concordia, promissory estoppel, breach of fiduciary duty, violations of the Texas Business Organizations Code, and tortious interference with a contract.

Concordia counter-sued LCMS in Texas state court, naming the Synod as a defendant that it characterized as an "unincorporated association" with a Texas residency ("2024 suit"). Asserting diversity of citizenship, LCMS removed the case to federal court, and the cases were consolidated. Concordia moved to dismiss LCMS's 2023 suit for lack of diversity jurisdiction, failure to prosecute in the name of the real party in interest, and failure to join an indispensable party. Concordia also moved to remand its 2024 suit to state court.

The magistrate judge issued a report and recommendation ("the R&R") regarding the motion to dismiss and motion to remand. The R&R found that "LCMS cannot show that it possesses rights with respect to Defendants that are independent of the Synod." It also found that the Synod is an "unincorporated association" under Texas law and as such, is "a citizen [for diversity purposes] of every state in which its members reside." The R&R acknowledged First Amendment implications of its conclusions and

relied heavily on an interpretation of the Synod's bylaws and governing documents but still determined that this case is "a pure civil-law controversy" and "does not require inquiry into religious doctrine."

The district court adopted the R&R "in full," granted Concordia's motion to dismiss LCMS's 2023 suit, and remanded Concordia's 2024 suit to state court for lack of subject matter jurisdiction.[2] The district court made several additional findings pertinent to this conclusion.

First, the district court repeated that the Synod is an unincorporated association under Texas law that has the capacity to sue or be sued. TEX. BUS. ORGS. CODE §§ 252.001, 002, 007. Second, the district court determined that the Synod holds the substantive rights that it wants to enforce against Concordia and is therefore the "real party in interest" under Federal Rule of Civil Procedure 17. The Synod, in other words, had to be joined as a plaintiff by LCMS. But third, the district court reiterated that the Synod, as an unincorporated association, is a Texas citizen for the purposes of diversity jurisdiction because it bears the citizenship of all of its members.

Critically, the district court rejected LCMS's argument that its analysis underlying these conclusions violated the First Amendment and the associated church autonomy doctrine. Instead, the district court claimed that the First Amendment allows "civil authorities to question a religious body's own understanding of its structure." The court drew the authority for that proposition from the "neutral principles" exception that has applied to church property disputes, and alleged that its approach "will not involve any

_____

[2] LCMS did not appeal the remand of Concordia's 2024 lawsuit.

change to the Synod's governing documents" or "inquiry into religious doctrine."

In sum, because LCMS did not join the Synod as an "indispensable" co-plaintiff, and because if joined, the Synod would defeat diversity, the 2023 suit must be dismissed for lack of diversity jurisdiction. LCMS timely appealed.

## STANDARD OF REVIEW

"Issues of subject matter jurisdiction are questions of law reviewed *de novo*. *Nat. Oilwell Varco, L.P. v. Auto-Dril, Inc.*, 68 F.4th 206, 213 (5th Cir. 2023). The district court's ruling is couched as a Rule 12(b)(1) dismissal on the pleadings, but since both parties introduced evidence outside the pleadings, the court is entitled to consider those in its deliberation. *See Crane v. Johnson,* 783 F.3d 244, 250–51 (5th Cir. 2015).

## DISCUSSION

The dispositive issue on appeal is whether LCMS is a real party to the controversy for diversity purposes in light of the First Amendment's church autonomy doctrine.[3]

LCMS asserts that the Synod, a strictly ecclesial body under Lutheran doctrine, does not have the capacity to sue or be sued. The Synod is barred by Church law from protecting its civil interests and cannot be a party to the lawsuit. But LCMS was deliberately incorporated pursuant to

---

[3] This court does not reach issues about federal civil procedure Rules 17 ("real party in interest") and 19 ("indispensable party") or the Synod's status as a legal entity. Our disposition of this appeal renders it unnecessary to decide other issues raised by LCMS, including the constitutional avoidance doctrine, the Texas Religious Freedom Restoration Act, and the Full Faith and Credit Clause's internal affairs rule.

Missouri law to represent the Church in civil affairs. Consequently, there is diversity jurisdiction between LCMS and Concordia.

Concordia responds that the Synod is a Texas unincorporated association, and hence, a citizen of Texas because of its churches and members in Texas.[4] Further, the Synod is a real party in interest to this suit. Concordia therefore advocates dismissal for lack of the Synod as an indispensable party. In addition, even if joined as a plaintiff, the Synod's Texas "citizenship" would destroy complete diversity with Concordia. We address the church autonomy doctrine followed by diversity.

## I.    Church Autonomy Doctrine

The church autonomy doctrine, a corollary of the First Amendment, protects religious institutions' internal management decisions and doctrinal self-governance from judicial intrusion. *See McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 157 F.4th 627, 635–36 (5th Cir. 2025). Courts cannot adjudicate controversies that "turn on the resolution . . . of . . . religious doctrine and practice." *Id.* at 636 (quoting *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 89 S. Ct. 601, 606 (1969)). This doctrine's shield is important because "'[e]ven the very process of inquiry' into a church's internal affairs can

---

[4] The district court's erroneous holding supporting Concordia's position is jarring as a matter of corporate law and conflict of law principles. The Church has operated under its current structure with a Missouri nonprofit corporation acting as the Synod's civil entity since 1894. Supreme Court precedent and Texas law both hold "that a court—state or federal—sitting in one State will as a general rule decline to interfere with or control by injunction or otherwise the management of the internal affairs of a corporation organized under the laws of another state...." *Rogers v. Guar. Tr. Co.*, 288 U.S. 123, 130, 53 S. Ct. 295, 297 (1933); *see also* Tex. Bus. Orgs. Code § 1.102 ("[T]he law of the state or other jurisdiction in which that foreign government authority is located governs the formation and internal affairs of that entity" organized under the foreign authority's law).

'impinge on the rights guaranteed by the [First Amendment.]'" *Id.* (quoting *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502, 99 S. Ct. 1313, 1320 (1979)).

This court's recent decision in *McRaney* informs our analysis. In *McRaney*, a pastor sued a constituent board of the Southern Baptist Convention after he was terminated from church leadership. *Id.* at 632. This court affirmed the summary judgment in favor of the Baptist entity because resolving the pastor's claims "would require the district court to decide 'matters of faith and doctrine.'" *Id.* at 650 (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747, 140 S. Ct. 2049, 2060 (2020)). *McRaney* put it simply: "[c]ivil courts cannot adjudicate ecclesiastical matters." *Id.* at 633.

The district court here did just that. It cherry-picked a few selections from the Church's internal governance documents and concluded that "even LCMS recognizes the Synod's capacity to be sued." Without explanation, it gave no weight to the Church's statements regarding its own formation and structure, even though these served to interpret and clarify its governing documents. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729 (1871) ("It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these [church] bodies as the ablest men in each are in reference to their own."). Its invasive inquiry replaced the Church's description of its polity, rooted in doctrine, with the court's secular reading of the Church's constitution, bylaws, and policies. The district court engaged in precisely the type of review that the doctrine seeks to prevent. *See Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 708, 96 S. Ct. 2372, 2380 (1976) (describing a state court's "impermissibl[e] substitut[ion] [of] its own inquiry into church polity and resolution based thereon" as a fatal fallacy).

No. 25-50130

In *Milivojevich*, the Illinois Supreme Court ruled against the Orthodox Diocese based on the court's own "interpretation of the Church's constitution and penal code." *Id.* The Supreme Court reversed. *Id.* at 698, 96 S. Ct. at 2375. The Supreme Court reasoned that "the reorganization of the Diocese involves a matter of internal church government, an issue at the core of ecclesiastical affairs," and "the constitutional provisions . . . were not so express that the civil courts could enforce them without engaging in a searching and therefore impermissible inquiry into church polity." *Id.* at 721–23, 96 S. Ct. at 2386–87.

Here, the district court claimed that its ruling "will not involve any change to the Synod's governing documents, nor will it require any inquiry into religious doctrine." Contrary to *Milivojevich,* the court made both errors. First, as explained previously, the Synod and LCMS are designed as separate but integrated entities based on the Lutherans' interpretation of Biblical Scripture. By imposing its own interpretation, the district court changed the meaning of the governing documents.[5] Regardless, "change" is not the line at which the church autonomy doctrine begins to apply. Second, the district court essentially denied the Church's self-identity, rooted in the "two kingdoms" doctrine, by finding that LCMS does not represent the Synod or does not share the same interest as the Synod. Yet "matters of religious 'faith and doctrine' are 'closely linked to . . . matters of church government.'" *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 257, 145 S. Ct. 1583, 1596 (2025) (Thomas, J., concurring) (quoting *Our Lady*, 591 U.S. at 746, 140 S. Ct. at 2060).

_____

[5] Indeed, the court inexplicably failed to credit the explanatory affidavit of Reverend Sias, a designated spokesman, who corroborated the consistency of the Church's organizing documents with the "two kingdoms" theology.

Concordia contends, and the district court echoes, that this case is merely a property dispute within a "neutral principles of law" exception to the church autonomy doctrine. True, the doctrine "does not grant 'religious institutions . . . a general immunity from secular laws.'" *McRaney*, 157 F.4th at 636 (quoting *Our Lady*, 591 U.S. at 746, 140 S. Ct. at 2060). Church autonomy is not violated when a court can apply neutral principles to disputes involving church property. *See Jones v. Wolf*, 443 U.S. 595, 603, 99 S. Ct. 3020, 3025 (1979). In such cases, courts must "rel[y] exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." *Id.* Moreover, LCMS asserts no general immunity from secular law.

But the property exception to the church autonomy doctrine is narrow. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871) (suggesting that an "individual right to property" that "*in no sense* depend[s] on ecclesiastical questions" would be appropriate for a civil court to adjudicate (emphasis added)). Real property disputes involving churches may require courts to "examine certain religious documents," but courts "must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts." *Wolf*, 443 U.S. at 604, 99 S. Ct. at 3026. In *Wolf*, the Court contrasted judicial examination of deeds or a corporate charter and a "Book of Church Order, which sets out the laws and regulations of [the affiliated] churches." *Id.* at 604, 609, 99 S. Ct. at 3026, 3028. If the church's identity is determined by applying secular laws and regulations, this would impermissibly "require a civil court to pass on questions of religious doctrine." *Id.* at 609, 99 S. Ct. at 3028. Instead, deference is owed to the church's determination of its identity. *Id.* The Supreme Court warned that even a deed or corporate charter may "incorporate[] religious concepts." *Id.* at 604, 99 S. Ct. at 3026. This is not to suggest that courts may *never* examine

church documents, but the circumstances in which interpretation is required are limited.

The real property exception does not apply here. As pled, this case secondarily involves a property dispute but principally requires a determination of church hierarchy between Concordia and the Church represented by LCMS.[6] And the issue of citizenship for diversity jurisdiction involves only church doctrine. Matters of church governance are not for the courts. *See Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974) ("Religious organizations . . . [have the] power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine . . . ."). The exception would swallow the rule if we were to conclude that the district court correctly waded into matters of ecclesiastical hierarchy and representation by its independent interpretation of the Church's governance documents.

Concordia alternatively contends that by filing suit on diversity grounds, the Church waived the "church autonomy defense." Based on the preceding discussion, we need not address this unsettled issue. *See McRaney,* 157 F.4th at 645–46.

The implications of the district court's denial of church autonomy are grave, as amici explain. First, religious institutions may be coerced into embracing a polity that is less susceptible to judicial reorganization, as

---

[6] In its complaint, LCMS acknowledges that a "real and justifiable controversy exists" concerning "LCMS's rights with respect to [Concordia's] property" and seeks, in part, placement of "a reversionary interest in [Concordia's] property." However, that a property issue will be addressed down the line does not render church autonomy irrelevant for the entire case. *See Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 89 S. Ct. 601, 606 (1969) ("But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.").

opposed to a structure that aligns with their religious doctrines. Second, authorizing the judiciary to assign legal status to religious entities likely presents Establishment Clause issues. Third, religious institutions structured similarly to the Synod/LCMS with a national membership will be excluded from federal court on diversity grounds. The common theme is impermissible judicial encroachment on religious autonomy.

## II.     Diversity Jurisdiction

Concordia also maintains that irrespective of the Synod's doctrinal incapacity to sue and be sued, LCMS is not a real party to the controversy. As such, "LCMS is a nominal party that must be ignored and diversity must be determined by [the] Synod's citizenship." Concordia is mistaken.[7]

Diversity jurisdiction exists in all civil actions where the matter in controversy exceeds $75,000 and is between citizens of different states. 28 U.S.C. § 1332(a). This statute requires "complete diversity," meaning no plaintiff may share the same citizenship as any defendant. *Whalen v. Carter*, 954 F.2d 1087, 1094 (5th Cir. 1992) (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806)). In establishing jurisdiction, the "citizens" must be "real and substantial parties to the controversy." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460, 100 S. Ct. 1779, 1781–82 (1980). Federal courts "must disregard nominal or formal parties" and rest jurisdiction only upon the real parties. *Id.* at 461, 100 S. Ct. at 1782.

On multiple fronts, LCMS is far from a mere nominal party. Under the church autonomy doctrine, deference is owed to the Church's

_____

[7] The "real party to the controversy" inquiry for diversity purposes is different from that of FRCP 17's "real party in interest" and FRCP 19's "indispensable party," although all three inquiries ask the same basic question: who is the proper party? All three issues were argued and became the basis of the district court's rulings. However, arguments on appeal pivoted to focus on the "real party to the controversy" question.

description of its own polity, displayed by its interpretation of its own governing documents. From a litigation perspective, LCMS and the Synod share the same board of directors, their "legal representative," which directs the legal actions of LCMS. Though the Synod has legal interests, LCMS formally and fully represents these interests. From a business perspective, LCMS owns property and enters into contracts. According to its bylaws and board policy manual, Concordia is "an educational institution" of LCMS, which is its "legal owner." For example, in the case of Concordia's dissolution or winding up, its assets are to be "transferred, conveyed, and distributed" to LCMS.

Finally, diversity jurisdiction requires only a party against whom the judgment is effective. *See Corfield v. Dall. Glen Hills LP*, 355 F.3d 853, 864–65 (5th Cir. 2003). Every possible party need not be present in court. As this court explained,

> The "real party to the controversy" test does not require a federal court to consider the citizenship of non-parties who have an interest in the litigation or might be affected by the judgment. The "real party to the controversy" test requires consideration of the citizenship of non-parties when a party already before the court is found to be a non-stake holder/agent suing only on behalf of another.

*Id.* at 865 n.10. LCMS has sufficient stake in the matter, as the secular reflection of the Synod, to be the proper party plaintiff.

For the foregoing reasons, the judgment of the district court dismissing for lack of diversity jurisdiction is REVERSED, and the case is REMANDED for further proceedings.

No. 25-50130

Jᴇɴɴɪꜰᴇʀ Wᴀʟᴋᴇʀ Eʟʀᴏᴅ, *Chief Judge*, concurring:

I agree with much of Jᴜᴅɢᴇ Jᴏɴᴇꜱ's reasoning.[1]  However, I believe
that this is a straightforward case that can be decided by relying upon the
Church's corporate documents and declarations.  The district court opinion
focuses on one subsection of the Lutheran Church–Missouri Synod's Policy
Manual to arrive at a conclusion that conflicts with both the best reading of
the Church's corporate documents as well as the Church's own
understanding of its structure.  This was error.  When considering the
documents together and in context, it is clear that the LCMS is the real party
to the controversy for purposes of diversity jurisdiction.

The district court opinion applies Texas law and relies on an
application of Texas corporate law to arrive at the determination that the
Synod was an unincorporated association with the capacity to sue or be sued

---

[1] I agree with Jᴜᴅɢᴇ Jᴏɴᴇꜱ that the district court opinion errs in "replac[ing] the
Church's description of its polity, rooted in doctrine, with the court's secular reading of
the Church's constitution, bylaws, and policies." *Ante*, at 8.  When a court "substitutes
its own inquiry" for that of a faith community regarding that community's own "polity,"
it raises serious questions under the church autonomy doctrine. *See Serbian E. Orthodox
Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 708 (1976).  Here, the district court
opinion misapplies the doctrine when it gives insufficient weight to Reverend Sias's
declarations, the Church's governing documents, and the Church's own conception of its
nature and structure.  When the Church's understanding of its polity and structure is
credited, as the First Amendment requires, it is abundantly clear that LCMS is the real
party to the controversy.  Even short of that though, a review of the corporate documents
renders the same result.  We thus need not chart the farthest limits of the church-autonomy
doctrine because it is not necessary to do so to decide this case.

For his part, Jᴜᴅɢᴇ Gʀᴀᴠᴇꜱ apparently suggests that we should defer to the
district court. *Post*, at_4 (noting that the district court "found that the Synod holds the
substantive rights at issue" and that that court was "thorough and considerate in its
analysis and correctly found that the church autonomy doctrine was not implicated").  But
this case presents us squarely with a question of corporate law, so it is not appropriate to
defer to the district court's findings no matter how thorough or considerate they are.

in Texas. But in doing so, the district court opinion does not adhere to a key tenet of corporate law. An entity's documents, such as articles and bylaws, should be harmonized and construed as a whole with the objective of capturing the documents' "general intent." 8 Fletcher Cyclopedia of the Law of Corporations § 4195 (2025); *see Bd. of Ins. Comm'rs v. Great S. Life Ins. Co.*, 239 S.W.2d 803, 809 (Tex. 1951) ("It is a generally accepted rule of contracts that '[w]here several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together although they do not expressly refer to each other.'"); *Crain v. Northern*, 2024 Tex. Bus. 4, ¶ 8, 730 S.W.3d 375, 381 (8th Div. 2026) ("When interpreting a company agreement, courts apply the general principles of contract construction." (citing *Abdullatif v. Choudhri*, 561 S.W.3d 590, 609–10 (Tex. App.—Houston [14th Dist.] 2018, pet. denied))). When multiple corporate documents are at issue, "the documents should be considered together." *Fletcher*, *supra*, § 4195; *see also* 15 Tex. Jur. 3d Corporations § 62 (2026) ("In construing corporate bylaws, courts apply the rules that govern the interpretation of contracts" and "attempt to harmonize and give effect to every provision.").

The district court opinion errs when it gives dispositive weight to § 4.18.4 of LCMS's Policy Manual without harmonizing it with the document as a whole or with the Church's other corporate documents. Specifically, the district court reads "Synod or Corporate Synod" to be evidence that the ecclesiastical component of the Church, the Synod, and LCMS were two separate legal entities, each with the capacity to sue and be sued. This reading is plausible only if § 4.18.4 of the Policy Manual is read in isolation.

As the documents describe, LCMS is, and has been for 125 years, the "civil law reflection" of the Church. The Church set up LCMS for the purpose of "carry[ing] out its secular functions, including the ability to sue

and be sued." The Synod's bylaws declare that the role of LCMS, also called the "Corporate Synod," is to assume the "responsibility to be subject to civil authority" for the Church. The documents explain that the Church, in keeping with its Two Kingdoms theology, has both an ecclesiastical component (the Synod) and a civil component (LCMS), and the civil component handles civil matters, including litigation, and assumes any responsibilities or liabilities that the Church may incur.

Taken together, the Church's documents show why the district court opinion's concern that "the Synod would not be subject to suit anywhere" is no concern at all. LCMS's Policy Manual and bylaws specify that if the ecclesiastical component of the Church incurs liability or must engage in litigation, the civil component of the Church, LCMS, bears full responsibility. So, contrary to JUDGE GRAVES'S concerns about "[g]eneral immunity," *post*, at 3, Lutheran Church could not avoid suit based on its internal governance structure. If you sue the Synod, you sue LCMS. Thus, as JUDGE JONES notes, the Church does not enjoy—nor has it asserted—any general immunity from secular laws. *Ante*, at 10; *see Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020).

The district court also understood the Policy Manual's references to "the Synod's general counsel" to indicate that the Synod is a separate legal entity. But reading this sentence in the context of the whole Policy Manual and the corporate documents leads to a different conclusion. Again, LCMS represents the Synod in matters of civil law. If the Synod—that is, the ecclesiastical component of the Church—is implicated in matters of civil law, LCMS handles the litigation. LCMS's Board of Directors, though ultimately responsible for the entire Church's legal decisions, selects and delegates certain duties to the general counsel. If the Church is involved in an "initiation of litigation, lawsuit, arbitration, or administrative proceeding," the Board of Directors, often working through the general counsel, handles

these matters. In this sense, then, the Church's general counsel is the "Synod's general counsel," but this does not mean that the Synod is a separate civil body, much less an unincorporated association under Texas law.

Finally, the district court opinion errs when it focuses its analysis on a slice of LCMS's Policy Manual without accounting for the "general intent" of the Policy Manual and the correlated corporate documents. *See Fletcher*, *supra*, § 4195. The documents indicate that the Church took deliberate steps to place responsibility for the entire Church's civil matters in the hands of LCMS. This includes the Church placing "[a]ll assets, real or personal, tangible or intangible," in the "name of the corporate Synod, its nominee, or an agency of the Synod." This arrangement makes sense because, as the corporate documents repeatedly state, the Synod "is not a civil law entity" and does not own any property. Instead, it is the ecclesiastical component of the Church that facilitates the "exercise [of] the mind of the church on matters of its doctrine and religious practice" and "exercise[s] governance of the church body." Again, this does not mean that the Synod is "immune" from civil litigation. Rather, the ecclesiastical component's civil matters are handled by the civil component of the Church, LCMS.

To be sure, the district court opinion states that it reviewed the Church's constitution, bylaws, and LCMS Board of Director's Policy Manual. But its review of these documents does not appear to have been accompanied by an application of the principles of corporate law discussed here. As such, the district court opinion errs on its own terms when it sought to resolve this case on corporate law grounds. In my view, this is enough to warrant reversal.

No. 25-50130

Jᴀᴍᴇs E. Gʀᴀᴠᴇs, Jʀ., *Circuit Judge*, dissenting:

The district court found that the Synod: (1) holds the substantive rights at issue in this case, (2) is an unincorporated association with the capacity to sue or be sued, and (3) is an indispensable party that must be joined. Because I would affirm, I respectfully dissent.

Civil courts "exercise no jurisdiction" over a dispute that is "strictly and purely ecclesiastical in its character," such as a "matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson v. Jones*, 80 U.S. 679, 733 (1871). However, courts can apply "neutral principles of law" to certain disputes. *Jones v. Wolf*, 443 U.S. 595, 603 (1979). In *Jones,* the Supreme Court applied the neutral principles method to a property dispute. *Id*. A neutral principles application is equally appropriate here, because the question before us is not a religious issue. We have been asked to find the real party in interest. Whether the Synod is or is not a real party in interest affects diversity jurisdiction. Jurisdictional questions are exactly the kind of questions courts must answer. *See Martinez v. Am. Fed'n of Gov't Emps.*, 980 F.2d 1039, 1042 (5th Cir. 1993) ("This court has a duty to determine whether it has jurisdiction over any case before it.").

In analyzing this jurisdictional question, the district court considered the Church's governing documents as well as Reverend Sias' testimony. I agree with the concurrence that it is appropriate to rely on the Church's corporate documents and declarations to decide the case. The neutral principles method "requires a civil court to examine certain religious documents, such as a church constitution," even though it "must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts." *Jones*, 443 U.S. at 604.

18

The Synod's status as a necessary party to the suit is evident just from the Church's briefs—its own representations—where it states that "the Church makes its universities [like Concordia] 'agencies' of the Synod, subject to the Synod's ecclesiastical governance and LCMS's civil oversight." The Synod adopted the Commission's judgment against Concordia, and elected regents of Concordia's board to replace the current board. Even these descriptions of the Synod-Concordia relationship could suffice for the court to determine, as the magistrate judge and the district court did, that the Synod holds the substantive rights at issue.

The Church resists, arguing that district courts should always accept a "church's determination about how its polity should operate in the civil sphere." *Jones* cautions against that. In fact, the Supreme Court does not agree "that the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of doctrinal controversy is involved." *Jones*, 443 U.S. at 605. The same should be true for this jurisdictional dispute—whether the proper parties are before the court is not a matter of doctrinal controversy. The Church next counters that "church autonomy is harmed when government encroaches upon the sphere of activity that is 'the church's alone.'" But the capacity to sue or be sued is simply not the church's sphere alone.

No case squarely deals with the issue at hand. However, we recently provided a detailed review of disputes subject to the church autonomy doctrine. *See McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 157 F.4th 627, 636 (5th Cir. 2025), *cert. denied sub nom.*, *McRaney v. N. AM. Mission Bd., Inc.*, 224 L. Ed. 2d 16 (Feb. 23, 2026). These include matters of church governance: "the determination of religious polity, such as membership, matters of discipline and good standing, and the identification of the 'true church' amidst internecine disputes." *Id.* The majority argues

that the district court invasively inquired into the Church's religious polity, in contravention of *McRaney*. Yet the issue before us is not one of "church discipline [or] the church's understanding of its own membership," *id*. at 639, and *McRaney* does not speak to whether a church gets to decide if it can or cannot be party to a suit.

There are good reasons to avoid extending the church autonomy doctrine. The doctrine "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732, 746 (2020). As Concordia argues, the "Synod proposes that a religious institution can, merely by declaration of sincere religious belief, render itself completely immune to the jurisdiction of all courts." General immunity—regardless of the underlying dispute—cannot be the rule. During oral argument, the Church asserted that it does not intend to reverse its position at the conclusion of the suit and argue that Concordia sued the wrong party. Additionally, as the majority opinion points out, diversity jurisdiction does not require that every possible party be present in court, so long as we have *a* party against whom the judgment is effective. But there is a reason why courts must be careful to follow the rules of civil procedure. In resolving and concluding a case, we do not want to find that we cannot grant relief because the proper parties are not actually before us.

One other reason to be concerned with this application of the church autonomy doctrine is that it may lead to disparate treatment among differently structured religious groups. Groups that do not have a corporate representative like LCMS may be unable to disentangle their ecclesial bodies from litigation, and may be less likely to take their disputes to federal court based on diversity jurisdiction. The church autonomy doctrine should not apply differently according to how a religious group is organized. As *McRaney* warns, "[t]he church autonomy doctrine is triggered by the subject matter of the dispute, not the organizational structure of the disputants." 157 F.4th at

650. Not only would there be disparate treatment among different religious groups because of their internal structure, but religious organizations would also stand alone among all other parties to a civil dispute. *See McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 348 (5th Cir. 2020) (A "categorical[] insulat[ion of] religious relationships from judicial scrutiny . . . would necessarily extend constitutional protection to the secular components of these relationships, which would impermissibly place a religious leader in a preferred position in our society." (citation modified)).

The district court found that the Synod holds the substantive rights at issue, and is therefore an indispensable party, defeating diversity jurisdiction. The district court was thorough and considerate in its analysis and correctly found that the church autonomy doctrine was not implicated.

I respectfully dissent.